# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

ESTATE OF ZACKARY MOFFITT, by and through its personal representative KELLY KRAMER;
M.M., a minor, by and through her next friend and mother, CASSANDRA HIGGINS;
C.M., a minor, by and through her next friend and mother, CASSANDRA HIGGINS;

       Plaintiffs,

v.

SHERIFF JOHN MINOR, in his official and individual capacities;
CAPTAIN ERIK J. BOURGERIE, in his individual capacity;
STAFF SERGEANT CHERYL GIORDANO, in her individual capacity;
DEPUTY JONATHON DIURBA, in his individual capacity;
DEPUTY NATHAN FIDLER, in his individual capacity;
DEPUTY RYAN HOSIER, in his individual capacity;
DEPUTY BRIAN HYDE, in his individual capacity;
DEPUTY KATHY LAMBERT, in her individual capacity; and
DEPUTY JEFF WILSON, in his individual capacity;

      Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiffs, by and through their attorneys, David A. Lane and Nicole B. Godfrey of KILLMER, LANE & NEWMAN, LLP, hereby brings this Complaint and Jury Demand and alleges as follows:

# INTRODUCTION

On July 6, 2013, Zackary Moffitt was being treated at the Summit County Medical Center in Breckenridge, Colorado for acute alcohol poisoning.  Mr. Moffitt, a severe alcoholic, was checked into the hospital by his significant-other, Kelly Kramer, with a blood alcohol level of .392, which could easily kill a person who was not an alcoholic.  Mr. Moffitt irrationally decided that he had had enough of the hospital so he unplugged his own IV, got dressed and was leaving the hospital.  A security guard, fearful for Mr. Moffitt's safety, called law enforcement who responded quickly.  On that morning, thirty-three year old Zackary Moffitt was arrested outside the St. Anthony Summit Medical Center for violating a restraining order prohibiting him from consuming alcohol. When Defendant Jeff Wilson arrested Mr. Moffitt, he had a blood alcohol level of .394, indicating acute intoxication.  Defendant Wilson nevertheless booked Mr. Moffitt into the Summit County Jail where, over the next several days, Mr. Moffitt began to exhibit classic and severe symptoms of delirium tremens caused by alcohol withdrawal. Left untreated, delirium tremens is frequently fatal; however, if appropriately identified, delirium tremens can be treated with benzodiazepines or other similar medications and survival is almost assured.

From July 6 through 9, 2013, while detained at the Summit County Jail, Mr. Moffitt's symptoms included hallucinations, altered thoughts and behavior, seizures, and suicidal ideations. As Mr. Moffitt's symptoms began to intensify, Defendants, all employees of the Summit County Sheriff's Department, watched as Mr. Moffitt became increasingly delirious, yet did nothing to provide Mr. Moffitt with the medical attention he so desperately needed. Eventually, on July 9, 2013, after suffering for three-days in plain view of his jailers, Mr. Moffitt

2

suffered a cardiac arrest in a holding cell of the jail. Mr. Moffitt never recovered, and, after being

placed on life support for four days, died on July 13, 2013. If any of the Defendants had initiated

an appropriate medical intervention on behalf of Mr. Moffitt, he would be alive today.

Defendants' willful and deliberate indifference to Mr. Moffitt's serious medical needs directly

led to his untimely, easily preventable, and unjustifiable death.

## JURISDICTION AND VENUE

1.      This action arises under the Constitution and laws of the United States and is

brought pursuant to 42 U.S.C. § 1983.

2.      Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1367.

Jurisdiction supporting Plaintiffs' claim for attorneys' fees and costs is conferred by 42 U.S.C. §

1988.

3.      Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All

of the events alleged herein occurred within the State of Colorado, and all of the parties were

residents of the State at the time of the events giving rise to this litigation.

## PARTIES

**Plaintiffs**:

4.      At all times pertinent hereto, the decedent, Zackary Moffitt, was a citizen of the

United States of America and a resident of the State of Colorado confined to the Summit County

Jail.

5.      At all times pertinent hereto, Kelly Kramer, personal representative to the Estate

of Zackary Moffitt, has been a citizen of the United States of America and a resident of the State

of Colorado.

3

6.      At all times pertinent hereto, Plaintiffs M.M. and C.M., children of Zackary Moffitt, represented here by their mother and next friend, Cassandra Higgins, have been citizens of the United States of America and residents of the State of Colorado.

