**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.     15-CV-00071-WYD-MJW

ESTATE OF ZACKARY MOFFITT, by and through its personal representative KELLY KRAMER;
M.M., a minor, by and through her next friend and mother, CASSANDRA HIGGINS;
C.M., a minor, by and through her next friend and mother, CASSANDRA HIGGINS;

Plaintiffs,

v.

SHERIFF JOHN MINOR, in his official and individual capacities;
CAPTAIN ERIK J. BOURGERIE, in his individual capacity;
STAFF SERGEANT CHERYL GIORDANO, in her individual capacity;
DEPUTY JONATHAN DIURBA, in his individual capacity;
DEPUTY NATHAN FIDLER, in his individual capacity;
DEPUTY RYAN HOSIER, in his individual capacity;
DEPUTY BRIAN HYDE, in his individual capacity;
DEPUTY KATHY LAMBERT, in her individual capacity; and
DEPUTY JEFF WILSON, in his individual capacity;

Defendants.

---

### DEFENDANTS GIORDANO, DIURBA, FIDLER, HOSIER, HYDE and LAMBERT'S MOTION FOR SUMMARY JUDGMENT

---

Defendants, Cheryl Giordano, Jonathan Diurba, Nathan Fidler, Ryan Hosier, Brian Hyde, and Kathy Lambert (n.k.a. Gallegos), by and through their attorneys, Nathan Dumm & Mayer P.C., move for Summary Judgment under Fed.R.Civ.P. 56:

### <u>INTRODUCTION</u>

Plaintiffs' Complaint asserts one claim for relief against Defendants Giordano, Diurba, Fidler, Hosier, Hyde and Lambert (collectively referred to as the "Jailhouse

Defendants") pursuant to 42 U.S.C. § 1983. The claim against the Jailhouse Defendants alleges a violation of the Claimant's Constitutional rights as protected by the Fourteenth Amendment based upon the Defendants' failure to provide medical care. Plaintiffs contend this failure led to Mr. Moffitt's death. To maintain this claim, Plaintiffs must prove that the Defendants were deliberately indifferent to Mr. Moffitt's need for medical care. The evidence, however, shows that Mr. Moffitt was under enhanced observation during his detention, his medical status was checked when Moffitt inaccurately thought he suffered from a seizure, after expressing suicidal ideation Moffitt was placed in a holding cell for observation and a mental health care check was requested, and when Moffitt attempted to physically harm himself deputies responded within minutes to the observation cell to provide aid. Under these circumstances, the Jailhouse Defendants cannot be considered deliberately indifferent to Mr. Moffitt's medical needs.

## <u>MOVANT'S STATEMENT OF MATERIAL FACTS</u>

1.      In 2013 John Minor was the Sheriff of the Summit County Sheriff's Office, and Erik J. Bourgerie was the Captain of the Sheriff's Detentions Division. Captain Bourgerie, who reported to the Undersheriff and to Sheriff Minor, oversaw the operations of the Summit County Detention Center (the "Jail"). *See* Declaration of Bourgerie at ¶1, attached as Exhibit A.

2.      At the entrance to the Jail is a booking area that consists of a main room containing a large desk where staff book inmates into the Jail and where they can complete paperwork throughout their shifts. Exhibit A at ¶4.

3.      Adjacent to the booking area are holding cells that are enclosed rooms, each with a small square window in its door. In 2013 the Jail had two holding cells called Holding 1 and Holding 2. Each holding cell had a video camera through which the activities in the cells could be visually monitored and an intercom through which an inmate could verbally communicate with the control center. *Id.* Holding 1 had padding on the walls and on the bench in the cell. *Id.*

4.      In a different part of the Jail from the booking area, the Jail had three housing pods used for its general male population: Pods B, C, and D. Each pod had individual cells and a day room. The day room in each pod is monitored by a video camera, but there are no video cameras in the individual cells of these pods. Each cell was equipped with an intercom through which inmates could verbally communicate with the control room. *Id.* at ¶5.

5.      In the center of the housing pods is a secure control room that is manned by a staff member 24 hours a day. In the control room are four large video screens. Each screen is divided into twelve approximately four-by-five-inch sections that display video from twelve surveillance cameras throughout the Jail and courthouse. *Id.* at ¶6; *see also* Deposition of Nathan Fidler, 18:4-25, attached as Exhibit B.

6. On July 6, 2013, Zackary Moffitt was arrested by Defendant Wilson on an outstanding warrant for his arrest and violation of a restraining order related to alcohol consumption. Warrantless Arrest Probable Cause Statement, attached as Exhibit C.

7. Before his arrest, Mr. Moffitt had eloped from medical treatment at St. Anthony's Summit County Medical Center. Emergency Department Report by Marc Doucette, M.D., attached as Exhibit D. The ER report showed that Mr. Moffitt was intoxicated and had BAC of .392.

8. As part of the booking process at the Summit County Jail it was noted in Mr. Moffitt's booking file that he was "medically cleared at SMC before to [sic] coming to Jail." Completed Questionnaire attached as Exhibit E.

9. Initially Mr. Moffitt was too intoxicated to complete the booking process and was at first held and observed in a holding cell.

10. According to Plaintiffs' expert witness, Joshua D. Blum, M.D., at this point while Mr. Moffitt remained intoxicated; there was no reason for the deputies to suspect severe alcohol withdrawal and a need for medical attention. Dr. Blum Deposition, 98:20-25, 99:1-4, attached as Exhibit F.

11. On July 7, 2016, during morning face count, Defendant Fidler observed that Mr. Moffitt had vomited in his cell. Defendant Fidler asked if Mr. Moffitt was okay, and Moffitt responded that he had been drinking a lot, was hungover, and wanted to go back to bed. Exhibit B, 24:3-16.

