*Estate of Zackary Moffitt, et al. vs.*

*Sheriff John Minor, et al.*

*Deposition of Brian D. Hyde*

*June 08, 2016*



700 17th Street, Suite 1750
Denver, CO 80202
303-988-8470 (Office)   303-988-8478 (Fax)
SKReporting.com

Stevens-Koenig Reporting

Exhibit N

Case 1:15-cv-00071-WYD-MEH   Document 78-13   Filed 09/01/16   USDC Colorado   Page 2 of 13

Estate of Zackary Moffitt, et al. vs.  
Sheriff John Minor, et al.  
Deposition of Brian D. Hyde  
June 08, 2016

Page 13

1  bit more efficient. We will go through it --
2     A. That's fine.
3     Q. -- and if you detect that something in here was
4  wrong or a mistake, let me know.
5     A. Yes, sir.
6     Q. Okay. But your memory was as fresh on July 9 as
7  it would ever be for these events; correct?
8     A. Yes.
9     Q. You gave the interview to the Jefferson County
10 folks, which will be our next exhibit, on July 31 --
11    A. A month later.
12    Q. What's that?
13    A. I'm sorry. I interrupted you. I'm sorry.
14    Q. It was about three weeks later.
15    A. Oh, three weeks.
16    Q. And then obviously today we're talking a couple
17 years -- three years down the road, almost.
18    A. Yes, sir.
19    Q. One reason I asked about the accuracy thing, is I
20 want to direct your attention to the fourth bullet point.
21    A. Okay. Yes, sir.
22    Q. It's the largest paragraph on there.
23    A. Gotcha you. Okay.
24    Q. This recalls the July 8 interaction you had with
25 Mr. Moffitt --

Page 14

1     A. Yes, sir.
2     Q. -- and the third sentence says, At that time
3  Moffitt called control and told Deputy Fidler that he
4  thought he had a stroke. Do you see that?
5     A. It should have been seizure.
6     Q. You do see it or --
7     A. Right here (indicating)? It says stroke.
8     Q. Right. That's exactly right.
9     A. Yes, sir.
10    Q. This is Hodges' notes of your interview with him.
11    A. Yes, sir.
12    Q. Do you recall that Moffitt, in fact, had reported
13 that he thought he had a stroke?
14    A. I remember him reporting he thought he had a
15 seizure.
16    Q. Right.
17    A. So that's a mistype. And my report says seizure
18 also.
19    Q. So you believe that Hodges probably made a mistake
20 by confusing seizure with stroke.
21    A. He could have. I don't know. He could have.
22    Q. Well, do you think you ever told Hodges that
23 Moffitt had reported that he thought he had a stroke?
24    A. No.
25    Q. Okay. You've always said seizure.

Page 15

1     A. Yes, sir.
2     Q. Now, what causes a seizure?
3     A. Depends on what kind of seizures you have, you
4  know. Tonic-clonic, if you have absence seizures --
5        THE COURT REPORTER: I'm sorry. What?
6        THE DEPONENT: Tonic-clonic.
7        THE COURT REPORTER: Thank you.
8     A. That's full shaking movement or unpurposeful
9  movement. There's all kinds of disorders.
10       There's a place down in Aurora that's an adult
11 place for people who have all kinds of seizures constantly.
12 Sometimes they don't call us until they've had 25 seizures.
13 So there's many different types of seizures.
14    Q. (By Mr. Killmer) Are you an expert in seizures?
15    A. No, sir.
16    Q. What kind of seizure did Moffitt say he had had?
17    A. He didn't. He just said he thought he had a
18 seizure.
19    Q. And you didn't think he was an expert in seizures
20 either, did you?
21    A. No, because he has, as far as I know, no history
22 of seizures.
23    Q. So when he reported to you that he thought he had
24 a seizure, he was just describing basic symptoms that he
25 thought he had recently experienced; correct?

Page 16

1     A. Yes. He thought -- and maybe he didn't know the
2  definition of seizure or not or I don't know.
3     Q. And do you know if he had a seizure or not?
4     A. I don't believe he did.
5     Q. I know you don't believe he did, but how is it
6  that you would know if you're not an expert in seizures?
7     A. Okay. So based on my experience, if he had a
8  seizure -- like we just had a gentleman that had one
9  recently in there.
10       The time that Deputy Fidler called us to go back
11 there and check on him, if he had had a seizure, he would
12 have still been laying on the floor, he would have still
13 been postictal. When I went back and looked at him, there's
14 no marks on his head where he fell or hit anything, which
15 usually happens a lot of times.
16       Same with the gentleman the other day or a week or
17 two ago, a couple weeks ago, you know, he had a little goose
18 egg on the back of his head from falling because, you know,
19 you lose all control.
20    Q. Well, that's a mark from falling, so that's trauma
21 to the head.
22    A. Trauma to the head, yes.
23    Q. But my question is: How can you tell, if somebody
24 didn't fall, people -- I mean, people have seizures all the
25 time and not fall.

Case 1:15-cv-00071-WYD-MEH   Document 78-13   Filed 09/01/16   USDC Colorado   Page 3 of 13

Estate of Zackary Moffitt, et al. vs.
Sheriff John Minor, et al.

Deposition of Brian D. Hyde
June 08, 2016

**Page 17**

1  A. Sure. Yes, sir.
2  Q. And your understanding was Moffitt had used the
3  intercom to report to the control room, I think I've had a
4  seizure.
5  A. Right. And he would not have been able to do that
6  because he would have still been, what they call,
7  postictal --
8  Q. Well --
9  A. -- if he had just had a seizure.
10 Q. -- what if he just called right after he was
11 postictal?
12 A. Then when we went back there, he still wouldn't
13 have been acting the way he was.
14 Q. How do you know? You're not an expert in
15 seizures.
16 A. I've seen a lot of seizures, been on a lot of
17 calls with seizures so...
18 Q. Okay. So you do think you have an expertise in
19 seizures?
20 A. I have experience.
21 Q. Well, have you ever been trained in recognizing
22 seizures?
23 A. Through paramedic school, you have the basic
24 common knowledge that --
25 Q. Well, it's not common to me. I mean, I've --

**Page 18**

1  A. Well, as far as --
2  Q. -- never been trained in recognizing the after
3  effects of a postictal state in seizures, so I wouldn't
4  trust myself in making a diagnosis that, no, you didn't have
5  a seizure, maybe you just had a panic attack.
6  A. Right.
7  Q. Right. I wouldn't trust myself on that because
8  I'm not an expert.
9  A. Right.
10 Q. You're not an expert either; right?
11 A. I have -- I don't have any certification in going
12 to schooling just for seizures, no.
13 Q. And you're not an expert, are you?
14    MR. WOESSNER: You can answer the question, if you
15 can.
16 Q. (By Mr. Killmer) Well, if you think you're an
17 expert on seizures, we'll go from there.
18 A. No.
19 Q. Okay. Nevertheless, you diagnosed him as not
20 having had a seizure even though --
21 A. I triaged him. I don't diagnose. I'm not a
22 doctor. Doctors are the only ones that diagnose. I triaged
23 him.
24 Q. Ah. What does that mean, you triaged him?
25 A. So we went in there, saw what the presentation

