## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.  1:15-cv-00071-WYD-MJW

ESTATE OF ZACKARY MOFFITT, by and through its personal representative KELLY KRAMER;
M.M., a minor, by and through her next friend and mother, CASSANDRA HIGGINS;
C.M., a minor, by and through her next friend and mother, CASSANDRA HIGGINS;

   Plaintiffs,

v.

SHERIFF JOHN MINOR, in his official and individual capacities;
CAPTAIN ERIK J. BOURGERIE, in his individual capacity;
STAFF SERGEANT CHERYL GIORDANO, in her individual capacity;
DEPUTY JONATHON DIURBA, in his individual capacity;
DEPUTY NATHAN FIDLER, in his individual capacity;
DEPUTY RYAN HOSIER, in his individual capacity;
DEPUTY BRIAN HYDE, in his individual capacity;
DEPUTY KATHY LAMBERT, in her individual capacity; and
DEPUTY JEFF WILSON, in his individual capacity;

   Defendants.

---

### RESPONSE TO DEFENDANT WILSON'S MOTION FOR SUMMARY JUDGEMENT

---

  Plaintiffs, through their attorneys, David A. Lane, Darold W. Killmer, Michael Fairhurst, and Andy McNulty, hereby submit the following Response to Defendant Deputy Jeff Wilson's Motion for Summary Judgment [Doc. 75, filed 8/29/16], and state as follows in support:

### INTRODUCTION

  Defendant Summit County Sheriff's Office Deputy Jeff Wilson was the first Defendant to interact with Zackary Moffitt in July 2013. Defendant Wilson met Mr. Moffitt shortly after he had pulled out his own IV at the emergency room at Summit Medical Center and left the hospital. Mr. Moffitt clearly was extremely intoxicated when Wilson first interacted with him

outside of the hospital, and Wilson knew Mr. Moffitt had a .392 Blood Alcohol Content ("BAC") at the time and had just been receiving medical care for severe alcohol intoxication at the hospital. Wilson also knew that Summit County Sheriff's Office had a policy and practice whereby detainees and inmates must be medically cleared before being taken into custody if they have a BAC of .3 and above; Wilson thus knew he was required to obtain medical clearance for Mr. Moffitt if he planned to arrest him and take him to jail.

Yet, Wilson deliberately violated Summit County Sheriff's Office policies and practices and Mr. Moffitt's rights secured by the United States Constitution by immediately arresting Mr. Moffitt on an outstanding warrant for criminal mischief and a restraining order prohibiting alcohol use, and immediately transporting him to Summit County Jail, without ever obtaining medical clearance for him. Wilson also illegally failed to even attempt to procure any medical aid for Mr. Moffitt despite observing his obvious medical needs caused by severe alcohol intoxication – and despite observing the unequivocal requests of eyewitnesses on the scene to take Mr. Moffitt straight back into the hospital that was a few steps away. Wilson then falsely told staff at the Summit County Jail that he had obtained medical clearance for Moffitt, which foreseeably further prevented Mr. Moffitt from receiving appropriate medical evaluation and medical aid.

Summit County Sheriff's Office ultimately made a decision to fire Wilson because of his inexcusable conduct with respect to Mr. Moffitt, which was a cause of Mr. Moffitt's death from alcohol withdrawal-related complications he suffered while in jail a few days later. Defendant Wilson nonetheless requests that this Court summarily judge Plaintiffs' claims against him but, for the reasons below, Defendant Wilson repeatedly acted with deliberate indifference to Mr.

Moffitt's serious and obvious medical needs, and his motion for summary judgment must be denied.

## RESPONSE TO MOVANT'S MATERIAL FACTS ("RMMF")[1]

1-3. Admit in part; however, Defendant's description of Wilson's employment is materially incomplete because it omits his extensive history of discipline and professional misconduct as an employee of Summit County Sheriff's Office before the Moffitt incident. Defendant Wilson received a final written warning in May 2002 for failing to complete an activity log within the proper amount of time after completing an assigned shift. **Exhibit 1**, *Jeff Wilson's Corrective Action Reports*. Defendant Wilson received another final written warning in June 2002 for being rude and unnecessarily physically aggressive and rough towards a suspect, for failing to complete an absolvement of arrest form and a report on the incident, and for failing to follow a superior's orders (and for other policy violations as well). *See* **Exhibit 1**, *Jeff Wilson's Corrective Action Reports*; **Exhibit 2**, *Deposition of Jeff Wilson*, 134:25-140:24. Defendant Wilson received another corrective action in January 2003 – and was suspended – for failing to complete a required report within the required timeframe. **Exhibit 1**, *Jeff Wilson's Corrective Action Reports*; **Exhibit 3**, *Deposition of Sheriff John Minor*, 141:3-18. Defendant Wilson received additional discipline in May 2003 for failing to show up to a scheduled mandatory training. **Exhibit 1**, *Jeff Wilson's Corrective Action Reports*; **Exhibit 3**, *Deposition of Sheriff John Minor*, 142:21-143:15.

Defendant Wilson received further discipline in April 2012 for failing to respond to a call for service. The call was on March 23, 2012 for a campfire in the Town of Blue River, Colorado.

---

[1] All of the facts and legal analysis herein are set forth for purposes of summary judgment only. In addition, Plaintiffs fully incorporate all of their summary judgment briefing submitted in this case by reference.

