**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.  1:15-cv-00071-WYD-MJW

ESTATE OF ZACKARY MOFFITT, by and through its personal representative KELLY
KRAMER;
M.M., a minor, by and through her next friend and mother, CASSANDRA HIGGINS;
C.M., a minor, by and through her next friend and mother, CASSANDRA HIGGINS;

       Plaintiffs,

v.

SHERIFF JOHN MINOR, in his official and individual capacities;
CAPTAIN ERIK J. BOURGERIE, in his individual capacity;
STAFF SERGEANT CHERYL GIORDANO, in her individual capacity;
DEPUTY JONATHON DIURBA, in his individual capacity;
DEPUTY NATHAN FIDLER, in his individual capacity;
DEPUTY RYAN HOSIER, in his individual capacity;
DEPUTY BRIAN HYDE, in his individual capacity;
DEPUTY KATHY LAMBERT, in her individual capacity; and
DEPUTY JEFF WILSON, in his individual capacity;

       Defendants.

_____

**RESPONSE TO DEFENDANTS GIORDANO, DIURBA, FIDLER, HOSIER, HYDE,**
**AND LAMBERT'S MOTION FOR SUMMARY JUDGEMENT**
_____

      Plaintiffs, through their attorneys, David A. Lane, Darold W. Killmer, Michael Fairhurst,

and Andy McNulty, hereby submit the following Response to Defendants Giordano, Diurba,

Filder, Hosier, Hyde, and Lambert's Motion for Summary Judgment [Doc. 78], and state as

follows in support:

**1. <u>Introduction</u>**

      Zackary Moffitt suffered an agonizing death over the course of three days as he suffered

obvious symptoms of alcohol withdrawal that were repeatedly and deliberately ignored by the

Defendant staff at the Summit County Detention Center. Mr. Moffitt ultimately succumbed to these symptoms of July 9, 2013. Throughout his incarceration, Mr. Moffitt was prevented from seeing any medical personnel by the Defendants in this case: Erik J. Bourgerie, Cheryl Giordano, Jonathon Diurba, Nathan Fidler, Ryan Hosier, Brian Hyde, Kathy Lambert, and Jeff Wilson. Defendants' observation of Mr. Moffitt's obvious symptoms of a serious, life-threatening syndrome and failure to provide Mr. Moffitt any medical treatment whatsoever after gaining knowledge that Mr. Moffitt was at risk of serious injury and/or death constitutes deliberate indifference. Because it is clear from the evidence in the record (so clear, in fact, that this Court could grant summary judgment in Plaintiffs' favor in this case) that Defendants violated Mr. Moffitt's Fourteenth Amendment right to medical care that is free of deliberate indifference to his serious medical needs while incarcerated (a right that has been clearly established in this Circuit, in the context presented by Mr. Moffitt's case, for decades), this Court should deny Defendants' motion for summary judgment.[1]

**2. Response to Movant's Material Facts ("RMMF")**[2]

    1-5.    Admit.

    6.    **Admit in part and deny in part**. Admit that Defendant Wilson arrested Moffitt on July 6, 2013; however, Defendants' description of the circumstances surrounding Mr. Moffitt's arrest is grossly inadequate; the material facts are as follows:

---

[1] This Court should also grant summary judgment on the question of liability against all of the Defendants and in Plaintiffs' favor, as no reasonable jury could conclude that the Defendants were anything but deliberately indifferent to Mr. Moffitt's serious and obvious medical needs, in violation of clearly established law.

[2] All of the facts and legal analysis herein are set forth for purposes of summary judgment only. In addition, Plaintiffs fully incorporate all of their summary judgment briefing submitted in this case by reference.

On July 6, 2013, Kelly Kramer and Jamie Schumaker took a highly intoxicated 33-year-old Zachary Moffitt to the St. Anthony Summit Medical Center ("SMC") at 340 Peak Drive, in unincorporated Summit County. At SMC, medical personnel discovered that Mr. Moffitt had a BAC over .392, meaning he was acutely intoxicated. SMC medical personnel began to immediately treat Mr. Moffitt for this acute intoxication. When Mr. Moffitt arrived at SMC, he complained of "alcohol intoxication, vomiting blood, coughing blood, [and] bloody stool," and that his "kidneys hurt, [and] liver hurts." *See* **Exhibit 1,** *St. Anthony Medical Center Records for Zachary Moffitt, July 6, 2013*. ("Laboratory workup demonstrates significant alcohol intoxication, alcohol hepatitis.").

Rather than complete his treatment, the severely intoxicated Mr. Moffitt left the SMC emergency room after he pulled out his own IV and exited the medical center. After leaving, Mr. Moffitt sat in front of the SMC building. Seeing Mr. Moffitt leave, SMC Security Officer Andrea Brown called the Summit County Sheriff's office to report that Mr. Moffitt had pulled the IV out of his arm and walked out of the emergency room after being admitted for acute intoxication. *See* **Exhibit 2,** *Andrea Brown Report – Summit Medical Center*. Defendant Sheriff's Deputy Defendant Jeff Wilson responded to SMC Security Officer Brown's call and arrived at SMC at or around 11:07 a.m. on July 6, 2013. Upon his arrival, Defendant Wilson arrested Mr. Moffitt on an outstanding warrant for criminal mischief and a restraining order prohibiting Mr. Moffitt's consumption of alcohol.

Upon arrest, Defendant Wilson explicitly noted that Mr. Moffitt "had the strong odor of alcohol on his breath, slurred speech[,] and was very unsteady on his feet." *See* **Exhibit 3,** *Warrantless Arrest Probable Cause Statement for Zachary Moffitt*. SMC Security Officer Brown notified Defendant Wilson that Mr. Moffitt's BAC was .392. SCSO's practices and policies

mandate that, when a SCSO deputy comes into contact with an intoxicated person who is suspected of committing a criminal act, the deputy, "upon encountering a person incapacitated by alcohol, an immediate evaluation shall be made as to whether medical personnel should be summoned to determine the person's medical condition." **Exhibit 4,** *SCSO Operations Manual Intoxicated Persons.*

Despite knowing about this policy and practice, and observing Mr. Moffitt's obvious intoxication and serious medical needs, Defendant Wilson did not take Mr. Moffitt back into the SMC Emergency Department. Instead, Defendant Wilson transported Mr. Moffitt to the Summit County Jail, where Mr. Moffitt would remain without any appropriate medical care for the next several days. As Defendant Wilson testified during his deposition:

> Q: Right. So the information that you had when you determined you didn't need to obtain a medical clearance was that dispatch was reporting somebody who was asleep, not conscious, under the bushes. Although he was awake when you came to him, you learned he had a .392 blood alcohol content and he was slurring his words and he was unstable on his feet and he smelled of alcohol and all of this information led you to believe that he was intoxicated; right?
> A: Yes.
> Q: And even though you knew all of that, especially that his BAC was almost .4, you decided you didn't need a medical clearance?
> A: I did not obtain a medical clearance.

**Exhibit 5,** *Deposition of Jeff Wilson*, 64:9-20; *see also id*. at 61:14-16 (admitting that there "was a general practice that if an individual was a .3 and above, to have that individual medically cleared").

7.     **Admit in part and deny in part**. RMMF ¶ 6 provides a more complete and therefore accurate description of the material events.

8.     Admit that, per SCSO detention policy, when an intoxicated person leaves the emergency room or any sort of hospital setting and arrives at the Summit County Jail ("SCJ") for booking, they are required to have medical clearance. *See* **Exhibit 4,** SCSO Operations Manual

Intoxicated Persons; *see also* **Exhibit 6,** *Deposition of Erik Bourgerie,* 11:19-12:25. This directive was widely ignored in Moffitt's case. When Defendant Deputy Wilson booked Mr. Moffitt into the jail, he informed other deputies at the jail of Mr. Moffitt's intoxication. *See* **Exhibit 6,** *Deposition of Erik Bourgerie,* 43:13-21. Contrary to SCSO policy, Defendant Sergeant Hochmuth accepted Mr. Moffitt into the SCJ without any written medical clearance. *See* **Exhibit 7,** *SCSO Disciplinary Report for Sergeant Hochmuth*. Neither Defendant Wilson nor Defendant Hochmuth, or anyone else, took any steps to ensure that Mr. Moffitt received any medical treatment after booking him in the jail. For these reasons along with those described in **RMMF** ¶ 6, Mr. Moffitt's booking file erroneously stated that he was medically cleared at SMC. In actuality, he had never been medically cleared.

9.      Admit Mr. Moffitt was very intoxicated – and obviously very intoxicated – when he was booked at the jail and that, because of this, he was at first assigned to a holding cell. Mr. Moffitt was so visibly intoxicated that, when Deputy Brooks performed a pat down search of him, he was having such difficulty balancing that Deputy Brooks had to lean him against the wall in order to check for contraband. *See* **Exhibit 8,** *Synopsis of CBI Interview with Deputy Brooks*.

10.     **Admit in part and deny in part**. Dr. Blum testified that Moffitt *did* need medical attention on July 6, 2013 because of his alcohol intoxication, B 63:11-64:11; moreover, there *were* obvious reasons for laypersons (including Defendants) to conclude that Moffitt had alcohol-related medical needs which merited immediate medical attention given his clearly very intoxicated state, *see* **RMMF** ¶ 9, and the fact that (at least) Defendant Wilson knew Moffitt had pulled out his IV and walked out of the ER at SMC, thereby cutting short his needed treatment

for alcohol intoxication at the hospital, *see* **RMMF** ¶ 6; *see also* **Exhibit 5**, *Deposition of Jeff Wilson,* 33:5-15.

11.     Admit that Defendant Fidler observed Moffitt vomit and knew Moffitt had been drinking a lot and was hungover, but failed to pass on any of this obviously critical medical information to any medical professional.  **Exhibit 9**, *Jefferson County Transcript of Interview with Nathan Fiddler, at SCSO 4073, 4077.*

12.     Admit that, by the morning of July 7, 2016, Defendant Bourgerie knew Moffitt had been repeatedly vomiting green fluid, observed Moffitt's green vomit, and observed that Moffitt was pale and agitated;  Bourgerie therefore knew at the time that Moffitt was displaying clear symptoms of alcohol withdrawal, which was a serious and obvious medical need.  Exh**ibit 6**, *Deposition of Erik Bourgerie*, 26:23-28:11

13.     Admit that Moffitt reported to Defendant Bourgerie that he was vomiting for alcohol-related reasons, that Bourgerie had no reason to believe Moffitt was *not* hallucinating, and that, despite all he knew, *see also* **RMMF** ¶ 12, Bourgerie entirely failed to contact any medical personnel for Moffitt and instead just transferred Moffitt to a different cell. B 31:3-32:20. Defendant Bourgerie deliberately indifferently dismissed Mr. Moffitt's (obviously well-founded) concerns about his vomiting and the bizarre and wholly unnatural color of his vomit because Bourgerie purportedly "did not believe the human body exuded anything green and that it had to be something [Mr. Moffitt] had consumed." **Exhibit 10,** *Bourgerie's Incident Report dated 7.7.13*; *see also* **Exhibit 6,** *Deposition of Erik Bourgerie,* 27:1-25, 28:1-11 (admitting that it was "extremely strange to see something sort of lime green coming out of the human body[,]" with reference to Mr. Moffitt's vomit); **Exhibit 11,** *Deposition of Brian Hyde,* 103:15-22

(admitting that "every first grader in the country" can recognize that vomiting is a sign that someone is sick).

14.     Plaintiffs lack sufficient information to fully admit or deny; Defendant Bourgerie admitted to learning that Moffitt had a BAC of .392 when booked into the jail but could not recall when he exactly learned this, **Exhibit 6**, *Deposition of Erik Bourgerie,* 44:23-45:22; in any event, Bourgerie knew at the time Moffitt had been very intoxicated and had since become very ill for alcohol-related reasons, *see* **RMMFs ¶¶** 12-13. Moreover, Defendant Bourgerie *admitted* that he failed to request medical assistance for Moffitt merely because the regular on-call[3] doctor happened to be vacationing.  **Exhibit 6**, *Deposition of Erik Bourgerie*, 56:15-58:6. Defendant Bourgerie responded with deliberate indifference to Moffitt's serious, obvious, and time-sensitive medical needs at least in part because he was more concerned with the financial impact of sending Mr. Moffitt to the hospital than with Mr. Moffitt receiving the immediate medical care he clearly needed. *See* **Exhibit 6,** *Deposition of Erik Bourgerie,* 76:13-16; *see also* **Exhibit 12,** *Deposition of Cheryl Giordano,* 64:16-22 (Q: "Who pays for medical care that needs to be provided to an inmate under [the circumstances of Mr. Moffitt]?" / A: "So if it is a preexisting condition then that gets billed back to the inmate. If it is something that happened, you know, while in the jail that is no preexisting, then the jail or sheriff's office would get billed."). Further, despite not having any medical training, Defendant Bourgerie wrongly and callously stated during his interview with the Colorado Bureau of Investigations regarding Mr. Moffitt's death that "there isn't much they or doctors can do for most inmates who are detoxing on a substance like alcohol except to observe them," **Exhibit 13,** *Synopsis of CBI Interview with Bourgerie*; this

---

[3] Summit County did not, at that time, have any on-site doctors or nurses.

supplies further evidence of Bourgerie's culpable mindset (deliberate indifference) during the

Moffitt incident.

