*Estate of Zackary Moffitt, et al. vs.*

*Sheriff John Minor, et al.*

*Deposition of Cheryl Giordano*

*May 20, 2016*



700 17th Street, Suite 1750
Denver, CO 80202
303-988-8470 (Office)   303-988-8478 (Fax)
SKReporting.com

Stevens-Koenig Reporting

Case 1:15-cv-00071-WYD-MEH   Document 112-12   Filed 02/06/17   USDC Colorado   Page 2 of 13

Estate of Zackary Moffitt, et al. vs.
Sheriff John Minor, et al.

Deposition of Cheryl Giordano
May 20, 2016

Page 5

| | PREVIOUSLY MARKED EXHIBITS: | PAGE |
|---|---|---|
| 4 | Completed questionnaire, Bates stamped SCSO 00104 | 76 |
| 13 | Alcohol Withdrawal Syndrome article, Bates stamped SCSO 04796 through 04800 | 23 |
| 17 | Colorado Bureau of Investigation video Summary, Bates stamped SCSO 00713 to 00720 | 116 |
| 31 | Suicide/Welfare checks dated 7/7/13, 7/8/13, and 7/9/13, Bates stamped SCSO 00096 through 00098 | 91 |

Page 6

P R O C E E D I N G S

CHERYL GIORDANO,
having been first duly sworn, was examined and testified as follows:

EXAMINATION
BY MR. KILLMER:
Q. Good morning. Could you state your name and spell your last name for the record, please.
A. Sure. My name is Cheryl Giordano, G, like in George, i-o-r-d, like in David, a-n-o.
Q. Are you currently employed?
A. No.
Q. What was the last job you had?
A. Summit County Sheriff's Office.
Q. What were the years that you worked at the Summit County Sheriff's Office?
A. November 25, 1997, until April 12 of 2016.
Q. Why did you leave?
A. Why did I leave? I had a difference of opinion, and I figured it would be better for my health and well-being.
Q. You left for a health problem, because you had a health problem?
A. Being on alert for 18 and a half years 24/7 sort of stresses the body.

Page 7

Q. You left because you were too stressed?
A. I felt that some of the medical issues that I might have had might have been caused by my work.
Q. Did you leave voluntarily?
A. Yes.
Q. Were you under investigation?
A. No.
Q. Was the investigation complete?
A. I wasn't under investigation.
MR. WOESSNER: Object to the form.
Q. (By Mr. Killmer) Were you accused of being -- of violating some policies or rules?
A. No.
Q. So your sworn testimony is you left not under any accusation or investigation or suggestion that you had violated some sheriff's department policy or rule.
A. No.
Q. Correct?
A. Yes.
Q. See, I'm not trying to be fancy here. We were told otherwise by the lawyers that there was IA investigations going on. Is that just false?
A. There was an IA that was performed in March. As far as I know, that IA was concluded. No information was ever given to me because that IA took place three to five

Page 8

weeks before I quit.
Q. So you're saying it's unrelated to your departure.
A. Yes.
Q. Oh. Well, what was the IA investigation, then?
MR. WOESSNER: Objection. This is subject to our motion for protective order.
MR. KILLMER: Well, your motion for protective order said they were related and she says that what you said in the motion is false. So I'm entitled to, at least, follow up on the basis for it so we have some way to come to grips with the motion. I mean, she's just saying what you filed with the Court and represented to the Court is just not true. That's serious.
MR. WOESSNER: Um.
MR. KILLMER: How?
MR. WOESSNER: I didn't say -- I think there's a -- well --
MR. KILLMER: There's obviously a miscommunication because you all won't communicate to me the basis for this woman leaving her position. But she worked there for 20 years almost and now she's said she's leaving for health reasons and you said she left for other reasons. You said that to the Court, actually.
Q. (By Mr. Killmer) So I'm trying to get to the bottom of why you left. I mean, were you accused, as far as

Case 1:15-cv-00071-WYD-MEH  Document 112-12  Filed 02/06/17  USDC Colorado  Page 3 of 13

Estate of Zackary Moffitt, et al. vs.
Sheriff John Minor, et al.

Deposition of Cheryl Giordano
May 20, 2016

Page 9

1  you know, of violating a policy?
2  A.  No.
3  Q.  Well, ma'am, you're saying there was an IA
4  investigation in March which was a few weeks before you
5  left.  What was the IA concerning?
6      MR. WOESSNER:  I'm going to instruct her not to
7  answer that question subject to the motion for protective
8  order.
9  Q.  (By Mr. Killmer)  Well, this is pretty serious.  I
10  mean, it seems to me you're saying the opposite of what your
11  lawyers have said to the Court, and I'm entitled to find out
12  where the disconnect is there for any number of reasons.
13  One is so we can file a response to the motion for
14  protective order.  How was your departure related to the IA
15  investigation, if at all?
16      MR. WOESSNER:  Objection to form.
17      MR. KILLMER:  What's wrong with the form of that?
18  There's no objection to form.
19      MR. WOESSNER:  Well, she answered the question
20  already that she didn't leave because of an IA investigation
21  so...
22  Q.  (By Mr. Killmer)  I said how was your departure
23  related to the IA investigation.  I think you're being cagy
24  with me, and I can't figure out how this works because your
25  lawyer has told us one thing, and has even said it to the

Page 10

1  Court, and you're saying it's unrelated.
2      And I may not be the smartest guy in the world,
3  but those two things seem inconsistent to me.  So I'm trying
4  to figure out which one of you is telling the truth.
5      And I'm entitled to know the honesty and the
6  truthfulness of a witness.  So if you're being honest and
7  truthful, then tell me how -- I mean, just say straight up,
8  my departure had nothing to do with any of the IA activities
9  in March or April of 2016.
10  A.  I don't know about an IA in April.  I only know
11  about an IA in March.
12  Q.  (By Mr. Killmer)  Okay.  Let's talk about March,
13  then.  Is your departure completely unrelated to the IA
14  activities in March of 2016?
15      MR. WOESSNER:  You can --
16  Q.  (By Mr. Killmer)  You're looking at your --
17      MR. WOESSNER:  You can answer the question.
18  A.  Well, no.  I'm just -- because he was saying I
19  couldn't say something before, so I was asking.
20      So in March, I had an IA that was performed
21  because I did not listen to a phone call.
22  Q.  (By Mr. Killmer)  From, like, a superior?
23  A.  No, between an inmate and his mother.
24  Q.  Because you did not listen to a phone call.
25  A.  Yes, sir.