**Defendants**:

7.      At all times relevant to the subject matter of this litigation, Defendant John Minor was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Minor was acting under color of state law in his capacity as the Summit County Sheriff. Defendant Minor was responsible for training and supervising all other Defendants and other employees of the Summit County Sheriff's Department working at the jail, for setting jail policy for the county and the overall management of the jail, and for insuring the health and welfare of all persons detained in the Summit County Jail.

8.      At all times relevant to the subject matter of this litigation, Defendant Erik J. Bourgerie was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Bourgerie was acting under color of state law in his capacity as a Captain employed by the Summit County Sheriff's Office.

9.      At all times relevant to the subject matter of this litigation, Defendant Cheryl Giordano was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Giordano was acting under color of state law in her capacity as a Staff Sergeant employed by the Summit County Sheriff's Office.

10.      At all times relevant to the subject matter of this litigation, Defendant Jonathon Diurba was a citizen of the United States and a resident of Colorado. At all relevant times,

Defendant Diurba was acting under color of state law in his capacity as a Deputy employed by the Summit County Sheriff's Office.

11.     At all times relevant to the subject matter of this litigation, Defendant Nathan Fidler was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Fidler was acting under color of state law in his capacity as a Deputy employed by the Summit County Sheriff's Office.

12.     At all times relevant to the subject matter of this litigation, Defendant Ryan Hosier was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Hosier was acting under color of state law in his capacity as a Deputy employed by the Summit County Sheriff's Office.

13.     At all times relevant to the subject matter of this litigation, Defendant Brian Hyde was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Hyde was acting under color of state law in his capacity as a Deputy employed by the Summit County Sheriff's Office.

14.     At all times relevant to the subject matter of this litigation, Defendant Kathy Lambert was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Lambert was acting under color of state law in her capacity as a Deputy employed by the Summit County Sheriff's Office.

15.     At all times relevant to the subject matter of this litigation, Defendant Jeff Wilson was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Wilson was acting under color of state law in his capacity as a Deputy employed by the Summit County Sheriff's Office.

## FACTUAL ALLEGATIONS

### *St. Anthony Summit Medical Center*

16.     On July 6, 2013, Kelly Kramer took 33-year-old Zachary Moffitt, who was highly intoxicated, to the St. Anthony Summit Medical Center ("SMC") at 340 Peak Drive, in unincorporated Summit County.

17.     When Mr. Moffitt arrived at SMC at approximately 8:32 a.m. on the morning of July 6, he complained of "alcohol intoxication, vomiting blood, coughing blood, bloody stool, kidneys hurt, [and] liver hurts." Mr. Moffitt requested that the SMC emergency room physician, Marc A. Doucette, M.D., ensure that he did "not have a bloodstream infection."

18.     Dr. Doucette ordered a number of tests be performed on Mr. Moffitt, including blood work to determine his blood alcohol content ("BAC"). On the morning of July 6, 2013, Mr. Moffitt had a BAC over .392, which meant he was "acutely intoxicated."

19.     To the non-alcoholic, a BAC of over .392 would lead to unconsciousness at the very least and possibly death. The fact that Mr. Moffitt remained conscious indicated that he suffered from acute alcoholism.

20.     The SMC medical personnel treated Mr. Moffitt with intravenous ("IV") fluids and vitamins.

21.     Rather than complete his treatment, however, Mr. Moffitt decided to leave the SMC – he pulled out his own IV, dressed, and left the SMC's emergency department.

22.     Mr. Moffitt's ability to walk, talk, and self-ambulate with a BAC of over .392 indicated a severe alcohol tolerance and a history of regular alcohol consumption to the SMC medical personnel. Mr. Moffitt confirmed these conclusions during the SMC intake process.

23.     During the SMC intake process, Mr. Moffitt reported drinking two pints of alcohol the preceding day and one pint the morning of his visit to SMC.

24.     When Mr. Moffitt left the SMC emergency department, he sat in front of the SMC building.

25.     After Mr. Moffitt left the SMC emergency department, SMC Security Officer Andrew Brown called the Summit County Sheriff's Office to report that, after being admitted to SMC for intoxication, Mr. Moffitt pulled his IV out of his arm and walked out of the emergency room.