12. Later that morning, Mr. Moffitt complained of feeling sick and Captain Bourgerie went to his cell. Mr. Moffitt told Captain Bourgerie that he had been throwing

up a green fluid for the last two hours. *See* Incident Report, Bourgerie Deposition Ex. 19 at SCSO 0046, attached as Exhibit G; *see also* Deposition of Erik Bourgerie, 27:12-28:19, attached as Exhibit H. He showed Captain Bourgerie a bright green substance on a towel, and Captain Bourgerie saw the vomit and thought it was green because of something that Mr. Moffitt ate. Exhibit H, 28:12-22.

13.     Captain Bourgerie asked Mr. Moffitt why he thought he was vomiting, and Mr. Moffitt stated that he was detoxing from a two-week bender. Exhibit G at SCSO 0046; Exhibit H 29:10-30:18. Captain Bourgerie asked Moffitt if he had a history of bad detoxes that included hallucinations or seizures, and Moffitt said he did not but this was the worst detox he had. *Id*. Moffitt said he was starting to see things out of the corners of his eyes, and Captain Bourgerie was unsure what Moffitt was describing, so he brought him up to Holding 1 to be observed by staff. See Exhibit G.

14.     At the time, Captain Bourgerie was unaware that Mr. Moffitt had a BAC of .392 when he was booked into the Jail. Exhibit H, 44:7-15.

15.     Plaintiff's expert, Joshua Blum, M.D. testified that with the symptoms that Mr. Moffitt reported to Captain Bourgerie, it would be "difficult" for someone to know at the time whether Mr. Moffitt was experiencing severe withdrawals that needed medical attention. Exhibit F, 99:5-102:20.

16.     Mr. Moffitt was placed under observation in a holding cell 1 from 11:00 a.m. through 11:10 p.m.  Suicide/Welfare Check Logs, July 7, 2013, at SCSO 00096 attached as Exhibit I.  The "purpose of this [Welfare] log is to make sure that the individual [Moffitt] is not harming themselves and that they are still breathing and alive

and well." Deposition of Jonathan Diurba, 53:4-8, attached as Exhibit J. During this 12 hour period, Mr. Moffitt was observed through video monitoring and deputies made 14 in-person observations or checks of Mr. Moffitt's condition. Defendants Fidler (NF54), Diurba (JD 57) and Hosier (RH42), made personal checks of Mr. Moffitt's condition. Exhibit I, at SCSO 00096.

17.     Mr. Moffitt was moved back to B-Pod at 11:25 p.m. on July 7, 2013. Exhibit I, at SCSO 00096.

18.     The late morning of July 8, 2013, Defendant Fidler escorted Mr. Moffitt to his appearance before a Judge. Exhibit B, 25:15, 26:1, 65:16-19.

19.     A copy of the audio recording of Mr. Moffitt's appearance before the Judge on July 8, 2013, is referenced as Exhibit K, and submitted to the Court pursuant to D.C.COLO.CivR 5.1(b)(1).     During his appearance in Court, Mr. Moffitt lucidly answered questions from the Judge and argued that he should be released on a personal recognizance bond. Included in his reasons for release, Mr. Moffitt expressed that he was ill and needed to address his health issues upon release. The Judge denied the request for a PR bond.

20.     According to Plaintiffs' expert Dr. Blum, when Mr. Moffitt appeared before the Judge he displayed signs of anxiousness suggesting alcohol withdrawal, but noted that there was "nothing that sounded emergent in the audio" and "in the absence of any physical symptoms at that moment, there would not be - - it would not be consistent with severe alcohol withdrawal, needing treatment." Exhibit E, 107:13-25, 108:1- 7.

21.	According to Michael J. Jobin, M.D., another of Plaintiffs medical experts, he listened to the audiotape of Mr. Moffitt's appearance before the judge [Exhibit K] and "thought he had pretty good mental functioning. He actually made sense when he was talking to the judge." Deposition of Dr. Jobin, 55:4-8, attached as Exhibit L. And, according to Dr. Jobin, at the time Mr. Moffitt appeared before the Judge, there was no reason to seek medical care. Exhibit L, 61:20-23.

22.	After his court appearance, Mr. Moffitt was returned to B Pod. Later in the afternoon of July 8, 2013, Mr. Moffitt used the intercom in his cell to inform Deputy Fidler, who was working in control at the time, that he thought he was going to have a seizure. Exhibit B, 53-54. This prompted Deputy Fidler to seek "attention from the deputies in the front [Hyde, Giordano, and Lambert] to bring him up front so that they could observe him and seek medical attention if it needed to be sought." Exhibit B, 54:9-15.

23.	At approximately 5:12 p.m., Deputies Lambert, Giordano and Hyde responded to Deputy Fidler's request to check on Mr. Moffitt. Hyde Jail Incident Report, July 8, 2013, attached as Exhibit M.

24.	Deputy Hyde, who has paramedic training, met with and made initial observations of Mr. Moffitt inconsistent with the claim of a seizure based on the absence of physical trauma and because Moffitt was not postictal . Deposition of Brian Hyde, 16:10-14, attached as Exhibit N. Deputy Hyde's observations of Moffitt inconsistent with a seizure or serious medical condition included that Moffitt:

> was not – he was not shaking, he did seem anxious, I know
> earlier in the day he went to court, so there's lots of reasons

> to be anxious.  He was walking and talking to me, normal
> course, we walked around, up the stairs, I didn't help him up
> the stairs, sat down, we had a normal conversation.

Exhibit N, at pp. 86-87.

25.     While Deputy Hyde met with Mr. Moffitt, Sgt. Giordano asked other inmates in the cell block common area if there was anything out of the ordinary with Moffitt, and learned that nothing "out of the ordinary had happened with Mr. Moffitt and – or if at any time they saw him on the floor or anything like that, they said no, he was sitting watching TV and then the next thing you know, he went to his cell and the next thing they knew, we were coming in."  Deposition of Cheryl Giordano, 48:6-20, attached as Exhibit O.

26.     Also responding with Deputy Hyde and Sgt. Giordano was Deputy Lambert.  She recalls Mr. Moffitt complaining that his head hurt.  Deposition of Kathy Gallegos (f.k.a. Lambert), 41:22-24, attached as Exhibit P.