**Page 19**

1  was, kind of went from there.
2  Q. You went nowhere from there, actually. You just
3  assumed he had a panic attack and didn't get him medical
4  care; right?
5  A. Not correct.
6     MR. WOESSNER: Objection to the form of the
7  question.
8  Q. (By Mr. Killmer) Right?
9  A. Not correct.
10 Q. Did you get him medical care?
11 A. So if I could explain how I triaged him, which I
12 can explain how that works.
13 Q. Well, just answer my questions. Did you give him
14 any medical care?
15 A. We took him up to the front for observation. Once
16 I checked his vitals, checked him out, once he was able to
17 walk and go up to the front, he was --
18 Q. Well, checking vitals is not providing medical
19 care, is it?
20 A. -- under supervision for 45 minutes in front of us
21 eating and talking and conversing.
22 Q. Deputy, my question is specific. You didn't
23 provide any medical care to him, did you?
24 A. Well, I did. I took his vitals and -- took his
25 vitals.

**Page 20**

1  Q. So you believe checking vitals is medical care?
2  A. Yes.
3  Q. All right. Did that make him feel better when you
4  checked his vitals?
5  A. Yes.
6  Q. How did that make him feel better?
7  A. He calmed down, he had his dinner, he wanted to go
8  back to his room.
9  Q. He, actually, reported that, according to Deputy
10 Lambert and Deputy Giordano, that he had been having
11 seizures all morning. Do you recall?
12 A. No, I do not recall that.
13 Q. Were you with Lambert and Giordano when you were
14 talking with Moffitt after that, after he reported he
15 thought he had a seizure?
16 A. Uh-hmm.
17 Q. Yes?
18 A. Yes, sir.
19 Q. By the way, did you interview any inmates as to
20 whether Moffitt had a seizure?
21 A. I did not.
22 Q. Did you see Lambert or Giordano interview any
23 inmates as to whether --
24 A. Not that I recall.
25 Q. Did you go back and review the video to see

Case 1:15-cv-00071-WYD-MEH   Document 78-13   Filed 09/01/16   USDC Colorado   Page 4 of 13

Estate of Zackary Moffitt, et al. vs.  
Sheriff John Minor, et al.

Deposition of Brian D. Hyde  
June 08, 2016

Page 29

1  Q. Was provided to us by Summit County.
2  A. Correct.
3  Q. And it looks to be some educational materials on
4  alcohol withdrawal syndrome but you're saying you never saw
5  it prior to Mr. Moffitt's death. You've already testified
6  to that; correct?
7  A. I don't remember seeing it; correct.
8  Q. And this talks about the DTs and you, at least,
9  had a general understanding of the delirium tremens --
10 A. Yes.
11 Q. -- concept prior to Mr. Moffitt's death; correct?
12 A. Yes.
13 Q. In fact, you thought Moffitt had the DTs.
14 A. No. I discussed that in the other CBI report.
15 Q. Yes, you -- well, in the Jefferson County.
16 A. That, as a thought afterwards, maybe it could have
17 been, but in my report, I still went with panic attack and
18 thought he was having anxiety from getting sentenced that
19 day and having a $2,000 fine and...
20 Q. All right. Well, we will get to that.
21 A. Okay.
22 Q. You see in the middle of the first page where it
23 says, Do people in withdrawal need to see a doctor, and the
24 answer is one word of that sentence, Yes. Do you see it?
25 A. Uh-hmm.

Page 30

1  Q. Yes?
2  A. Yes, sir. Yes, sir.
3  Q. And you believed that Mr. Moffitt was in alcohol
4  withdrawal, didn't you?
5  A. I believe he was having -- he was detoxing. He
6  even mentioned it in his report to Commander Bo that he was
7  detoxing.
8  Q. Correct. And that is alcohol withdrawal. That's
9  detoxing. It's the same thing; correct? Are you using them
10 in some different way and, if so, please explain to me what
11 the difference is.
12 A. Well, a lot of people go through detoxing, which
13 there's, like, detoxing and beginning withdrawals (sic) and
14 beginning with -- on the next page where you have your mild
15 to moderate, that kind of stuff.
16 Q. Well, you're moving forward in this policy --
17 A. Sorry. Sorry.
18 Q. -- that you had -- that you had never seen before.
19 A. Until just recently with --
20 Q. Until just recently. So let's just go with my
21 questions right now.
22 A. Yes, sir. Yes, sir.
23 Q. You knew that he had come in with a .3 -- a higher
24 than .3. Actually it was .392. You now know that; right?
25 A. Correct.

Page 31

1  Q. Almost .4 BAC.
2  A. Correct. And he was medically cleared, to my
3  knowledge.
4  Q. Well, you assumed so because there he was in the
5  jail; right?
6  A. No, we were told that he was medically cleared.
7  It's on his --
8  Q. Who told you?
9  A. It's on his medical questionnaire, medically
10 cleared.
11 Q. Had you seen his medical questionnaire when you
12 were dealing with him in the jail?
13 A. I can't remember if I did but later on.
14 Q. All right. But let's just talk about what you
15 knew in the jail.
16 A. Sure. Sure. At that time.
17 Q. At that time --
18 A. At that time --
19 Q. -- you knew -- hold on. Just let me finish my
20 question.
21 A. Sorry.
22 Q. It will just make it a lot more clear.
23     You knew when you were interacting with him in the
24 jail, that he came in with an extraordinarily high BAC,
25 .392.

Page 32

1  A. Sure. Sure.
2  Q. And he hadn't had any alcohol while in the jail.
3  You assumed that.
4  A. No, sir.
5  Q. And if he came in on the 6th of July and you're
6  dealing with him in the late afternoon of the 8th and you're
7  talking over two days of not drinking after having an
8  extraordinarily high BAC; right?
9  A. Correct.
10 Q. So he's withdrawing from that high BAC. It's
11 reducing; right? That's just science.
12 A. Yes.
13 Q. So you assumed he was undergoing alcohol
14 withdrawal, didn't you, or detoxing?
15 A. Detoxing. Alcohol withdrawals.
16 Q. And, sir, I'm trying to figure out whether you're
17 saying something different than me or the exact same thing
18 when you use detox and I use alcohol withdrawal. They are
19 the same thing, aren't they?
20 A. By definition I'm not a hundred percent sure, but
21 I would say yes.
22 Q. Yeah. So you assumed this man's detoxing and now
23 he's expressing symptoms to me that caused him to think he
24 had a seizure but I don't think he did; right?
25 A. Correct.