Defendant Wilson claimed that he forgot the call regarding a potentially out-of-control fire was pending; no one responded to the call as a result. Defendant Wilson was given a two day unpaid suspension and three month suspension from the SWAT team. **Exhibit 4**, *Defendant Wilson's Discovery Responses.*

In February 2013, Defendant Wilson received a verbal warning/counseling resulting from an incident involving a vehicle that was stuck on a four wheel drive road. Defendant Wilson failed to reach the vehicle and assist the occupants despite being explicitly instructed to do so. **Exhibit 4**, *Defendant Wilson's Discovery Responses.* Additionally, Summit County Sheriff's Office placed Wilson on a performance improvement plan in 2011 for his consistently deficient report writing. **Exhibit 5**, *Performance Improvement Plan*; **Exhibit 3**, *Deposition of Sheriff John Minor*, 145:21-146:17. Summit County then recommended firing Defendant Wilson for his gross dereliction of his professional and legal duties during the Moffitt incident (further discussed below at **SADF ¶** 2).

4. Admit Summit County Sheriff's Office operations policy regarding the treatment of intoxicated persons (which Wilson violated, *see* **SADF ¶** 1) so stated. The general practice of the Summit County Sheriff's Office was to medically clear ***all*** incoming detainee/inmates with a BAC of .3 and above before accepting them at the jail. **Exhibit 2,** *Deposition of Jeff Wilson*, 61:14-16 (admitting that there "was a general practice that if an individual was a .3 and above, to have that individual medically cleared").

5-8. Admit in part and deny in part. Dispute that the mere fact that Moffitt was not on an emergency commitment hold is a "material" fact, as Moffitt had just been in the hospital for severe alcohol intoxication and Moffitt was still highly intoxicated at the time (.392 BAC) Wilson interacted with him, and because Moffitt was an alcoholic on the precipice of

4

experiencing alcohol withdrawal in the absence of appropriate medical observation and treatment.

9.   Admit Wilson knew Moffitt had just pulled out his own IV and left the emergency room ("ER"), thereby cutting short his obviously needed medical treatment at Summit Medical Center ("SMC") for alcohol intoxication, and admit that Wilson knew Moffitt had a .392 BAC at the time Moffitt made his so-called "choice" (while obviously highly intoxicated) to leave the hospital. *See, e.g.*, **Exhibit 2**, *Deposition of Jeff Wilson*, 59:19-60-12.

10. Deny; Defendant Wilson only asked Brown if there was a hold on Moffitt.  **Exhibit 6**, *Deposition of Andrea Brown*, 49:13-50:7. Moreover, even if Moffitt did not legally *have* to go back to the ER, he did obviously *need* additional medical monitoring and treatment by a trained medical professional at the time, given his extremely high BAC and clearly intoxicated state, and the fact that he had just been in the hospital to treat his severe alcohol intoxication. Wilson nonetheless deliberately failed to even attempt to obtain any medical aid for Moffitt even though the aid was just a handful of yards away at SMC; Wilson instead immediately arrested Moffitt and took him away from the hospital to jail.

11. Admit only that Wilson so stated; Plaintiffs lack sufficient information to admit or deny what Moffitt (who is now dead) actually told Wilson regarding his "wishes" (assuming, *arguendo*, that a person as intoxicated as Moffitt clearly was could express anything approximating informed consent) to remain at the hospital. Moreover, Kelly Kramer (Moffitt's longtime girlfriend) and James Shumaker (Kramer's friend who was with her at the time) *did* implore Wilson to take Moffitt back into the hospital because they observed that Moffitt was still very sick from alcohol intoxication, but Wilson refused to so and commanded them not to say anything more or he would detain them.  **Exhibit 7**, *Deposition of Kelly Kramer*, 97:10-98:12;

**Exhibit 2**, *Deposition of Jeff Wilson*, 115:15-116:12. The need to immediately procure additional medical aid for Moffitt, given his extremely high BAC and visibly very intoxicated state, was thus obvious to laypersons on scene who had observed Moffitt at the same time as Wilson. No Summit County Sheriff's Office policy or practice would have prevented Wilson from taking Moffitt right back into the hospital under the circumstances; even Wilson admitted that he could have taken Moffitt back into the hospital instead of to jail. **Exhibit 2**, *Deposition of Jeff Wilson*, 47:24-48:9.

12. Admit Wilson knew Moffitt was highly intoxicated; Defendant Wilson explicitly noted in his warrantless arrest probable cause statement that Mr. Moffitt "had the strong odor of alcohol on his breath, slurred speech[,] and was very unsteady on his feet." *See* **Exhibit 8**, *Warrantless Arrest Probable Cause Statement for Zachary Moffitt* ("When I contacted Moffitt he had the strong odor of alcohol on his breath, slurred speech and was very unsteady on his feet. Brown advised me Moffitt submitted to a PBT at SMC and his BAC was .392. I also observed an ankle bracelet on Moffitt's right leg and asked what it was for. He replied for drinking"). While Moffitt eventually was barely able to stand on his own before Wilson arrested him, Wilson knew Moffitt had been lying down passed out near bushes at the front of the hospital right before standing up. *Id.*; **Exhibit 7**, *Deposition of Kelly Kramer*, 95:23-96:15, **RMMF** ¶ 15. Plaintiffs lack sufficient information to address the veracity of Wilson's self-serving claim that Moffitt answered questions coherently, as Moffitt is dead.

13-14. Admit.

15. Deny. Defendant Wilson was deliberately indifferent to Moffitt's serious and obvious medical needs because he was aware Moffitt had a .392 BAC at the time, because he observed Moffitt behaving in an extremely intoxicated manner, because he knew Moffitt had just

absconded from the hospital (where he was being treated for severe alcohol intoxication), because he intentionally cut off Moffitt from additional medical aid at the hospital by taking Moffitt to jail instead of back into the hospital, *see* **RMMF** ¶ 10, because he failed to obtain the medical clearance required by Summit County Sheriff's Office policies and practices before transporting Moffitt to jail, *see* **RMMF** ¶ 4, and because he then falsely told jail personnel that he had obtained medical clearance for Moffitt, *see* **RMMF** ¶ 17. As Defendant Wilson testified during his deposition:

> Q: Right. So the information that you had when you determined you didn't need to obtain a medical clearance was that dispatch was reporting somebody who was asleep, not conscious, under the bushes. Although he was awake when you came to him, you learned he had a .392 blood alcohol content and he was slurring his words and he was unstable on his feet and he smelled of alcohol and all of this information led you to believe that he was intoxicated; right?
> A: Yes.
> Q: And even though you knew all of that, especially that his BAC was almost .4, you decided you didn't need a medical clearance?
> A: I did not obtain a medical clearance.