15.     **Admit in part and deny in part**. Admit Dr. Blum so stated; however, Moffitt

needed to be evaluated by a medical professional at the time in order to have his condition

properly assessed. As Jane Grametbaur, RN, testified, *see* **Exhibit 14**, *Deposition of Jane*

*Grametbauer*, 49:10-50:20:

> Q: [D]o you believe he should have been taken to the emergency room for
> his severe nausea and vomiting?
> A: Yes. Because there's no -- there's no medical on staff and -- and while
> they didn't know it, he did have a history of possible Giardia, which would cause
> nausea and vomiting, as well as the alcohol withdrawal will cause that, too. But
> when you're having continuous nausea and vomiting, and he was, according to
> the documentation, having pretty continuous nausea and vomiting in the holding
> cell and his cell, and everybody was talking about neon green vomit, there's --
> there's a problem. And he needs medication and needs to be worked up to see
> what's going on with him. . . .

> Q: Right. But -- but was there a period of time within these four days that
> you can narrow down to say that was severe enough that he needed to – he needed
> to be in the emergency room?
> A: The fact -- the fact that he was vomiting from the holding cell on.
> However, when the captain came in to see him with the neon green, yes, because
> he said he had been vomiting for two hours and that -- since they don't have any -
> - if they had medical there, the medical people could make an assessment, but
> they didn't, so then, he needed to go out. He needed to go to the hospital.

16.     Admit the cited exhibits so stated; Plaintiffs lack sufficient information to admit

or deny the actual number of times deputies checked on Moffitt, as Mr. Moffitt is dead.

17-18.  Admit.

19.     **Admit in part and deny in part.** Deny that Moffitt "lucidly" answered questions

to whatever extent Defendants seek to imply that Moffitt's health was sound at the time or that

his obvious and serious medical needs were being appropriately addressed. Moffitt asked for a

personal recognizance bond because he was very sick and needed immediate medical help.

Moffitt explained to the judge that he had not eaten since the preceding Wednesday, was barely able to hold down a glass of water, and had been vomiting green substances, and that he needed to address these very serious medical issues and could not get help so long as he remained in jail. Video (Beginning at 36 seconds). Fidler was present in the courtroom during Moffitt's entire colloquy with the judge during which he described his serious medical condition and emergent need for professional medical treatment.  **Exhibit 15**, *Deposition of Nathan Fidler*, 26:5-11.

20.     **Admit in part and deny in part**. Admit Dr. Blum so stated; however (1) Moffitt obviously needed to be assessed at that time by a medical professional in order for his serious and obvious medical needs to be properly evaluated and addressed (Defendants nonetheless failed to contact any medical professionals for Moffitt or otherwise procure medical care for him), *see* **Exhibit 14**, *Deposition of Jane Grametbauer*, 49:10-50:20, and (2) Dr. Blum did not personally observe Plaintiff in the courtroom or see how sick Plaintiff looked at the time.

21.     **Admit in part and deny in part**. Admit Dr. Jobin so stated; however (1) Moffitt obviously needed to be assessed at that time by a medical professional in order for his serious medical needs to be properly evaluated and addressed (Defendants nonetheless failed to contact any medical professionals for Moffitt or otherwise procure medical care for him), *see* **Exhibit 14**, *Deposition of Jane Grametbauer*, 49:10-50:20, and (2) Dr. Jobin did not personally observe Plaintiff in the courtroom or see how sick Plaintiff looked at the time.

22.     Admit that, at approximately 5:00 p.m. on July 8, 2013, Mr. Moffitt again notified Defendant Fidler that he felt sick and believed he was going to have and was also actively experiencing a seizure. *See* **Exhibit 15,** *Deposition of Nathan Fidler,* 53:18-25, 54:1-5. Rather than initiate a medical intervention to address Mr. Moffitt's serious and obvious medical needs, which Defendant Fidler admitted would be appropriate given that a seizure is a medical red flag

for deputies, *Id*. 54:22-24, Defendant Fidler contacted Defendant Cheryl Giordano, a Staff Sergeant with the Summit County Sheriff's Office, as well as Defendants Kathy Lambert and Brian Hyde, both deputies (not medical professionals) with the Summit County Sheriff's Office.

23.     Admit.

24.     Admit that Defendants Giordano, Lambert, and Hyde went to Mr. Moffitt's cell, upon his report of seizures, where they found him "pacing" and "panicky." *See* **Exhibit 28**, *Synopsis of CBI Interview with Giordano, at 3*. Mr. Moffitt informed the three Defendants he was having some type of attack, such as a stroke, heart attack or panic attack, *see* **Exhibit 28**, *Synopsis of CBI Interview with Giordano, at 3*, and that he had a headache and had been throwing up, **Exhibit 17**, *Jefferson County Transcript of Interview with Brian Hyde, at 2*.  Admit that Hyde, despite being a trained EMT (though Hyde was working as a deputy not an EMT at the time, **Exhibit 11,** *Deposition of Brian Hyde,* 155:20-156:24, and had in fact been asked to resign from the Aurora Fire Department in 2008 because he had repeatedly failed to meet Aurora's paramedic training requirements, **Exhibit 11**, *Deposition of Brian Hyde*, 161:13-163:24, nonetheless failed to procure any medical aid for Moffitt or assess Moffitt in any way besides merely taking his blood pressure and pulse.  **Exhibit 17**, *Jefferson County Transcript of Interview with Brian Hyde, at 2*. Hyde therefore responded with deliberate indifference to Moffitt's serious and obvious medical needs. Deny that Moffitt did not have a serious medical condition; he had a very serious and ultimately fatal medical condition. During his internal affairs interview with Jefferson County, even Defendant Hyde admitted he knew "Mr. Moffitt was a super alcoholic going and through the DT's." *Id.*

25.     Plaintiffs lack sufficient information to admit or deny; in any event, **RMMF ¶** 24 provides a more complete and therefore accurate description of the pertinent events.

26.     **Admit in part and deny in part**. **RMMF** ¶ 24 provides a more complete and therefore accurate description of the material events.

27.     **Admit in part and deny in part**. Admit that Defendants' cherry-picked description of the events is technically correct, but that the far more salient point is this: After Defendant Hyde took Mr. Moffitt's pulse and blood pressure, these three Defendants intentionally failed to take any steps to initiate a medical intervention on behalf of Mr. Moffitt, despite their knowledge that his blood pressure was "a little high," that he had entered the jail extremely intoxicated, that he had repeatedly vomited green liquid the prior day and had been vomiting since that time, that he recently may have had seizures (for the first time in his life), that he was experiencing dizziness and sleeplessness, that he had a headache, that he had diarrhea, that he was extremely anxious, and that, based on all of this along with ***the training materials previously given to them (and all other Defendants who interacted with Mr. Moffitt) by Summit County***,[4] Mr. Moffitt had been exhibiting obvious symptoms of DTs for the past *two days*. *CBI Report with Giordano*; *see also* **Exhibit 18**, *Deposition Exhibit 13, alcohol withdrawal training materials*; **Exhibit 11**, *Deposition of Brian Hyde*, 32:2-33:11, 35:2-5, 72:2-23 (admitting that Moffitt's anxiety could have been a sign of a serious medical condition and that doctors are the ones who should have decided how serious it was), 96:9-11; **Exhibit 19**, *Deposition of Kathy Lambert,* 48:22-49:23; **Exhibit 12**, *Deposition of Cheryl Giordano,* 42:10-17; 46:14-20; 52:21-25; 53:1-3, 6-13; 56:15-21; *see also* Deputy Hyde interview with Jefferson County (Hyde admitted he knew Moffitt was a super alcoholic going through DTs); **Exhibit 12**,

---

[4] *See Walton v. Gomez (In re Estate of Booker)*, 745 F.3d 405, 430 (10th Cir. 2014) ("although not dispositive, an official's training may undermine his or her claim that he or she was unaware of such a risk[]").

*Deposition of Cheryl Giordano,* 73:20-74:25 (Giordano knew that Mr. Moffitt was an alcoholic at the time).

28.     **Admit in part and deny in part**. Admit that taking Moffitt's vitals was a necessary <u>but not sufficient</u> step required to properly evaluate his medical condition; Moffitt obviously needed a much more thorough evaluation conducted by a trained medical professional than the extraordinarily cursory evaluation he was given at the time by the Defendant deputies on-site. *See* **RMMF** ¶ 15.

29.     **Admit in part and deny in part**. Admit only that Hyde's self-serving testimony and report so stated, but a disputed issue of material fact exists regarding Hyde's credibility. *See* **SADF** ¶ 3.

30.     **Admit in part and deny in part**. Admit that documentation *prepared by certain Defendant deputies* who are (at least in some cases) demonstrably blatantly untruthful, *see* **SADFs** ¶ 2-3) did not definitively show that Moffitt had a seizure; moreover, the records are grossly inadequate and incomplete from a medical perspective because the Defendant deputies failed to contact any medical professional to evaluate Moffitt, and only took his pulse and blood pressure, *see, e.g.*, **RMMFs** ¶¶ 15, 28.

31.     **Deny**. Dr. Jobin testified that Plaintiff may have suffered a partial seizure. **Exhibit 20**, *Deposition of Dr. Jobin*, 64:20-254.

32.     **Admit in part and deny in part**. Admit Dr. Blum so stated, but that in reality Moffitt had many other obvious symptoms of withdrawal at the time in addition to anxiety, including repeatedly vomiting green substances, severe panic attacks (not just "anxiety"), diarrhea, a headache, dizziness, and sleeplessness. *See* **RMMF** ¶ 27. This constellation of potentially life-threatening symptoms (about which Defendants were aware, and which

Defendants knew were red flags for DTs) obviously should have been immediately evaluated by a competent medical professional, *see* **RMMF** ¶ 15.

33.  **Deny**. Defendants Giordano, Lambert, and Hyde did not meaningfully "respond" to Moffitt's complaints; they were deliberately indifferent to his serious and obvious medical needs for the reasons stated in (at least) **RMMFs** ¶ ¶ 24, 27-28. Admit that Defendant Hosier observed and interacted with Moffitt, who was clearly very ill, *see* **RMMF** ¶ 27, between about 6:00 and 6:30 p.m. on July 8, 2013, and that Moffitt was nonetheless returned to the general population despite his serious and obvious medical needs at the time, *see* **RMMF** ¶ 34.

34.  Admit that Moffitt was returned to general population in the B-Pod despite clearly displaying multiple symptoms of DTs, *see* **RMMF** ¶ 27, and that, because of this, there was no way for deputies to observe him in his cell other than viewing him in-person and face-to-face, as there are video surveillance cameras in the holding cells but not in the general population cells, *see* Defs.' Mtn. at ¶¶ 3-5; Moffitt's relocation to general population also meant that he was no longer in the section of the jail where deputies (are at least supposed to) check on inmates every fifteen inmates, **Exhibit 6**, *Deposition of Erik Bourgerie*, 94:4-24. Moffitt was therefore further cut off from potential medical aid as a result of Defendants' intentional acts and omissions, all made with deliberate indifference to his serious medical needs.