Page 11

1  Q.  And you think there was an IA investigation
2  arising out of that allegation?
3  A.  That was the allegation, sir.  That was the
4  allegation that the commander told me.
5  Q.  And do you know if the IA investigation yielded
6  confirmation of that allegation?
7      MR. WOESSNER:  And I'm going to object and
8  instruct you not to answer the question.
9  Q.  (By Mr. Killmer)  Have you ever been accused of
10  dishonesty while employed at the sheriff's office?
11  A.  No.
12  Q.  And I'm not asking if you're admitting to having
13  been dishonest.  That's why I asked it broadly, if you've
14  ever had an accusation.
15  A.  No, not to my knowledge.
16  Q.  Not to your knowledge.  Have you ever been accused
17  of violating any sheriff's department policies besides this
18  thing arising in March of 2016?
19  A.  Not that I know of.
20  Q.  Have you ever been subject to any disciplinary
21  action at the sheriff's department?
22  A.  Describe -- explain disciplinary action.
23  Q.  Do you not understand what disciplinary action is?
24  A.  Well, if you're talking about being suspended for
25  something.

Page 12

1  Q.  That would fall within it, but it's not limited to
2  that.
3  A.  Then I was not suspended.  I -- I -- I was sent to
4  fitness for duty after the Moffitt incident.
5  Q.  What does that mean, sent to fitness for duty?
6  A.  Okay.  Because I've never done CPR on someone, I
7  was having some issues, first time I had ever done CPR and
8  then later found out he died.  I was having some emotional
9  maybe -- I don't know, mental, but I wasn't sleeping very
10  well, anxiety, that type of thing, so I was sent to a
11  mental -- I was sent to a fitness-for-duty evaluation
12  through Nicoletti-Flater.
13  Q.  Okay.  So this was like a psychological evaluation
14  or something?
15  A.  Yes, sir.
16  Q.  Okay.  And the Nicoletti group would have
17  interviewed you, and did they administer tests and so forth?
18  A.  Yes.
19  Q.  And issued a report that you're, once again, fit
20  for duty?  Is that what happened?
21  A.  As far as I know.  I'm still employed there, so as
22  far as I know, yes.
23  Q.  Yeah.  Did you consider that disciplinary?
24  A.  No, I -- I -- what did -- I would not consider
25  that disciplinary.  I would consider that checking on my

Case 1:15-cv-00071-WYD-MEH   Document 112-12   Filed 02/06/17   USDC Colorado   Page 4 of 13

Estate of Zackary Moffitt, et al. vs.
Sheriff John Minor, et al.

Deposition of Cheryl Giordano
May 20, 2016

Page 13

1 welfare, if I was able to perform my job. They'd help if I
2 needed.
3    Q.   Did they also send you to some sort of retraining
4 program regarding CPR techniques?
5    A.   No. No. Just our standard training so our
6 normal -- they didn't send me to anything additional, if
7 that's what you're asking, just the recertifications that we
8 normally would go to.
9    Q.   Did you do that after the Moffitt incident?
10    A.   We get recertified every, I believe, two years, so
11 I'm sure I have been certified since the Moffitt incident,
12 recertified.
13    Q.   The reason I ask, ma'am, is because you said you
14 weren't certain of some of your CPR techniques or something.
15 I thought you had testified to that when you were leading
16 into the fitness-for-duty exam.
17    A.   No, sir.
18    Q.   All right. Other than what you've testified to,
19 have you ever been subject to any discipline, whether it led
20 to a suspension or a write-up or a counseling, you know,
21 from a superior since you've been --
22    A.   Eighteen and a half years with the sheriff's
23 office, I'm sure that I've had probably a counseling or two.
24 I could not -- nothing -- anything major that sticks out in
25 my mind.

Page 14

1    Q.   In other words, nothing that you remember?
2    A.   Right.
3    Q.   Describe for me your educational background,
4 please.
5    A.   I have had some college.
6    Q.   You graduated from high school when and where?
7    A.   Graduated high school in 1979, Arundel High School
8 in Gambrills, Maryland.
9    Q.   Employment -- oh, well, you had some college after
10 that?
11    A.   Some college, yes.
12    Q.   When was that and where?
13    A.   I went to Maryland University in College Park and
14 took sociology and -- oh, computer programming.
15    Q.   Was that --
16    A.   Cobol and Basic and Fortran.
17    Q.   -- right after high school?
18    A.   I'm trying to think if I went there or Wheeling,
19 West Virginia right after high school. Yes, I believe
20 University of Maryland was right after high school. So in
21 '79 for about a year.
22    Q.   And then to West Virginia?
23    A.   West Liberty, West Virginia, for a year.
24    Q.   What was your course of study?
25    A.   I took an economics course, music appreciation,

Page 15

1 law 101, and then I know the basic, you know, English,
2 history.
3    Q.   You didn't obtain a degree?
4    A.   No, sir.
5    Q.   Were you pursuing a particular degree?
6    A.   No, sir.
7    Q.   So you were in general studies trying to figure
8 out what you wanted to specialize in.
9    A.   Yes, sir. Hence the diversity in classes.
10    Q.   And what did you do after you left college?
11    A.   When I left college, I worked for AAA Data
12 Processing for approximately, I think, a year -- a year,
13 maybe two years, which basically was a subsidiary of
14 Transamerica Real Estate Tax Corporation.
15    Q.   Where were you living?
16    A.   Crofton, Maryland.
17    Q.   All right. Then what?
18    A.   After that, I got a job with Federal Express down
19 in Washington DC as a foot courier delivering FedEx by foot
20 in Washington.
21    Q.   Then what?
22    A.   I worked for FedEx for 14 and a half years,
23 several different locations.
24    Q.   1984 through '97?
25    A.   Yes. Yeah.

Page 16

1    Q.   Then what?
2    A.   I think when I left Federal Express -- so with
3 FedEx, I worked in Washington DC, Maryland, North Dakota,
4 West Virginia, they -- they -- I transferred as a manager in
5 several locations, and then they brought me up to Colorado.
6         When I left Federal Express about a month and a
7 half later, two months later or so, I started with Summit
8 County Sheriff's Office.
9    Q.   Why did you leave FedEx?
10    A.   Different -- just I had been a manager for a
11 while, family didn't want to move, I got tired of doing that
12 and wanted to try something new.
13    Q.   You lived in Colorado at the time?
14    A.   Yes.
15    Q.   Where?
16    A.   Fairplay, Colorado, where I live now.
17    Q.   Were you being given the choice that you're going
18 to have to move with the company or quit?
19    A.   Well, no. So I had an ethical dilemma when I left
20 Federal Express for about two months where I wasn't sure
21 whether I wanted to come to work. We had a senior manager
22 who wanted me to falsify numbers on the courier's stops per
23 hour, which I refused to do because that affects their
24 review and I'm not going to falsify numbers. So it was a
25 very ethical dilemma that to me -- how do I want to say, for

Case 1:15-cv-00071-WYD-MEH   Document 112-12   Filed 02/06/17   USDC Colorado   Page 5 of 13

Estate of Zackary Moffitt, et al. vs.
Sheriff John Minor, et al.