26.     Defendant Jeff Wilson, a Summit County Sheriff's Deputy, responded to SMC Security Officer Brown's report. Defendant Wilson ran Mr. Moffitt's name through the CCIC/NCIC database and discovered that Mr. Moffitt had a warrant out of Lake County, Colorado, for criminal mischief and a restraining order out of Lake County, Colorado, which prohibited Mr. Moffitt's consumption of alcoholic beverages.

27.     Defendant Wilson arrested Mr. Moffitt at approximately 11:07 a.m. on July 6, 2013.

28.     When arresting Mr. Moffitt, Defendant Wilson explicitly noted that Mr. Moffitt, "had the strong odor of alcohol on his breath, slurred speech[,] and was very unsteady on his feet."

29.     SMC Security Officer Brown notified Defendant Wilson that Mr. Moffitt's BAC was .392.

30.     Despite Mr. Moffitt's obvious intoxication and extraordinarily high BAC, Deputy Wilson did not take Mr. Moffitt back into the SMC emergency department for completion of his medical care. Instead, Deputy Wilson transported Mr. Moffitt to the Summit County Jail, where he would remain for the next several days.

31.     Upon information and belief, when Deputy Wilson booked Mr. Moffitt into the Summit County Jail on July 6, 2013, he recorded Mr. Moffitt's BAC in the jail's records and informed officers of the jail of Mr. Moffitt's extreme intoxication.

32.     Upon information and belief, Deputy Wilson took no steps to ensure that Mr. Moffitt was provided the appropriate medical treatment after booking him into the jail.

***Mr. Moffitt's Detention at the Summit County Jail***

33.     Over the next several days, as Mr. Moffitt sat detained in the Summit County Jail, he began to experience acute alcohol withdrawal, or delirium tremens ("DTs").

34.     DTs manifests itself in alcoholics who undergo unmonitored and untreated withdrawal. Symptoms of DTs include nightmares, global confusion, disorientation, fever, visual and auditory hallucinations, agitation, seizures, and actions of self-harm and fear. DTs can sometimes be associated with severe, uncontrollable tremors of the extremities and secondary symptoms, including anxiety, panic attacks, and paranoia. Mr. Moffitt would exhibit all of these symptoms over his three-day stay at the Summit County Jail.

35.     Despite his obvious medical distress, the staff at the Summit County Jail, Defendants in this action, failed to take any reasonable measures to treat Mr. Moffitt's medical condition. This failure ultimately led to his death on July 13, 2013.

36.     DTs due to alcohol withdrawal can be treated with benzodiazepines, although high doses may be necessary to prevent mortality.

37.     Had Mr. Moffitt received medical care and treatment for his alcohol withdrawal, the full manifestation of his withdrawal symptoms may have been prevented or, at a minimum, ameliorated. The risk of death from untreated DTs is very significant and has been listed as approximately 37% in medical studies. In stark contrast, the mortality rate from DTs is greatly reduced to just 5% with care in a medical facility with specified treatment for acute alcohol withdrawal.

38.     Upon information and belief, had Mr. Moffitt received appropriate medical attention from his jailers in July 2013, he would be alive today.

39.     Over the course of Mr. Moffitt's detention at the Summit County Jail, Defendants would observe numerous symptoms of alcohol withdrawal or DTs but would refuse, time and again, to initiate a medical intervention on behalf of Mr. Moffitt. This failure directly contributed to his death.

*July 7, 2013: Mr. Moffitt begins manifesting symptoms of delirium tremens.*

40.     On July 7, 2013, at approximately 11:30 a.m., roughly twenty-four hours after his arrival at the Summit County Jail, Mr. Moffitt began complaining of feeling sick to Defendant

Nathan Fidler, a Summit County Sheriff's Deputy working in the control office of the Summit County Jail.

41.     Defendant Fidler contacted Defendant Erik J. Bourgerie, a Captain at the Summit County Sheriff's Office, to inform Defendant Bourgerie of Mr. Moffitt's complaints.

42.     Defendant Bourgerie instructed Defendant Fidler to send Mr. Moffitt to the Booking Desk of the jail so that Defendant Bourgerie could speak to him. Defendant Fidler told Defendant Bourgerie that Mr. Moffitt wanted to show Defendant Bourgerie something in his cell.