27.     Defendants Hyde, Sgt. Giordano and Deputy Lambert escorted Mr. Moffitt out of B Pod, and Mr. Moffitt walked on his own with them down the hallway to the front of the Jail. Exhibit N, 86:25, 87:6 There Deputy Hyde continued his observations of Mr. Moffitt by checking his vital signs that he reported within "normal limits", but slightly elevated."  Exhibit M.

28.     Plaintiffs' Expert, Dr. Blum testified that taking vitals was a reasonable step to assess Mr. Moffitt's medical condition.  Exhibit F, 112:10-14. Dr. Blum notes that neither of these vitals or "readings jump out at you."  Exhibit F, at pp. 110-11.

29. Then, Defendants Hyde, Giordano and Lambert put Mr. Moffitt under observation for 45 minutes while Moffitt ate and conversed with the deputies. Exhibit N, 19:15-21, Exhibit M. Moffitt asked Giordano if he could return to his cell because he was feeling better and he told Hyde that he wanted to go back to his cell. Giordano Jail Incident Report, at SCSO 00038; Exhibit N, 20:6-8.

30. Plaintiffs' Expert physician, Dr. Blum, noted that there is "pretty clear documentation" that Mr. Moffitt did not suffer a seizure, and he agrees with Deputy Hyde's conclusion that Mr. Moffitt's presentation was not consistent with a seizure. Exhibit F, at pp. 108-109.

31. Plaintiffs' expert physician Dr. Jobin also agrees that Mr. Moffitt did not suffer a seizure. Exhibit L, 64:14-21.

32. At this point according to Plaintiffs' expert Dr. Blum, Mr. Moffitt's "anxiety supports alcohol withdrawal symptoms. His lack of other symptoms do not support severe alcohol withdrawal. His lack of clear alteration and sensorium or hallucination . . . the absence of tremors is not supportive of severe alcohol, yes." Exhibit F, pp. 113-114. And, Mr. Moffitt's presentation "does not support the need for urgent medical treatment." Exhibit F, 114:15-19.

33. After Defendants Hyde, Giordano and Lambert responded to Mr. Moffitt's complaints, and just as Defendant Hosier begin his shift on July 8, 2013, between 6:00 and 6:30 p.m., he observed Mr. Moffitt in the holding cell through the slightly ajar door. Deposition of Ryan Hosier, 72:1-11, 151-52, attached as Exhibit R. Mr. Moffitt explained that he was "getting ready to go back to the pod." Exhibit R, 152:7-10.

34.     At approximately 6:30 p.m. on July 8, 2013, Mr. Moffitt was returned to general population in the B-Pod.  Exhibit I, at SCSO 00097.

35.     Early the next morning, at approximately 1:00 a.m., Deputies Diurba and Hosier responded to a request from control room to check on Mr. Moffitt.  Jail Incident report by Deputy Diurba, attached as Exhibit S.  When Deputy Diurba and Hosier spoke with Mr. Moffitt, he expressed suicidal ideation, and Deputy Diurba contacted Colorado West Mental Health for a mental health check, placed Mr. Moffitt in a suicide smock, and moved Moffitt to the padded cell in Holding 1 for suicide watch.  Exhibit S.

36.     According to Defendant Hosier, Mr. Moffitt "was making some suicidal statements and said that he and tried to choke himself or kill himself three times and then that's when Diurba and I brought him up front and Diurba did the change over into a suicide smock and let him sit on the bench to talk with him.  Exhibit R, 84:3-12.

37.     Defendants Diurba and Hosier brought Mr. Moffitt from his jail cell "up front, Diurba let him sit on the bench to speak with us and he went in the holding cell on his own."  Exhibit R, 108:10-12.

38.     Defendant Diurba listed specific statements of suicidal ideation on the Incident Report.  Exhibit S.

39.     When Defendant Diurba called Colorado West Mental Health, he used the phone to allow the mental health professional to hear Mr. Moffitt's "symptoms over the phone directly .  .  . and their assessment of this was 'We'll be there at 7:30 [a.m.].'" Exhibit J, 68:19-25.

40.     Over the next six hours, 15 in-person checks were made by deputies, including defendants Ryan Hosier (RH42), Jonathan Diurba (JD57) and Cheryl Giordano (CG 16).  Exhibit I, at SCSO 00098.

41.     Throughout the early morning, Mr. Moffitt remained in a holding cell under video observation and periodic in-person checks.  A copy of the video recording of Mr. Moffitt's detention in the Holding Cell 1 from 5:30 a.m. until 9:00 a.m. is attached Exhibit T, and submitted to the Court pursuant to D.C.COLO.CivR 5.1(b)(1).

42.     Shortly after being placed in the holding cell, at approximately 1:20 a.m., Mr. Moffitt was seen on the video monitor with his hands on his throat.  The deputy watching the video contacted Defendant Hosier reporting that they could see Mr. Moffitt put his hands on his throat but that they did not think he was applying any pressure. Exhibit R, 110:14-19.  Defendant Hosier checked on Mr. Moffitt, and did not see him try to choke himself.  Exhibit R 110:20-22.

43.     Defendants Fidler Giordano, Hyde and Lambert came on duty the morning of July 6, 2013 at 6:00 a.m.  DAFRs, July 9, 2013, attached as Exhibit U.

44.     When Sgt. Cheryl Giordano came on shift on July 9, 2013, she was informed that Mr. Moffitt had threatened to hurt himself but had not actually done so. Exhibit O, at pp. 103-104.  Similarly, Defendant Hyde was informed that a mental health check had been requested by Colorado West, now known as Mind Springs.  Exhibit N, 45:7-21.