Case 1:15-cv-00071-WYD-MEH   Document 78-13   Filed 09/01/16   USDC Colorado   Page 5 of 13

Estate of Zackary Moffitt, et al. vs.
Sheriff John Minor, et al.

Deposition of Brian D. Hyde
June 08, 2016

Page 37

1  Q. I mean, this is frequently the case when you're
2  dealing with medical issues is the patient reports the
3  symptoms --
4  A. Right.
5  Q. -- and you respond accordingly; correct?
6  A. Correct.
7  Q. You're not trained to assume that they are lying
8  to you, are you?
9  A. No.
10 Q. If they report serious medical symptoms, then your
11 job is to get them medical care; correct?
12 A. Or go check them out, see where they're at, and if
13 we need to get them medical care.
14 Q. Well, your job -- you're required to get a sick
15 person medical care; correct?
16 A. No.
17 Q. Why not? You don't think that's your job?
18 A. You have to define sick. You have to define --
19 Q. Well, do you have a difficulty understanding what
20 the word sick means?
21 A. No. Do you have the flu? Do you have --
22 what's --
23 Q. Suppose you think you just had a seizure and
24 you're dizzy and you have been vomiting for days, you
25 haven't been able to eat and you haven't been able to sleep.

Page 38

1  A. Uh-hmm.
2  Q. Those seem to me like signs of sickness. Do they
3  not to you?
4  A. Seems like signs of detoxing or...
5  Q. And this alcohol withdrawal syndrome document that
6  Summit County gave us answers the question quite clearly, do
7  people in withdrawal need to see a doctor? Answer: Yes.
8  Correct?
9  A. Where are you looking at?
10 Q. The first page --
11    MR. WOESSNER: He's switched --
12 A. Oh, the first page. You switched back.
13    MR. WOESSNER: First page. He switched exhibits.
14 Q. (By Mr. Killmer) First page, Exhibit 13.
15    I will do it again.
16 A. Yes.
17 Q. Do people in withdrawal need to see a doctor?
18 Answer: Yes. Right?
19 A. That's what this document says.
20 Q. Yeah. But you decided the answer would be no, he
21 doesn't need to see a doctor; right?
22 A. Based on my interaction with him.
23 Q. Based on your training at the Summit County
24 Sheriff's Office, you decided no --
25 A. No, because --

Page 39

1  Q. -- was an okay answer; right?
2  A. Based on the paramedic training and seeing the
3  same type of person in a situation when I went and checked
4  his vitals, walked him up to the front, talked to him, we
5  had him on observation for 45 minutes at the front with the
6  door open, he ate his food.
7  Q. Well, it turns out --
8  A. Someone who just had a seizure wouldn't have been
9  able to do that.
10 Q. And you think observation was good enough for him?
11 A. Yes.
12 Q. Turns out you, actually "you" being the sheriff's
13 office and the jail deputies, had him on observation for
14 four days and he died; right?
15 A. He did not die in the jail. He died down at the
16 hospital.
17 Q. Well, he never spoke a word from the moment that
18 he left the hospital until all functions of his body
19 stopped; right?
20    MS. LEWIS: Object to foundation.
21 A. I do not know. I was not there at the hospital.
22 Q. (By Mr. Killmer) Are you under the impression
23 that his experience at the jail was unrelated to his death?
24 Is that what you think? You think he just died sort of
25 randomly down at Saint Anthony's Hospital a few days later

Page 40

1  unrelated to his experience at the jail? I mean, you're
2  taking issue with me describing him as dying in the jail.
3  A. No. No issue. I was just being technical.
4  Q. Yes, you were.
5  A. Technically he was pronounced at the hospital, so
6  technically he was not pronounced at the jail. That's all.
7  Q. Do you think he should have maybe seen a doctor
8  when he was at the jail in retrospect knowing now that the
9  man is dead?
10 A. He was medically cleared, as far as we knew,
11 brought to the jail.
12    In retrospect, as far as his medical history, from
13 what I understand is ten years of drinking, trying to commit
14 suicide several times, I don't know if he would have died in
15 the jail or if he would have died out somewhere else.
16 Luckily he didn't drink and drive and kill somebody. It's
17 an unfortunate event.
18 Q. What are you saying, that it's okay that he died
19 in jail because he might have hurt somebody outside of jail?
20 A. I didn't say he died in the jail. I said he was
21 pronounced dead down at the hospital at Saint Anthony's.
22 Q. I know, but then you went off on some sort of
23 random, nonresponsive testimony about maybe he would have
24 killed somebody out of the jail or maybe he would have
25 committed suicide. What are you talking about? Are you

Case 1:15-cv-00071-WYD-MEH   Document 78-13   Filed 09/01/16   USDC Colorado   Page 6 of 13

Estate of Zackary Moffitt, et al. vs.
Sheriff John Minor, et al.

Deposition of Brian D. Hyde
June 08, 2016

Page 41

1  suggesting that he somehow was -- you didn't have to save
2  his life if you had the opportunity to do so?
3      A.  No, and I would try to save his life again.
4      Q.  Well, my question -- well, you didn't try to the
5  first time.
6      A.  I did.  Did you see me --
7          MR. WOESSNER:  Objection to the form of the
8  question.
9      Q.  (By Mr. Killmer)  What did you do to try to save
10 Zack Moffitt's life?
11         MS. LEWIS:  Object to the form.
12     A.  If you see the video, you see me trying to do CPR
13 on him.
14     Q.  (By Mr. Killmer)  Oh, that's true.  At the very
15 end, you broke his chest in trying to give CPR; right?
16     A.  Definitely.  That normally happens, the sternum
17 breaks when you're doing CPR.
18     Q.  All right.  Well, why didn't you try to get him a
19 doctor, Deputy Hyde?
20     A.  I did everything in the parameters of the jail and
21 how we're supposed to do it.  He was brought up front for
22 observation, took his vitals and everything.  You can see in
23 Sergeant Giordano's report that she talked to him.  The
24 sergeant has the ultimate say and if she felt that he needed
25 to go to the doctor or not...