**Exhibit 2**, *Deposition of Jeff Wilson*, 64:9-20; *see also id*. at 61:14-16.

16. Admit.

17. Deny. Wilson falsely told Sgt. Hocmuth and Deputy Christopher Brooks that Moffitt had been medically cleared even though he knew Moffitt had never been medically cleared. **Exhibit 9**, *Jefferson County's Internal Affairs Investigation Report at SCSO 3517*.  Indeed, Summit County decided to terminate Wilson in part because he provided false or misleading statements to Hocmuth regarding Moffitt's medical clearance.  **Exhibit 10**, *IA Report 2013-IA02 at SCSO 8364-8365*.

18. Admit Moffitt was still visibly very intoxicated when booked, *see* **Exhibit 11** *CBI Interview with Deputy Brooks*; because Moffitt was still very intoxicated, he was not going through alcohol withdrawal yet.

19. Admit.

20. Admit in part. Deny that Moffitt "lucidly" answered questions to whatever extent Defendants seek to imply that Moffitt's health was sound at the time or that his obvious and serious medical needs were being appropriately addressed. Moffitt asked for a personal recognizance bond because he was very sick and needed immediate medical help. Moffitt explained to the judge that he had not eaten since the preceding Wednesday, was barely able to hold down a glass of water, and had been vomiting green substances, and that he needed to address these very serious medical issues and could not get help so long as he remained in jail. Video (Beginning at 36 seconds).

21-23. Admit.

24. Deny. Moffitt died from delirium tremens ("DTs") as a result of Defendants' deliberate indifference to his serious medical needs, likely suffering a fatal arrhythmia at the end of his life. **Exhibit 12**, *Deposition of Dr. Blum*, 20:13-23; **Exhibit 13**, *Deposition of Dr. Jobin*, 91:9-92:5.

<u>**STATEMENT OF ADDITIONAL DISPUTED FACTS ("SADF")**</u>

1. Summit County Sheriff's Office investigated Defendant Wilson's conduct during the Moffitt incident and found as follows, in relevant part:

> There is no disputing Moffitt had the right to discharge himself from the medical care he had voluntarily sought. However, once Deputy Wilson placed Moffitt into custody he had a duty to ensure he had either already received any necessary medical attention or received medical attention after being taken into custody. Whatever information was given to Deputy Wilson by Andrea Brown is immaterial. After Moffitt was taken into custody Deputy Wilson was responsible for Moffitt's care.

**Exhibit 10**, *IA Report 2013-IA02* at SCSO 8370. Based on its investigation, Summit County concluded that, "[on July 6th, 2013 at 0351 hours, while on duty Deputy Wilson failed to obtain

medical clearance for Zachary Moffitt prior to booking. ***In violation of SCSO Policy and Procedures 405 III (A) 3 and 405 III (A) 8.***" *Id*. at 8371 (emphasis in original). Summit County also concluded: "On July 6th, 2013 Deputy Wilson provided false or misleading statements to Sergeant Ron Hochmuth regarding Zachary Moffitt's medical clearance. ***In violation of SCSO Policy and Procedures 405 III (B) 4 and 405 III (B) 5.***" *Id*. at 8372 (emphasis in original).

2. Summit County Sheriff's Office decided to terminate Defendant Wilson's employment as a result of his wrongdoing during the Moffitt incident but then agreed to let Wilson technically "resign" in exchange for him waiving his right to appeal or otherwise challenge the termination decision. **Exhibit 2**, *Deposition of Jeff Wilson*, 18:12-24, 53:14-54:7, 94:19-22. Nonetheless, there is no doubt that Wilson's employment with Summit County ended as a result of his inexcusable conduct with respect to Mr. Moffitt.

3. If Moffitt had stayed in the hospital on the day Wilson arrested him, he would have had further repletion of his dehydration for the correction of his electrolyte disturbance and, if he had stayed for days in the hospital, treatment of alcohol withdrawal symptoms. **Exhibit 12**, *Deposition of Dr. Blum*, 67:2-7.

## STANDARD OF REVIEW

Summary judgment is appropriate only if the record contains no evidence of a genuine issue of material fact and demonstrates that the moving party is entitled to judgment as a matter of law. *Woodman v. Runyon*, 132 F.3d 1330, 1337 (10th Cir. 1997). "The party that moves for summary judgment bears the burden of proving that no genuine issue of material fact exists on all claims for which it seeks summary judgment." *Trujillo v. Atmos Energy Corp.*, No. 11-cv-01151-RBJ-MEH, 2012 U.S. Dist. LEXIS 87273, at *4 (D. Colo. June 25, 2012). The Tenth Circuit has emphasized that the nonmovant is given "wide berth to prove a factual controversy

exists." *Ulissey v. Shvartsman*, 61 F.3d 805, 808 (10th Cir. 1995). In making this determination, the district court must view the record and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *Thomas v. Int'l Bus. Machines*, 48 F.3d 478, 484 (10th Cir. 1995). "Where different ultimate inferences may be drawn from the evidence presented by the parties, the case is not one for summary judgment." *Brown v. Parker-Hannifan Corp.*, 746 F.2d 1407, 1411 (10th Cir. 1984). Critically:

> The right to confront, cross-examine and impeach adverse witnesses is one of the most fundamental rights sought to be preserved by the Seventh Amendment provision for jury trials in civil cases. The advantages of trial before a live jury with live witnesses, and all the possibilities of considering the human factors, should not be eliminated by substituting trial by affidavit and the sterile bareness of summary judgment. It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of "even handed justice."

*Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 176 (1970) (Black, J., concurring); *see also Fisher v. Shamburg*, 624 F.2d 156, 162 (10th Cir. 1980).

## **ARGUMENT**

The United States Supreme Court has long made clear that prisoners have a constitutional right to medical care:

> An inmate must rely on prison authorities to meet his medical needs; if the authorities fail to do so, those needs will not be met. *In the worst cases, such a failure may actually produce physical torture or a lingering death, the evils of most immediate concern to the drafters of the [Eighth] Amendment.*[2] In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose. *The infliction of such unnecessary suffering* is inconsistent with contemporary standards of decency as manifested in modern legislation codifying the common law view that it is but

---

[2] "Although pretrial detainees are protected under the Due Process Clause [of the Fourteenth Amendment] rather than the Eighth Amendment, . . . this Court applies an analysis identical to that applied in Eighth Amendment cases brought pursuant to § 1983."*Lopez v. LeMaster*, 172 F.3d 756, 759 n.2 (10th Cir. 1999); *see also Bell v. Wolfish*, 441 U.S. 520, 537 (1979).

> just that the public be required to care for the prisoner, who cannot by reason of
> the deprivation of his liberty, care for himself.

*Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976) (internal quotation marks and citations omitted)

(emphasis added).

A prison official violates a prisoner's constitutional rights if he acts with "deliberate

indifference to serious medical needs" of the prisoner, as such conduct "constitutes the

unnecessary and wanton infliction of pain proscribed by the Eighth Amendment," and, "[t]his is

true whether the indifference is manifested by prison doctors in their response to the prisoner's

needs or by prison guards in intentionally denying or delaying access to medical care." *Id.* at

104-05.  The Supreme Court reasons:

> When the State takes a person into its custody and holds him there against his
> will, the Constitution imposes upon it a corresponding duty to assume some
> responsibility for his safety and general well-being…. The rationale for this
> principle is simple enough: when the State by the affirmative exercise of its power
> so restrains an individual's liberty that it renders him unable to care for himself,
> and at the same time fails to provide for his basic human needs -- e.g., food,
> clothing, shelter, medical care, and reasonable safety -- it transgresses the
> substantive limits on state action set by the Eighth Amendment. . . . [.]"

*Helling v. McKinney*, 509 U.S. 25, 32 (1993) (quoting *DeShaney v. Winnebago County Dept. of*

*Social Servs.*, 489 U.S. 189, 199-200 (1989)).

"The test for constitutional liability of prison officials involves 'both an objective and a

subjective component.'" *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Sealock v.*

*Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)).[3] The objective component is met if the

---

[3] For the reasons stated in Plaintiffs' Response to Defendants Giordano, Diurba, Filder, Hosier, Hyde, and Lambert's Motion for Summary Judgment, Plaintiffs maintain that *Kingsley v. Hendrickson* obviates prior precedent and calls for the utilization of an objective standard in evaluating pretrial detainees' claims under the Fourteenth Amendment. Plaintiffs incorporate that briefing by reference herein, and evaluate Wilson's liability under the subjective standard simply for efficiency's sake. Because a jury could reasonably conclude that Wilson is liable under the subjective standard (by repeatedly responding with deliberate indifference to Moffitt's serious

medical need is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The subjective component is met if a prison official "knows of and disregards an excessive risk to [prisoner] health or safety." *Id*. at 837. The circumstances surrounding Defendant Wilson's involvement with Mr. Moffitt's death meet both components.

## I.       Mr. Moffitt Suffered a Sufficiently Serious Medical Need.[4]

A medical need is objectively "sufficiently serious" if it is an injury that equates to the "denial of the minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834 (internal quotation marks omitted). Mr. Moffitt died as a result of the failure of Defendants Wilson, Giordano, Diurba, Fidler, Hosier, Hyde, and Lambert's, along with Commander Bougerie and Sheriff Minor's, failure to provide him with access to medical attention to treat his alcohol withdrawal syndrome. Numerous courts have found that alcohol withdrawal constitutes a sufficiently serious medical need. *Stefan v. Olson*, 497 F. App'x 568, 577 (6th Cir. 2012) (holding plaintiff's "extremely elevated .349 blood-alcohol level and verbal communication of a history of alcoholism accompanied by withdrawal seizures communicated an objectively serious medical need possessing the sufficiently imminent danger that is actionable under the Eighth Amendment"); *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009) (holding there was "no dispute" that the plaintiff, who was suffering from alcohol withdrawal, "had a serious medical condition"); *Lancaster v. Monroe Cnty.*, 116 F.3d 1419, 1426 (11th Cir. 1997) (holding that it was "clearly established that that sheriffs and jailers cannot place or keep a chronic alcoholic in

---

and obvious medical needs), it follows that a reasonable jury also could find that Wilson's challenged conduct was objectively unreasonable and unsupportable under *Kingsley* and its progeny, in violation of Moffitt's Fourteenth Amendment rights.
[4] Defendant Wilson concedes for purposes of summary judgment that Plaintiffs meet the objective component of the deliberate indifference test, *see* [Doc. 75] at 10; however, Plaintiffs evaluate this element out of an abundance of caution.

jail without any medical supervision, when the defendants are aware that the alcoholic is

suffering from a severe form of alcohol withdrawal"); *M.H. v. Cnty. of Alameda*, Case No. 11-

cv-02868-JST, 62 F. Supp. 3d 1049, 2014 U.S. Dist. LEXIS 48592, 2014 WL 1429720, at *20-

21 (N.D. Cal. Apr. 7, 2014) (finding deliberate indifference after defendant was "subjectively

aware of the risk of alcohol withdrawal, but failed nevertheless to fill out a CIWA form, initiate

the CIWA protocol, or otherwise ensure [plaintiff] would receive medical help"). Further,

because Mr. Moffitt died from the withdrawal symptoms that Defendants deliberately

disregarded, his death alone satisfies the objective component of the Eighth[5]/Fourteenth

Amendment standard. *See Martinez v. Beggs*, 563 F.3d 1082, 1088-90 (10th Cir. 2009). The

harm Mr. Moffitt suffered was, therefore, "without doubt, sufficiently serious to meet the

objective component." *Id*.