35.  Admit that, at approximately 1:00 a.m. on July 9, 2013, Mr. Moffitt called into the control room to talk to Defendant Diurba, who was back on duty. *See* **Exhibit 21,** *Synopsis of CBI Interview with Diurba*. When Defendant Diurba could not understand Mr. Moffitt, he and Defendant Ryan Hosier went to Mr. Moffitt's cell. There, they found a clearly delusional Mr. Moffitt reporting that he was hearing voices that were telling him to kill himself. *Id*. Despite the fact that the two Defendants knew that Mr. Moffitt had come into the jail in an extremely

intoxicated state and that Mr. Moffitt had been experiencing tell-tale symptoms of severe alcohol withdrawal over the prior two days, each Defendant deliberately failed to take any steps to ensure Mr. Moffitt received medical treatment for DTs. *See* **Exhibit 22,** *Deposition of Ryan Hosier,* 113:18-114:1 (Q:·"I'm not asking you what people do in a holding cell.· I'm asking what Mr. Moffitt was presenting to you as. He's already said he's hearing voices and he's tried to kill himself and he's grabbing at things in the air and he's not sleeping and he's sweating. None of this occurred to you that he's got a physical problem that maybe he needed medical care?" / A: "No, sir."); **Exhibit 23,** *Deposition of Jonathon Diurba*, 20:19-24, 40:5-8 (Q: "Did he exhibit any signs of hallucinations" / A: "Yes." / Q: "What were those?" / A: "The hallucinations were when he was saying that voices were telling him to kill himself." / Q: "You definitely noted that Moffitt was agitated, didn't you?" / A: "I could see myself noting that, yes."). Instead, Defendants Diurba and Hosier strip searched Mr. Moffitt, placed him in a suicide smock, and contacted Colorado West Mental Health, who (allegedly) told them that they would stop by the next day. Of course, Colorado West *Mental* Health obviously could not provide Mr. Moffitt treatment for his alcohol withdrawal, which is obviously a *physical condition* with *physical symptoms* which, if untreated, could prove fatal. *See* **Exhibit 21,** *Synopsis of CBI Interview with Diurba*.

36.     Admit that Hosier and Duirba knew that Moffitt was engaging in extraordinarily bizarre behavior, including physical self-harm and suicidal ideations, and that this provided further evidence that Moffitt was suffering from DTs at the time.

37.     Admit that Diurba and Hosier placed Mr. Moffitt in a holding cell, where he continued to exhibit apparent symptoms of DTs. Throughout the early morning hours of July 9, 2013, other detainees in the jail reported that Mr. Moffitt appeared to be hallucinating and that

Mr. Moffitt "believed that the [jail] staff and hospital staff were fighting and spilling human organs on the floor" and that he had heard voices "telling him to kill himself." *See* **Exhibit 21,** *Synopsis of CBI Interview with Diurba*; **Exhibit 23**, *Deposition of Jonathon Diurba,* 20:19-24. Despite Mr. Moffitt's display of auditory and visual hallucinations, his profuse sweating, his constant agitation, and all of the other obvious symptoms of DT he had been reporting, none of the Defendants or other jail staff took steps to initiate an appropriate medical intervention on behalf of Mr. Moffitt. As a result of the Defendants' deliberate indifference to his serious medical needs, Mr. Moffitt's condition continued to dramatically deteriorate. *See* **Exhibit 24,** *Synopsis of CBI Interview with Hosier.*

38.     Admit; *see also* **RMMF** ¶ 37 (describing additional obvious signs of DTs that Moffitt was displaying)

39.     Admit that even though Moffitt had an obviously life-threatening *physical* condition which obviously necessitated an immediate hands-on *physical* assessment by a trained medical professional, Moffitt spoke on the phone with a mental health professional and purportedly "described" his symptoms – though, by Diurba's own admission, Moffitt was hallucinating at the time (which obviously made him a less-than-reliable and thorough self-reporter); Diurba himself even admitted Moffitt may not described the symptoms of alcohol withdrawal he had been experiencing.  **Exhibit 23**, *Deposition of Jonathon Diurba,* 68:19-69:16

40.     Plaintiffs lack sufficient information to admit or deny; in any event, Defendants Hosier, Diurba, and Giordano all reacted to Moffitt's serious and obvious medical needs with deliberate indifference because they intentionally failed to procure the professional medical care he clearly needed to treat his ever-worsening DTs despite being aware that he had multiple symptoms of DTs.

41.    **Deny, in part**. Mr. Moffitt was not under constant video observation throughout the morning of July 9, 2013. It was common practice for the guard observing inmates to be sleeping or watching Netflix during the early morning hours. There is no proof that Mr. Moffitt was constantly being observed that morning.

42.    **Deny**. Defendant Diurba admitted in his CBI interview that he "heard a choking and coughing sound in the cell" on the morning of July 9, 2013 and called Deputy Collins in the control room to ask what Mr. Moffitt was doing on the surveillance camera. Deputy Collins told Defendant Diurba that he saw Mr. Moffitt trying to choke himself. Defendant Diurba told the CBI investigators that he "was not concerned about [Mr.] Moffitt 'choking' himself as he believed that the worst case scenario [wa]s that he could go unconscious[.]" **Exhibit 21**, *Synopsis of CBI Interview with Diurba*. Defendant Hosier received a call from Deputy Collins that Mr. Moffitt was choking himself, but did not check on Mr. Moffitt. **Exhibit 24**, *Synopsis of CBI Interview with Hosier, at SCSO 00618*.

43.    Admit.

44.    **Deny, in part**. Defendants Giordano and Hyde were informed that Mr. Moffitt had more than threatened to hurt himself but had not actually done so. Defendants were both informed that Mr. Moffitt was "seeing delusions or visions" and that Mr. Moffitt had told guards on staff that he had already seen a doctor when no doctor had visited his cell. **Exhibit 25**, *Synopsis of CBI Interview with Hyde, at SCSO 00590*.

45.    **Deny, in part.** Defendant Hyde informed the other Defendants that Mr. Moffitt was more "erratic" on July 9, 2013 than on July 8, 2013 and that Mr. Moffitt was seeing "delusions", claiming he already talked to someone from Colorado West. **Exhibit 25**, *Synopsis of CBI Interview with Hyde, at SCSO 00589, 00590*.

46.     **Deny**. Defendant Giordano knew that Mr. Moffitt had been hallucinating; she knew this because Mr. Moffitt had asked her for her keys and had told her that he had already seen a doctor (when Defendant Giordano knew that Mr. Moffitt had not seen any doctor). **Exhibit 26**, *Jefferson County Transcript of Interview with Cheryl Giordano, at SCSO 4101-4102*. Defendant Giordano admitted that she spoke with Defendants Hyde and Lambert about Mr. Moffitt and that herself, Defendant Hyde, and Defendant Lambert were all concerned that Mr. Moffitt had stated he had seen a doctor when he had not, in fact, seen any medical provider. **Exhibit 27A**, *Audio of CBI Interview of Lambert, SCSO 00540,* **Exhibit 27B***, Synopsis of CBI Interview with Lambert*. Mr. Moffitt being naked is obviously strange and out of the ordinary. **Exhibit 27A**, *Audio of CBI Interview of Lambert, SCSO 00540,* **Exhibit 27B***, Synopsis of CBI Interview with Lambert*, **Exhibit 26**, *Jefferson County Transcript of Interview with Cheryl Giordano, at SCSO 4101-4102*. Defendant Giordano also knew that Moffitt had attempted to harm himself, and was experiencing other symptoms of alcohol withdrawal.

47.     Admit.

48.     **Deny, in part**. Defendant Giordano does not just state that it is unusual, she also tells Defendant Lambert about this conversation and that Moffitt's tongue was moving oddly because he was dehydrated or had some other problem like SCDC's bondman's' husband had after he was hospitalized. **Exhibit 26**, *Jefferson County Transcript of Interview with Cheryl Giordano, at SCSO 4103*. Defendant Giordano never asked Mr. Moffitt what was going on with his tongue. **Exhibit 28A**, *Audio of CBI Interview of Giordano, SCSO 536 (9 min 40 sec)*, **Exhibit 28B**, *Synopsis of CBI Interview with Giordano*. Yet, Defendant Giordano doesn't put this information in the pass-on book.

49.     **Deny**. Mr. Moffitt was striking himself, and attempting to harm himself, for over six hours prior to 7:20 a.m. **Exhibit 29**, *Video*.

50.     **Deny**. Dr. Jobin opined that the need for medical assessment becomes apparent when individuals present with agitation and tremors. At the very least, Dr. Jobin opined that when an individual presents with agitation, altered mentation, hallucinations, self-harm, and seizures, he should be medically assessed. Mr. Moffitt was obviously presenting with these symptoms prior to July 8, 2013. **Exhibit 30**, *Dr. Jobin's Report*.

51.     Admit.

52.     **Deny**. Mr. Moffitt's violent, self-harming behavior actually began and was observable on the video monitor screen in the control room six hours prior to Defendant Fidler calling Deputy Lambert at approximately 7:23a.m. **Exhibit 29**, *Video*.

53.     Admit.

54.     Admit.

55.     Admit.

56.     Admit.

57.     Admit.

58.     **Deny.** Dr. Jobin opined that the need for medical assessment becomes apparent when individuals present with agitation (including sweating) and tremors. At the very least, Dr. Jobin opined that when an individual presents with agitation, altered mentation, hallucinations, self-harm, and seizures, he should be medically assessed. Mr. Moffitt was presenting with these obvious symptoms prior to July 8, 2013. He was never given any form of treatment from Defendants, let alone a medical assessment. **Exhibit 30**, *Dr. Jobin's Report*.

59.    **Deny**. Defendant Hyde testified that he saw Mr. Moffitt as "super slippery" because of his profuse sweating, and "as the paramedic side, I should have recognized [DTs] right off the bat like, but you can't ... that's also a sign of having a heart attack, you know[.]" **Exhibit 17**, *Jefferson County Transcript of Interview with Brian Hyde, at SCSO 04191*. Mr. Moffitt's profuse sweating is visible from the video of his cell at this time. **Exhibit 29**, *Video*. Further, Defendant Hyde also noticed at this point that he "[i]nstaneously knew something was wrong" with Mr. Moffitt from just looking at him. Defendant Hyde noted that he observed that Mr. Moffitt had knocked himself out and "breathing really hard" and fast. **Exhibit 17**, *Jefferson County Transcript of Interview with Brian Hyde, at SCSO 4190, 4203, 4198*. Finally, Defendant Giordano notices Mr. Moffitt is on the ground and sounded like he was snoring, and Defendant Hyde tells her that "he hit himself hard enough, he might have knocked himself out." Defendant Giordano at this point thinks "something doesn't sound right." **Exhibit 26**, *Jefferson County Transcript of Interview with Cheryl Giordano, at SCSO 4103*.

60.    Admit that this is what Dr. Blum testified, however, Dr. Blum stated in his deposition that the deputies should have intervened with medical attention far earlier than they did, given the obvious symptoms of life-threatening alcohol withdrawal Mr. Moffitt was experiencing. He also testified that they ignored his obvious symptoms of alcohol withdrawal in their determination that he should be assessed by a mental health specialist and not medical personnel. *See* **Exhibit 31**, *Deposition of Dr. Blum,* 119:3-119:23; **Exhibit 32**, *Dr. Blum's Report*.

61.    Admit.

62.    Admit that Defendant Hyde testified as much. However, Defendant Hyde was not the only deputy working at the time and another deputy, including Deputy Fidler (the deputy

supposedly observing the situation in the control room), could have and should have called for emergency medical assistance.

63.     Admit.

64.     Admit that Dr. Blum stated that by the time the situation had gotten to this point, no medical personnel could treat Mr. Moffitt while he was hallucinating out-of-control. Dr. Blum stated in his deposition that the deputies should have intervened with medical attention far earlier than they did, given the obvious symptoms of life-threatening alcohol withdrawal Mr. Moffitt was experiencing. He also testified that they ignored his obvious symptoms of alcohol withdrawal in their determination that he should be assessed by a mental health specialist and not medical personnel. *See* **Exhibit 31**, *Deposition of Dr. Blum,* 119:3-119:23; **Exhibit 32**, *Dr. Blum's Report*.

65.     Admit.

66.     Plaintiffs lack sufficient information to admit or deny; in any event it is also important to note that there was no reason to delay calling for an ambulance until after Mr. Moffitt was restrained. There were numerous deputies on duty at the SCDC who could have been requested to call 911 while Defendants Hyde, Giordano, and Lambert were restraining Mr. Moffitt.

67.     Admit.

68.     Admit, however, Mr. Moffitt obviously required emergency medical intervention far earlier than the point at which he stopped breathing. *See* **Exhibit 32**, *Dr. Blum's Report*; **Exhibit 30**, *Dr. Jobin's Report*; **Exhibit 33**, *Jane Grametbaur's Report*.

69.     Admit.

70.     Admit.

71.     Admit.

72.     **Deny**. This is what the coroner determined as the cause of death. Every expert witness retained by Plaintiffs disagreed with the coroner's flawed decision and reasoning. *See* **Exhibit 32**, *Dr. Blum's Report*; **Exhibit 30**, *Dr. Jobin's Report*; **Exhibit 33**, *Jane Grammetbaur's Report*.

73.     **Deny**. Sheriff Minor personally participated in the decisions regarding Mr. Moffitt's treatment at the Summit County Detention Center through the obvious lack of training that he provided to SCDC deputies and the policies he promulgated regarding that training, and also his lack of policies regarding passing on information between shifts.