Deposition of Cheryl Giordano
May 20, 2016

Page 41

1  if it's not your Friday, okay, if it's not your Friday and
2  it's going to cause overtime, unless it's something that
3  immediately has to be written that they want right then and
4  there, then you can hold it over until the next day.
5      Q.  Well --
6      A.  Which is what was going to happen until we ran
7  into the other incident.
8      Q.  So you're saying you delayed three days so that
9  the County wouldn't have to pay you overtime for writing the
10 report on the shift when it happened?
11         MR. WOESSNER:  Objection to form.
12     A.  No, sir.
13     Q.  (By Mr. Killmer)  Well, what are you talking about
14 if it's going to cause overtime you can wait?
15     A.  I did not write it that very first day.  It was
16 towards the end of my shift, I was wrapping up other work, I
17 was able to pass on the information verbally.
18     Q.  To who?
19     A.  To the shift that was oncoming.
20     Q.  Who?
21     A.  I think -- I think it was Sergeant Gilbert.  I
22 think it was Sergeant Gilbert, I believe I listed in here
23 who -- or somewhere that I -- who I had passed on to or in
24 one of my interviews who it was I passed on to.  But it's
25 been two and a half years, so I can't remember exactly who

Page 42

1  it was.
2          But it was whoever was working that night shift
3  that was coming on that was in the booking and that
4  sergeant, I explained to them that we had received a call a
5  little after 5:00 about an inmate claiming to have possibly
6  have had a seizure.
7          We went back, brought --
8      Q.  You received a call from who?
9      A.  I'm sorry.  Deputy Fidler from control.
10     Q.  Yeah.  So you're on shift and Fidler from control
11 says, an inmate has reported that he had a seizure, could
12 you go check on him?
13     A.  He did not talk to me, he did talk to someone
14 else, but yes.
15     Q.  Who?
16     A.  I believe that -- I don't know it -- it -- I think
17 it was Deputy Lambert, but I cannot say for sure.
18     Q.  One of the reasons you write reports is because
19 it's hard to remember these things months or years later;
20 correct?
21     A.  Uh-hmm.
22     Q.  Yes?
23     A.  Right.
24     Q.  But you didn't put in your report who --
25     A.  Well, I believe if I read over my report, it

Page 43

1  will -- I wrote down who he spoke to or who told me what was
2  going on.
3      Q.  Well, in the first paragraph of this Exhibit 77 --
4  or 71, excuse me, it says Fidler called booking and informed
5  us that Moffitt thought he had a seizure.
6      A.  Okay.  So I failed to write exactly who it was
7  that he spoke to.
8      Q.  Yesterday Deputy Lambert said that Captain -- or
9  Commander Bo had instructed everybody to take some notes on
10 this so that they could, you know, use those for the
11 reports.  Do you recall that?
12     A.  Yes.
13     Q.  Do you recall that Captain Bo made such a
14 directive?
15     A.  He asked that everybody start writing part of
16 their report, yes.
17     Q.  Yes.  Did you do that?
18     A.  He had me taking care of the shift and working
19 with the kitchen to feed the inmates.
20     Q.  Did you write notes?
21     A.  No, sir.
22     Q.  So he directed you to do so, and you failed to
23 comply with that.
24     A.  He gave me a different directive, sir.
25     Q.  He wanted you to feed the inmates instead of

Page 44

1  writing notes about Mr. Moffitt?
2      A.  At that time, yes, sir.
3      Q.  Well --
4      A.  Yes.
5      Q.  Did you have an understanding that you should then
6  write notes, I mean after the inmates get fed?
7      A.  Once staff arrived to replace us, yes.
8      Q.  Okay.  So did you write some notes?
9      A.  I started to write my -- on the computer, my
10 report on the computer so that I had some -- my report
11 already started with some basic detail.  I did not do any
12 handwritten notes, if that's what you're asking.
13     Q.  You never did any handwritten notes?
14     A.  No, sir.  I had access to a computer that I could
15 save my basic details on to a Word document and then
16 completed the next day after one good cycle of sleep.
17     Q.  Is that what we're looking at here, Exhibit 71?
18     A.  I cannot say for sure that's what happened.
19 That's what I believe happened.
20     Q.  What's what you believe happened?
21     A.  What you just asked me.
22     Q.  I can't -- you said --
23     A.  That I started -- that I started the document and
24 then completed it later.
25     Q.  Well, do you still have it?

Case 1:15-cv-00071-WYD-MEH   Document 112-12   Filed 02/06/17   USDC Colorado   Page 6 of 13

Estate of Zackary Moffitt, et al. vs.
Sheriff John Minor, et al.

Deposition of Cheryl Giordano
May 20, 2016

Page 45

1  A. This is the document.
2  Q. That's what I'm asking. Is Exhibit 71 the notes
3  that you took?
4  A. Yes.
5  Q. Do you have drafts?
6  A. No, sir.
7  Q. What happened to the earlier drafts?
8  A. I didn't make any other earlier drafts. I put
9  down the basic details so I would have the times and then
10 went back and revised on the original document.
11 Q. So is this Exhibit 71 your writing of the events
12 of July 8 but you're writing it on the 11th of July?
13 A. No, I was finishing it on the 11th of July.
14 Q. How long did this page -- one good page and one
15 paragraph document take you to write?
16 A. I could not tell you right now offhand.
17 Q. What were you using, just sitting there
18 remembering things, or did you have notes that you were
19 using, or were you looking at other people's reports or, you
20 know, things like that?
21 A. I was not looking at anybody else's report. I was
22 going off my memory.
23 Q. All right. So you say that on the 8th around 5 in
24 the afternoon, you received a notification from Fidler that
25 Moffitt had had a seizure; right?

Page 46

1  A. Possibly had a seizure. He reported it. I did
2  not say Fidler saw him have a seizure.
3  Q. Well, that's one question I have. Fidler was at
4  control; correct?
5  A. Yes.
6  Q. Was Moffitt in the B pod?
7  A. Yes. To my knowledge, yes.
8  Q. Did you ask Fidler if there was anything on video
9  that would bear upon the issue?
10 A. No, sir.
11 Q. Did you ever go look at the video to see if you
12 could see anything on that?
13 A. No, sir.
14 Q. What did you do in response to the report from
15 Fidler that Moffitt thought he had a seizure?
16 A. Deputy Hyde, Deputy Lambert and I went back to B
17 pod. When we arrived in B pod, Moffitt was walking back and
18 forth in his cell, so I would call that pacing, walking back
19 and forth through his cell. So -- let's see. I believe I
20 asked him -- let's see here. Yeah.
21     So I contact -- so Deputy Hyde started asking him
22 some questions. As Deputy Hyde was asking questions, I saw
23 that Mr. Moffitt was making eye contact with him, was
24 articulate with him, and he was able to stand up and he was
25 walking, he was not stumbling, and he was not slurring his