43.     Defendant Bourgerie went to Mr. Moffitt's cell, which he found to be "disheveled with the bunk being unmade," and Defendant Bourgerie observed Mr. Moffitt "standing in his cell, appearing pale and slightly agitated."

44.     Mr. Moffitt told Defendant Bourgerie that "he had been throwing up a green fluid for the last two hours" and showed Defendant Bourgerie a towel "streaked with a green colored substance." Defendant Bourgerie observed that "[t]he [green] substance appeared to be a liquid the towel had absorbed."

45.     Mr. Moffitt was distressed by the color of his vomit. Defendant Bourgerie casually dismissed Mr. Moffitt's concern because Defendant Bourgerie "did not believe the human body exuded anything green and that it had to be something [Mr. Moffitt] had consumed."

46.     Defendant Bourgerie took no steps to make sure that Mr. Moffitt received prompt and adequate medical attention, despite Mr. Moffitt's obvious medical distress.

47.     Instead, Defendant Bourgerie asked Mr. Moffitt "why he thought he was vomiting." Mr. Moffitt informed Defendant Bourgerie that "he was detoxing."

48.     Defendant Bourgerie asked Mr. Moffitt "if he had a history of bad detox symptoms," to which Mr. Moffitt responded that he did not and that "he would normally just stop drinking with no side effects." Mr. Moffitt informed Defendant Bourgerie that he had no history of any seizures while detoxing in the past, that he had no history of hallucinations, and that this "was the worst detox he had experienced."

49.     Despite Mr. Moffitt's clear indications that he needed medical attention, Defendant Bourgerie "did not see a reason for an Emergency Room visit," and rather moved Mr. Moffitt to a holding cell, where he was placed on fifteen-minute watch.

50.     At the end of Defendant Bourgerie's shift, he "briefed" Defendant Jonathan Diurba, a Summit County Sheriff's Office deputy, on Mr. Moffitt's condition.

51.     Upon information and belief, Defendant Diurba failed to take any steps to initiate a medical intervention on behalf of Mr. Moffitt.

52.     Upon information and belief, had Defendant Bourgerie, Defendant Diurba, or Defendant Fidler taken any steps to initiate a medical intervention on behalf of Mr. Moffitt on July 7, 2013, Mr. Moffitt would be alive today.

*July 8, 2013: Mr. Moffitt's alcohol withdrawal symptoms grow markedly worse.*

53.     Over the next twenty-four hours, Mr. Moffitt's DTs' symptoms would grow markedly worse.

54.     At approximately 5:00 p.m. on July 8, 2013, Mr. Moffitt again notified Defendant Fidler that he felt sick and believed he had a seizure.

55.     Rather than initiate a medical intervention on behalf of Mr. Moffitt, Defendant Fidler contacted Defendant Cheryl Giordano, a Staff Sergeant with the Summit County Sheriff's Office, as well as Defendants Kathy Lambert and Brian Hyde, both deputies with the Summit County Sheriff's Office.

56.     Defendant Hyde is a national and state-certified paramedic and has been since 2010. Upon information and belief, Defendant Hyde has knowledge of the symptoms that accompany DTs and alcohol withdrawal.

57.     Defendants Giordano, Lambert, and Hyde all went to Mr. Moffitt's cell "to see what was going on" with him. When Defendants Giordano, Lambert, and Hyde arrived at the cell front, they observed Mr. Moffitt "pacing in his cell and seem[ing] ramped up and upset."

58.     Mr. Moffitt informed Defendants Giordano, Lambert, and Hyde "that he was watching TV when he started to feel strange, like he was spinning."

59.     Mr. Moffitt further informed Defendants Giordano, Lambert, and Hyde that "he felt dizzy, had a bad headache, [] had been throwing up, and [hadn't] been able to sleep for the last couple of days."

60.     Defendants Giordano, Lambert, and Hyde escorted Mr. Moffitt up to the booking area of the jail, where Mr. Moffitt explained to the Defendants that he had never had a seizure before that day.

61.     Mr. Moffitt also informed Defendants Giordano, Lambert, and Hyde that he had not had a bowel movement since his detention began on July 6, 2013.