45.     Defendant Hyde checked on Mr. Moffitt after Hyde hears Moffitt yelling. Exhibit N at pp. 106-107; Exhibit W at 6:08:11 through 6:10:35 a.m. A copy of the video

recording of the Booking Front Hall outside Holding Cell 1 is attached Exhibit W, and submitted to the Court pursuant to D.C.COLO.CivR 5.1(b)(1). Defendant Hyde described Mr. Moffitt as agitated, but as "soon as I started talking to him, he was not." Exhibit N, 107:11-12.

46.     At 6:18:42 a.m., Defendant Giordano checked on Mr. Moffitt as she started her shift and saw that he was naked.  Exhibit O, 100:4-12; Exhibit I at SCSO 00098, Exhibit W.   According to Defendant Giordano, the fact that Mr. Moffitt was naked was not "strange" or out of the ordinary.  Exhibit O, 105:3-5; Exhibit N, 44:15-20. When Ms. Giordano contacted Mr. Moffitt the morning of July 9, 2013, she described him as "articulate, he made contact with me."  Exhibit O, 104:1-9, Exhibit W at 6:18:42 through 06:19:03 a.m.

47.     At 7:15:41, Cheryl Giordano approaches the holding cell to check on Mr. Moffitt.  Exhibit W; Exhibit I, at SCSO 00098.  At this time, Defendant Giordano and Mr. Moffitt had a conversation.  Exhibit O, 105:15-25; Exhibit W at 7:15:41 through 7:16:41.

48.     Defendant Giordano also noted that Moffitt kept sticking his tongue out in an unusual way when he spoke, causing her to ask her staff if they had noticed this behavior and check the pass-on book.  Exhibit O at pp. 110-111.

49.     At approximately 7:20:46 a.m., Mr. Moffitt begins to strike himself forcefully, including a sequence where he hits his head against the corner of the padded bench.  Exhibit T.

50.     Dr. Jobin testified that the need for medical assessment did not become evident until this moment on the morning of July 9, 2013 when Mr. Moffitt began

harming himself, that Dr. Jobin described as "trying to strangle himself with his own hands, hitting himself in his neck with his hands in a type of like karate chop, and then hitting his neck on the corner of his bunk." Exhibit L, 79:9 – 81:5.

51.    Defendant Fidler, who is then working in the Control Room, sees Mr. Moffitt's violent behavior on a video monitor screen in the control room and calls Deputy Lambert at the booking desk at approximately 7:23 a.m.  Exhibit B, 113:3-18.

52.    Approximately three to four minutes passed between when Mr. Moffitt begins forcefully striking his throat and hitting his head on the padded bench until Defendant Fidler calls the booking desk to aid Mr. Moffitt.  Id. p. 113, ll.22-25, and p. 114, ll. 1-5.

53.    At 7:24:18 a.m., Defendant Lambert is seen answering phone at the booking desk.  A copy of the video recording of the Booking Desk Area is attached Exhibit V, and submitted to the Court pursuant to D.C.COLO.CivR 5.1(b)(1).

54.    Defendant Fidler told Defendant Lambert that Mr. Moffitt was hitting his head, so she went to check on Moffitt.  Exhibit P, 58:20-24. Both Defendant Lambert and Defendant Giordano talk to Mr. Moffitt through a small window opening in the cell door.  Exhibit P, 60:7-13, Exhibit W, at 7:24:36 through 7:25:35.

55.    At approximately 7:26 a.m., Colorado West counselor Kristie Taylor arrives and approaches the door of Holding Cell 1 where Defendant Lambert is still talking to Mr. Moffitt. Exhibit W at 7:26:20.

56.    At 7:26:56, Defendant Hyde approaches the door and begins speaking to Mr. Moffitt.  Exhibit W.

57.    When Mr. Moffitt starts striking himself again, Defendants Lambert, Hyde and Giordano ask Defendant Fidler to open the door to the cell.  Exhibit P, 63:3-16; Exhibit N, 64:1-6; Exhibit W at 7:27:19.

58.    Plaintiffs' expert Dr. Jobin agreed that the point when Mr. Moffitt started striking his throat and hitting his neck onto the edge of the bench was when deputies should have responded to stop Mr. Moffitt from hurting himself and that responding within "minutes would be reasonable." Exhibit L, 109:7-14, 112:9-16 [emphasis supplied].

59.    At  7:27:30 a.m. Defendant Hyde enters the cell to talk to Moffitt. Defendant Hyde begins by making a few initial assessments of Mr. Moffitt's condition, including that there is no vomit, Mr. Moffitt is talking, is not sweating and checking his pulse.  Exhibits T and W at 7:27:30; Exhibit N, 67:12-17, 68:9-17.

60.    According to Plaintiffs' expert, Dr. Blum, at this point:

> A    Would I have tried to speak with him and tried to talk
>
> him down, yes, I would have tried to speak with him and get
>
> him to stop hitting himself and harming himself.
>
> Q    And you understand the deputies tried to do that too?
>
> A    Yes.

Exhibit F, 126:4-10.

61.    As Defendant Hyde was speaking with Mr. Moffitt, he observed that Moffitt was unsettled with a crazy look in his eye, and Mr. Moffitt raises his hand back in a maneuver that prompts Defendant Hyde to move Mr. Moffitt to a sitting position where

he continues to talk to Mr. Moffitt.  Exhibit N, pp. 117-18; Exhibit T at 7:27:48 through 7:28:00 a.m.

62.    At this point, Defendant Hyde "was worried about trying to keep him safe, let him not hit me, he was bleeding from the nose.  So my focus was – because I was the one in there trying to make sure he didn't hurt himself or me."  Exhibit N, 118:11-16. And, "once we had the situation controlled, 911 would have been the next immediate action to get him physical help prior to what did happen."  Id., 119:20-25,120:1.

63.    At 7:28:01 a.m. Mr. Moffitt attempts to strike Defendant Hyde, who then begins to restrain Mr. Moffitt.  Exhibit T.

64.    Plaintiffs' expert, Dr. Blum, agreed that before any medical professional could provide aid to Mr. Moffitt, the deputies needed to obtain compliance because Mr. Moffitt posed a risk.  Exhibit F, pp. 126-127.