Page 42

1      Q.  Well, you did everything the way you were trained
2  to do it with -- in dealing with Mr. Moffitt at the jail.
3  Is that what you're saying?
4      A.  I did everything within the parameters of what the
5  jail -- their policies and procedures are.
6      Q.  So this is how they trained you to do it.
7      A.  Yes.
8      Q.  I take it, then, if you confronted the same
9  situation again, you would do it that way again.
10     A.  As far as his presentation to me every time that I
11 talked to him, which is only a few times, I didn't see any
12 of these other signs and symptoms, as I explained earlier.
13 To me, we had normal conversations, I didn't see any of the
14 delirium tremens or anything else that would have made me
15 worry or suspicious that this gentleman needs to go
16 immediately to the hospital.  Again, he was brought up front
17 for observation where we, again, had normal conversation
18 with us, talked to us.
19     Q.  On Exhibit 90 on the next page, it's number 590 in
20 the lower right-hand corner, next page.
21     A.  Next page.  Gotcha.
22     Q.  The third bullet point from the bottom -- or
23 fourth bullet point.  I'm sorry.
24     A.  Up from the bottom.  Okay.
25     Q.  Where it says, He thought that perhaps Moffitt was

Page 43

1  seeing delusions or visions before they dealt with him that
2  morning.  Do you see that?
3      A.  Yes.
4      Q.  This was because Moffitt had said to you he had
5  already seen the doctor; right?
6      A.  He said that to Sergeant Giordano, not to me.
7      Q.  Had you heard that he had said that?
8      A.  No.  Because the only thing I dealt with him that
9  morning was I opened the door, he was naked, I said, hey,
10 man, put on your clothes.  Okay.  Put on his clothes.  That
11 was it.  That was my only interaction with him that morning.
12     Q.  That was at about 6:00 when you came on duty?
13     A.  Yes, sir, when I walked in the door.
14     Q.  Now, when you had left duty the previous night at
15 6:00, he -- you thought he was all right.
16     A.  Yeah, he seemed to me -- he had normal
17 conversation, eating his dinner, laughing and talking, the
18 door was open --
19     Q.  Yeah.
20     A.  -- and there was nothing that gave any indication
21 of anything that was further to come.
22     Q.  Yeah.  And this was an hour or two after you had
23 these interactions where he thought he had a seizure but you
24 decided it was a panic attack.
25     A.  I felt based on his presentation --

Page 44

1      Q.  Yeah.
2      A.  -- that it was a panic attack and we brought him
3  up to the front.  So that whole 45 minutes, there was
4  nothing that happened.
5      Q.  All right.  So just go with me here.
6      A.  Yes, sir.
7      Q.  You finish out that shift on the 8th at about 6:00
8  in the evening and you thought he's getting better; correct?
9      A.  Yes.
10     Q.  But then 12 hours later, you show up at 6 in the
11 morning to start your next day's shift; correct?
12     A.  Yes.
13     Q.  And Mr. Moffitt is in the holding cell again.
14     A.  Yes.
15     Q.  And at this time, he's completely naked when you
16 see him; correct?
17     A.  Yes.
18     Q.  Which is a little strange; true?
19     A.  No, because it happens all the time in holding
20 one.
21     Q.  In the holding cell but --
22     A.  Yes.
23     Q.  -- the holding cell itself is where you put people
24 who you want to have a special observation of because of
25 either medical conditions or something; right?

Case 1:15-cv-00071-WYD-MEH   Document 78-13   Filed 09/01/16   USDC Colorado   Page 7 of 13

Estate of Zackary Moffitt, et al. vs.
Sheriff John Minor, et al.

Deposition of Brian D. Hyde
June 08, 2016

Page 45

1  A. Yes. Or they want to hurt themselves or whatever
2  the --
3  Q. This is. Right. They might be suicidal; right?
4  A. Uh-hmm.
5  Q. Yes?
6  A. Sorry. Yes.
7  Q. And do you know why Mr. Moffitt was in the holding
8  cell when you showed up at the 6 a.m. shift on the 9th?
9  A. No, because we walked in and he's there and then
10 we had to find out from the previous shift why he -- why is
11 he back in here.
12 Q. Okay. But you found out why he's back in there.
13 A. Later, yes.
14 Q. Well, I mean, pretty soon. When -- because that
15 shift is going off shift; correct?
16 A. Yes.
17 Q. So they have to brief you on, here's the status of
18 the facility now that you're taking over and we're going
19 home.
20 A. Yes. And they had called before we got there,
21 Mind Springs, to come talk to him.
22 Q. That's not my question, Deputy.
23 A. Sure.
24 Q. I'm asking what you knew. All right. Just answer
25 my questions and it will go a lot quicker.

Page 46

1  A. He's back up front.
2  Q. He was back up front --
3  A. Uh-hmm.
4  Q. -- and somebody told you why.
5  A. Yes. But I -- I don't remember the conversation
6  at this present time.
7  Q. But you know it must have had something to do with
8  the guy has made suicidal comments.
9  A. That I don't know. I knew that he had made some
10 sort of comments to them. They brought him back up front.
11 Q. Well, I'm just trying to figure out the
12 communication system in your jail.
13 A. Uh-hmm.
14 Q. I thought you were supposed to learn from the
15 off-going shift what the status is because you're the
16 oncoming shift; right?
17 A. Right.
18 Q. And so you've got a guy in a padded cell up front
19 who is just buck-naked and you know he, the previous day,
20 had reported these symptoms that he thought he should see a
21 doctor but you thought was just a panic attack; right?
22    MS. LEWIS: Object to foundation. Form.
23 A. Uh-hmm.
24 Q. (By Mr. Killmer) And you thought he had been
25 getting better at the time you left but now, all of a

Page 47

1  sudden, here he is in the observation cell again; correct?
2  A. Correct.
3  Q. That would be a step backwards from this, I think
4  he's getting better status, that you thought you left him
5  with; right?
6  A. Possibly.
7  Q. It's 12 hours later and he's stripped naked in the
8  holding cell in a padded cell.
9  A. Correct.
10 Q. Right?
11 A. Correct.
12 Q. And I take it your deputies must have given you
13 some information as to what this man's status is.
14 A. And I'm sure they did. I don't remember what our
15 conversation was because I know Sergeant Giordano was
16 talking to them when I talked to him.
17 Q. But didn't you see it as a regression from getting
18 better that, oh, my goodness, he apparently isn't getting
19 better because it's 12 hours later and he's still --
20 A. And that's when --
21    MR. WOESSNER: Objection. Asked and answered.
22 Q. (By Mr. Killmer) My question is did you --
23    MR. WOESSNER: And you guys are starting -- you
24 keep talking over each other --
25    THE DEPONENT: Sorry. I apologize.

Page 48

1    MR. WOESSNER: -- as we've mentioned before.
2  Q. (By Mr. Killmer) My question is: Didn't you see
3  this as a regression, a step back, in his status from what
4  you thought was improvement the afternoon when you went
5  home?
6    MR. WOESSNER: Objection. Asked and answered.
7  You can answer the question.
8    THE DEPONENT: Okay. Sorry. I was waiting.
9  Q. (By Mr. Killmer) Did you think this was a
10 regression?
11    MR. WOESSNER: Same.
12 A. No. But they -- but someone called Mind Springs
13 to come talk to him to help him out so that was getting him
14 help.
15 Q. (By Mr. Killmer) Well, Mind Springs is a mental
16 health outfit; right?
17 A. Correct.
18 Q. Did it occur to you that this was a physical
19 medical issue rather than a mental one?
20 A. It appeared to be -- because those are all the
21 same signs and symptoms, it appeared to be a mental issue, a
22 mental problem.
23 Q. Well, the symptoms that you were aware of at this
24 time when you show up at 6:00 in the morning is that the
25 last time you saw him, he had reported throwing up for days.