### II.     Defendant Wilson Knew of Mr. Moffitt's Serious Medical Need and Deliberately Failed to Take Reasonable Measures to Abate It.

"To prevail on the subjective component, [a plaintiff] must show that the defendants

knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable

measures to abate it." *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006) (internal

quotation marks omitted). A plaintiff need not plead a defendant's acts or omissions were taken

"for the very purpose of causing harm or with knowledge that harm will result." *Brennan*, 511

U.S. at 835. Instead, a plaintiff need only allege that a defendant was made aware of the risk of

harm and failed to treat it. *Id*. Plaintiffs have done so here.

---

[5] Plaintiffs maintain that Moffitt's right to adequate medical care was secured by the Fourteenth Amendment at all relevant times. However, assuming, *arguendo*, that the Eighth Amendment applied to him instead, the underlying *Pre-Kingsley* standard is the same under both amendments and, therefore, Defendants also violated Moffitt's rights secured by the Eighth Amendment.

"Unlike the objective component, the symptoms displayed by the prisoner are relevant to the subjective component of deliberate indifference. The question is: 'were the symptoms such that a prison employee knew the risk to the prisoner and chose (recklessly) to disregard it?'" *Martinez*, 563 F.3d at 1089 (quoting *Mata v. Saiz*, 427 F.3d 745, 753 (10th Cir. 2005)). Defendant Wilson knew the grave risk to Mr. Moffitt of letting his extreme intoxication go untreated and unobserved by a medical professional, along with the risk of lying about Moffitt's medical clearance at Summit County Jail, but deliberately disregarded those risks. Defendant Wilson deliberately disregarded these serious and obvious risk to Mr. Moffitt in at least three critical ways – any one of which provides a sufficient basis to deny his request for summary judgment here.

First, Defendant Wilson intentionally failed to obtain any medical clearance for Mr. Moffitt before arresting him and transporting him to the hospital despite observing Mr. Moffitt's very intoxicated state and associated poor physical condition, despite knowing that Mr. Moffitt had a (very high) BAC of .392, and despite knowing that Summit County's policies and practices required him to obtain medical clearance for anyone with a BAC of .3 or over before taking them to jail. *See* **RMMFs ¶¶** 4-8, 15, 17, **SADF ¶** 1.

Second, Wilson failed to even attempt to procure any medical aid for Mr. Moffitt when he first interacted with him right outside of SMC even though medical attention was readily available and could have been easily accessed by taking just a few steps into the hospital, even though he knew Moffitt had just made the so-called "choice" (while very, very intoxicated) to cut off his needed treatment for severe alcohol intoxication at the hospital, even though he observed that Moffitt was still extremely intoxicated, and even though two other eyewitnesses (Kelly Kramer and James Shumaker) urged him to take Moffitt straight back into the hospital

14

because they observed that Moffitt was so sick from alcohol intoxication. *See* **RMMFs** ¶¶ 9-12,

15. Third, Wilson falsely told Sgt. Hocmuth and Deputy Brooks that Moffitt had been medically

cleared when he arrived with Moffitt at Summit County Jail, even though Wilson knew Moffitt

had never been medically cleared. *See* **RMMFs** ¶¶ 15, 17, **SADF** ¶ 1.

In *Barton v. Taber*, 820 F.3d 958, 964-65 (8th Cir. 2016), the Eighth Circuit Court of

Appeals held that an arresting officer who interacted with the (eventual) decedent (who was

visibly intoxicated at the time) could be found liable under the objective prong of the deliberate

indifference to serious medical needs test based on the following analysis – reasoning which also

applies here:

> Owens argues that the complaint does not plead an objectively serious medical
> need because Barton's behavior would not indicate to a layperson that he was
> suffering from a heart condition that would later kill him. But the complaint was
> not required to allege that Owens knew of Barton's heart condition, only that
> Barton showed obvious signs of an objectively serious medical need. We
> determine whether an objectively serious medical need exists based on the
> attendant circumstances, irrespective of what the officer believes the cause to
> be. *See Vaughn v. Gray*, 557 F.3d 904, 909 (8th Cir. 2009) (denying qualified
> immunity to officers who claimed that they thought a prisoner's vomiting "was
> caused by the ingestion of shampoo"); *see also McRaven v. Sanders*, 577 F.3d
> 974, 981 (8th Cir. 2009) (denying qualified immunity where an inmate exhibited
> symptoms of severe intoxication and circumstances suggested that the inmate had
> overdosed on prescription medications); *Grayson*, 454 F.3d at 809 (granting
> qualified immunity where an arrestee was under the influence of
> methamphetamines, but "sat calmly in the back of the patrol car, followed
> directions, answered questions posed, and remained quiet and seated on a bench
> inside the jail"). Although we can assume that most individuals arrested on
> intoxication-related charges are not in obvious need of prompt medical care, the
> complaint here has stated sufficient facts to show that Barton was experiencing a
> medical need so obvious that a layperson would recognize that he needed prompt
> medical attention. Accepting once again the truth of the complaint's allegations,
> Barton fell down at the scene of his accident, could not walk on his own, and
> became unresponsive such that an officer was obliged to check for a pulse. At the
> detention center, he could not answer questions and could not remain seated
> without falling over. While some of these alleged symptoms are consistent with
> those exhibited by intoxicated persons, when viewed in their totality and in the
> light most favorable to the non-moving party, they were sufficient to establish that

Barton suffered from an objectively serious medical need.