74.     Admit.

76.     **Deny**. Mr. Moffitt's BAC of .392 was printed on a large board in SCDC and was seen by each Defendant. **Exhibit 6**, *Deposition of Erik Bourgerie*, 44:7-45:2. Defendants knew that Mr. Moffitt had entered SCDC with a BAC that was dangerous and higher than allowed without medical clearance.

### 3. <u>Statement of Additional Disputed Facts ("SADF")</u>

1.     Other inmates observed Moffitt's serious medical needs and his requests for medical aid, and Defendants' deliberate indifference to Moffitt's serious and apparent medical needs. **Chad Demming** asserted that "Moffitt was complaining that he was sick. . . On one of the days, he heard Moffitt push his intercom button and tell the staff he was having chest pains. . . Every day Moffitt was there he was 'freaking out.'" **Exhibit 34,** *Synopsis of CBI Interview of Inmate Demming*. **John Watson** stated: "Moffitt called for help and was crying that he couldn't be locked into six walls. He said he had a seizure and needed a doctor. . . The night before Moffitt died he heard Moffitt push the intercom button and three deputies came to check on him.

One of the deputies was Deputy Diurba. . . Moffitt told the staff he thought he needed to see a doctor and that he was dizzy. . . Moffitt said he was sick from alcohol and not from any other substance." **Exhibit 35**, *Synopsis of CBI Interview with Inmate Watson*.

2.      There is a plethora of admissible and damning evidence relating to Defendant Lambert's credibility and mental state during the Moffitt incident, in addition to her conduct during the incident itself. Summit County terminated Defendant Lambert's employment after the Moffitt incident for watching a movie on March 13, 2016, while she was staffed in the inmate surveillance monitoring room, when she should have been watching the inmates, and one of the inmates attempted to commit suicide during the move-watching. **Exhibit 19**, *Deposition of Kathy Lambert*, 206:11-207:25; **Exhibit 36**, *Deposition Exhibit 100, SCSO Disciplinary Hearing of Kathy Lambert, 2016-IA03*. Lambert's deliberate indifference during this closely-related incident is probative of her deliberate indifference when she was supposed to be caring for Mr. Moffitt, and impeaches her sworn testimony that she did everything she should have done with respect to Mr. Moffitt.

3.      Like Lambert, Hyde's credibility was called into very serious doubt during discovery. When deposed, Defendant Hyde admitted to falsely asserting under oath in his written discovery responses that he had never been subject to professional discipline, when, in fact, he had been disciplined at the time for improperly performing a welfare check on another inmate. *See* **Ex. 11**, *Deposition of Brian Hyde*, 148:4-14.

4.      Even a layperson would have known that Mr. Moffitt required emergent medical care for his medical symptoms prior to July 9, 2013. **Exhibit 33**, *Jane Grametbaur's Report*.

5.      Symptoms of DTs include nightmares, global confusion, disorientation, fever, visual and auditory hallucinations, agitation, seizures, and actions of self-harm and fear. DTs can

sometimes be associated with severe, uncontrollable tremors of the extremities and secondary symptoms, including anxiety, panic attacks, and paranoia. *See* **Exhibit 32**, *Blum's Report*.

6.      On July 7, 2013, at approximately 11:30 a.m., roughly 24 hours after his arrival at the Summit County Jail, Mr. Moffitt began complaining of feeling sick to Defendant Nathan Fidler, a Summit County Sheriff's Deputy working in the control office of the Summit County Jail, who admits that he knew Mr. Moffitt was vomiting on July 7, 2013.  *See* **Exhibit 10**, *Bourgerie's Incident Report dated 7.7.13*; *see also* **Exhibit 15**, *Deposition of Nathan Fidler,* 34:3-11.

7.      At approximately 5:00 p.m. on July 8, 2013, Mr. Moffitt again notified Defendant Fidler that he felt sick and believed he had had a seizure. *See* **Exhibit 15**, *Deposition of Nathan Fidler,* 53:18-25, 54:1-5.

8.      Defendant Fidler did not initiate a medical intervention on behalf of Mr. Moffitt after being told that Mr. Moffitt had continued to vomit and experienced a seizure, even though he knew that would be appropriate given that a seizure is a medical red flag for deputies. **Exhibit 15**, *Deposition of Nathan Fidler,* 54:22-24

9.      At approximately 5:00 p.m. on July 8, 2013, Defendants Giordano, Lambert, and Hyde visited Mr. Moffitt's cell, where he informed them that he had experienced a seizure and showed signs of anxiety, paranoia, agitation, and fear. Mr. Moffitt also informed the Defendants that he felt dizzy, had a bad headache, had been throwing up consistently, was experiencing diarrhea and hadn't slept for the past two days. *See* **Exhibit 28**, *Synopsis of CBI Interview with Giordano*; **Exhibit 11**, *Deposition of Brian Hyde,* 32:2-33:11, 35:2-5, 72:2-23 (admitting that Moffitt's anxiety could have been a sign of a serious medical condition and that doctors are the ones who should have decided how serious it was), 96:9-11; **Exhibit 19**, *Deposition of Kathy*

23

*Lambert,* 48:22-49:23; **Exhibit 12**, *Deposition of Cheryl Giordano,* 42:10-17; 46:14-20; 52:21-25; 53:1-3, 6-13; 56:15-21.

10.     After speaking with Mr. Moffitt and directly observing multiple symptoms of severe alcohol withdrawal, Defendants took no steps to initiate medical intervention. *See* **Exhibit 28**, *Synopsis of CBI Interview with Giordano*.

11.     Defendant Hyde admitted that when he interacted with Mr. Moffitt at approximately 5:00 p.m. on July 8, 2013, he knew "Mr. Moffitt was a super alcoholic going through the DT's." **Exhibit 25**, *Synopsis of CBI Interview with Hyde*.

12.     Defendant Giordano knew that Mr. Moffitt was an alcoholic, based on a July 8, 2013 phone call with Mr. Moffitt's girlfriend Kelly Kramer. *See* **Exhibit 12**, *Deposition of Cheryl Giordano,* 73:20-74:25.

13.     At approximately 1:00 a.m. on July 9, 2013, Mr. Moffitt called into the control room to talk to Defendant Diurba, who was back on duty. Defendant Diurba could not understand Mr. Moffitt, he and Defendant Ryan Hosier (another deputy employed by the Summit County Sheriff's Office) went to Mr. Moffitt's cell. There, they found a clearly delusional Mr. Moffitt reporting that he was hearing voices that were telling him to kill himself. *See* **Exhibit 21**, *Synopsis of CBI Interview with Diurba*.

14.     Despite the fact that the Defendant Diurba and Defendant Hosier knew that Mr. Moffitt had come into the jail in an extremely intoxicated state and that Mr. Moffitt had been experiencing tell-tale symptoms of severe alcohol withdrawal over the prior two days, neither Defendant took any steps to ensure Mr. Moffitt received medical treatment after their conversation with him at approximately 1:00 a.m. on July 9, 2013. **Exhibit 22**, *Deposition of Ryan Hosier,* 113:18-114:1 (Q: "I'm not asking you what people do in a holding cell. I'm asking

what Mr. Moffitt was presenting to you as. He's already said he's hearing voices and he's tried to kill himself and he's grabbing at things in the air and he's not sleeping and he's sweating. None of this occurred to you that he's got a physical problem that maybe he needed medical care?" / A: "No, sir."); **Exhibit 33**, *Deposition of Jonathon Diurba,* 20:19-24, 40:5-8 (Q: "Did he exhibit any signs of hallucinations" / A: "Yes." / Q: "What were those?" / A: "The hallucinations were when he was saying that voices were telling him to kill himself." / Q: "You definitely noted that Moffitt was agitated, didn't you?" / A: "I could see myself noting that, yes.").

15.     At approximately 6:20 a.m. on July 9, 2013, Defendant Giordano also observed Mr. Moffitt sitting naked in the holding cell. Despite this odd behavior from Mr. Moffitt, which was particularly odd when combined with the other obvious symptoms of alcohol withdrawal that Defendant Giordano had previously witnessed, Defendant Giordano did nothing to initiate a medical intervention on Mr. Moffitt's behalf. *See* **Exhibit 28**, *Synopsis of CBI Interview with Giordano*.

16.     At approximately 7:16 a.m., Defendant Giordano again checked on Mr. Moffitt in the holding cell. At this time, Mr. Moffitt was standing up and came to the door to talk to Defendant Giordano. Mr. Moffitt asked Defendant Giordano for the keys, stating that he needed "to open the door, and go back to my cell, I've seen the doctor, and want to go back to his cell." Defendant Giordano observed that Mr. Moffitt "kept sticking his tongue out while talking" during this conversation. Defendant Giordano admitted that Mr. Moffitt sticking out his tongue while talking was potentially a sign of dehydration and that it could be "a sign of additional symptomology for a medical problem." *See* **Exhibit 28**, *Synopsis of CBI Interview with Giordano*; *see also* **Exhibit 12**, *Deposition of Cheryl Giordano,* 107:11-108:7, 111:10-16, 113:6-10.

17.     After verifying with Defendant Lambert, after her conversation at approximately 7:16 a.m. on July 9, 2013 with Mr. Moffitt, that Mr. Moffitt had not seen a mental health professional or any doctor yet, and therefore had hallucinated the doctor visit Mr. Moffitt had informed her that he had just participated in, Defendant Giordano left Mr. Moffitt in the holding cell, doing nothing to provide him medical care despite his clear disorientation, dehydration, and hallucinations. *See* **Exhibit 28**, *Synopsis of CBI Interview with Giordano*; *see also* **Exhibit 12**, *Deposition of Cheryl Giordano,* 107:11-108:7, 111:10-16, 113:6-10.

18.     Likewise, Defendant Lambert did nothing to provide Mr. Moffitt medical care, even after Defendant Giordano informed Defendant Lambert that Mr. Moffitt had been unable to control his tongue during their conversation and had obviously been hallucinating. Defendant Lambert later admitted that medical personnel should have assessed Mr. Moffitt at this point in time. *See* **Exhibit 19**, *Deposition of Kathy Lambert*, 82:8-83:14; *see also* **Exhibit 12**, *Deposition of Cheryl Giordano,* 111:10-20.

19.     Mr. Moffitt's condition deteriorated throughout the morning hours of July 9, 2013. *See* **Exhibit 248**, *Synopsis of CBI Interview with Hosier.*

20.     At approximately 7:20 a.m. on July 9, 2013, Defendant Lambert, who was working at the booking desk of the jail, received a call from Defendant Fidler who, through the jail's control room cameras, had observed Mr. Moffitt lying on the floor, punching himself in the face in the holding cell. *See* **Exhibit 11,** *Deposition of Brian Hyde,* 125:2-126:4.

21.     Despite observing Mr. Moffitt lying on the floor, punching himself hard in the face, and slamming the back of his head against the floor, Defendant Fidler took no steps to initiate a medical intervention on behalf of Mr. Moffitt. From his post in the control room, Defendant Fidler and other deputies, including Defendant Diurba, assigned to that post had a

bird's eye view of Mr. Moffitt's deterioration over the course of much of his three-day detention in the jail, yet took no steps to ensure that Mr. Moffitt received the immediate medical attention he so obviously needed.  *See* **Exhibit 37**, *Synopsis of CBI Interview with Fidler*; **Exhibit 15** *Deposition of Nathan Fidler,* 103:1-113:21; *see also* **Exhibit 22**, *Deposition of Ryan Hosier*, 35:1-3, 130:7-10.