Page 47

1  speech.
2     Let's see. He had told Hyde that he had not lost
3  consciousness and this happened when he was in -- supposedly
4  the seizure he had was when he was in the day room of B pod
5  watching TV.
6  Q. The day room is a common area?
7  A. Yes, it is a common area.
8     So as Hyde -- and after hearing that and I
9  finished listening a little bit, then I stepped away and
10 there were inmates that were sitting in the day room when we
11 walked in who were still sitting there. I did not write
12 down their names. I did ask them if anybody had seen
13 anything out of the ordinary with Mr. Moffitt in the day
14 room because that's where he said that this happened.
15 Q. Wait a minute. You said you interviewed inmates
16 about whether they saw this?
17 A. I asked a general -- in general to all the inmates
18 that were in that area, yes. I failed to write it in my
19 report.
20 Q. I notice that.
21 A. Yes.
22 Q. Why did you fail to write that in your report?
23 A. At this time, I really couldn't tell you why I did
24 not put it in there.
25 Q. Did you tell the interviewers, the Jefferson

Page 48

1  County people about it?
2  A. I believe so, but I can't say for sure.
3  Q. How about the CBI, did you tell them that you
4  interviewed inmates about this?
5  A. I believe so, but I cannot say for sure.
6  Q. All right. And they said they didn't see
7  anything? Is that --
8  A. They said that the only thing -- well, a couple of
9  them were playing cards, so some said they didn't see
10 anything. A couple guys said that -- you know, I asked if
11 anything strange had happened or if -- they said, no,
12 nothing happened. I asked if they saw if anything had -- if
13 they had noticed Mr. Moffitt watching TV. A couple of them
14 said that they had. I asked if they noticed that anything
15 strange had happened or out of the ordinary had happened
16 with Mr. Moffitt and -- or if at any time they saw him on
17 the floor or anything like that, they said no, he was
18 sitting watching TV and then the next thing you know, he
19 went to his cell and the next thing they knew, we were
20 coming in.
21 Q. But Moffitt told you that he had not only thought
22 he had a seizure but he had been having seizures all
23 morning.
24 A. No, he did not tell me.
25 Q. Did you hear Deputy Lambert testify to that

Case 1:15-cv-00071-WYD-MEH   Document 112-12   Filed 02/06/17   USDC Colorado   Page 7 of 13

Estate of Zackary Moffitt, et al. vs.
Sheriff John Minor, et al.

Deposition of Cheryl Giordano
May 20, 2016

Page 49

1  yesterday?
2  A. Yes, I did.
3  Q. And did you see her documents where she reported
4  that Moffitt had made those statements in her interviews?
5  A. And that -- yes. Well, no, I did not see her
6  report. I did hear what she said.
7  Q. Yes.
8  A. That was not something that I heard.
9  Q. All right. Do you think she's wrong on that?
10 A. They -- her and Deputy Hyde continued talking to
11 him when I was talking to the inmates in the day room.
12 Q. Okay.
13 A. So it may have happened at that time. I don't
14 know.
15 Q. All right. And he also said, according to Deputy
16 Hyde, that he had been dizzy. Do you remember Moffitt
17 making that report?
18 A. No, sir.
19 Q. Well, did you not believe Moffitt when he said he
20 had a seizure?
21 A. Sir, I -- he didn't -- he didn't ever tell me that
22 he had a seizure. The only time I heard that he had had a
23 seizure -- hold on. Let me back that up.
24    Okay. So I never heard that he had seizures
25 throughout the day, just that we got the call that he

Page 50

1  possibly had a seizure.
2     If you look into my report, when Moffitt and I
3  were up in the booking area, I believe it was, I asked him
4  if -- or at some point I -- it's in my report. I had asked
5  him that -- if he at any time -- what's the word I want to
6  say -- fell on the ground or lost consciousness or Hyde had
7  asked him that, he said no.
8  Q. Well, my question was: Do you remember him
9  reporting that he had been dizzy and you said no.
10 A. No. He may have said that when I was talking to
11 the folks in the day room.
12 Q. In your report in the second paragraph you say,
13 Inmate Moffitt told us he was watching TV when he started
14 feeling strange like he was spinning. Do you see that?
15 A. Yes.
16 Q. Do you consider that something different than I
17 feel dizzy? I feel like I'm spinning. That's like a
18 disorientation; right?
19 A. Right. Right. Right. Right. I understand what
20 you're asking. Yes.
21 Q. Yes what?
22 A. Yes, I would consider that as an --
23 Q. It's like dizzy.
24 A. -- aspect of dizzy, yes.
25 Q. Sure.

Page 51

1  So maybe you're reminded now that he did make that
2  report; correct?
3  A. Right, just not the word dizzy.
4  Q. I mean, that's the word that Hyde used but
5  whatever. Dizzy, spinning, basically the same symptoms.
6  Would you agree?
7  A. Yes.
8  Q. All right. Don't you think this raises at least a
9  concern of a medical issue?
10 A. When I stand up too quick, sometimes I get dizzy.
11 Q. Well, that's true. There may be an innocent
12 explanation to the symptom of dizziness, but there could be
13 a medical malady as well; right?
14 A. And, hence, why there was further questioning and
15 why we did a -- what do you call --
16 Q. A what?
17 A. Hold on. I'm getting the word. It just went out
18 of my brain. Blood pressure. Hence why we checked his
19 vitals and we also did further questioning on that.
20 Q. Well, what was his blood pressure?
21 A. His blood pressure was noted on the -- so when we
22 took him up and we were going to place him in holding,
23 that's where we did his blood pressure. That was noted on
24 the check sheet because I placed him in holding. I believe
25 it was 140 over 104. I cannot say exactly what the number

Page 52

1  is. You would have to look on the welfare check sheet. It
2  has it written on there with the time that was checked.
3  Q. Now, do you have medical training to determine,
4  sort of, the significance of what that blood pressure or
5  pulse rate statistics are?
6  A. Except for that I have high blood pressure, no.
7  Q. You mean personally, you have some experience with
8  blood pressure issues.
9  A. Yes.
10 Q. All right. But I'm asking about as an employee of
11 at the jail. Have they given you medical training as to
12 interpreting the significance of those statistics?
13 A. No.
14 Q. But you understood it to be an elevated blood
15 pressure.
16 A. That is what Deputy Hyde told me.
17 Q. Well, and even based on your own knowledge, you
18 understand that's higher than you would like.
19 A. Yes, but it's not something that would send me to
20 the hospital.
21 Q. So you understood that he had symptoms that he
22 believed he had a seizure, he felt like he was spinning with
23 those dizzy or those sensations, you also knew that he
24 reported to you that he had not been pooping for the
25 previous day or so; right?