12

62.     Defendant Hyde took Mr. Moffitt's blood pressure and pulse. Defendant Hyde determined that Mr. Moffitt's blood pressure and pulse were "a little high but within the normal ranges."

63.     Upon information and belief, Defendants Giordano, Lambert, and Hyde knew that Mr. Moffitt had entered the jail extremely intoxicated and knew that he had been vomiting green liquid the prior day.

64.     Despite their knowledge that Mr. Moffitt had been exhibiting DTs' symptoms for the past two days, Defendants Giordano, Lambert, and Hyde concluded that Mr. Moffitt was having a panic attack.

65.     Defendant Giordano placed Mr. Moffitt in a holding cell for observation, but she took no steps to initiate a medical intervention on behalf of Mr. Moffitt.

66.     Likewise, Defendants Lambert and Hyde took no steps to initiate a medical intervention on behalf of Mr. Moffitt.

67.     Upon information and belief, had Defendant Fidler, Defendant Giordano, Defendant Lambert, or Defendant Hyde taken any steps to initiate a medical intervention on behalf of Mr. Moffitt on July 8, 2013, Mr. Moffitt would be alive today.

*July 9, 2013: Mr. Moffitt's condition continues to deteriorate as he tells Defendants that he is experiencing suicidal thoughts, which is further symptomatic of delirium tremens.*

68.     Over the next twelve hours, Mr. Moffitt's DTs' symptoms continued to amplify.

69.     On July 9, 2013, at approximately 1:00 a.m., Mr. Moffitt called into the control room to talk to Defendant Diurba, who was on duty in the control room of the jail.

70.     Defendant Diurba could not understand Mr. Moffitt, so he and Defendant Ryan Hosier, another deputy employed by the Summit County Sheriff's Office, when to Mr. Moffitt's cell.

71.     When Defendants Diurba and Hosier arrived at Mr. Moffitt's cell, Mr. Moffitt told them that he was hearing voices that were telling him to kill himself. Mr. Moffitt told Defendant Diurba and Hosier that the voices were coming from the vents and the intercom in his cell.

72.     Specifically, Mr. Moffitt stated:

    a.  "The only way to heaven is to kill myself."

    b.  "It will only take 5 minutes to kill myself."

    c.  "Voices asked me what the most beautifully thing was I said my daughter and the voices replied kill yourself."

    d.  "I tried to kill myself three times with my hands."

73.     Defendant Diurba knew that Mr. Moffitt had been vomiting green liquid just three days prior to these suicidal ideations, yet he did nothing to ensure that Mr. Moffitt received a medical intervention.

74.     Upon information and belief, Defendants Diurba and Hosier knew that Mr. Moffitt had been experiencing symptoms of alcohol withdrawal over the prior two days, yet neither Defendant Diurba nor Defendant Hosier took any steps to ensure that Mr. Moffitt received treatment for DTs.

75.     Instead, Defendants Diurba and Hosier strip searched Mr. Moffitt, placed Mr. Moffitt in a suicide smock, and contacted Colorado West Mental Health.

76.     Upon information and belief, Colorado West Mental Health would only provide a mental health counselor to talk to Mr. Moffitt. Defendants Diurba and Hosier did not contact a medical provider who could provide Mr. Moffitt treatment for his alcohol withdrawal.

77.     Defendants Diurba and Hosier placed Mr. Moffitt in a holding cell, where he continued to exhibit symptoms of DTs.

78.     Throughout the early morning hours of July 9, 2013, other detainees in the jail reported that Mr. Moffitt appeared to be hallucinating and that Mr. Moffitt "believed that the [jail] staff and hospital staff were fighting and spilling human organs on the floor."

79.     Despite Mr. Moffitt's apparent display of obvious auditory and visual hallucinations, none of the Defendants or other jail staff took steps to initiate an appropriate medical intervention on behalf of Mr. Moffitt to treat his DTs.

80.     As a result, Mr. Moffitt's condition continued to dramatically deteriorate.

81.     By 6:00 a.m., when Defendants Lambert, Hyde, Giordano, and Fidler reported for duty, Mr. Moffitt had not been seen by anyone from Colorado West, and his medical condition continued to deteriorate.

82.     At approximately 6:10 a.m., Defendant Hyde observed Mr. Moffitt sitting naked in the holding cell. Defendant Hyde told Mr. Moffitt to put his smock back on, but Defendant Hyde did nothing to initiate an appropriate medical intervention on behalf of Mr. Moffitt.