65.    Both Defendants Lambert and Giordano helped Defendant Hyde restrain Mr. Moffitt.  Exhibit O, 145:5-20; Exhibit T at 7:28:09 through 7:29:30 a.m.

66.    While Defendant Hyde is trying to calm Mr. Moffitt, and then with Defendant Giordano's assistance, restrain Mr. Moffitt, at 7:30:09 a.m. Defendant Lambert exits the cell to call for an ambulance.  Exhibit W.

67.    Defendant Lambert began the call by requesting non-emergency assistance, but during call she heard Giordano say that Moffitt was not breathing, so Lambert requested immediate emergency assistance.  Exhibit O, 147:21-24; Exhibit P, 8:15-24.

68.     Once Mr. Moffitt stopped breathing, Defendants Hyde and Giordano performed CPR and then attempted to use an AED.  Exhibit O, pp. 147-148.  Shortly thereafter the ambulance arrived and paramedics took over Mr. Moffitt's medical care. Exhibit O, 149:18-25; Exhibit W at 7:35:50 a.m.

69.     Mr. Moffitt was then transported from the Summit County Jail to the Summit Medical Center.  Complaint, ¶¶ 100, 104.

70.     Mr. Moffitt was later transferred to St. Anthony Central Hospital in Lakewood, Colorado.  Complaint, ¶ 108.

71.     Mr. Moffitt died on July 13, 2013 after his life-support systems were discontinued.  Complaint, ¶ 108.

72.     Following an autopsy, it was determined that Mr. Moffitt died as a result of the lack of oxygen to the brain due to or as a consequence of cardiac arrest that caused by the "combined impact of an abnormal heart and excited delirium syndrome." Exhibit X, at SCSO 01929.

73.     The first time that Sheriff John Minor learned about Mr. Moffitt was on July 9, 2013, after Mr. Moffitt was transported out of the Jail. He did not participate in any decisions regarding Moffitt's medical care in the Jail. Deposition of Sheriff Minor, 24:21-25:4, attached as Exhibit Y.

74.     After Mr. Moffitt's death and after the conclusion of an independent Internal Affairs investigation by Jefferson County, the Summit County Sheriff's Office initiated a follow-up internal affairs investigation regarding Deputy Jeff Wilson's actions, concluding that Deputy Wilson violated Summit County Sheriff's Office Policy and

Procedures by failing to obtain medical clearance prior to booking Mr. Moffitt into the detention facility and by providing false or misleading statements regarding Mr. Moffitt's medical clearance. Defendants Minor and Bourgerie's Responses to First Set of Interrogatories, Response to Interrogatory No. 17, p. 21, attached as exhibit Z.

75.     Defendants Giordano, Diurba, Fidler, Hosier, Hyde and Lambert were unaware at the time of Mr. Moffitt's detention at the jail that the Completed Questionnaire report was inaccurate. Exhibit R, 28:8-16; Exhibit O, 154:16-18; Exhibit J, 14:4-12, 41:20-23; Exhibit P, pp. 29-30; Exhibit B, 42:14-23; Exhibit N, 30:23-25 – 31:1-10, 40:7-11, 127:25 – 128:1-2.

**ARGUMENT**

**Summary of Argument**

A state actor may be liable under 42 U.S.C. § 1983 for deliberate indifference to a prisoner s medical needs by intentionally denying or delaying access to medical care. *Estelle v. Gamble,* 429 U.S. 97, 104-05 (1976). In order to prove this claim, Plaintiffs must satisfy both an objective and subjective component. First, from an objective perspective, there must be evidence that the need for medical treatment is sufficiently serious so as to be obvious to even a lay person that there is a need for medical care. *Estate of Booker v. Gomez,* 745 F.3d. 405 (10th Cir. 2014). Here, the undisputed facts and admissions by the Plaintiffs' experts show from an objective perspective no sufficiently serious and obvious need for medical care during Mr. Moffitt's detention from July 6 through July 8, 2013 when Mr. Moffitt suffered from intermittent mild or moderate alcohol withdrawal, but also was able to lucidly argue before a Judge for release on a

PR bond and did not display symptoms that would have objectively signaled the need for medical care. As Plaintiffs' expert Dr. Blum testified, as late as the afternoon of July 8, 2013, Mr. Moffitt's presentation did "not support the need for urgent medical treatment." See Statement of Material Facts, ¶ 32.

Then, from a subjective perspective, the Plaintiffs must show that the state actor failed to provide medical care despite the knowledge of substantial risk or harm. *Estate of Booker v. Gomez*, 745 F.3d 405 (10th Cir. 2013). An inadvertent, or even negligent, failure to provide adequate medical care does not rise to the level of a constitutional violation. *Estelle*, 429 U.S. at 105-06. Here, the undisputed facts and admissions by the Plaintiffs experts demonstrate that Defendants responded reasonably to Mr. Moffitt's complaints, even those not needing immediate medical attention, at all times during his incarceration. Then, when Mr. Moffitt expressed suicidal ideation the early morning of July 9, 2013, these Defendants responded reasonably by seeking a mental health consult and placing Mr. Moffitt under suicide watch in a holding cell. And, later when Mr. Moffitt's condition deteriorated to the point he was aggressively attempting self-harm, the Defendants quickly responded within minutes to intervene, a response time that Plaintiffs' expert Dr. Jobin admitted: "I think minutes would be reasonable." See Statement of Material Facts, ¶ 58

Finally, even assuming for purposes of argument that Mr. Moffitt's condition was sufficient serious to warrant immediate medical treatment, the Jailhouse Defendants are also afforded qualified immunity when their conduct does not violate a clearly established constitutional right. *Harlow v. Fitzgerald*, 47 U.S. 800 (1982). A right is

clearly established when the contours of that right were "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Gann v. Cline*, 519 F.3d 1090, 1092 (10th Cir. 2005). Here, the law is not sufficiently clear to indicate that Defendants actions to seek a mental health check and respond within minutes to Mr. Moffitt's deteriorating condition the morning of July 9, 2013 violates a constitutionally protected right to medical care.