Case 1:15-cv-00071-WYD-MEH   Document 78-13   Filed 09/01/16   USDC Colorado   Page 8 of 13

Estate of Zackary Moffitt, et al. vs.
Sheriff John Minor, et al.

Deposition of Brian D. Hyde
June 08, 2016

Page 61

1  Q. Are you doing okay or would you like to take a
2  break?
3  A. I'm okay.
4  Q. Let's go for a few more minutes and then take a
5  break.
6  A. Sure, take a bathroom break?
7  Q. Take a break in about ten minutes?
8  A. Okay. No problem.
9     This is the first time I've ever done any of this
10 stuff, so as you can read, it's yeah, um, yes, um, okay.
11 Q. Oh, sure.
12 A. Horrible.
13 Q. No, don't worry about that. That's normal.
14 A. I read it and I was, like, I really sound like an
15 idiot.
16 Q. No. No. No, you don't. That's normal because
17 they were tape-recording the questions and answers; right?
18 A. Yes, sir. Yes, sir.
19 Q. And that's kind of your style to sometimes to say
20 uh-uh or uh-hmm.
21 A. Yes.
22 Q. There's nothing wrong with that.
23 A. Yes.
24 Q. So I do see that, but don't worry about it.
25    In our deposition, I will try to make you say yes

Page 62

1  or no so that we can be more clear.
2  A. Yes, sir. Yep.
3  Q. Well, turn, if you would, to page 5.
4  A. Okay.
5  Q. And there in the middle of asking you some of the
6  same questions you and I have touched upon, which is you
7  telling me about your interactions with Mr. Moffitt, and in
8  the middle of --
9  A. Yes, sir.
10 Q. -- that huge answer there is where I'm going to
11 focus.
12 A. Okay. Yes, sir.
13 Q. You're describing your July 8 interaction with
14 him.
15 A. Yes, sir.
16 Q. And if I understand it right, Deputy -- who was it
17 that told you that Moffitt's reporting he thinks he had a
18 seizure?
19 A. It was whoever was in the control room that took
20 the intercom, and I do not remember who was in there at that
21 time.
22 Q. Okay. The control room is --
23 A. I think it was -- sorry.
24 Q. Well, if you know who it is, tell me.
25 A. I believe it was Deputy Fidler, but I'm not sure.

Page 63

1  Q. Fidler?
2  A. I think, but I'm not sure.
3  Q. And the guy stationed at the control room is
4  watching some videos and also has the intercom system
5  throughout the facility; right?
6  A. Yes, he has little monitors, which is all the
7  cameras in the facility and outside of the facility and then
8  where you can visually see the rooms.
9  Q. So if one of the inmates presses the intercom in
10 his cell and says, I need a doctor or I need to talk to a
11 guard or something like that --
12 A. Uh-hmm.
13 Q. -- that goes into the control room deputy.
14 A. Yes, sir.
15 Q. And if I understand the proceedings, the control
16 room deputy would then tell somebody who is on the floor to
17 say, why don't you go see what is wrong with Moffitt in B
18 pod.
19 A. Yes, sir. He would either call the front desk if
20 we're there or if we're in the back, there or in a different
21 cell or pod, there is speakers that they can say, hey, you
22 need to go into the --
23 Q. Where were you when you were told to go check on
24 Moffitt?
25 A. I believe I was at the front desk.

Page 64

1  Q. What did you do when you got the report?
2  A. We immediately went back there to see what was
3  going on.
4  Q. "We" being you and who?
5  A. I believe it was myself, Sergeant Giordano, and
6  Lambert.
7  Q. Is that standard operating procedure to take three
8  people?
9  A. Yeah. You can take as many because if he had had
10 a seizure or if he was still laying there on the floor
11 postictal or anything like that, we would have had one
12 person, you know, relaying to the control room, hey, get the
13 ambulance here, just like we did a few weeks ago, and both
14 of us would have been trying to do what we could to make
15 sure they didn't hit their head or hurt themselves, you
16 know, checking their blood sugar, make sure everybody is
17 locked down, all those other kind of safety procedures that
18 we have to follow.
19 Q. Have you received training at the jail regarding
20 what to do for somebody who has had a seizure?
21 A. Nothing except for specific emergencies, like you
22 lock everybody down, call 911, all that kind of stuff.
23    So nothing -- there's no guidelines there like,
24 this person has a seizure, you do this, this person had a
25 diabetic reaction, you do this --

Case 1:15-cv-00071-WYD-MEH Document 78-13 Filed 09/01/16 USDC Colorado Page 9 of 13

Estate of Zackary Moffitt, et al. vs.
Sheriff John Minor, et al.

Deposition of Brian D. Hyde
June 08, 2016

Page 65

1 THE COURT REPORTER: I'm sorry, what?
2 MR. KILLMER: Diabetic reaction.
3 THE DEPONENT: Sorry. Diabetic reaction or
4 problem.
5  A. There's not a -- except for now that we have the
6 Denver Metro protocols there because --
7  Q. (By Mr. Killmer) That's new.
8  A. That's new. That's way before any of this so...
9  Q. Way after that.
10  A. Yeah. I mean way after this. Sorry.
11  Q. So back then, you hadn't received any training as
12 to how you should respond to somebody with a seizure.
13  A. Not specifically a seizure, no.
14  Q. Okay. But you say that you do see sometimes
15 inmates who have had seizures.
16  A. Yes, sometimes inmates do have a seizures in
17 there.
18  Q. Has that happened, like, once in your career there
19 or...
20  A. It's happened a few times.
21  Q. Okay.
22  A. And recently, like I said, just this last few
23 weeks, there was a gentleman that had a seizure who did not
24 have the same high blood alcohol as this gentleman.
25  Q. So it is something that does happen.

Page 66

1  A. It does happen, sir, yes.
2  Q. But even though it is something that happens from
3 time to time in the jail, you hadn't received any training
4 or were unaware of any policy in 2013 as to what to do in
5 that event; correct?
6  A. Not to do for a seizure but --
7  Q. Right.
8  A. -- but as far as an emergency, lock everybody
9 down, call the ambulance, all those kinds of procedures.
10  Q. Okay.
11  A. Yeah.
12  Q. And locking everybody down, make sure the inmates
13 are locked down so that we can focus on this --
14  A. Yes.
15  Q. -- and not worry about security.
16  A. Yes. That way you don't have someone trying to --
17 if someone were faking a seizure or some other incident, not
18 trying to jump the guards, beat them up, and any kind of
19 other safety issue.
20  Q. Sure. That makes sense to me.
21  A. Sure.
22  Q. And the other thing you said is to call 911 once
23 security is taken care of.
24  A. Sure. Yes, sir.
25  Q. So you didn't do either one of those things with

Page 67

1 Mr. Moffitt; correct?
2  A. Actually, all the -- pretty much all of the
3 inmates had been locked down or I can't remember if we all
4 locked down, but there was nobody out when we were talking
5 to Mr. Moffitt --
6  Q. Okay.
7  A. -- as far as I remember.
8  Q. So the security risk was taken care of --
9  A. Yes, sir.
10  Q. -- but you didn't do that part about calling 911;
11 right?
12  A. No, because when we got to the cell, he was
13 standing there talking, conversing. When I go up I say,
14 hey, Mr. Moffitt, what's going on, grabbing his wrist just
15 like I am here to Bernie, my lawyer, I'm talking, looking at
16 him, he's talking to me, he's not sweating, there's no
17 throw-up.
18  Q. Are you providing medical care to your lawyer
19 right now?
20  A. Yes.
21  Q. You're checking his pulse.
22  A. Yes. I am assisting him and checking his pulse
23 right now. Or if he's sweaty, he's not sweaty.
24  Q. He's a little sweaty.
25  A. I'm looking at his breathing.