The Court then held that the subjective component was satisfied because, [f]rom his observations at the scene of the accident and at the Detention Center, Owens had direct knowledge of Barton's obvious need for prompt medical attention and yet took no steps to secure such care for Barton." *Id*. at 965. Finally, the court denied the arresting officer's request for qualified immunity, holding that a "**reasonable officer in 2011 would have recognized that failing to seek medical care for an intoxicated arrestee who exhibits symptoms substantially more severe than ordinary intoxication violates the arrestee's constitutional rights, all the more so when the surrounding circumstances indicate that a medical emergency exists**." *Id*. at 967 (emphasis added). The result should be no different here – particularly considering that the driver who Owens (the defendant) arrested in *Barton* had a BAC of 0.11 at the time. *Id*. at 968. Moffitt's BAC was more than *three times* greater when Wilson interacted with him. Moffitt's need for additional immediate medical attention was therefore abundantly clear to laypersons like Wilson.

Conversely, the court in *Grayson v. Peed*, 195 F.3d 692 (4th Cir. 1999) (abrogated on other grounds) held that the arresting officer did not act with deliberate indifference to the detainee's serious medical needs when he took the detainee to a detention center rather than the hospital because, **unlike here**, (1) the officer could have reasonably concluded that taking the detainee to the detention center, which had medical personnel on duty 24 hours a day, would not prevent him from receiving needed medical attention, and (2) the officer alerted center staff of the detainee's possible intoxication from the drug PCP (Wilson meanwhile lied about having obtained medical clearance for Moffitt). Thus, the admissible evidence shows that Wilson was subjectively aware of Moffitt's objectively serious medical needs, and that Wilson deliberately – and repeatedly – disregarded the serious risk of harm to Moffitt.

16

**A.**      **Defendant Wilson Is Not Entitled To Qualified Immunity.**

Mr. Moffitt's rights that Defendant Wilson violated were clearly established[6] at the time by the weight of authority in the Tenth Circuit and elsewhere. *See, e.g.*, *Sealock v. Colorado*, 218 F.3d 1205; *Mata v. Saiz*, 427 F.3d 745; *Barton v. Taber*, 820 F.3d 958; *Stefan v. Olson*, 497 F. App'x 568; *Caiozzo v. Koreman*, 581 F.3d 63; *Lancaster v. Monroe Cnty.*, 116 F.3d 1419; *Fielder v. Bosshard,* 590 F.2d 105 (5th Cir. 1979). Defendant Wilson's motion for summary judgment relies heavily (indeed, nearly exclusively) on *Becker v. Fannin Cnty.*, 2014 U.S. Dist. LEXIS 138860 (N.D. Ga. Aug. 15, 2014), a district court case from outside the Tenth Circuit. In addition to being legally nonbinding in this Court, that case is factually inapposite and thus unpersuasive here for several reasons.

---

[6] In determining whether a right was "clearly established," the court assesses the objective legal reasonableness of the action at the time and asks whether "the right is sufficiently clear that a reasonable officer would understand that what he is doing violates that right." *Wilson v. Layne*, 526 U.S. 603, 615 (1999). The plaintiff need not establish a "precise factual correlation between the then-existing law and the case at hand." *Patrick v. Miller*, 953 F.2d 1240, 1249 (10th Cir. 1992) (quoting *Snell v. Tunnell*, 920 F.2d 673, 699 (10th Cir. 1990)). The Supreme Court has rejected an overly abstract approach to this issue, which would "destroy the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). Instead, the Court has adopted a more particularized approach to whether a right has been "clearly established," requiring that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640. Importantly, "[t]his is not to say that an official action is protected . . . unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.*; *see also United States v. Lanier*, 520 U.S. 259, 271 (1997) ("There has never been . . . a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages [or criminal] liability.") (internal quotation marks omitted). Officials acting under color of state law committing outrageous, yet *sui generis*, constitutional violations ought not be permitted to shield their behavior behind qualified immunity simply because another official has not previously had the audacity to commit a similar transgression. *Fuerschbach v. Southwest Airlines Co.*, 439 F.3d 1197, 1206 n.4 (10th Cir. 2006) (citing *Jones v. Hunt*, 410 F.3d 1221, 1230 (10th Cir. 2005)). Finally, when deciding an issue of qualified immunity, the court adopts the plaintiff's version of the facts. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

First, unlike Wilson, the defendant there did not lie to jail staff about obtaining medical clearance for the individual who was going through alcohol withdrawal. Second, the defendant there did not have the readily-available opportunity that Wilson had to return the individual going through alcohol withdrawal to a medical care facility; Mr. Moffitt was right outside the hospital and clearly very intoxicated when Wilson decided to arrest him and take him away from the hospital to jail. Third, the (eventual) decedent in *Becker* was not as obviously intoxicated and in need of medical care as Mr. Moffitt was when Wilson interacted with him. Wilson knew that Moffitt had an extremely high .392 BAC when he arrested him outside the hospital, knew Moffitt was so intoxicated that he had passed out near shrubs at the front of the hospital right after leaving the hospital, and knew Moffitt had just been in the hospital to treat his severe alcohol intoxication. Wilson also deliberately disregarded the requests of eyewitnesses on scene to take Moffitt back into the hospital and even threatened to retaliate against them by detaining them if they did not shut up about Moffitt's serious medical needs.

Therefore, Defendant Wilson's request for qualified immunity must be denied. He knowingly violated his training by failing to obtain the required medical clearance for Moffitt despite observing Moffitt's serious medical needs caused by extreme and obvious alcohol intoxication,[7] he intentionally lied about Moffitt's medical clearance, and he was unequivocally on notice in 2013 that his challenged deliberate indifference to Moffitt's serious medical needs violated the clear mandates of the United States Constitution. *See, e.g.*, *Sealock v. Colorado*, 218 F.3d 1205; *Mata v. Saiz*, 427 F.3d 745; *Barton v. Taber*, 820 F.3d 958; *Stefan v. Olson*, 497 F.