22.     A few minutes after 7:20 a.m. on July 9, 2013, Defendant Lambert went to the holding cell where Mr. Moffitt was housed and asked Mr. Moffitt why he hit himself. Overhearing Defendant Lambert, Defendant Giordano requested that Defendant Hyde talk to Mr. Moffitt to inform him that he would be placed in the restraint chair to keep him from injuring himself if he did not stop hitting his head. When Defendant Hyde arrived at the holding cell, he observed Mr. Moffitt "lying on the floor on his back, breathing rapidly, naked with his hands clenched." Rather than provide Mr. Moffitt medical attention, Defendant Hyde told Mr. Moffitt to stop punching himself in the face and warned Mr. Moffitt that he failed to do so, he would be placed in the restraint chair. Mr. Moffitt again began to punch himself in the face, throat, and jaw several times, while still lying on the floor. Defendant Giordano then walked to the holding cell, where she observed Mr. Moffitt lying naked on the floor, his neck red, making noise that sounded like snoring. Mr. Moffitt was not snoring, however. He was, in fact, stridor breathing. Stridor breathing occurs when a person's air passages are blocked and sounds like loud snoring. Stridor breathing is often a sign of a need for emergent medical attention. **Exhibit 25**, *Synopsis of CBI Interview with Hyde;* **Exhibit 12**, *Deposition of Cheryl Giordano,* 114:24-115:25; **Exhibit 28**, *Synopsis of CBI Interview with Giordano.*

23.     Despite these obvious signs that Mr. Moffitt required emergent medical attention a few minutes after 7:20 a.m. on July 9, 2013, none was summoned by Defendants Lambert,

Hyde, or Giordano. **Exhibit 25**, *Synopsis of CBI Interview with Hyde;* **Exhibit 12**, *Deposition of Cheryl Giordano,* 114:24-115:25; **Exhibit 28**, *Synopsis of CBI Interview with Giordano.*

24.     On July 8, 2013, Defendant Hyde prepared a written report describing Mr. Moffitt, which stated as follows in relevant part:

> On July 8, 2013, at approximately 17:12 hrs, SSGT C. Giordano, Deputy Lambert, Deputy Fidler and I were working at the Summit county Detention, 501 N Park *Ave.,* Summit County, Co, when Deputy Fidler called to the booking desk from control to Inform Deputy Lambert and I the Inmate Moffit had called In and that he was **having a seizure**. Immediately Deputy Lambert, SSGT. C Giordano, and I went back to B - Pod, B2 and found Inmate Moffit walking around telling us that he thinks he had a seizure. Inmate Moffit [sic] stated **he felt dizzy, had a bad headache, he had been throwing up, and hasn't been able to sleep for the last couple of day**s. Mr. Inmate Moffit [sic] was brought up to Holding 2 for observation and his vitals were taken. Vitals were within normal limits. Mr. Moffit [sic] **appeared to have had a panic attack**. While Inmate Moffit [sic] was up at the front, he calmed down, ate his dinner, and stated he was feeling better after sometime.

**Exhibit 38**, *Brian Hyde's Report, SCSO 10154* (emphasis added). *Every single individual Defendant* (with the exception of Minor and Wilson) appears to have initialed this report describing Moffitt's serious and obvious medical needs, which was contained in a pass-on book that jail guards were supposed to review whenever they started a shift. **Exhibit 11**, *Deposition of Brian Hyde*, 132:13-104:2. *Every single individual Defendant* (with the exception of Minor and Wilson) was therefore aware that Moffitt was dizzy, had a bad headache, had been throwing up, had not been able to sleep for days, and appeared to have a panic attack before he suffered a cardiac arrest at the jail.

25.     Also on July 8, 2013, Deputy Fidler accompanied Mr. Moffitt to a court appearance. During the court appearance, and in the presence of Deputy Fidler, Mr. Moffitt told the court that he was very "sick," that he had not eaten "since last Wednesday" because of he has been sick, that, since the previous Wednesday, that he had "barely been able to hold down a glass

of water," and that these symptoms are not being caused by stress, rather they are attributable to him being "ill." Mr. Moffitt ultimately asked the court to grant him a personal recognizance ("PR") bond because he was not receiving medical treatment for these obvious medical issues at SCDC. **Exhibit 39**, *Audio of Zackary Moffitt's July 8, 2013 Court Appearance*; **Exhibit 15**, *Deposition of Nathan Fidler*, 25:25-27:17.

26.     Dr. Joshua Blum opined that: "Mr. Moffitt died from alcohol withdrawal when his many signs and symptoms were not triaged appropriately by jail deputies. Several of the deputies were aware that Mr. Moffitt was an alcoholic who had been arrested while intoxicated, were aware of the typical symptoms of alcohol withdrawal, and identified Mr. Moffitt as going through alcohol withdrawal. Based on this knowledge, it is my opinion to a reasonable degree of medical confidence that these deputies should have recognized Mr. Moffitt's need for medical evaluation and treatment, and demonstrated deliberate indifference to his medical needs."
**Exhibit 32,** *Dr. Blum's Report*.

**4. <u>Standard of Review</u>**

Summary judgment is appropriate only if the record contains no evidence of a genuine issue of material fact and demonstrates that the moving party is entitled to judgment as a matter of law. *Woodman v. Runyon*, 132 F.3d 1330, 1337 (10th Cir. 1997). "The party that moves for summary judgment bears the burden of proving that no genuine issue of material fact exists on all claims for which it seeks summary judgment." *Trujillo v. Atmos Energy Corp.*, No. 11-cv-01151-RBJ-MEH, 2012 U.S. Dist. LEXIS 87273, at *4 (D. Colo. June 25, 2012). The Tenth Circuit has emphasized that the nonmovant is given "wide berth to prove a factual controversy exists." *Ulissey v. Shvartsman*, 61 F.3d 805, 808 (10th Cir. 1995). In making this determination, the district court must view the record and all reasonable inferences drawn therefrom in the light

most favorable to the nonmoving party. *Thomas v. Int'l Bus. Machines*, 48 F.3d 478, 484 (10th

Cir. 1995). "Where different ultimate inferences may be drawn from the evidence presented by

the parties, the case is not one for summary judgment." *Brown v. Parker-Hannifan Corp.*, 746

F.2d 1407, 1411 (10th Cir. 1984). Critically:

> The right to confront, cross-examine and impeach adverse witnesses is one of the
> most fundamental rights sought to be preserved by the Seventh Amendment
> provision for jury trials in civil cases. The advantages of trial before a live jury
> with live witnesses, and all the possibilities of considering the human factors,
> should not be eliminated by substituting trial by affidavit and the sterile bareness
> of summary judgment. It is only when the witnesses are present and subject to
> cross-examination that their credibility and the weight to be given their testimony
> can be appraised. Trial by affidavit is no substitute for trial by jury which so long
> has been the hallmark of "even handed justice."

*Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 176 (1970) (Black, J., concurring); *see also*

*Fisher v. Shamburg*, 624 F.2d 156, 162 (10th Cir. 1980).

## 5. <u>Argument</u>

### 5.1 Summary judgment is particularly unwarranted here because Mr. Moffitt is dead.

Courts should be especially circumspect in granting summary judgment in a case like Mr.

Moffitt's, where the victim is dead (as a result of the defendants' challenged conduct) and thus

unable to provide their own testimony regarding the defendants' wrongdoing. As the Tenth

Circuit explained in *Pauly v. White*, 814 F.3d 1060, 1079-80 (10th Cir. 2016), *vacated on other*

*grounds*, 196 L.Ed.2d 463 (U.S. 2017), in affirming the district court's denial of summary

judgment.

> "[S]ince the victim of deadly force is unable to testify, courts should be cautious
> on summary judgment to 'ensure that the officer is not taking advantage of the
> fact that the witness most likely to contradict his story—the person shot dead—is
> unable to testify.'" *Id.* (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir.
> 1994)). As the Ninth Circuit noted in *Scott*, 39 F.3d at 915, "the court may not
> simply accept what may be a self-serving account by the police officer."
> Rather, "[i]t must also look at the circumstantial evidence that, if believed, would
> tend to discredit the police officer's story, and consider whether this evidence

could convince a rational factfinder that the officer acted unreasonably." *Id.* In any event, this factor highlights the district court's ultimate conclusion that genuine fact issues remain for the jury with respect to this issue.

The same sound reasoning applies here – and amplifies the need for a jury to carefully weigh and compare each Defendants' credibility when testifying, as part of its evaluation as to whether Plaintiffs have proven their claims.

**5.2** *Kingsley v. Hendrickson* **obviates prior precedent and calls for the utilization of an objective standard in evaluating pretrial detainees' claims under the Fourteenth Amendment**.

The United States Supreme Court has long made clear that detainees and prisoners have a constitutional right to adequate medical care:

> An inmate must rely on prison authorities to meet his medical needs; if the authorities fail to do so, those needs will not be met. *In the worst cases, such a failure may actually produce physical torture or a lingering death, the evils of most immediate concern to the drafters of the [Fourteenth] Amendment*. In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose. *The infliction of such unnecessary suffering* is inconsistent with contemporary standards of decency as manifested in modern legislation codifying the common law view that it is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself.

*Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976) (internal quotation marks and citations omitted) (emphasis added). Under the Fourteenth Amendment, a constitutional claim for inadequate medical care requires that defendants respond with deliberate indifference to the victim's serious medical needs. *Martinez v. Beggs*, 563 F.3d at 1088. Prior to *Kingsley v. Hendrickson*, 135 S.Ct. 2466 (2015), the Tenth Circuit has held, pursuant to the Fourteenth Amendment's due process clause, "pretrial detainees are . . . entitled to the degree of protection against denial of medical attention which applies to convicted inmates" under the Eighth Amendment. *Garcia v. Salt Lake County*, 768 F.2d 303, 307 (10th Cir. 1985). Post-*Kingsley*, the Tenth Circuit's holding in *Garcia*, and the application of the same deliberate indifference standard to both pretrial and

convicted detainees, is in serious doubt. *See Castro v. Cnty. of L.A.*, 2016 U.S. App. LEXIS

14950, *19 (9th Cir. Aug. 15, 2016) (en banc); *Castro v. County of Los Angeles*, 797 F.3d 654,

681 (9th Cir. 2015) (Callahan, J., concurring) ("In light of *Kingsley*'**s** focus on the differences

between the relevant constitutional provisions, we ought not apply a decision grounded in the

Eighth Amendment to a claim arising under the Fourteenth Amendment. . . . [I]n my

view, *Kingsley* strongly suggests that proof of actual knowledge of the risk is not required for a

claim arising under the Fourteenth Amendment."); *Abila v. Funk*, No. CIV 14-1002 JB/SMV,

2016 U.S. Dist. LEXIS 162474, at *146 (D.N.M. Nov. 23, 2016) (Browning, J.).

    In *Kingsley*, the Supreme Court concluded that Eighth Amendment culpable state of

mind rules arising out of the prohibition of "wanton" punishment cannot be extended to pretrial

detainees, who have a Fourteenth Amendment right to be free from all punishment. 135 S.Ct. at

2475. "The language of the two Clauses differs," the Court reasoned, "and the nature of the

claims often differs. And, most importantly, pretrial detainees (unlike convicted prisoners)

cannot be punished at all . . ." *Id*. Because there is no requirement that a pretrial detainee

demonstrate the wanton infliction of pain, "a pretrial detainee can prevail by providing *only*

*objective evidence* that the challenged governmental action is not rationally related to a

legitimate governmental objective or that it is excessive in relation to that purpose." *Id.* at 2473-

74 (emphasis added). Thus, "the appropriate standard for a pretrial detainee's excessive force

claim is solely an objective one." *Id*. at 2473.

    The implications of *Kingsley* are by no means limited to excessive force claims. *See id.* at

2473 ("The *Bell* Court applied [an] objective standard to evaluate a *variety* of prison conditions .

. . . In doing so, it did not consider the prison officials' subjective beliefs about the policy.")

(citing *Bell v. Wolfish*, 441 U.S. 520, 541-43 (1977)) (emphasis added); *see also Castro*, 2016

U.S. App. LEXIS 14950 at *19 (holding that "a single deliberate indifference standard for all §

1983 claims" is inappropriate post-*Kingsley* and applying a wholly objective standard to a

pretrial detainee's failure-to-protect claim); *Abila*, 2016 U.S. Dist. LEXIS 162474, at *146

("*Kingsley v. Hendrickson* held that there does not exist a single 'deliberate indifference'

standard applicable to all § 1983 claims, whether pretrial detainees or convicted prisoners bring

the claim."). The mandate of *Kingsley*, in short, is that objective standards, not the subjective

standards that characterize Eighth Amendment jurisprudence, must govern claims brought by

pretrial detainees.

    As demonstrated below, regardless of whether Plaintiffs' allegations are analyzed under

an objective standard, in accordance with *Kingsley*, or the Fourteenth Amendment's subjective

deliberate indifference standard, the application of which to pretrial detainees has been rendered

legally dubious by *Kingsley*, the outcome is the same: Defendants violated Mr. Moffitt's clearly

established Fourteenth Amendment rights.