Case 1:15-cv-00071-WYD-MEH   Document 112-12   Filed 02/06/17   USDC Colorado   Page 8 of 13

**Estate of Zackary Moffitt, et al. vs.
Sheriff John Minor, et al.**

**Deposition of Cheryl Giordano
May 20, 2016**

Page 53

1  A. Uh-hmm.
2  Q. Yes?
3  A. Yes.
4  Q. We have to have yes or no answers for the record.
5  A. Yes.
6  Q. And you also detected that he exhibited signs of
7  anxiety; correct?
8  A. Yes. These -- his symptoms I contributed (sic) to
9  anxiety after questioning with him, yes.
10 Q. Right. And he looked like he was undergoing
11 anxiety and you figured that's probably the explanation for
12 these other symptoms; right?
13 A. Yes, sir.
14 Q. But you now know that anxiety is a symptom of
15 alcohol withdrawal syndrome; correct?
16 A. I do not remember anxiety being listed as one of
17 the symptoms. There are several symptoms I know of alcohol
18 withdrawal, and I cannot say that I -- I know that anxiety
19 is one of them.
20 Q. Have you ever been trained on alcohol withdrawal
21 syndrome?
22 A. Besides reading this, no.
23 Q. Well, okay. What you were pointing to was
24 Exhibit 13.
25 A. Yes, sir.

Page 54

1  Q. My question is: Have you ever been trained at the
2  Summit County Sheriff's Office on alcohol withdrawal
3  syndrome, and you're saying only by being provided with this
4  Exhibit 13 article.
5  A. Yes.
6  Q. And even then it's just providing the article.
7  There was no discussion about it or anything else; right?
8  A. No.
9  Q. No what?
10 A. There was no discussion.
11 Q. Nothing further.
12 A. No, nothing further.
13 Q. All right. Well, take a look --
14 A. No formal training.
15 Q. You've got it open there.
16 A. Sure.
17 Q. Alcohol withdrawal syndrome is -- it's a five-page
18 document, but the second page has at the bottom symptoms and
19 the third one, and it's even underlined, it says anxiety.
20 Do you see that?
21 A. Yes, sir.
22 Q. So just even a passing reference to the single
23 document that's ever given to anybody at the Summit County
24 Sheriff's Office would educate you that anxiety is a symptom
25 of alcohol withdrawal syndrome.

Page 55

1  MR. WOESSNER: Objection to form.
2  Q. (By Mr. Killmer) Right?
3  A. Yes.
4  Q. And you had read this article before your
5  interactions with Mr. Moffitt; correct?
6  A. Approximately 2007, yes, sir.
7  Q. So, you know, like six or so years --
8  A. Yes.
9  Q. -- before your interaction. And you probably
10 hadn't gone back and read it again; right?
11 A. No, not verbatim.
12 Q. Well, not verbatim because that's how we read
13 things.
14 A. Yeah. Right.
15 Q. You didn't even look at it again, did you?
16 A. I have referred to it but I have not, like, gone
17 through and read everything over and over again, yes, sir.
18 Q. Well, what do you mean you referred to it? Why
19 did you refer to it?
20 A. If I was training someone and I -- if they
21 happened to fall during that week with those two questions,
22 as far as alcohol withdrawal, we had discussed that some of
23 the things that they might see would be shaky, you know,
24 uncontrollable shaking, that type of thing.
25 Q. These would be reasons you would refer to it but

Page 56

1  my question is --
2  A. Right.
3  Q. -- can you swear under oath that you, in fact,
4  referred to it after 2007? I mean, you're saying, if I
5  happened to be training somebody, I would have done that.
6  A. Uh-hmm.
7  Q. But do you know that you did?
8  A. I cannot say for a fact that I did.
9  Q. In any event, even to today, you forgot that it
10 listed anxiety as one of the symptoms of --
11 A. Yes, sir.
12 Q. So you probably had forgotten as of the time you
13 were interacting with Mr. Moffitt; right?
14 A. Yes, sir.
15 Q. In any event, you observed with your own two eyes
16 anxiety in Mr. Moffitt when you were interacting with him.
17 A. Yes, sir.
18 Q. And you knew from his report that he believed he
19 had a seizure, that he had some constipation, that he had
20 these spinning sensations too; correct?
21 A. Yes, sir.
22 Q. And you've learned that Mr. Moffitt also reported
23 to your reports, Lambert and Hyde, that he felt he had been
24 having seizures all morning long.
25 A. After the fact I learned that that's what he had

Case 1:15-cv-00071-WYD-MEH   Document 112-12   Filed 02/06/17   USDC Colorado   Page 9 of 13

Estate of Zackary Moffitt, et al. vs.
Sheriff John Minor, et al.

Deposition of Cheryl Giordano
May 20, 2016

Page 61

1 that day that had happened.
2  Q. Like what?
3  A. Okay. So earlier that day -- well, he had court,
4 his bond amount had been raised, so I forget where it was
5 originally -- oh, yeah. It went from 1,000 up to 2,000,
6 which was going to be harder for him to bond out. He was
7 pulled up front, asked if he wouldn't mind releasing his
8 phone to his girlfriend, which he did --
9  Q. Did he seem stressed about that?
10  A. -- at which time -- at which time it also says
11 that while he was up there, he was going on -- he was going
12 on about his bond being raised from 1,000 to 2,000, he was
13 going on about how Lake County put a warrant out for him for
14 $10,000 for not showing up to a class, he was -- I think --
15 I don't remember if he said something about his friend died
16 or his girlfriend telling me that, but all these things as
17 he's going on and on and complaining about them, he's -- how
18 do I want to say it, not escalating but getting agitated,
19 you know, like, you know, everything is happening at once.
20  Q. Sure. Well --
21  A. And so he's starting --
22  Q. But why is that even important? Suppose the
23 stress was from -- it doesn't -- why does it matter what the
24 stress is from? If it's causing physical manifestations,
25 like a seizure or these other events that he's reporting,

Page 62

1 why does it matter what is causing it?
2  MR. WOESSNER: Objection to form.
3  A. He wasn't explaining that he actually had -- he
4 said he thought he had a seizure but the symptoms he was
5 giving us was nothing of what we understood a seizure to be
6 or what Brian -- Deputy Hyde and the seizures I had seen in
7 the jail and worked with, whether it be diabetics or a woman
8 who had a stent in her head that caused seizures from that,
9 another one that had a head injury, he wasn't describing
10 anything -- any -- what is the word I want to use? No
11 symptoms, but, you know, where a seizure -- usually somebody
12 will go under -- they will go unconscious --
13  Q. (By Mr. Killmer) Well, you're not a medical
14 expert, are you?
15  A. -- and they will go on the ground. So that's why
16 we were asking him so we could find -- asking him why do you
17 think it was a seizure, what is it -- could it have been
18 anxiety, could it have been this based on the other things,
19 and that's where he said, I didn't know.
20  Q. You're not a medical expert, are you?
21  A. No, that's why we were probing questions.
22  Q. I know, but you don't know what to do with the
23 information that he gives you because you're not a medical
24 expert. You can't make a diagnosis, can you?
25  MR. WOESSNER: Objection to form.