83.     At approximately 6:20 a.m., Defendant Giordano also observed Mr. Moffitt sitting naked in the holding cell. Defendant Giordano reported that Mr. Moffitt "was sitting on the bench, right of the door, under the camera. [She] could see his feet, part of his head, and part

of his legs and arms." Defendant Giordano did nothing to initiate an appropriate medical intervention on behalf of Mr. Moffitt.

84.     At approximately 7:16 a.m., Defendant Giordano again checked on Mr. Moffitt in the holding cell. At this time, Mr. Moffitt was standing up in the cell and moved towards the door to talk to Defendant Giordano. Mr. Moffitt asked Defendant Giordano for the keys. When Defendant Giordano asked why Mr. Moffitt needed the keys, Mr. Moffitt replied, "To open the door, and go back to my cell, I've seen the doctor, and want to go back to my cell." Defendant Giordano reported that Mr. Moffitt "kept sticking his tongue out while talking" during this conversation.

85.     Defendant Giordano verified with Defendant Lambert that Mr. Moffitt had not yet seen any mental health professional from Colorado West. Despite Mr. Moffitt's clear disorientation and hallucinations, Defendant Giordano did nothing to initiate a medical intervention on behalf of Mr. Moffitt.

86.     Defendant Giordano informed Defendant Lambert of her observations of Mr. Moffitt, including his inability to control his tongue during their conversation and his obvious hallucination. Defendant Lambert did nothing to initiate a medical intervention on behalf of Mr. Moffitt.

87.     At approximately 7:20 a.m., Defendant Lambert, who was working the booking desk of the jail, received a call from Defendant Fidler who had observed Mr. Moffitt lying on the floor, punching himself in the face, from the jail's control room.

88.     Despite observing Mr. Moffitt lying on the floor, punching himself in the face, and slamming the back of his head against the floor, Defendant Fidler took no steps to initiate a

medical intervention on behalf of Mr. Moffitt. From his post in the control room, Defendant

Fidler had a bird's eye view of Mr. Moffitt's deterioration over the course of his three-day

detention at the jail, yet he took no steps to ensure that Mr. Moffitt received the immediate

medical attention he so desperately needed.

89.     Defendant Lambert went to the holding cell where Mr. Moffitt was being

detained. Once there, Defendant Lambert called Mr. Moffitt's name several times. Defendant

Lambert asked Mr. Moffitt why he hit himself.

90.     After overhearing Defendant Lambert talking to Mr. Moffitt, Defendant Giordano

requested that Defendant Hyde talk to Mr. Moffitt to inform Mr. Moffitt that he would be placed

in the restraint chair to keep him from injuring himself.

91.     Defendant Hyde went to the holding cell, where he observed Mr. Moffitt "lying

on the floor on his back, breathing rapidly, naked with his hands clenched."

92.     Instead of recognizing that Mr. Moffitt needed immediate medical attention and

taking steps to provide that attention, Defendant Hyde told Mr. Moffitt to stop punching himself

in the face and warned Mr. Moffitt that he failed to do so, Mr. Moffitt would be placed in a

restraint chair.

93.     After Defendant Hyde said this to Mr. Moffitt, he began to punch himself in the

face, throat, and jaw "several times while lying on the floor."

94.     Defendant Giordano followed Defendant Hyde to the holding cell. Once at the

front of the holding cell, Defendant Giordano observed Defendant Moffitt lying naked on the

floor, his neck red. Defendant Giordano reported that Mr. Moffitt was snoring.

95.     Upon information and belief, Mr. Moffitt was not snoring, but was, in fact, stridor breathing. Stridor breathing occurs when a person's air passages are blocked and often sounds like loud snoring. Stridor breathing is often a sign of a need for emergent medical attention.

96.     Defendant Hyde informed Defendant Giordano that Mr. Moffitt "had punched himself pretty hard" and that Defendant Hyde "thought he might have knocked himself out."

97.     After taking the time to "glove up," Defendants Giordano, Hyde, and Lambert entered the holding cell and began to restrain Mr. Moffitt.