**Through the end of July 8, 2013, from an objective perspective there is no Serious Medical Condition in Need of Immediate Medical Treatment**

From an objective perspective, there must be evidence that the need for medical treatment is sufficiently serious so as to be obvious to even a lay person that there is a need for medical care. *Estate of Booker v. Gomez,* 745 F.3d. 405 (10th Cir. 2014). Applying the standard that a patient's medical needs must be so obvious that a lay person would easily recognize the need for a doctor's attention, the Tenth Circuit held that a medical condition that a lay person properly should recognize as blatantly serious would include a badly bleeding ulcer. *Blackmon v. Sutton*, 734 F.3d 1237, 1245-46 (10th Cir. 2013). As further explained by the Tenth Circuit, where "the necessity for treatment would not be obvious to a lay person, the medical judgment of the physician, even if grossly negligent, is not subject to second-guessing in the guise of an Eighth Amendment claim." *Mata v Saiz*, 427 F.3d 745, 751 (10th Cir, 2005).

Here, it is undisputed that these Defendants did not confront circumstances objectively presenting a serious medical condition requiring medical treatment through the end of July 8, 2013. On July 6, 2013, while Mr. Moffitt remained intoxicated; there was no reason for the deputies to suspect severe alcohol withdrawal and a need for

medical attention.  Fact ¶ 10.   Then, on July 7, 2013, while Mr. Moffitt continued to detox from alcohol, Plaintiffs' expert acknowledged it would be "difficult" for someone to know that Mr. Moffitt needed medical attention.  Fact ¶ 15.

The next day, when Defendant Fidler escorted Mr. Moffitt to Court on July 8, 2013, according to Plaintiffs' expert Dr. Blum he heard "nothing that sounded emergent in the audio" and "in the absence of any physical symptoms at that moment, there would not be - - it would not be consistent with severe alcohol withdrawal, needing treatment." Fact ¶ 20.  After reviewing the audio of Mr. Moffit's appearance, Plaintiff's expert Dr. Jobin also concluded that when Mr. Moffitt appeared before the Judge, there was no reason to seek medical care.  Fact ¶ 21.  Later on July 8, 2013, when Mr. Moffitt inaccurately reported that he had a seizure, Plaintiffs' expert Dr. Blum concluded that there was no need for urgent medical treatment. Fact ¶ 32.

Under these circumstances, where the undisputed facts and statements of Plaintiffs' experts show that there was no blatantly obvious immediate need for medical care, the Plaintiffs cannot meet the objective component of the deliberate indifference standard.  Therefore, any claim for delay in providing medical care arising out of Mr. Moffitt's detention through July 8, 2013 fails as a matter of law.

**Throughout Mr. Moffitt's Detention at the Jail from July 6 until July 9, 2013, the Jailhouse Defendants responded appropriately, and without deliberate indifference, to Mr. Moffitt's symptoms and complaints**

From a subjective perspective, the Plaintiffs must show that the state actor failed to provide medical care despite the knowledge of substantial risk or harm. *Estate of Booker v. Gomez*, 745 F.3d 405 (10th Cir. 2013).  An inadvertent, or even negligent,

failure to provide adequate medical care does not rise to the level of a constitutional violation.  *Estelle*, 429 U.S. at 105-06.  Instead, a jailhouse deputy acts with "deliberate indifference" when that deputy knows of and disregards an excessive risk to inmate health or safety.  In the context of the failure to procure medical care, the Tenth Circuit has described deliberate indifference as the knowing disregard of an excessive risk to inmate health or safety.  *Todd v. Bigelow*, 497 Fed. Appx.  839 (10th Cir. 2012).  No constitutional violation occurs unless medical care is intentionally or recklessly denied.  *Boyett v. County of Washington*, 282 Fed.Appx. 667 (10th Cir. 2008).   As noted by the Tenth Circuit:

> The question is:  "were the symptoms such that prison employee knew the risk to the prisoner and chose (recklessly) to disregard it?"

*Martinez v. Beggs*, 563 F.3d 1082, 1089 (10th Cir.) (quoting *Mata v. Saiz*, 427 F.3d 745, 753 (10th Cir. 2005).  Importantly, the defendants "must subjectively disregard the risk of [Plaintiff's] claimed harm – death and heart attack – and not merely the risks of intoxication."  *Martinez v. Beggs*, 563 F.3d 1082, 1089-90 (10th Cir. 2009).

**Deputy Diurba and Deputy Hosier were not Deliberately Indifferent**

Defendants Diurba and Hosier first encountered Mr. Moffitt as part of the welfare checks completed when he was in the holding cell detoxing on July 7, 2013; a time when Mr. Moffitt objectively did not need medical care. Fact ¶¶ 15-16.  Even so, Defendants Diurba and Hosier continued to monitor Mr. Moffitt as part of the jail's welfare check system.  Id.

Diurba and Hosier next encountered Moffitt when they responded to a request to check on Mr. Moffitt during the early morning hours of July 9, 2013.  At that time, Mr. Moffitt expressed suicidal ideation.  In response to this specific risk of suicide, Defendants Hosier and Diurba called for a mental health check, including allowing the mental health provider to listen to Mr. Moffitt over the phone.  Fact ¶ 35.  Diurba and Hosier then placed Mr. Moffitt in a suicide smock and padded observation cell to await the mental health check.  Id.  And, as part of this process, spent the time to talk with him and calm him to the point that Mr. Moffitt entered the holding cell on his own.  Fact ¶¶ 36-37.