Page 68

1 MR. WOESSNER: Let the record reflect that I am
2 not sweating.
3  A. Not what we can see. I obviously get that.
4   But this is exactly what I did to Mr. Moffitt.
5  Q. (By Mr. Killmer) He seems anxious.
6 MR. WOESSNER: I know.
7  A. Well, I'm anxious. I'm in here.
8  Q. (By Mr. Killmer) I hear you. I hear you.
9  A. So going -- this is my point is that I went in
10 there, I talked to him, there's no vomit in the toilet,
11 there's nothing --
12  Q. So he seems okay to you.
13  A. He seemed really fine because we were talking --
14  Q. Okay. Let's continue through your answer, though.
15  A. Yes, sir.
16  Q. To explore that, he seemed okay to you.
17  A. Yes, sir.
18  Q. You said on the fifth line down, he thought he had
19 a seizure, and you said you've seen many of those where
20 people are faking it; right?
21  A. Yes, sir. I can explain that to you -- for you.
22  Q. Did you think he was faking it?
23  A. No.
24  Q. Okay. He said -- three lines further down it
25 says, He seemed really agitated and worked up.

Case 1:15-cv-00071-WYD-MEH   Document 78-13   Filed 09/01/16   USDC Colorado   Page 10 of 13

Estate of Zackary Moffitt, et al. vs.
Sheriff John Minor, et al.

Deposition of Brian D. Hyde
June 08, 2016

Page 85

1  Q. Just set them in a stack here.
2  A. Set them in a stack?
3  Q. Yes. These are for the court reporter so don't
4  take them with you when you're done either --
5  A. Yes, sir.
6  Q. -- because they are hers.
7  A. Yes, sir.
8  Q. Turn to page 6 of the interview. In the middle is
9  where you're saying that it was your perception on the 8th
10 of July that Mr. Moffitt had a panic attack; right?
11 A. Yes, sir.
12 Q. But you also give the disclaimer in the middle of
13 the page, obviously I'm not a doctor, but that's what I
14 perceived; right?
15 A. Yes, sir.
16 Q. They said, So why do you believe this was a panic
17 attack and not DTs if he cited that he was coming off
18 alcoholism? Why is it that you thought it was not DTs or
19 did you think it was not DTs or did it even occur to you?
20 A. I did not think it was DTs. He had told me all
21 these things that he said, as we discussed earlier, that he
22 was having. I didn't see any of these things.
23    Obviously when I did my triage of him, seeing him
24 in the room, standing there walking around, checking his
25 pulse, looking and talking to him and there's no vomit or

Page 86

1  blood or anything from -- any of that stuff.
2  Q. Well, this is when you were determining it was not
3  a seizure.
4  A. Yes.
5  Q. Okay.
6  A. This is in the cell.
7  Q. But a seizure and DTs don't -- they're not the
8  same thing, are they?
9  A. You can have a seizure.
10 Q. If you're undergoing DTs?
11 A. Yes, if you're going -- well, withdrawals.
12 Because DTs or excited deliriums -- or not excited
13 deliriums, but the tremens, as we were talking about with
14 DTs, the tremens and stuff, he wasn't doing any of that
15 stuff. And I was doing --
16 Q. Doing any of what? All -- you mean he wasn't
17 doing the things that you would expect to see --
18 A. Yes. So an example, if I can.
19 Q. Yeah.
20 A. So lots of times people start having DTs, the
21 tremens part, which quite a few of the people that are in
22 there very often, they always start doing the shaking and
23 all that kind of stuff. He was not -- he was not shaking,
24 he did seem anxious, I know earlier in the day he went to
25 court, so there's lots of reasons to be anxious. He was

Page 87

1  walking and talking to me, normal course, we walked around,
2  up the stairs, I didn't help him up the stairs, sat down, we
3  had a normal conversation. I can't remember how long -- we
4  were back there for a little while. And we took him up to
5  the front and then still a normal conversation with the door
6  open and him eating dinner.
7     And most of the time with any kind of alcohol
8  withdrawals when people have a seizure, it's usually a tonic
9  clonic.
10 Q. Is what?
11 A. Tonic clonic, which is that full nonpurposeful
12 movement, you know, you can't control yourself, you poop and
13 pee yourself, all that kind of -- you lose all your body
14 functions.
15 Q. But there's different degrees of it, I take it.
16 It's not like just a switch where you always have all those
17 symptoms.
18 A. If he had been diagnosed with seizures or a
19 specific type of seizure, then that would be in history,
20 then he would have had a medication for it or he would have
21 been on that. But I'm saying just as far as --
22 Q. Did you check his history?
23 A. -- with the alcohol -- did I check his history?
24 Q. Yeah.
25 A. At that time?

Page 88

1  Q. Yeah.
2  A. I don't remember if I did or not because I did not
3  book him in.
4  Q. Well, take a look at Exhibit 4.
5  A. Sure.
6  Q. Exhibit 4 is a completed questionnaire, which is a
7  jail document with a medical history.
8  A. Yes, sir. Yep.
9  Q. Have you seen this before?
10 A. Just saw this recently with the attorney. I don't
11 remember if I saw this at that time.
12 Q. But you recognize the form as one that the jail
13 keeps as a medical questionnaire for people who have been
14 booked in; correct?
15 A. Yes, sir, that's a standard medical questionnaire.
16 Q. So this makes clear that when Moffitt was checked
17 in, they realized in question 7, you can see, that he had
18 recently been hospitalized at SMC before coming to the jail;
19 correct?
20 A. Yes, sir.
21 Q. And question 13 tells the jail, and anybody who
22 reads this form, that there are medical problems he would
23 like to be known because it says, Going through alcohol
24 withdrawal; correct?
25 A. Yes, sir.

Case 1:15-cv-00071-WYD-MEH   Document 78-13   Filed 09/01/16   USDC Colorado   Page 11 of 13

Estate of Zackary Moffitt, et al. vs.
Sheriff John Minor, et al.