---

[7] *See Walton v. Gomez (In re Estate of Booker)*, 745 F.3d 405, 430 (10th Cir. 2014) ("although not dispositive, an official's training may undermine his or her claim that he or she was unaware of such a risk[]").

App'x 568; *Caiozzo v. Koreman*, 581 F.3d 63; *Lancaster v. Monroe Cnty.*, 116 F.3d
1419; *Fielder v. Bosshard*, 590 F.2d 105 (5th Cir. 1979).

**III.    Defendant Wilson *Caused* Mr. Moffitt's Injuries And Is Liable For Those Injuries.**

Defendant Wilson's challenged acts (and inactions) foreseeably were a cause of the
grossly inadequate medical monitoring and care Mr. Moffitt received at the Summit County Jail
– and foreseeably were a cause of Moffitt's alcohol-related illness and eventual death from
associated complications. The fact that Moffitt had an approximately .392 BAC but **had not
been medically cleared** when he was booked was obviously critical medical information which
the jail obviously needed at the time, but Wilson lied about this critical fact throughout Moffitt's
entire period of incarceration by intentionally misleading jail personnel into believing that
Moffitt had been medically cleared. *See, e.g.*, **RMMFs ¶¶ 15, 17, SADF ¶ 1**. It was reasonably
foreseeable under the circumstances that Wilson's false reporting would cause[8] Moffitt to
receive inadequate medical monitoring and care while in jail.

Indeed, *but for* Wilson's deliberate wrongdoing, Mr. Moffitt never would have even been
admitted to the Summit County Jail on July 6, 2013 (which set in motion a serious of events that
culminated in Moffitt's death) because he did not have the required medical clearance (given his
approximately .392 BAC) at the time.[9] Similarly, had Wilson simply taken Moffitt back into

---

[8] Obviously, Plaintiffs contend that the other Defendants' wrongdoing also caused Moffitt's pain
and suffering and, ultimately, his demise.

[9] Because all facts must be construed in a light most favorable to Plaintiffs and reasonable
inferences drawn from those facts, this Court should infer that Wilson would *not* have received
medical clearance for Moffitt on July 6, 2013 had he actually requested it from SMC, given Mr.
Moffitt's extreme intoxication at the time. Likewise, this Court should infer for purposes of
summary judgment that Moffitt would have returned to the hospital and stayed in the hospital as
long as medically appropriate *but for* Wilson's decision to take him to jail. This is a reasonable
inference for at least two reasons. First, as even Defendant Wilson admitted, he could have taken
Moffitt right back into the hospital himself. Second, because Ms. Kramer and Mr. Shumaker
were with Moffitt outside the hospital, were very concerned about his health, and had previously

SMC, which would have been the logical, humane, and obviously appropriate response to a profoundly intoxicated man who has just pulled out his own IV, left the hospital (where he was being treated for alcohol intoxication), and passed out under bushes in the front of the hospital because he was still so drunk, then Moffitt would not have been booked at the jail and instead would have received the medical monitoring and treatment he obviously needed at the hospital. *See* **SADF** ¶ 3.

The fact that the other Defendants also violated Moffitt's rights (for the reasons stated in Plaintiffs' additional summary judgment briefing submitted to this Court) does not provide Wilson with a viable defense from liability. The United States Supreme Court has repeatedly held that "42. U.S.C. § 1983 creates a species of tort liability." *See Heck v. Humphrey*, 512 U.S. 477, 483 (1994) (*quoting Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 305 (1986)); *Imbler v. Pachtman*, 424 U.S. 409, 418 (1976) ("§ 1983 is to be read in harmony with general principles of tort immunities and defenses rather than in derogation of them"); *City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 709-10 (1999) ("[T]here can be no doubt that claims brought pursuant to § 1983 sound in tort."); *Meyer v. Holley*, 537 U.S. 280, 285 (2003) ("when Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules") (citations omitted).

Following the logic of these Supreme Court cases, the Tenth Circuit has likewise applied tort concepts in 42 U.S.C. § 1983 claims. *See Northington v. Marin*, 102 F.3d 1564, 1568 n.1

---

succeeded in convincing Moffitt to go to the hospital, they likely would have persuaded Moffitt to return to the hospital had Wilson not interfered with the situation. If either of these (plausible) scenarios transpired, there is no evidence to suggest Moffitt would have absconded from the hospital again, as he was not in a hurry to leave the area after going outside (to say the least; he passed out right in front of the hospital) and he never refused to go back inside the hospital.

(10th Cir. 1996) ("Tort law principles may appropriately be applied in § 1983 cases.") (citations omitted); *see also Lippoldt v. Cole*, 468 F.3d 1204, 1219 (10th Cir. 2006) (applying tort concept of joint and several liability to multi-defendant § 1983 claim.); *Berry v. Muskogee*, 900 F.2d 1489, 1507 (10th Cir. 1990) (recognizing and applying "damages recognized in common law tort actions" to § 1983 claim). Applying the principal of joint and several liability in a § 1983 case with multiple defendants, the Tenth Circuit held:

> Multiple tortfeasors who concurrently cause an indivisible injury are jointly and severally liable; each can be held liable for the entire injury. . . . Consequently, a tortfeasor who cannot prove the extent to which the harm resulted from other concurrent causes is liable for the entire harm. . . . These rules apply in § 1983 actions. Persons who concurrently violate others' civil rights are jointly and severally liable for injuries that cannot be apportioned.

*Northington,* 102 F.3d at 1569 (citations omitted); *see also Lippoldt v. Cole* 468 F.3d at 1219 ("In a case of concurrent causation, the burden of proof shifts to the defendants in that a tortfeasor who cannot prove the extent to which the harm resulted from other concurrent causes is liable for the whole harm because multiple tortfeasors are jointly and severally liable.") (citations omitted).