**5.3 Defendants violated Mr. Moffitt's Fourteenth Amendment[5] rights under the post-**
    ***Kingsley* objective deliberate indifference standard *and* under the pre *Kingsley***
    **subjective standard.**

    Pursuant to *Kingsley*, for a pretrial detainee to allege a Fourteenth Amendment claim, she

or he must satisfy three factors. First, she or he must show that each Defendant "acted

purposefully or knowingly with respect to" their actions. *Kingsley*, 135 S. Ct. at 2472. Second,

the detainee must show that he or she suffered from an objectively serious medical need. Third,

Defendants' conduct was objectively unreasonable; in other words, Defendants did not take

---

[5] Plaintiffs maintain that Moffitt's right to adequate medical care was secured by the Fourteenth
Amendment at all relevant times. However, assuming, *arguendo*, that the Eighth Amendment
applied to him instead, the underlying *Pre-Kingsley* standard is the same under both amendments
and, therefore, Defendants also violated Moffitt's rights secured by the Eighth Amendment.

reasonable available measures to abate the risk caused by the serious medical condition, even though a reasonable jail official would have appreciated the high degree of risk involved, making the consequences of Defendants' conduct obvious. *Id*. at 2473. The facts in the record show that Mr. Moffitt has satisfied each of these factors.

The facts in record demonstrate Defendants "acted purposefully or knowingly with respect to" their failure to provide medical care to Mr. Moffitt, or to ensure that Mr. Moffitt was provided medical care by a healthcare professional. *Id*. at 2472. In other words, the lack of care given to Mr. Moffitt was purposeful, not accidental. *See Id.* Defendants were not incapacitated by injury or illness, they actively chose not to provide any medical care to Mr. Moffitt or ensure that he was provided treatment by a healthcare professional. *Id*. This adequately establishes the first component of the deliberate indifference standard post-*Kingsley*. The rest of the inquiry turns on objective reasonableness.

A medical need is objectively "sufficiently serious" if it is an injury that equates to the "denial of the minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834 (internal quotation marks omitted). Mr. Moffitt died as a result of the failure of Defendants Giordano, Diurba, Fidler, Hosier, Hyde, Lambert and Wilson, along with Commander Bougerie and Sheriff Minor, to provide him medical attention (or any access to medical attention) to treat his alcohol withdrawal syndrome. Numerous courts have found that alcohol withdrawal constitutes a sufficiently serious medical need. *Stefan v. Olson*, 497 F. App'x 568, 577 (6th Cir. 2012) (holding plaintiff's "extremely elevated .349 blood-alcohol level and verbal communication of a history of alcoholism accompanied by withdrawal seizures communicated an objectively serious medical need possessing the sufficiently imminent danger that is actionable under the Eighth Amendment"); *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009) (holding there was "no

dispute" that the plaintiff, who was suffering from alcohol withdrawal, "had a serious medical condition"); *Lancaster v. Monroe Cnty.*, 116 F.3d 1419, 1426 (11th Cir. 1997) (holding that it was "clearly established that that sheriffs and jailers cannot place or keep a chronic alcoholic in jail without any medical supervision, when the defendants are aware that the alcoholic is suffering from a severe form of alcohol withdrawal"); *M.H. v. Cnty. of Alameda*, Case No. 11-cv-02868-JST, 62 F. Supp. 3d 1049, 2014 U.S. Dist. LEXIS 48592, 2014 WL 1429720, at *20-21 (N.D. Cal. Apr. 7, 2014) (finding deliberate indifference after defendant was "subjectively aware of the risk of alcohol withdrawal, but failed nevertheless to fill out a CIWA form, initiate the CIWA protocol, or otherwise ensure [plaintiff] would receive medical help"). Further, because Mr. Moffitt died from the withdrawal symptoms that Defendants deliberately disregarded, his death alone satisfies the objective component of the Eighth Amendment standard. *See Martinez v. Beggs*, 563 F.3d 1082, 1088-90 (10th Cir. 2009). The harm Mr. Moffitt suffered was, therefore, "without doubt, sufficiently serious to meet the objective component." *Id*.

The final objective unreasonableness determination under the *Kingsley* standard "turns on the facts and circumstances of each particular case." *Kingsley*, 135 S. Ct. at 2473; *accord* Restatement (Second) of Torts § 500 cmt. a (Am. Law Inst. 2016) (recognizing that "reckless disregard" may be shown by an objective standard under which an individual "is held to the realization of the aggravated risk which a reasonable [person] in his place would have, although he does not himself have it").

Mr. Moffitt's need for treatment was obvious. **Exhibit 11**, *Deposition of Brian Hyde,* 103:15-22 (admitting that "every first grader in the country" can recognize that vomiting is a sign that someone is sick). It was so obvious that certain Defendants (including, but not limited

to, Bourgerie) considered calling for medical attention. They did not, however, in part because the doctor contracted to provide medical services to inmates at SCDC was out of town, and providing Mr. Moffitt with emergent medical care or with access to emergent medical care would be too expensive and burdensome under the circumstances. **Exhibit 40**, *Deposition of Sheriff John Minor*, 24:8-24:12; **Exhibit 6**, *Deposition of Erik Bourgerie*, 58:3-6, 58:18-20, 123:13-125:1.

A summary of the facts demonstrating the culpability of Defendants Fidler, Giordano, Hyde, Diurba, Hosier, and Lambert under **both** pre[6]- and post-*Kingsley* standards follows[7] and,

---

[6] The pre-*Kingsley* test is met here because (1) Moffitt died from the obvious and serious withdrawal symptoms that Defendants deliberately disregarded (objective component, further discussed above), and because the evidence shows that Defendants knew of and intentionally disregarded the excessive risk to Moffitt's health and safety (subjective component, further discussed below). Pre-*Kingsley*, "[t]he test for constitutional liability of prison officials involve[d] 'both an objective and a subjective component.'" *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)). The objective component was met if the medical need is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The subjective component was met if a prison official "knows of and disregards an excessive risk to [prisoner] health or safety." *Id*. at 837. "Although deliberate indifference is a subjective inquiry, a jury is permitted to infer that a prison official had actual knowledge of the constitutionally infirm condition based solely on circumstantial evidence, such as the obviousness of the condition." *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008) (internal quotations omitted).

   "To prevail on the subjective component, [a plaintiff] must show that the defendants knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006) (internal quotation marks omitted). A plaintiff need not plead a defendant's acts or omissions were taken "for the very purpose of causing harm or with knowledge that harm will result." *Brennan*, 511 U.S. at 835. Instead, a plaintiff need only allege that a defendant was made aware of the risk of harm and failed to treat it. *Id*. "Unlike the objective component, the symptoms displayed by the prisoner are relevant to the subjective component of deliberate indifference. The question is: 'were the symptoms such that a prison employee knew the risk to the prisoner and chose (recklessly) to disregard it?'" *Martinez*, 563 F.3d at 1089 (quoting *Mata v. Saiz*, 427 F.3d 745, 753 (10th Cir. 2005)).

[7] The bases for Defendant Bourgerie's liability are described in Plaintiffs' Response to Minor's and Bourgerie's separate motion for summary judgment. The bases for Defendant Minor's and Defendant Summit County's liability are also described in Plaintiffs' Response to Minor's and

at a bare minimum, shows that there are many hotly-disputed issues of material fact which preclude the entry of summary judgment in favor of any of these Defendants.

### Common Facts Known By Each Defendant[8]

- Mr. Moffitt's BAC of .392 was printed on a large board in SCDC. The Board was easily seen by each Defendant.

### Defendant Fidler[9]

- On July 7, 2013, at approximately 11:30 a.m., Moffitt began complaining of feeling sick to Filder; Fidler admits that he knew Moffitt was vomiting on July 7, 2013.

- At approximately 5:00 p.m. on July 8, 2013, Moffitt again notified Fidler that he felt sick and believed he had had a seizure.

- Fidler was present in the courtroom during Moffitt's entire colloquy with the judge on July 8, 2013, during which he described his serious medical condition and emergent need for professional medical treatment.

- Fidler did not initiate a medical intervention on behalf of Moffitt after being told that Moffitt had continued to vomit and experienced a seizure, even though he knew that would be appropriate given that a seizure is a medical red flag for deputies.

- At approximately 7:20 a.m. on July 9, 2013, Defendant Lambert, who was working at the booking desk of the jail, received a call from Fidler who, through the jail's control room cameras, had observed Moffitt lying on the floor, punching himself in the face in the

---

Bourgerie's separate motion for summary judgment. Finally, the bases for Defendant Wilson's liability are described in Plaintiffs' response to Wilson's separate motion for summary judgment.

[8] The relevant and admissible evidence which contains these facts is set forth at **RMMF** ¶ 76
[9] The relevant and admissible evidence which contains these facts is set forth at **RMMFs** ¶¶ 11, 19, 22, and 41, and **SADFs** ¶¶ 6, 7, 8, 20, 21, 24, and 26.

holding cell. Despite observing Moffitt lying on the floor, punching himself hard in the face, and slamming the back of his head against the floor, Fidler deliberately took no steps to initiate a medical intervention on behalf of Moffitt. From his post in the control room, Defendant Fidler and other deputies (including Defendant Diurba) assigned to that post had a bird's eye view of Moffitt's deterioration over the course of much of his three-day detention in the jail, yet took no steps to ensure that Moffitt received the immediate medical attention he obviously needed.

### *Defendant Giordano* [10]

- At approximately 5:00 p.m. on July 8, 2013, Defendants Giordano, Lambert, and Hyde visited Moffitt's cell, where he informed them that he had experienced a seizure and showed signs of anxiety, paranoia, agitation, and fear. Moffitt also informed these Defendants that he felt dizzy, had a bad headache, had been throwing up consistently, was experiencing diarrhea and hadn't slept for the past two days. After speaking with Moffitt and directly observing multiple symptoms of severe alcohol withdrawal, these Defendants deliberately took no steps to initiate medical intervention.

- Giordano knew that Moffitt was an alcoholic, based on a July 8, 2013 phone call with Moffitt's girlfriend Kelly Kramer.

- At approximately 6:20 a.m. on July 9, 2013, Defendant Giordano also observed Moffitt sitting naked in the holding cell. Despite this odd behavior from Moffitt, which was particularly odd (thus clearly warranting an evaluation by a trained medical professional) when combined with the other obvious symptoms of alcohol withdrawal that Defendant

---

[10] The relevant and admissible evidence which contains these facts is set forth at **RMMFs ¶¶** 22, 24, 27, 33, 44, 46, 48, and 59, and **SADFs ¶¶** 1, 9, 10, 12, 16-18, and 22-24.

Giordano had previously witnessed, Giordano deliberately did nothing to initiate a medical intervention on Moffitt's behalf.

- At approximately 7:16 a.m. on July 9, Giordano again checked on Moffitt in the holding cell. At this time, Moffitt was standing up and came to the door to talk to Defendant Giordano. Moffitt asked Giordano for the keys, stating that he needed "to open the door, and go back to my cell, I've seen the doctor, and want to go back to his cell." Defendant Giordano observed that Moffitt "kept sticking his tongue out while talking" during this conversation. Defendant Giordano admitted that Moffitt sticking out his tongue while talking was potentially a sign of dehydration and that it could be "a sign of additional symptomology for a medical problem."

- After verifying with Defendant Lambert, after her conversation at approximately 7:16 a.m. on July 9, 2013 with Moffitt, that Moffitt had not seen a mental health professional or any doctor yet, and therefore had hallucinated the doctor visit Moffitt had informed her that he had just participated in, Defendant Giordano left Moffitt in the holding cell, doing nothing to provide him medical care despite his clear disorientation, dehydration, and hallucinations.

- A few minutes after 7:20 a.m. on July 9, 2013, Defendant Lambert went to the holding cell where Moffitt was housed and asked Moffitt why he hit himself. Overhearing Defendant Lambert, Giordano requested that Defendant Hyde talk to Moffitt to inform him that he would be placed in the restraint chair to keep him from injuring himself if he did not stop hitting his head. When Defendant Hyde arrived at the holding cell, he observed Moffitt "lying on the floor on his back, breathing rapidly, naked with his hands clenched." Rather than provide Moffitt medical attention or seek medical attention for

him, Defendant Hyde told Moffitt to stop punching himself in the face and warned Moffitt that he failed to do so, he would be placed in the restraint chair. Moffitt again began to punch himself in the face, throat, and jaw several times, while still lying on the floor. Defendant Giordano then walked to the holding cell, where she observed Moffitt lying naked on the floor, his neck red, making ominous noise that sounded like snoring.

- Despite these obvious signs that Moffitt required emergent medical attention a few minutes after 7:20 a.m. on July 9, 2013, none was summoned by Defendants Lambert, Hyde, or Giordano. They were all deliberately indifferent to Moffitt's serious and obvious medical needs.

  ***Defendant Hyde***[11]

- At approximately 5:00 p.m. on July 8, 2013, Defendants Giordano, Lambert, and Hyde visited Moffitt's cell, where he informed them that he had experienced a seizure and showed signs of anxiety, paranoia, agitation, and fear. Moffitt also informed the Defendants that he felt dizzy, had a bad headache, had been throwing up consistently, was experiencing diarrhea and hadn't slept for the past two days.