Page 63

1  A. No.
2  Q. (By Mr. Killmer) That would be up to a doctor;
3 correct?
4  A. Yes.
5  Q. And Deputy Hyde is not a doctor, is he?
6  A. No.
7  Q. Is he considered the medical expert in the jail?
8  A. No.
9  Q. When there's a medical question as to what is the
10 medical condition of somebody, you need to bring in medical
11 expertise; correct?
12  A. If somebody said they have a cold, I usually don't
13 bring a doctor in.
14  Q. Zack Moffitt wasn't reporting that he was having a
15 cold, was he?
16  A. No, but we've had folks there with seizures before
17 where their doctors have said -- okay. So the one woman,
18 she had a head injury, and she had continual seizures.
19  Q. Okay. When there is a seizure that --
20  A. Right.
21  Q. -- does that or does it not raise a medical
22 concern to you?
23  A. Well, if he had a seizure in the day room, nobody
24 witnessed the seizure, he did not describe what are the
25 normal symptoms of a seizure.

Page 64

1  Q. So you weren't concerned.
2  A. No, sir.
3  Q. You were indifferent to that report.
4  A. No, that's why I asked him further questions and
5 we talked.
6  Q. And you asked him further questions and proceeded
7 to not get him any medical assistance; correct?
8  A. I did not call for a doctor, no, sir.
9  Q. Now, when it is time to call for a doctor at the
10 jail, who do you call?
11  A. So there are several options. Back at that time,
12 it would have been Dr. Gray. If you cannot get a hold of
13 Dr. Gray, then -- and you felt it was medically necessary
14 that they have to see a doctor right then, then you either
15 call for an ambulance or take them to the hospital.
16  Q. Who pays for the medical care that needs to be
17 provided to the inmate under that circumstance?
18  A. So if it is a preexisting condition, then that
19 gets billed back to the inmate. If it is something that
20 happened, you know, while in the jail that is not
21 preexisting, then the jail or sheriff's office would get
22 billed.
23  Q. Suppose it's alcohol withdrawal syndrome, somebody
24 comes in and they have been on a two-week bender and now
25 they're withdrawing from alcohol consumption, you understand

Case 1:15-cv-00071-WYD-MEH   Document 112-12   Filed 02/06/17   USDC Colorado   Page 10 of 13

Estate of Zackary Moffitt, et al. vs.
Sheriff John Minor, et al.

Deposition of Cheryl Giordano
May 20, 2016

Page 73

1  hospital with a BAC of above .3; correct?
2     A.  Yes.
3     Q.  Because above .3 is what triggers the necessity
4  for a medical clearance.
5     A.  Yes.
6     Q.  And you believed he had been medically cleared.
7     A.  Yes. I had been told.
8     Q.  And you actually looked in the file and you didn't
9  see a medical clearance; right?
10    A.  Not until the incident that happened on the 9th
11 when the ambulance -- I believe when the ambulance was there
12 or after he left or some time at the very end part.
13    Q.  You're saying you didn't check to see that until
14 after he left in the ambulance?
15    A.  I believe -- yes. I believe in here it says that
16 at first it -- I didn't know if it was his or someone else's
17 that I was looking for, because I actually had a couple
18 other highly intoxicated folks that came in. And anybody
19 that I receive, I make sure that I have a form.
20    Q.  Well, you're aware that Mr. Moffitt's girlfriend,
21 Kelly Kramer, had come in during his stay at the jail;
22 right?
23    A.  Yes.
24    Q.  And she was concerned about his health because he
25 had been highly intoxicated; right?

Page 74

1     A.  Yes.
2     Q.  You knew that at the time.
3     A.  Yes. When she came to get the phone.
4     Q.  Did you ever interact with her?
5     A.  Yes.
6     Q.  Tell me about that.
7     A.  Okay. So on the 8th of July, I believe it was
8  sometime in the afternoon, I couldn't tell you exactly what
9  the time was, she came to get his phone or ask for his
10 phone. At which time he was being pulled up for the phone,
11 she was -- she was upset because -- she was upset that he
12 had been arrested because she had taken him to the hospital
13 for help. And then somehow -- this is what she was telling
14 me --
15    Q.  Right.
16    A.  -- she was really upset, you know, she took him to
17 the hospital to get some help and here he got arrested and
18 she didn't mean for him to get arrested. You know, she
19 didn't understand why he was arrested. And so she was
20 telling me that a friend of his had died and so that he had
21 been drinking for a couple of days and that's why she took
22 him to the hospital.
23    Q.  And you reassured her that she had done the right
24 thing by taking him to the hospital.
25    A.  Yes.

Page 75

1     Q.  Right.
2        Turn, if you would, in that transcript,
3  Exhibit 73, to page 4095.
4     A.  I'm on it.
5     Q.  You're on it?
6     A.  Yeah.
7     Q.  On this bottom half of the page, you're saying --
8  I will just point it out there. It starts with "or".
9     A.  Yes.
10    Q.  Or possess, you know, possess or consume alcohol.
11 You then described that she was upset because she said she
12 had taken him to the hospital. She thought she was doing
13 the right thing by taking him to the hospital because he was
14 so intoxicated and I believe it was like .392 and I think is
15 what I heard. Do you see that?
16    A.  Yes.
17    Q.  That's -- that's highly intoxicated; correct?
18    A.  Yes, and that's why I was -- that's why Sergeant
19 Gilbert, I believe, was the one that had told me that he had
20 been medically cleared.
21    Q.  Is there a written form for medical clearance?
22    A.  No.
23    Q.  It was just a verbal thing.
24    A.  Okay. So she verbally told me that he had been
25 medically cleared but whoever -- whatever deputy or sergeant

Page 76

1  received him, doesn't -- does not take a verbal. It has to
2  be something from the hospital.
3     Q.  Well, Sergeant Gilbert is who told you he had been
4  cleared.
5     A.  Yes, because when I came on, she was the relieving
6  sergeant.
7     Q.  Relieving -- the person --
8     A.  She was coming off shift. I was coming on.
9     Q.  So you relieved her.
10    A.  Yes.
11    Q.  So part of her briefing of the next shift coming
12 in was to tell you, we've got a guy who came in, he was
13 .392, he's been medically cleared; right?
14    A.  Right. And about some of the other inmates too,
15 yes.
16    Q.  Turn in that book to Exhibit 4, this book here.
17    A.  Go right here? The next one.
18       MR. WOESSNER: Just slide that out so it doesn't
19 get buried in there.
20    A.  Here?
21    Q.  (By Mr. Killmer) Yes. You see the document
22 called completed questionnaire?
23    A.  Yes.
24    Q.  Do you recognize the form of that document?
25    A.  Yes, that's a standard medical questionnaire in

Case 1:15-cv-00071-WYD-MEH   Document 112-12   Filed 02/06/17   USDC Colorado   Page 11 of 13

Estate of Zackary Moffitt, et al. vs.  
Sheriff John Minor, et al.