98.     Defendant Hyde entered the holding cell first. Defendant Hyde pulled Mr. Moffitt up so that he sat upright on the floor and again instructed him not to punch himself or he would be placed in the restraint chair. Defendant Hyde reported that Mr. Moffitt, who had blood coming out of his nose, looked at Defendant Hyde "with a wild-eyed look as if he didn't recognize" him. Mr. Moffitt took a "swing" at Defendant Hyde.

99.     Defendant Hyde and Defendant Lambert began restraining a struggling Mr. Moffitt, who was obviously continuing to have hallucinations as a result of the DTs.

100.     During the process of restraining Mr. Moffitt, Defendant Giordano, Hyde, and Lambert noticed that Mr. Moffitt had stopped breathing. Mr. Moffitt's hands were yellow/white, his lips were dark blue/purple, and "his eyes appeared to be just staring."

101.     Defendants Giordano and Hyde began administering cardiopulmonary resuscitation (CPR) on Mr. Moffitt.

102.     At this point, after the Defendants had watched Mr. Moffitt's health deteriorate over the course of three days, Defendant Giordano finally instructed Defendant Lambert to call dispatch to request immediate medical attention for Mr. Moffitt.

103.    Inexplicably, Defendant Lambert, who could observe Mr. Moffitt's pale face "with a bluish shade" from where she was standing on the phone and who knew of all of the symptoms of DTs that Mr. Moffitt had been exhibiting over the past three days, first requested "non-emergency" medical assistance. It was only during the course of the call that Defendant Lambert changed her request and notified dispatch that "this call was an emergency."

104.    When the ambulance crew and firefighters arrived at the Summit County Jail, Defendants Giordano and Hyde had been unable to resuscitate Mr. Moffitt. The ambulance crew and firefighters took over, and, eventually, transported Mr. Moffitt back to SMC.

***Mr. Moffitt's Untimely Death Results from Defendants Failure to Provide Him Medical Care***

105.    Once at SMC, Mr. Moffitt was stabilized, and medical staff determined that he had experienced cardiac arrest at the Summit County Jail.

106.    Once stabilized, medical personnel transferred Mr. Moffitt to St. Anthony Central Hospital in Lakewood, Colorado. Mr. Moffitt was admitted with a diagnosis of anoxic encephalopathy and was placed on life-support.

107.    Mr. Moffitt remained on life-support, with no improvement, from July 9, 2013 until July 13, 2013.

108.    On July 13, 2013, medical personnel at St. Anthony Central Hospital discontinued the life-support systems, and Mr. Moffitt died.

109.    An autopsy revealed that Mr. Moffitt died of "excited delirium" with an unknown cause.

110.    Upon information and belief, the unknown cause was alcohol withdrawal.

111.    Had any one of the Defendants initiated a medical intervention during the course of Mr. Moffitt's three-day detention at the Summit County Jail, Mr. Moffitt would be alive today.

112.    Upon information and belief, Defendants were acting pursuant to municipal custom, policy, or practice in their actions pertaining to Mr. Moffitt.

113.    Defendant John Minor, as the Summit County Sheriff, is responsible for training and supervising all Summit County deputies, including Defendants, in recognizing and providing appropriate medical attention to any person detained in the Summit County Jail. Defendant Minor is also responsible for implementing appropriate policies to ensure that all Summit County detainees receive appropriate medical care.

114.    According the Department of Justice's Bureau of Justice Statistics, approximately 47% of the nation's jail detainees are dependent on alcohol and approximately half were under the influence of alcohol at the time of their offense.

115.    Upon information and belief, despite knowledge of these statistics, Defendant Minor failed to train Defendants in how to recognize the symptoms of DTs and how to ensure that detainees experiencing acute alcohol withdrawal receive prompt, adequate, and life-saving medical attention.

116.    Upon information and believe, Defendant Minor failed to implement any policies that would instruct staff at the Summit County Jail on how to treat detainees that exhibit symptom of delirium tremens. Upon information and belief, at the time of Mr. Moffitt's death, Summit County had no policies or procedures in place that instructed deputies on how and when to initiate a medical intervention on behalf of a detainee experiencing acute alcohol withdrawal.