Seeking a mental health check does not amount to deliberate indifference because neither Defendant Hosier nor Defendant Diurba disregarded the known risk of suicide.  Deliberate indifference requires that Defendants disregarded the risk of suicide.  *Cox v. Glanz*, 800 F.3d 1231, n. 10 (10th Cir. 2015).  Defendants Diurba and Hosier were anything but indifferent.  Instead, they reasonably believed Mr. Moffitt was suicidal and suffering from a psychiatric problem, and in response sought care for Mr. Moffitt.  Although Plaintiffs will point out that Diurba and Hosier were wrong in their assessment, a mistake or even negligent failure to provide adequate medical care does not rise to the level of a constitutional violation.  *Estelle*, 429 U.S. at 105-06.

**Defendants Diurba and Hosier Should be Afforded Qualified Immunity**.

Defendants should be afforded qualified immunity when their conduct does not violate a clearly established constitutional right.  *Harlow v. Fitzgerald*, 47 U.S. 800 (1982).  A right is clearly established when the contours of that right were "sufficiently

clear that a reasonable official would understand that what he is doing violates that right." *Gann v. Cline*, 519 F.3d 1090, 1092 (10th Cir. 2005).  Because there is no clearly established case law that would tell Defendants Diurba and Hosier that taking precautions to prevent suicide and seeking a mental health check is a constitutional violation, they should be afforded immunity from the claims against them.

In *Bame v Iron County*, 566 Fed.Appx. 731 (10th Cir. 2014), the Court examined similar circumstances and held that a jailors efforts to place an inmate in a suicide smock, call for a crisis center volunteer, and establishing a monitoring schedule did not equal deliberate indifference to the inmate.  With Defendants Diurba and Hosier making substantially similar efforts, the claims against them should fail and the application of qualified immunity is appropriate.

**Defendant Fidler was not Deliberately Indifferent**

Defendant Fidler first saw Mr. Moffitt in his sell the morning of July 7, 2016 before he was moved to observation to detox, at a time when there was no objective need for medical treatment. Fact ¶ 10.  Defendant Fidler's first substantial interaction with Mr. Moffitt was on July 8, 2016 when he escorted Mr. Moffitt to an appearance before a judge; at a time when Mr. Moffitt was functioning well enough to argue with the judge and there is no objective evidence that Mr. Moffitt was suffering from a serious medical condition needing immediate medical attention.  Fact ¶¶ 18-21.  Later that afternoon, Mr. Moffitt used the intercom to inform Fidler that he thought he was about to have a seizure.  Ultimately, it was determined that Mr. Moffitt did not suffer from a seizure and there was no objective need for medical care.  Fact ¶¶ 22-34.  Nonetheless, Defendant

Fidler's response requesting other deputies to check on Mr. Moffitt is not evidence of deliberate indifference.

Deputy Fidler was next in the Control Room monitoring by video Mr. Moffitt in Holding Cell 1 the morning of July 9, 2013 beginning at 6:00 a.m. Fact ¶ 43. During this time, Mr. Moffitt was subject to periodic suicide/welfare checks and observation by deputies in the jail. Fact ¶¶ 40-41, 45-48. But, Defendant Fidler observed Mr. Moffitt's behavior deteriorate when he began to aggressively strike himself in an attempt to cause self-harm at approximately 7:20 a.m. Fact ¶ 51. According to Plaintiffs' expert Dr. Jobin, it is at this moment that the need for a medical assessment became obvious. Fact ¶ 50.

And, observing this behavior, Defendant Fidler calls to the booking desk to ask his fellow deputies to check on Mr. Moffitt. Calling for colleagues to check on Mr. Moffitt is not deliberate indifference. Fact ¶ 51. Dr. Jobin testified that he thought Fidler's response time to Mr. Moffitt's deteriorating behavior was reasonable. Fact ¶¶ 50-52. Deliberate indifference requires the knowing disregard of a risk. *Martinez v. Beggs*, 563 F.3d 1082, 1089 (10th Cir.). Defendant Fidler's conduct seeking assistance for Mr. Moffitt does not demonstrate a knowing disregard to a risk. Just the opposite; he called for deputies to provide assistance. This response does not amount to deliberate indifference, and therefore the claims against him should be dismissed.

**Defendant Fidler should be Afforded Qualified Immunity**

There is no law indicating that it is a violation of an inmates constitutionally protected rights to request fellow deputies to provide aid. And, similar to the *Bame*

case, Defendant Fidler reasonably believed that the deputies working on the jail floor would respond. *Bame*, 566 Fed.Appx. at 739. In fact, Defendants Hyde, Giordano and Lambert did respond, placing deputies in position to provide a response and aid to Mr. Moffitt. Fact ¶¶ 54 & 56. Qualified immunity should be afforded to Defendant Fidler because his conduct in requesting the floor deputies to respond to an inmate's aid does not violate a clearly established constitutional right. *Harlow v. Fitzgerald*, 47 U.S. 800 (1982).

**Defendants Hyde, Lambert and Giordano were not Deliberately Indifferent**

Defendants Hyde, Lambert and Giordano first encountered Mr. Moffitt the afternoon of July 8, 2013 when Defendant Fidler asked them to check on Mr. Moffitt who had reported the anticipation of a seizure. Fact ¶ 23. At this time, there is no objective evidence that Hyde, Lambert and Giordano were deliberately indifferent to the need for medical treatment. Fact ¶¶ 30-32. Regardless, these deputies evaluated Mr. Moffitt, including checking his vitals, making an in-person assessment, providing Mr. Moffitt with food, and interviewing other inmates, before returning him to his cell. Fact ¶¶ 24-23. Taking these steps to evaluate Mr. Moffitt is not deliberate indifference as a matter of law.

Then, the morning of July 9, 2013 Defendants Hyde, Lambert and Giordano all came on shift at the jail at 6:00 a.m. Fact ¶ 43. Both Defendant Hyde and Giordano made in-person checks of Mr. Moffitt who was in the holding cell for observation. Fact ¶¶ 45-47. Giordano saw that Mr. Moffitt was naked, but that he was also articulate and spoke with her. Fact ¶¶ 46 - 47. Defendant Hyde checked on Mr. Moffitt when he heard

him yelling in his cell, noting that Mr. Moffitt was agitated, but calmed as soon as Hyde checked on him.  Fact ¶ 45.