Deposition of Brian D. Hyde
June 08, 2016

Page 105

1 A. Yes. Yes.
2 Q. And he told you he had been throwing up, he
3 couldn't eat, he couldn't keep anything down, he was dizzy,
4 he had headaches, something happened that convinced him that
5 he had a seizure, and you're saying that's common in
6 detoxing; correct?
7 A. Yes.
8 Q. And he also said diarrhea and the other things
9 we've talked about.
10 A. Yes.
11 Q. All of this you believe was common in detoxing.
12 A. Yes, sir.
13 Q. And I'm asking -- and you concluded that was not a
14 serious medical need; correct?
15 A. At that time, no.
16 Q. Today, if the same set of symptoms is being
17 reported to you, do you agree that that's a serious medical
18 need?
19 A. No. And based on us taking him up to the front
20 for observation and him eating, doing all the things he did,
21 if any of that had changed, we would have definitely called
22 911 or the ambulance to come over but...
23 Q. Well, you eventually did call 911, but that's
24 right when he was dying; right?
25 A. I didn't call 911. I was in there doing CPR.

Page 106

1 Q. All right. Let's move to July 9 and on page 9 of
2 your interview, you start to talk about -- about this and
3 the top half you say, when you left on the 8th, you thought
4 he was good and they were going to take him back to the pods
5 and so forth.
6 A. Yes, sir.
7 Q. Did they take him back to the pods while you were
8 still on shift or did that happen after the shift change?
9 A. That was after we left.
10 Q. Okay.
11 A. When we left, he was up front eating, talking,
12 hanging --
13 Q. But you believed he is basically wrapping up up
14 here, and he's going to go back to the pods.
15 A. That was my understanding, yes.
16 Q. And in this first big answer you're kind of
17 describing it, you say, you thought all was good. There was
18 nothing really to cause any more alarms.
19    So the next morning we come in and someone is
20 yelling there in holding one in the padded cell and they are
21 like, well, who is in there now? And it's Moffitt. Do you
22 see that?
23 A. Uh-hmm.
24 Q. Yes?
25 A. Yes, sir.

Page 107

1 Q. You were surprised that Moffitt was back up there?
2 A. I was.
3 Q. You actually opened up the doors and started
4 talking to him. What's going on? You know, you got to
5 settle down, dude; right?
6 A. Right. Put on your clothes. Or the smock.
7 Q. What's that?
8 A. Your smock. Smock is a one-piece outfit.
9 Q. I know, but he wasn't in his smock. He was naked.
10 A. He was naked, but he was on the floor next to it.
11 Q. He was pretty agitated, wasn't he?
12 A. As soon as I started talking to him, he was not.
13 I heard him yelling when I walked in the door, but when I
14 opened the door, he looked right at me --
15 Q. Well, okay, you say he was not but look to your
16 next answer.
17    You're saying, He's standing there naked and he
18 puts the smock back on but he was agitated. Did you mean it
19 when you said it or was he not agitated but you just decided
20 to tell the investigators that he was agitated?
21    MR. WOESSNER: Objection to the form of the
22 question.
23 A. I guess it means -- what do you mean by agitated
24 and what level --
25 Q. (By Mr. Killmer) What do you mean? You say, but

Page 108

1 he was agitated and worked up, you know.
2 A. He had his clothes off. He seemed kind of
3 excited.
4 Q. Okay. I'm not asking you to agree with my words.
5 A. Oh, no. No.
6 Q. I'm asking you what your words mean. You say he
7 was agitated.
8 A. Yeah.
9 Q. So he was agitated; right?
10 A. Yes.
11 Q. So you just told him to settle down and you left
12 him.
13 A. He put his smock back on and responded to me.
14 That's what was unusual about it. I said, hey, man, what's
15 going on, it's Deputy Hyde, you're naked, put your clothes
16 on, and he did and that was -- that was --
17 Q. Was any information given to you on pass-on about
18 Mr. Moffitt's conduct in the previous five hours?
19 A. The only thing I remember when we discussed
20 earlier is that they brought him up front for whatever
21 reason was --
22 Q. At 12:55 in the morning.
23 A. His actions or something like that and then they
24 called Mind Springs to come talk to him.
25 Q. Okay. So at 12:55, they brought him up to the

Case 1:15-cv-00071-WYD-MEH   Document 78-13   Filed 09/01/16   USDC Colorado   Page 12 of 13

Estate of Zackary Moffitt, et al. vs.
Sheriff John Minor, et al.

Deposition of Brian D. Hyde
June 08, 2016

Page 117

1  Q.  -- these hits; correct?
2  A.  Yes.
3      MR. WOESSNER:  Objection to the form of the
4  question.  You can answer the question.
5  Q.  (By Mr. Killmer)  And his face and his neck were
6  all red; correct?
7  A.  Yes.
8  Q.  So his hands were swollen and his face and neck
9  were all red.
10 A.  Yes.
11 Q.  At one point you thought he knocked himself out
12 from his own self-inflicted punches; correct?
13 A.  Yes.  When I -- when I was told about the event
14 happening, I went over there and talked to him in the
15 window, it appeared like he could have possibly knocked
16 himself out.
17 Q.  And that wouldn't have surprised you because he
18 was, in fact, striking himself extremely hard.
19 A.  Yes.
20 Q.  When you did respond at some point, he looks at
21 you with kind of a crazy look in his eye.  This is right
22 before he took a swing; correct?
23 A.  Yes, when I sat him up or he sat up and he kind of
24 gave me -- because I just spoke with him when I got there at
25 6 and we had -- all these things were going on, and I told

Page 118

1  him to put on the smock and he did, but it appeared to me
2  that he didn't recognize me or know who I was and I was
3  there to help him.
4  Q.  Why -- he was all sweaty, super sweaty at the
5  time, wasn't he?
6  A.  Yes.
7  Q.  And pale and his body was rigid too when you tried
8  to grab it; correct?
9  A.  Yes, because he, all of a sudden, was trying to
10 fight.
11 Q.  Did you, at that time, scream out, call a doctor,
12 or anything like that?
13 A.  No.  Because I was worried about trying to keep
14 him safe, let him not hit me, he was bleeding from the nose.
15 So my focus was -- because I was the one in there trying to
16 make sure he didn't hurt himself or me or...
17 Q.  So by this time he was also bleeding because of
18 the strikes.
19 A.  Yes, sir, his nose was dripping blood.
20 Q.  Well, I mean, so he had an obvious serious medical
21 need; right?
22 A.  He hurt himself.  I don't know what he did.  I
23 don't know if he hurt his airway or anything.  So,
24 obviously, once we had the situation controlled, 911 would
25 have been the next immediate action to get him physical help