Here, the pain and suffering Moffitt suffered and his ultimate death are not susceptible to apportionment among the individual Defendants (including but not limited to Wilson) because each of the Defendants' deliberate indifference to Moffitt's serious and obvious medical needs collectively caused these harms. Each individual Defendant was, in other words, "a substantial factor in bringing [Moffitt's] injury about." *Id*.; *see also Martinez v. Carson*, 697 F.3d 1252, 1255 (10th Cir. 2012).

And even if relative fault could be apportioned among various Defendants, they all are were deliberately indifferent to Mr. Moffitt's serious medical needs (as discussed elsewhere herein and in Plaintiffs' additional summary judgment briefing submitted to this Court).

Apportionment is therefore question of damages, <u>not liability</u>, which a jury may resolve after weighing the evidence presented at trial. Defendants bear the burden of apportioning harm amongst themselves at trial if they choose to do so. *See Northington*, 102 F.3d at 1569.

**IV.    Summary Judgment in Favor of Defendant Wilson Is Also improper Because Serious Questions Exist Regarding His Credibility.**

Wilson's history of lying during the Moffitt incident and when testifying under oath about material facts in the case reinforces the conclusion that Wilson is not entitled to summary judgment here. *See Newmaker v. City of Fortuna*, 2016 U.S. App. LEXIS 20932, at *20 (9th Cir. Nov. 22, 2016) ("Because this case 'requires a jury to sift through disputed factual contentions' — including whether the officers were telling the truth about when, why, and how Soeth shot Newmaker — summary judgment was inappropriate.") (internal citations omitted); *see also Jones v. Barnhart*, 349 F.3d 1260, 1265-66 (10th Cir. 2003) ("We recognize that at the summary judgment stage credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. In this procedural posture, therefore, our role is simply to determine whether the evidence proffered by plaintiff would be sufficient, if believed by the ultimate factfinder, to sustain her claim.") (quotations and citations omitted). Indeed, Summit County Sheriff's Office terminated Wilson's employment in large part because he lied about obtaining medical clearance for Moffitt. Wilson also testified falsely about asking SMC security guard Brown a number of questions regarding Moffitt's medical condition when, in fact, and as Brown testified, Wilson merely asked her if Moffitt was on a "hold" at SMC. *See* **RMMF ¶ 10**. A jury is therefore entitled to evaluate – and disbelieve – all of Wilson's self-serving testimony in this case.

**V.    Summary Judgment Is Particularly Unwarranted Here Because Mr. Moffitt Is Dead.**

Courts should be especially circumspect in granting summary judgment in a case like Mr. Moffitt's, where the victim is dead (as a result of the defendants' challenged conduct) and thus unable to provide their own testimony regarding the defendants' wrongdoing. As the Tenth Circuit explained in *Pauly v. White*, 814 F.3d 1060, 1079-80 (10th Cir. 2016), *vacated on other grounds*, 196 L.Ed.2d 463 (U.S. 2017), in affirming the district court's denial of summary judgment.

> "[S]ince the victim of deadly force is unable to testify, courts should be cautious on summary judgment to 'ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead—is unable to testify.'" *Id.* (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)). As the Ninth Circuit noted in *Scott*, 39 F.3d at 915, "the court may not simply accept what may be a self-serving account by the police officer." Rather, "[i]t must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably." *Id.* In any event, this factor highlights the district court's ultimate conclusion that genuine fact issues remain for the jury with respect to this issue.

The same sound reasoning applies here – and amplifies the need for a jury to carefully weigh and compare each Defendants' credibility when testifying as part of its evaluation of whether Plaintiffs have proven their claims.

## CONCLUSION

WHEREFORE, Plaintiffs respectfully request that the Court entirely deny Defendant Wilson's Motion for Summary Judgment, and for any additional and further relief deemed just and proper.

DATED this 6th day of February 2017

KILLMER, LANE & NEWMAN, LLP

*s/ Michael Fairhurst*

_____

David A. Lane
Darold W. Killmer

Michael Fairhurst
Andy McNulty
1543 Champa Street, Suite 400
Denver, Colorado 80202
Phone:  (303) 571-1000
dlane@kln-law.com
dkillmer@kln-law.com
mfairhurst@kln-law.com
amcnulty@kln-law.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on this 6th day of February, 2017, I filed this **RESPONSE TO DEFENDANT WILSON'S MOTION FOR SUMMARY JUDGMENT** via CM/ECF, and CM/ECF will generate a Notice of Electronic Filing to the following:


Andy Nathan
Bernard Woessner
Ashley Hernandez Schlagel
Nathan, Dumm & Myers, PC
7990 East Union Ave., Ste 600
Denver, CO 80237
303-691-3737
anathan@ndm-law.com
bwoessner@ndm-law.com
aschlagel@ndm-law.com
kletner@ndm-law.com
*Attorneys for Defendants Giordano, Diurba, Fidler, Hosier Hyde, and Lambert*

Josh Marks
Melanie B Lewis
Berg Hill Greenleaf & Ruscitti LLP
1712 Pearl Street
Boulder, Colorado 80302
Ph: 303-402-1600
Fax: 303-402-1601
jam@bhgrlaw.com;
mbl@bhgrlaw.com;
cds@bhgrlaw.com
*Attorneys for Defendants Minor and Bourgerie*

Cathy H. Greer
William O'Connell
Brendan Loy
Wells, Anderson & Race, LLC
1700 Broadway, Suite 1020
Denver, CO 80290
T: 303-830-1212
cgreer@warllc.com
woconnell@warllc.com
bloy@warllc.com
*Attorney for Defendant Jeff Wilson*

*s/ Jamie Akard*
Jamie Akard

25