- Defendant Hyde admitted that when he interacted with Moffitt at approximately 5:00 p.m. on July 8, 2013, he knew "Mr. Moffitt was a super alcoholic going through the DT's."

- A few minutes after 7:20 a.m. on July 9, 2013, Defendant Lambert went to the holding cell where Moffitt was housed and asked Moffitt why he hit himself. Overhearing Defendant Lambert, Defendant Giordano requested that Defendant Hyde talk to Moffitt

---

[11] The relevant and admissible evidence which contains these facts is set forth at **RMMFs** ¶¶ 22, 24, 27, 44-46, and 59, and **SADFs** ¶¶ 1, 9, 11, and 22-24.

to inform him that he would be placed in the restraint chair to keep him from injuring himself if he did not stop hitting his head. When Hyde arrived at the holding cell, he observed Moffitt "lying on the floor on his back, breathing rapidly, naked with his hands clenched." Rather than provide Moffitt medical attention, Defendant Hyde told Moffitt to stop punching himself in the face and warned Moffitt that he failed to do so, he would be placed in the restraint chair. Moffitt again began to punch himself in the face, throat, and jaw several times, while still lying on the floor.

- Despite these obvious signs that Moffitt required emergent medical attention a few minutes after 7:20 a.m. on July 9, 2013, none was summoned by Defendants Lambert, Hyde, or Giordano. They were all deliberately indifferent to Moffitt's serious and obvious medical needs.

### Defendant Diurba[12]

- At approximately 1:00 a.m. on July 9, 2013, Moffitt called into the control room to talk to Defendant Diurba, who was back on duty. Because Defendant Diurba could not understand Moffitt, he and Defendant Ryan Hosier went to Moffitt's cell. There, they found a clearly delusional Moffitt reporting that he was hearing voices that were telling him to kill himself.

- Despite the fact that Diurba and Hosier knew that Moffitt had come into the jail in an extremely intoxicated state and that Moffitt had been experiencing tell-tale symptoms of severe alcohol withdrawal over the prior two days, neither Defendant took any steps to

---

[12] The relevant and admissible evidence which contains these facts is set forth at **RMMFs** ¶¶ 35, 40, 42, and **SADFs** ¶¶ 1, 13-14, 21, and 24.

ensure Moffitt received medical treatment after their conversation with him at approximately 1:00 a.m. on July 9, 2013.

- From his post in the control room, Defendant Diurba had a bird's eye view of Moffitt's deterioration over the course of much of his three-day detention in the jail, yet deliberately took no steps to ensure that Moffitt received the immediate medical attention he so obviously needed despite observing Moffitt lying on the floor, punching himself hard in the face, and slamming the back of his head against the floor (among other obvious signs of Moffitt's emergent medical needs).

- *Additional bases for Diurba's liability are set for below in the subsection describing Defendant Hosier's deliberate indifference to Moffitt's serious and obvious medical needs.*

### Defendant Hosier[13]

- Defendant Hosier observed and interacted with Moffitt, who was clearly very ill between about 6:00 and 6:30 p.m. on July 8, 2013, but Moffitt was nonetheless returned to the general population despite his serious and obvious medical needs.

- At approximately 1:00 a.m. on July 9, 2013, Moffitt called into the control room to talk to Defendant Diurba, who was back on duty. Diurba could not understand Moffitt, he and Defendant Hosier went to Moffitt's cell. There, they found a clearly delusional Moffitt reporting that he was hearing voices that were telling him to kill himself. Despite the fact that these two Defendants knew that Moffitt had come into the jail in an extremely intoxicated state and that Moffitt had been experiencing tell-tale symptoms of severe

---

[13] The relevant and admissible evidence which contains these facts is set forth at **RMMFs** ¶¶ 33, 35-37, and 42, and **SADFs** ¶¶ 1, 13-14, and 24.

alcohol withdrawal over the prior two days, neither Defendant took any steps to ensure Moffitt received medical treatment for DTs. Instead, Defendants Diurba and Hosier strip searched Moffitt, placed him in a suicide smock, and contacted Colorado West Mental Health, who allegedly told them that they would stop by the next day. Of course, Colorado West *Mental* Health obviously could not provide Moffitt treatment for his alcohol withdrawal, which is an obviously *physical condition* with *physical symptoms* which, if untreated, could prove fatal.

- Hosier and Duirba knew that Moffitt was engaging in extraordinarily bizarre behavior, including physical self-harm and suicidal ideations, and that this provided further evidence that Moffitt was suffering from DTs. Diurba and Hosier nonetheless placed Moffitt in a holding cell (as opposed to seeking medical aid for him), where he continued to exhibit apparent symptoms of DTs.

- Defendant Hosier received a call from Deputy Collins that Moffitt was choking himself, but did not check on Moffitt.

- Despite the fact that Hosier and Diurba knew that Moffitt had come into the jail in an extremely intoxicated state and that Moffitt had been experiencing tell-tale symptoms of severe alcohol withdrawal over the prior two days, neither Defendant took any steps to ensure Moffitt received medical treatment after their conversation with him at approximately 1:00 a.m. on July 9, 2013. Hosier and Diurba were deliberately indifferent to Moffitt's serious and obvious medical needs.

*Defendant Lambert*[14]

---

[14] The relevant and admissible evidence which contains these facts is set forth at **RMMFs** ¶¶ 22, 24, 46, and 48, and **SADFs** ¶¶ 1, 9, 17-18, and 22-24.

- At approximately 5:00 p.m. on July 8, 2013, Defendants Giordano, Lambert, and Hyde visited Moffitt's cell, where he informed them that he had experienced a seizure and showed signs of anxiety, paranoia, agitation, and fear. Moffitt also informed the Defendants that he felt dizzy, had a bad headache, had been throwing up consistently, was experiencing diarrhea and hadn't slept for the past two days.

- Defendant Lambert did nothing to provide Moffitt medical care, even after Defendant Giordano informed Defendant Lambert that Moffitt had been unable to control his tongue during their conversation and had obviously been hallucinating. Defendant Lambert later admitted that medical personnel should have assessed Moffitt at this point in time.

- At approximately 7:20 a.m. on July 9, 2013, Defendant Lambert, who was working at the booking desk of the jail, received a call from Defendant Fidler who, through the jail's control room cameras, had observed Moffitt lying on the floor, punching himself in the face in the holding cell.

- A few minutes after 7:20 a.m. on July 9, 2013, Defendant Lambert went to the holding cell where Moffitt was housed and asked Moffitt why he hit himself. Overhearing Defendant Lambert, Defendant Giordano requested that Defendant Hyde talk to Moffitt to inform him that he would be placed in the restraint chair to keep him from injuring himself if he did not stop hitting his head. When Defendant Hyde arrived at the holding cell, he observed Moffitt "lying on the floor on his back, breathing rapidly, naked with his hands clenched." Rather than provide Moffitt medical attention, Defendant Hyde told Moffitt to stop punching himself in the face and warned Moffitt that he failed to do so, he would be placed in the restraint chair. Moffitt again began to punch himself in the face, throat, and jaw several times, while still lying on the floor. Defendant Giordano then

walked to the holding cell, where she observed Moffitt lying naked on the floor, his neck red, making noise that sounded like snoring.

- Despite these obvious signs that Moffitt required emergent medical attention a few minutes after 7:20 a.m. on July 9, 2013, none was summoned by Defendants Lambert, Hyde, or Giordano. They were all deliberately indifferent to Moffitt's serious and obvious medical needs.

The above-outlined actions evince that each Defendant is liable for violation of Mr. Moffitt's Fourteenth Amendment rights. Multiple analogous cases illustrate Defendants deliberate indifference in violation of the pre-*Kingsley* standard under the Fourteenth Amendment. In *Harper v. Lawrence County*, 592 F.3d 1227 (11th Cir. Ala. 2010)**,** the decedent was arrested on a public intoxication charge. He was processed and incarcerated without receiving an appropriate or reasonable medical examination and/or screening. *Id.* at 230-31. The decedent was an alcoholic and experienced severe alcohol withdrawal while in jail. *Id.* Symptoms included hallucinations, slurred speech, incoherence, and difficulty walking. *Id*. Other inmates informed jailers that the decedent was saying "crazy things," was "talking off the wall," and was having trouble keeping his balance. *Id*. Jailers never took any steps to secure medical attention for the decedent, despite his dire need. *Id.* The decedent did not receive any medical care and died of problems related to alcohol withdrawal in jail, four days after his arrest. *Id.* The Court found that the defendant jailers were deliberately indifferent. *Id.* at 234-35. Specifically, the Court found that because the defendant jailers had witnessed some (or all) of the decedents symptoms, and that the symptoms the decedent displayed were obvious signs of alcohol withdrawal, the defendant jailers' failure to summon medical attention constituted deliberate indifference. . *Id.* at 234-35. Similarly, in this case, Defendants (as outlined above) witnessed

Mr. Moffitt exhibit obvious symptoms of alcohol withdrawal and did nothing to ensure that he received medical attention. This is deliberate indifference.

In *Stefan v. Olson*, 497 Fed. Appx. 568 (6th Cir. 2012)**,** upon the decedent's arrest, his blood-alcohol level was .349%. The decedent was booked at 8:00 p.m. and reported that he had DTs. Officers observed the decedent through a cell window in 30 minute intervals overnight. They never checked his vitals or looked inside the cell for signs of withdrawals. *Id.* at 569-574. At 8:30 a.m. the next morning, the decedent stood up and pressed the call buzzer in his cell to request assistance. *Id.* While at the buzzer, he suffered a violent seizure and struck his head as he fell to the ground, causing a bursting laceration. *Id.* He was rushed to the hospital where he was pronounced brain dead and removed from life support five days later. *Id.* The court found that a nurse who treated the decedent could be found deliberately indifferent by a jury and denied summary judgment. *Id.* at 581. The court held that the decedent's "racing pulse, dehydration, and .349% blood-alcohol level, accompanied by verbal warnings of withdrawal and seizures, were **sufficient to alert even a lay person**, let alone a licensed practical nurse and EMT, that the detainee should see a physician." *Id.* at 577 (emphasis added). Similarly, Defendants in this case all had knowledge of Mr. Moffitt's dehydration, high blood alcohol level, and dehydration. *See* **RMMFs** ¶¶ 11, 19, 22, 24, 27, 33, 35-37, 40-42, 44-46, 48, 59, 76 and **SADFs** ¶¶ 1, 6-14, 16-18, 20-24. As the Court in *Stefan* noted, the fact that they are not medical professionals does not excuse them from liability, as such signs of alcohol withdrawal are obvious even to a lay person.

In another analogous case, *Lancaster v. Monroe Cnty.*, 116 F.3d 1419 (11th Cir. 1997), the Eleventh Circuit found that jail officials had been deliberately indifferent to an inmate's serious medical needs caused by alcohol withdrawal. The court held that the defendant jail officials had the requisite subjective knowledge to establish deliberate indifference because they

knew the inmate was a chronic alcoholic in withdrawal and that he had had a seizure. *Id*. at 1426. The Court held that ignoring the dangers of alcohol withdrawal and waiting for a "manifest emergency" before summoning medical help constituted deliberate indifference. *Id*. Likewise, in this case, Defendants Lambert, Hosier, Hyde, and Giordano, all knew that Mr. Moffitt was an alcoholic in alcohol withdrawal who had suffered a seizure. *See* **RMMFs** ¶¶ 11, 19, 22, 24, 27, 33, 35-37, 40-42, 44-46, 48, 59, 76 and **SADFs** ¶¶ 1, 6-14, 16-18, 20-24. Despite this knowledge, they deliberately did nothing to ensure that Mr. Moffitt received medical attention until his death.

Finally, the Tenth Circuit's decision in *Martinez v. Beggs*, 563 F.3d 1082, cited by Defendants, is distinguishable from the case at bar. In *Martinez*, the plaintiff was arrested for public intoxication and entered the local jail with a BAC of .32%. *Id*. at 1085-86. While in the jail, the plaintiff was coherent, but argumentative, when he entered the jail and was placed in a cell. *Id*. at 1086. Once in the cell, he laid down on the cell bench. *Id*. Three hours later, the plaintiff died from a heart attack. *Id*. at 1087. The Tenth Circuit found that the plaintiff had suffered from an objectively serious medical condition, under the pre-*Kingsley* standard for deliberate indifference under the Fourteenth Amendment. *Id*. at 1088. However, the Court found that the defendants were not subjectively deliberately indifferent because the plaintiff was "conscious, on his feet, argumentative, and cognizant" which are "characteristics that are common to many intoxicated individuals" and that he, therefore, "showed no obvious symptoms indicating a risk of serious harm" from lack of medical treatment. *Id*. at 1091. This is readily distinguishable from the facts outlined above and the numerous, obvious symptoms that each and every Defendant observed Mr. Moffitt experience. Unlike the officers in *Martinez*, Defendants witnessed Mr. Moffitt experience every symptom of severe alcohol withdrawal. *See* **RMMFs** ¶¶

11, 19, 22, 24, 27, 33, 35-37, 40-42, 44-46, 48, 59, 76 and **SADFs** ¶¶ 1, 6-14, 16-18, 20-24.[15]

Defendants' deliberate indifference to these signs and symptoms of alcohol withdrawal was what

caused Mr. Moffitt's death.