Deposition of Cheryl Giordano  
May 20, 2016

Page 105

1  holding cell.
2    A.  Yes, sir.
3    Q.  Was it strange to you that he was naked?
4    A.  Not necessarily, sir.  I just had a naked man the
5  day before.
6    Q.  I don't need to know about that.
7    A.  Well, you asked so...
8    Q.  Okay.
9       MR. WOESSNER:  You're talking about the jail.
10  You're still talking about the jail; right?
11    A.  Unfortunately, I can't tell you how many naked
12  people are in the jail.
13    Q.  (By Mr. Killmer)  I said I don't need to know
14  about that.
15       In your visits with Mr. Moffitt, did he tell you
16  he had already seen the doctor?
17    A.  Yes.  That would have been at approximately 7:16.
18  At the 1716 when I was having a conversation with him, so we
19  had come back, and I was talking to him, in my report it
20  says I was checking on him.  During that conversation, he
21  had asked for the keys, and I asked him what he needed the
22  keys for, and he said that he wanted to go back to his cell.
23  I told him he could not go back to his cell because Colorado
24  West was supposed to be coming to see him.  He said he
25  already saw them.

Page 106

1       I looked at, I believe it was Lambert, and I'm,
2  like, did Colorado West come and I missed it?  You know,
3  because I had done face count and stuff so I didn't know
4  maybe if I had missed it or something, and she's, like, no,
5  they haven't been here, they're not due here till something.
6    Q.  Did Moffitt seem sincere when he said he had
7  already seen the doctor?
8    A.  No.  No, because I'm -- no.  He wanted out of the
9  holding cell.
10    Q.  How do you know?
11    A.  Is what I want -- how do you know because the day
12  before when I -- that's why I had to leave the door open was
13  because he -- well, one, he had asked me not to shut it
14  because then it would cause him more anxiety and
15  claustrophobic and stuff.  And he had been in there all
16  night.
17       And from that earlier conversation where I just
18  said that he was naked, he, you know, had asked me if I
19  could let him out then and I told him no and I explained to
20  him what we were going to be doing and that I would be back
21  and I would get back with him.
22    Q.  So here he was --
23    A.  I know it's not in my report.  I'm sorry it's not
24  documented.
25    Q.  Why is it not in your report?

Page 107

1    A.  I -- I couldn't tell you, sir.  I -- I don't think
2  it's in my report.
3    Q.  So you're dealing with a naked man who has just
4  told you something that is just not so, I've seen the
5  doctor, I want to go back to the pod --
6    A.  He had his smock on at that time, sir.  It's in my
7  report as well.
8    Q.  You're dealing with a man who the last round had
9  been naked --
10    A.  At 6:20.  At 7:16 he was dressed.
11    Q.  All right.  But he tells you -- he now tells you
12  something that -- did it occur to you he was hallucinating,
13  he thought he had seen the doctor but he hadn't?
14    A.  That's why I immediately checked with the deputy
15  and she said no, she didn't think they had been there.
16    Q.  Right.  So he's telling you something that wasn't
17  so.  I've seen the doctor already.  And I'm wondering why it
18  didn't occur -- or did it occur to you that maybe he was
19  hallucinating?
20    A.  He said that statement after I had told him that
21  he could not go back to his cell and that he had to wait
22  until he saw the doctor.  That's when he said, well, I've
23  seen the doctor, I saw the doctor already.  He's trying to
24  convince me to let him out of that cell.
25    Q.  He asked you if he could have the keys?

Page 108

1    A.  Yes, sir.
2    Q.  Is that something that you allow inmates to do is
3  to get keys?
4    A.  No, that is what I did find very odd, and that's
5  why I went, well, why do you want the keys?  He's like,
6  well, I want to go to my cell, and I'm like, you're not
7  going to your cell.
8    Q.  Did that cause you to think maybe he's
9  hallucinating?  I mean, he's thinking the jail guard is
10  going to give him the keys to the jail?
11    A.  At the time I did not think of it as a
12  hallucination.  I definitely thought it as being off.
13    Q.  And you have learned since then that he, in fact,
14  had been undergoing hallucinations; correct?
15    A.  Only from the thing I was reading last night from
16  the inmates.  The inmates had never told any of us or the
17  staff or any -- expressed any concerns or told us that he
18  had been having the hallucinations that were in the
19  statements from the report that I was reading last night,
20  which I was never privy to until last night.
21    Q.  Until last night.
22    A.  Yes.  It was the first time I read any of that.
23  As I was reading it, if my husband were here, which he
24  isn't, I was just like, why didn't somebody say something?
25  I honestly did not know any of that.

Case 1:15-cv-00071-WYD-MEH   Document 112-12   Filed 02/06/17   USDC Colorado   Page 12 of 13

Estate of Zackary Moffitt, et al. vs.
Sheriff John Minor, et al.

Deposition of Cheryl Giordano
May 20, 2016

Page 109

1  Q. Really.
2  A. No.
3  Q. Weird. But you would expect to have known that,
4  those things, correct, to be informed of such things?
5  A. They are inmates. I don't know if they were
6  making these claims later or why -- but this was all in the
7  interview. Who interviewed them, was that Jeffco or was
8  that CBI? One of the two where they had interviews with
9  them. I didn't even know that they had interviewed all
10 these inmates.
11 Q. And they're inmates that are giving information
12 about their observations of another inmate.
13 A. Right.
14 Q. And this isn't something you learned about until
15 the night before your deposition.
16 A. Correct.
17 Q. Even though you're one of the senior members of
18 the command staff at the jail, senior sergeant having worked
19 there for almost 20 years.
20 A. What is your question, sir?
21 Q. Well, my question is: When there's information
22 like this, I would expect the command staff to learn about
23 it. I mean, that's -- you're there to take care of the
24 welfare of the inmates; right?
25    MR. MARKS: Object to the form of the question.

Page 110

1  A. Yes. These statements --
2  Q. (By Mr. Killmer) Did you ever learn that the
3  video of Mr. Moffitt in the holding cell also reflected that
4  he's having hallucinations? He's talking to the -- to the
5  vents and so forth and he's talking into the corner of the
6  cell. Have you ever heard any of this?
7  A. No, sir.
8     MR. WOESSNER: Objection to form.
9  Q. (By Mr. Killmer) You've never -- to this moment
10 when I'm raising these questions with you, you've never
11 heard that on the video he appears to be talking to the
12 vents?
13 A. No, sir.
14 Q. What is the responsibility of the person in the
15 control room watching the monitors of the surveillance in
16 the holding cells?
17 A. So the responsibility is if they see something
18 odd, then they would inform us. And from what I understood
19 from the call that came to Kathy Lambert based off what she
20 was saying at his door, the only thing that I could assess
21 was control might have saw that he hit himself. Because the
22 only thing I heard was Lambert go, why did you hit yourself.
23 Q. You also note in your interview that when you were
24 interacting with him, he kept sticking his tongue out. Do
25 you remember that?