117.    Defendant Minor's failure to train Defendants and failure to implement appropriate policies directly contributed to Mr. Moffitt's untimely, easily preventable, and unjustifiable death.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
(§1983 – Fourteenth Amendment
Failure to Provide Medical Care and Treatment)
(Against All Defendants in their individual capacities and
Defendant Minor in his official capacity)

118.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

119.    At all times relevant to the allegations in this Complaint, Defendants acted or failed to act under color of state law.

120.    Defendants are persons under 42 U.S.C. § 1983.

121.    At all times relevant to the allegations in this Complaint, Defendants were acting pursuant to municipal custom, policy, or practice in their actions pertaining to Mr. Moffitt.

122.    At all times relevant to the allegations in this Complaint, Defendants knew or should have known of Mr. Moffitt's potentially life-threatening medical condition.

123.    Nevertheless, with deliberate indifference to Mr. Moffitt's constitutional right not to be denied necessary medical care, protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, Defendants failed to examine, treat, and care for Mr. Moffitt's worsening condition and failed to send Mr. Moffitt for treatment. They did so despite their knowledge of Mr. Moffitt's serious medical needs, placing him at risk of substantial physical harm.

21

124.     When Mr. Moffitt, and others on his behalf, alerted Defendants to Mr. Moffitt's need for medical assistance, Defendants acted with deliberate indifference to Mr. Moffitt's obviously serious medical need and constitutional rights by failing to obtain and provide medical treatment for him in a timely and appropriate fashion.

125.     The acts or omissions of all Defendants were conducted within the scope of their official duties and employment.

126.     The acts or omissions of all Defendants were the legal and proximate cause of Mr. Moffitt's injuries and death.

127.     Defendant John Minor's unconstitutional policies, customs or practices, as described herein, were the legal and proximate cause of the Mr. Moffitt's injuries and death.

128.     The acts or omissions of each Defendant caused Mr. Moffitt damages in that he suffered extreme physical and mental pain during the approximately seventy-two hours, or three days, leading up to his death, and ultimately caused Mr. Moffitt's death.

129.     The actions or inactions of Defendants as described herein intentionally deprived Mr. Moffitt of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, and caused him other damages.

**SECOND CLAIM FOR RELIEF**
**(§1983 – Fourteenth Amendment- Supervisory Liability for**
**Failure to Train and Supervise)**
**(Against Defendant Minor in his**
**official and individual capacities)**

130.     Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

131.    Defendant Minor has a duty to train and supervise duty sheriffs, staff sergeants, captains, and other jail personnel to recognize the symptoms of alcohol withdrawal and initiate an appropriate medical intervention for a detainee exhibiting those symptoms.

132.    Defendant Minor failed to discharge this duty.

133.    Defendant Minor acted intentionally in failing to adequately train and supervise deputy sheriffs, staff sergeants, captains, and other jail personnel.

134.    Defendant Minor's failure to properly train and supervise his subordinate employees was the moving force and proximate cause of the violation of Mr. Moffitt's constitutional rights.

135.    The acts or omissions of Defendant Minor caused Mr. Moffitt damages in that he suffered extreme physical and mental pain during the approximately seventy-two hours, or three days, leading up to his death.

136.    The actions of Defendant Minor as described herein deprived Mr. Moffitt of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and caused her other damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and grant:

(a)    Appropriate relief at law and equity;

(b)    Declaratory relief and other appropriate equitable relief;

(c)    Economic losses on all claims allowed by law;

(d)     Compensatory and consequential damages, including damages for emotional

        distress, humiliation, loss of enjoyment of life, and other pain and suffering on all

        claims allowed by law in an amount to be determined at trial;

(e)     Punitive damages on all claims allowed by law and in an amount to be determined

        at trial;

(f)     Attorneys' fees and the costs associated with this action, including expert witness

        fees, on all claims allowed by law;

(g)     Pre- and post-judgment interest at the highest lawful rate;

(h)     Any further relief that this Court deems just and proper, and any other relief as

        allowed by law.

PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.

Dated this 12th day of January, 2015.

KILLMER, LANE & NEWMAN, LLP

_s/David A. Lane_____
David A. Lane
Nicole B. Godfrey
KILLMER, LANE & NEWMAN, LLP
1543 Champa Street, Suite 400
Denver, Colorado 80202
(303) 571-1000
dlane@kln-law.com
ngodfrey@kln-law.com

ATTORNEYS FOR PLAINTIFF