A few minutes later, Mr. Moffitt started forcefully striking himself in the neck and hitting his head or neck against the padded bench in the cell at 7:20:45 a.m.  Fact ¶ 49. Within minutes, at approximately 7:24 a.m., Defendant Fidler sees Mr. Moffitt's behavior and calls the booking desk to have a deputy check on Mr. Moffitt.   Fact ¶¶ 52-53.

At this point, Defendants Giordano, Hyde and Lambert respond and talk to Mr. Moffitt, temporarily calming him.  Fact ¶¶ 54-56.  But, Mr. Moffitt resumes self-harm behavior and the deputies enter the holding cell to provide speak with him and attempt to calm Mr. Moffitt.  Fact ¶¶ 57 & 59.  These efforts are conduct that even Plaintiff's expert Dr. Blum agrees was reasonable and that he himself would also take in attempting to calm and aid Mr. Moffitt. Fact ¶ 60.

As Defendant Hyde was trying to calm the prisoner, Mr. Moffitt swung at Defendant Hyde, leading the Defendants Hyde, Giordano and Lambert to restrain Mr. Moffitt.  Fact ¶¶ 61-63.  Again, Dr. Blum agrees that it was appropriate to take these steps to restrain Mr. Moffitt.  Fact ¶ 64.  While Defendants Hyde and Giordano continue to restrain Mr. Moffitt, Defendant Lambert calls for an ambulance.  Fact ¶¶ 66-67.

The subjective test for deliberate indifference requires the obvious "symptoms such that prison employee knew the risk to the prisoner and chose (recklessly) to disregard it?" *Martinez v. Beggs*, 563 F.3d 1082, 1089 (10th Cir.)   Defendants Hyde, Giordano and Lambert's efforts the morning of July 9, 2013 do not amount to indifference or disregard.  Even before Mr. Moffitt's condition deteriorated to the point

that he was aggressively attempting self-harm, Defendants Hyde and Giordano were checking on Mr. Moffitt through the door of holding cell 1. Then, after Defendant Fidler informed them of Mr. Moffitt's deteriorating condition, the efforts by Defendants Hyde, Lambert and Giordano to aid Mr. Moffitt, including checking on his condition, entering the cell to attempt to calm him, restraining Mr. Moffitt after he tried to strike Defendant Hyde, and calling for emergency assistance and an ambulance. This conduct does not equal deliberate indifference and the claims against Defendants Hyde, Lambert and Giordano should be dismissed as a matter of law.

## Defendants Hyde, Lambert and Giordano should be Afforded Qualified Immunity

Defendants should be afforded qualified immunity when their conduct does not violate a clearly established constitutional right. *Harlow v. Fitzgerald*, 47 U.S. 800 (1982). A right is clearly established when the contours of that right were "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Gann v. Cline*, 519 F.3d 1090, 1092 (10th Cir. 2005). Because there is no clearly established case law that would tell Defendants Hyde, Lambert and Giordano that their efforts to intervene to first observe and assess Mr. Moffitt, then attempt to calm Mr. Moffitt, and finally to restrain and provide aid, these Defendants should be afforded qualified immunity.

## CONCLUSION AND REQUEST FOR RELIEF

Plaintiffs have failed to establish triable issues of fact with respect to their claims against the Jailhouse Defendants. For this reason, Defendants Giordano, Diurba, Hosier, Fidler, Hyde and Lambert respectfully request the entry of Summary Judgment

in their favor dismissing Plaintiffs' Complaint against them, and for other such relief the Court deems just.

Respectfully submitted this 1st day of September, 2016.

*s/ Bernard Woessner*
J. Andrew Nathan
Bernard R. Woessner
NATHAN DUMM & MAYER P.C.
7900 E. Union, Suite 600
Denver, CO  80237
Phone Number: (303) 691-3737
Fax: (303) 757-5106
Email: anathan@ndm-law.com
         bwoessner@ndm-law.com
*Attorneys for Defendants Giordano, Diurba, Fidler, Hosier, Hyde, and Lambert*

## <u>CERTIFICATE OF SERVICE (CM/ECF)</u>

I hereby certify that on September 1, 2016, I electronically filed the foregoing **DEFENDANTS GIORDANO, DIURBA, FIDLER, HOSIER, HYDE and LAMBERT'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system which will send notification to the following at their e-mail addresses:

David A. Lane, Esq.
Casey Denson, Esq.
Killmer, Lane & Newman, LLP
1543 Champa Street, Suite 400
Denver, CO 80202
Email:  dlane@kln-law.com
        cdenson@kln-law.com
*Attorneys for Plaintiffs*

Josh A Marks, Esq.
Melanie B. Lewis, Esq.
Berg Hill Greenleaf Ruscitti, LLP
1712 Pearl Street
Boulder, CO 80302
(303)402-1600
Email:  jam@bhgrlaw.com
        mbl@bhgrlaw.com
*Attorneys for Defendants John Minor and Erik J. Bourgerie*

Cathy H. Greer, Esq.
William O'Connell, Esq.
Brendan L. Loy, Esq.
WELLS, ANDERSON, & RACE LLC
1700 Broadway, Ste. 1020
Denver, CO 80290
303-830-1212
Email:  cgreer@warllc.com
        woconnell@warllc.com
        bloy@warllc.com
*Attorneys for Defendant Jeff Wilson*


*s/ Bernard Woessner*
J. Andrew Nathan
Bernard R. Woessner
NATHAN DUMM & MAYER P.C.
7900 E. Union, Suite 600
Denver, CO  80237
Phone Number: (303) 691-3737
Fax: (303) 757-5106
Email: anathan@ndm-law.com
       bwoessner@ndm-law.com
*Attorneys for Defendants Giordano, Diurba, Fidler, Hosier, Hyde, and Lambert*