Page 119

1  prior to what did happen.
2  Q.  By this time, it was -- this was about 7:25 or
3  thereafter that you had been called to respond; correct?
4  A.  I believe so.
5  Q.  And he was completely out of it at this time;
6  right?
7  A.  Meaning...
8  Q.  I'm reading your stuff.  It says, he was so out of
9  it.  I'm on page 12.
10 A.  Oh, as far as his response to me talking to him.
11 Q.  Yeah.  You said, I don't even think he recognized
12 us.
13 A.  I don't think he did -- or any of us.
14 Q.  So by this time he was so out of it, that he
15 didn't -- even though he talked to you a couple hours
16 earlier, he couldn't even recognize you now, apparently.
17 A.  That's what I believe, that he could not respond.
18 Yep.
19 Q.  And in the cell was you and Giordano and Lambert.
20 Am I right?
21 A.  Yes, sir.
22 Q.  Who detected that he stopped breathing?
23 A.  That was Sergeant Giordano.  After all this had
24 happened and he took a big swing at me, you can see on the
25 video, I didn't try to hit him or injure him or do anything

Page 120

1  but try to keep anything from happening.  We had sat down
2  and Sergeant Giordano -- he stopped moving and Sergeant
3  Giordano detected it.
4  Q.  So she's the one that said he's not breathing?
5  A.  Yes.  She was sitting at his head, and I was
6  sitting next to his feet and she said something -- he's not
7  breathing.  Will you check him?  And I came around to check
8  him.
9  Q.  So who gave CPR?
10 A.  Well, we both did.  She --
11 Q.  Who first?
12 A.  Depends on how you describe CPR.  Giordano
13 attempted CPR --
14 Q.  Cardiopulmonary resuscitation.
15 A.  Well, there's good CPR and there's bad CPR.
16 Q.  Well, describe who gave CPR first and then tell me
17 whether it's the good type or the bad type.
18 A.  Well, Giordano attempted as, in my opinion, CPR,
19 pushing on his chest and --
20 Q.  Was it bad CPR?
21 A.  Yes.
22 Q.  Okay.
23 A.  And that's one reason I became a CPR instructor
24 after all this so I can help that not happen and make that
25 better.

Case 1:15-cv-00071-WYD-MEH   Document 78-13   Filed 09/01/16   USDC Colorado   Page 13 of 13

Estate of Zackary Moffitt, et al. vs.
Sheriff John Minor, et al.

Deposition of Brian D. Hyde
June 08, 2016

Page 125

1  of the question.  You can answer, if you can.
2      A.   And I apologize for trying to jump in there.  I
3  apologize.
4      Q.   (By Mr. Killmer)  No worries.  I asked you a
5  question, you were going to answer it.  No apology
6  necessary.
7           You believe Lambert did a great job, you think
8  Fidler did a great job; correct?
9      A.   As far as what they had to do as far as the rules
10 of the jail, so in that aspect, I mean, Lambert locked
11 everybody down, called 911, she grabbed the AED for us, she
12 grabbed the bag to bag him and, in that aspect, I think,
13 good job.
14          Fidler I'm not sure, but Giordano and I tried the
15 best we could -- in doing CPR, tried to do the best we could
16 as far as what we could.
17     Q.   Well, you said at the bottom of page 4 (sic),
18 Fidler, I think, did a great job.
19          MR. WOESSNER:  Page 14.
20          MR. KILLMER:  I'm sorry.  Thank you, Counsel.
21     Q.   (By Mr. Killmer)  Page 14.  It's the last two
22 lines.  Fidler, I think, did a great job.
23     A.   Okay.
24     Q.   Now, Fidler's job was to be in the control room --
25     A.   Uh-hmm.

Page 126

1      Q.   -- from 6:00 until Mr. Moffitt was taken out of
2  the jail in an ambulance and his job was to monitor the
3  welfare of the inmates; right?
4      A.   Right.
5      Q.   And for an hour and a half, Mr. Moffitt presented
6  the way he did in that video.  And at 7:25 finally Fidler
7  tells somebody to check on Moffitt.  You think he -- Fidler
8  did a great job in that respect?
9           MR. WOESSNER:  Object to the form of the question.
10     A.   For me I think this was a general statement.  I
11 was talking about what -- the events that happened at that
12 specific time with the CPR --
13     Q.   (By Mr. Killmer)  Well, what did Fidler do?
14     A.   -- with the CPR -- not prior to, but when the CPR
15 started and we went in there.
16     Q.   Look, I'm just trying to find out what you're
17 talking about.  You said, Fidler, I think, did a great job.
18 By doing what?
19     A.   By being in the control room and locking everybody
20 down in the back.  I'm talking about the events that
21 happened during the -- that during -- during the CPR part,
22 and I -- I'm -- I'm sure I just said he did a good job as
23 far as just trying to be a team.  I don't have a good answer
24 for you.  I'm sorry.  I don't have a good answer as far as
25 he did whatever it was he was supposed to do in the control

Page 127

1  room.
2      Q.   Well, wasn't he supposed to, in the control room,
3  report when there was signs of distress for the person who
4  was supposed to be monitored?
5      A.   That would be a job of someone in the control
6  room.
7      Q.   That is, in fact, his primary job; correct?
8      A.   Yes.
9      Q.   You said that the policy at the jail is that if
10 they are above .3 BAC, then they can't come without being
11 medically cleared.
12     A.   Yes, sir.
13     Q.   Where is that policy written down?
14     A.   Gosh.  It's in their jail policy books.  It's one
15 of the books they have up there at the front counter.
16     Q.   So if they are not medically cleared, what do you
17 have to do?
18     A.   Then the police officers -- because we're
19 deputies, everybody else, Breck, Silverthorn, Frisco,
20 Dillon -- sorry -- they have to take them over to the
21 hospital, get them medically cleared, come back with a
22 medical sheet that says medically cleared, and then they can
23 be there and they usually send them with -- usually with
24 Ativan, like four little Ativan tablets.
25     Q.   So when Mr. Moffitt is -- in terms of -- you now

Page 128

1  know Moffitt was not medically cleared.  You now know that.
2      A.   Yeah.  Yeah, now it's -- but not at the time.
3      Q.   But you're also in charge of doing med checks,
4  right, and providing medicines to inmates who have
5  medicines; right?
6      A.   Not me specifically but anybody.
7      Q.   Sometimes?
8      A.   Yes, sometimes.  Yes.
9      Q.   And you guards have the job of administering meds.
10     A.   Yes.
11     Q.   Did it occur to you that when there was no med for
12 Zack Moffitt, that that's surprising because he came from
13 the hospital with a .392 BAC?
14     A.   No, because I wasn't -- I was there Saturday night
15 but didn't have any interaction with him and it was after --
16 and then -- so no on Saturday night and then I was not there
17 Sunday.  If I had been there Sunday on duty, we were not --
18 then that would have been a great question because it would
19 have been, where is his Ativan, which is pretty normal
20 practice.
21     Q.   Yeah.  Right.  But there wasn't any.
22     A.   No.
23     Q.   So why didn't somebody say, what's the deal?  How
24 come this guy doesn't have any meds?  He came from the
25 hospital?