### 5.4 Mr. Moffitt's right to be free from deliberate indifference to his serious medical needs was clearly established in July 2013.

As fully demonstrated above, the evidence demonstrates that Mr. Moffitt's constitutional

right to be free from deliberate indifference to his serious medical needs was violated by

Defendants. The only remaining question is whether that right was clearly established at the time

of the events at issue. "[T]here is little doubt that deliberate indifference to an inmate's serious

medical need is a clearly established constitutional right." *Mata*, 427 F.3d at 749. As stated by

the Supreme Court in *Estelle*:

> Elementary principles establish the government's obligation to provide
> medical care for those whom it is punishing by incarceration. An inmate
> must rely on prison authorities to treat his medical needs; if the
> authorities fail to do so, those needs will not be met. In the worst cases,
> such a failure may actually produce physical "torture or a lingering
> death," . . . the evils of most immediate concern to the drafters of the
> Amendment. . . . The infliction of such unnecessary suffering is
> inconsistent with contemporary standards of decency. . . .

429 U.S. at 103 (citations omitted). Pretrial detainees, such as Mr. Moffitt, have long been

recognized as having this right through the Due Process Clause of the Fourteenth Amendment.

*See City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 243-44 (1983); *Bell*, 441 U.S. at

537. Defendants were therefore on notice that their failure to provide any meaningful care to Mr.

---

[15] Likewise, the facts in *Bame v. Iron Cty.*, 566 F. App'x 731 (10th Cir. 2014) are miles apart from those here, as the claim in that case was predicated on defendants' failure to protect the decedent from self-harm by failing to properly address his risk of suicide caused by mental illness. Conversely, Moffitt did not harm himself; he died because Defendants repeatedly failed to address his ever-worsening and obvious medical needs caused by a physical illness.

Moffitt (or obtain medical care for him), despite obvious signs of serious medical needs, violated his clearly established rights.

Additionally, it was clearly established that when Defendants—with the actual knowledge that Mr. Moffitt was suffering from severe and life-threatening alcohol withdrawal syndrome—were confronted with obvious signs that Mr. Moffitt's withdrawal was life-threatening, they had the obligation to provide Mr. Moffitt access to necessary medical personnel, including a treating physician. Defendants were thus on fair notice that failing to provide such access would be sufficient to show a constitutional violation. *See, e.g., Estelle*, 429 U.S. at 104-05 (deliberate indifference may be found when prison guards intentionally deny or delay an inmate access to medical care); *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000) (holding prison guard could be liable for deliberate indifference when he was told that plaintiff might be having a heart attack and refused to transport him to a doctor).

Defendants deliberately failed to provide Mr. Moffitt with adequate care to address his basic, obvious, and emergent medical needs. *See Ramos v. Lamm*, 639 F.2d 559, 574 (10th Cir. 1980) (stating that in order to comply with constitutional guarantees, a state must make "available to inmates a level of medical care which is reasonably designed to meet the routine and emergency health care needs of inmates... [and t]his includes medical treatment for inmates' physical ills, dental care, and psychological or psychiatric care."). Further, Defendants' failure to provide Mr. Moffitt with *access to* further medical treatment, including physician assistance and emergent medical care, after witnessing his obvious medical needs, implicates a clearly established right to receive adequate "gatekeeping" treatment in order to obtain basic medical care. *See Sealock*, 218 F.3d at 1211(holding prison officials are deliberately indifferent when

they fail to perform "gatekeeping" roles, thereby preventing serious medical needs from being met).

Finally, in July 2013, the great weight of authority demonstrated that it is "clearly established that sheriffs and jailers cannot place or keep a chronic alcoholic in jail without any medical supervision, when the defendants are aware that the alcoholic is suffering from a severe form of alcohol withdrawal." *Lancaster v. Monroe Cnty.*, 116 F.3d 1419, 1426 (11th Cir. 1997); *Harper v. Lawrence Cnty.*, 592 F.3d 1227, 1237 (11th Cir. 2010) (explaining that delayed or inadequate treatment of alcohol withdrawal is "unlawful"); *Liscio v. Warren*, 901 F.2d 274, 275-77 (2d Cir. 1990) (finding deliberate indifference when staff-ordered withdrawal regimen was inadequate because provider failed to examine inmate for three days); *Morrison v. Washington Cnty.*, 700 F.2d 678, 686 (11th Cir. 1983) (concluding that a deliberate indifference finding could be made where prison officials place or keep a chronic alcoholic in jail without any medical supervision when defendants are aware that the alcoholic is suffering from a severe form of alcohol withdrawal); *Stefan v. Olson*, 497 F. App'x 568, 577 (6th Cir. 2012) (holding plaintiff's "extremely elevated .349 blood-alcohol level and verbal communication of a history of alcoholism accompanied by withdrawal seizures communicated an objectively serious medical need possessing the sufficiently imminent danger that is actionable under the Eighth Amendment"); *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009) (holding there was "no dispute" that the plaintiff, who was suffering from alcohol withdrawal, "had a serious medical condition"); *Fielder v. Bosshard,* 590 F.2d 105 (5th Cir. 1979) (holding that a sheriff and his jail officials acted with deliberate indifference by refusing to obtain medical treatment for a chronic alcoholic suffering from withdrawal"); *M.H. v. Cnty. of Alameda*, Case No. 11-cv-02868-JST, 62 F. Supp. 3d 1049, 2014 U.S. Dist. LEXIS 48592, 2014 WL 1429720, at \*20-21 (N.D. Cal. Apr.

7, 2014) (finding deliberate indifference after defendant was "subjectively aware of the risk of alcohol withdrawal, but failed nevertheless to fill out a CIWA form, initiate the CIWA protocol, or otherwise ensure [plaintiff] would receive medical help"). Defendants violated Mr. Moffitt's clearly established right to receive adequate care for his serious and obvious medical needs.

**5.5 Summary judgment is inappropriate in this matter because the video footage from July 8, 2013, the most pertinent footage of Mr. Moffitt's suffering and certain Defendants' deliberate indifference, was intentionally destroyed.**

Summary judgment is particularly inappropriate in cases like this one, where there has been spoliation of crucial evidence while it was in the sole control of Defendants.[16] Summit County has failed to produce any surveillance footage from July 8, 2013, yet has produced footage from the other days that Mr. Moffitt was incarcerated. Plaintiffs have undisputed evidence that Mr. Moffitt was manifesting signs of obvious serious medical need on that day and it is reasonable to believe this "lost" surveillance footage contains highly relevant evidence that would support their claims. Plaintiffs' lack of access to this evidence will prejudice them at trial, and Summit County's failure to produce it gives rise to an inference that production of the surveillance footage would have been unfavorable to the Defendants  *See Aramburu v. Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir. 1997) ("[T]he bad faith destruction of a document relevant to proof of an issue at trial gives rise to an inference that production of the document would have been unfavorable to the party responsible for its destruction."); s*ee also Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998) ("The spoliation of evidence germane 'to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party

---

[16] Not only is there no footage of Mr. Moffitt's suffering on July 8, 2013, but (as outlined *supra* Section 5.1) Mr. Moffitt is dead and unable to provide his own testimony about Defendants wrongdoing.

responsible for its destruction.'") (internal citations omitted).

Viewing the facts in the light most favorable to Plaintiffs, there is a presumption of spoliation related to the July 8, 2013 surveillance footage, and this Court should find that this obliterated evidence would have given substantial support to Plaintiffs' claims. Given the adverse inference that must be drawn based on the undisputed testimony of Defendants that shows Mr. Moffitt was exhibiting symptoms of alcohol withdrawal on July 8, 2013, and the fact that Plaintiffs have been deprived of this important (and likely compelling) evidence, summary judgment is especially inappropriate in this case. *See Rowe v. Albertson's, Inc.*, 178 Fed. Appx. 859, 861 (10th Cir. 2006) (finding the "presumption of spoliation may preclude summary judgment."); s*ee also Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 107 (2d Cir. 2001) ("In borderline cases, an inference of spoliation, in combination with 'some (not insubstantial) evidence' for the plaintiff's cause of action, can allow the plaintiff to survive summary judgment.") (internal citations omitted).

Even if this Court does not definitively find at this stage of the litigation that Defendants spoliation of critical evidence gives rise to an adverse inference against them, there are genuine issues of material fact as to whether Summit County acted in bad faith by failing to produce this surveillance footage such that Plaintiffs could be entitled to an adverse inference instruction at trial.  *See Gillman v. Ford (In re Ford)*, 492 F.3d 1148, 1156 (10th Cir. 2007) ("Like most questions of motive and intent, bad faith is a question of fact."); *United States v. Richard*, 969 F.2d 849, 853 (10th Cir. 1992) ("determination regarding bad faith is a mixed question of fact and law, in which the quintessentially factual question of intent predominates . . ."). The genuine issues of material fact as to the motivation of Defendants in the destruction of the video is yet another basis for denying Defendants motion for summary judgment.

**5.6 Summary judgment in favor of Defendants Lambert and Hyde is also improper because serious questions exist regarding their credibility.**

Defendant's Lambert's and Hyde's history of lying when testifying under oath about material facts in this case and about closely-related incidents reinforces the conclusion that they are not entitled to summary judgment here. *See Newmaker v. City of Fortuna*, 2016 U.S. App. LEXIS 20932, at *20 (9th Cir. Nov. 22, 2016) ("Because this case 'requires a jury to sift through disputed factual contentions' — including whether the officers were telling the truth about when, why, and how Soeth shot Newmaker — summary judgment was inappropriate.") (internal citations omitted); *see also Jones v. Barnhart*, 349 F.3d 1260, 1265-66 (10th Cir. 2003) ("We recognize that at the summary judgment stage credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. In this procedural posture, therefore, our role is simply to determine whether the evidence proffered by plaintiff would be sufficient, if believed by the ultimate factfinder, to sustain her claim.") (quotations and citations omitted). *See* **SADFs ¶ 2-3.** A jury is therefore entitled to evaluate – and disbelieve – all of their self-serving testimony in this case.

## 6. Conclusion

WHEREFORE, Plaintiffs respectfully request that the Court entirely deny Defendants Giordano, Diurba, Filder, Hosier, Hyde, and Lambert's Motion for Summary Judgment.

DATED this 6th day of February 2017

KILLMER, LANE & NEWMAN, LLP

*s/ David A. Lane*
_____
David A. Lane
Darold W. Killmer
Michael Fairhurst
Andy McNulty
1543 Champa Street, Suite 400

Denver, Colorado 80202
Phone: (303) 571-1000
dlane@kln-law.com
dkillmer@kln-law.com
mfairhurst@kln-law.com
amcnulty@kln-law.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that on this 6th day of February, 2017, I filed this **RESPONSE TO INDIVIDUAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** via CM/ECF, and CM/ECF will generate a Notice of Electronic Filing to the following:

Andy Nathan
Bernard Woessner
Ashley Hernandez Schlagel
Nathan, Dumm & Myers, PC
7990 East Union Ave., Ste 600
Denver, CO 80237
303-691-3737
anathan@ndm-law.com
bwoessner@ndm-law.com
aschlagel@ndm-law.com
kletner@ndm-law.com
*Attorneys for Defendants Giordano, Diurba, Fidler, Hosier Hyde, and Lambert*

Josh Marks
Melanie B Lewis
Berg Hill Greenleaf & Ruscitti LLP
1712 Pearl Street
Boulder, Colorado 80302
Ph: 303-402-1600
Fax: 303-402-1601
jam@bhgrlaw.com;
mbl@bhgrlaw.com;
cds@bhgrlaw.com
*Attorneys for Defendants Minor and Bourgerie*

Cathy H. Greer
William O'Connell
Brendan Loy
Wells, Anderson & Race, LLC
1700 Broadway, Suite 1020

Denver, CO 80290
T: 303-830-1212
cgreer@warllc.com
woconnell@warllc.com
bloy@warllc.com
*Attorney for Defendant Jeff Wilson*

*s/ Jamie Akard*
Jamie Akard