Page 111

1  A. Yes. That was --
2  Q. That was that morning of the 9th; right?
3  A. Yes. That was after the -- when was that? That
4  was...
5  Q. I'm not --
6  A. It was around after -- it was after the 7:16
7  conversation that him and I were having, and I was noticing
8  that when he was talking, he was -- I can't explain it. It
9  was --
10 Q. You're sort of showing me the --
11 A. Sort of an odd -- I don't know if it was because
12 he was dehydrated, I wasn't quite sure, because I noticed it
13 was something that when I went -- well, that was strange.
14 And I asked the staff, and I believe it's in my report, if
15 that was something that anybody had noticed when they had
16 dealt with him if he'd done that.
17 Q. And what did they say?
18 A. They had not noticed it. And at that point in my
19 report, I went over to pass-on to see if there was something
20 in there documenting any other issues.
21 Q. Well, one thing you just said, and you said also
22 in your interviews --
23 A. Yes.
24 Q. -- is that, you were wondering is that dehydration
25 or what could be happening that causes him to do this. That

Page 112

1  occurred to you at the time; right?
2  A. Yes.
3  Q. Does it raise a flag of a medical need to you?
4  A. Not at that time, it did not. It -- it raised a
5  flag of, I need to check -- you know, to check pass-on to
6  see if there was anything that they didn't tell me, any
7  reports that they had from last night.
8  Q. No, I'm just asking what you were seeing at the
9  time.
10 A. Uh-hmm.
11 Q. And that feels to me like it's either dry mouth or
12 dehydration or something like that that would cause somebody
13 maybe even involuntarily or unconsciously be doing that.
14 A. Which is what I'm doing right now.
15 Q. Well -- yes, but --
16 A. Yes, sir.
17 Q. -- I mean, it's what he was doing and you -- it
18 was noticeable to you and you noted it; correct?
19 A. Yes. Mental -- yes.
20 Q. Well, and you told the investigators about it --
21 A. Yes.
22 Q. -- and you told me about it too.
23 A. Yes. And I asked the deputies if they noticed it
24 too. I was just wondering if it was something I just
25 noticed.

Case 1:15-cv-00071-WYD-MEH   Document 112-12   Filed 02/06/17   USDC Colorado   Page 13 of 13

Estate of Zackary Moffitt, et al. vs.  
Sheriff John Minor, et al.

Deposition of Cheryl Giordano  
May 20, 2016

Page 113

1  Q. So it was notable for you to even ask people
2  follow-ups about it.
3  A. Uh-hmm.
4  Q. Yes?
5  A. Yes.
6  Q. So that could be a sign of additional symptomology
7  for a medical problem; correct?
8  A. Could be a sign?
9  Q. Yes.
10  A. Yes.
11  Q. Did it occur to you that it was?
12  A. No.
13  Q. You noted also, then, I think after -- well, I'm
14  getting these from your interview.
15  A. Uh-hmm.
16  Q. At some point he was making sounds like he was
17  snoring. Was that after Hyde and Lambert had already
18  responded to the cell?
19  A. Yes.
20  Q. All right. So Hyde and Lambert responded to the
21  cell initially because of these reports that he was hitting
22  himself; correct?
23  A. Yes.
24  Q. Were you with them?
25  A. No.

Page 114

1  Q. Do you remember who made the initial report that
2  he appears to be hitting himself?
3  A. Who made the initial report?
4  Q. Yeah, who alerted everybody that this was
5  happening?
6  A. I remember a phone rang, Lambert picking it up,
7  and why I keyed in on this I cannot tell you, you know, it
8  was just something I keyed in on to because I was at -- like
9  this pass-on book I was trying to find more information.
10  Q. Right.
11  A. Phone rang, Lambert goes to the cell window, and
12  what I heard was, why did you hit yourself.
13  Q. That's Lambert saying that to Moffitt?
14  A. Yes.
15  Q. My question was different. It was, who made the
16  report in the first instance that he's hitting himself?
17  A. Well, I'm assuming it was whoever was in control.
18  Q. Who?
19  A. Which would have been Deputy Fidler.
20  Q. That's --
21  A. I'm sorry.
22  Q. That's okay.
23  A. Yeah. Not receive the report. Made the report.
24  Q. Lambert responded to the cell and said, why are
25  you hitting yourself or something like that, or stop hitting

Page 115

1  yourself?
2  A. Why did you hit yourself.
3  Q. Then what happened?
4  A. He didn't answer her.
5  Q. Were you at the booking desk?
6  A. Yes, I was on the far side.
7  Q. So you're what 10, 15 feet away from the cell
8  door?
9  A. I think a little farther than that, but yes.
10  Q. All right. Did Lambert and Hyde go into the cell?
11  A. Not at that time.
12  Q. Did they open the door?
13  A. Not at that time.
14  Q. So they are yelling through the window of the
15  door, why did you hit yourself or stop hitting yourself?
16  A. Lambert is at the window.
17  Q. Of the cell?
18  A. She asked why he hit himself. She asked why he
19  hit himself. He doesn't -- I'm looking over there. He
20  doesn't respond. Hyde goes up and I -- I don't remember if
21  Hyde said stop hitting or something or -- or anyway, so then
22  Hyde said something, I immediately stopped looking, trying
23  to look for further information because they are taking --
24  and get up and go straight over there, and I look in the
25  window and he's laying down and it sounds like he's snoring

Page 116

1  and --
2  Q. Door is still closed?
3  A. Door is closed.
4  Q. But you can hear snoring noises through the door.
5  A. Through the glass. Yes. There's a box in the
6  door with little holes so you can hear and you can talk
7  through the door. Yes.
8  Q. So you can hear that and this is before you all
9  have gone -- opened the door to go in.
10  A. Uh-hmm.
11  Q. Yes?
12  A. Yes.
13  MR. KILLMER: All right. I think we should break
14  for lunch so we do not have to wait in line at the lunch
15  places. Why don't we come back around 10 after 1?
16  MR. WOESSNER: Sure.
17  (Recess from 11:48 a.m. to 1:15 p.m.)
18  MR. KILLMER: Back on the record.
19  Q. (By Mr. Killmer) Ms. Giordano, could you turn in
20  the exhibit notebook to Exhibit 17, please. 17. It's
21  behind tab number 17.
22  A. I don't know why I am looking in the single
23  digits. I'm sorry about that.
24  Q. I am just here to help.
25  Do you recognize this as a Colorado Bureau of