IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Senior Judge Wiley Y. Daniel**

Civil Action No.   15-cv-00071-WYD-MJW

ESTATE OF ZACKARY MOFFITT, by and through its personal representative KELLY
KRAMER;
M.M., a minor, by and through her next friend and mother, CASSANDRA HIGGINS;
C.M., a minor, by and through her next friend and mother, CASSANDRA HIGGINS,

      Plaintiffs,

v.

SHERIFF JOHN MINOR, in his official and individual capacities;
CAPTAIN ERIK J. BOURGERIE, in his individual capacity;
STAFF SERGEANT CHERYL GIORDANO, in her individual capacity;
DEPUTY JONATHON DIURBA, in his individual capacity;
DEPUTY NATHAN FIDLER, in his individual capacity;
DEPUTY RYAN HOSIER, in his individual capacity;
DEPUTY BRIAN HYDE, in his individual capacity;
DEPUTY KATHY LAMBERT, in her individual capacity; and
DEPUTY JEFF WILSON, in his individual capacity;

      Defendants.

---

**ORDER ON REMAINING SUMMARY JUDGMENT MOTIONS**

---

I.    <u>INTRODUCTION</u>

      THIS MATTER is before the Court on the Motion for Summary Judgment filed by

Defendant Deputies Cheryl Giordano ["Giordano"], Jonathan Diurba ["Diurba"], Nathan

Fidler ["Fidler"], Ryan Hosier ["Hosier"], Brian Hyde ["Hyde"] and Kathy Lambert

["Lambert"] [collectively the "Jailhouse Defendants"] and the Motion for Summary

Judgment filed by Defendants Sheriff John Minor ["Minor" or "Sheriff Minor"] and

Captain Erik J. Bourgerie ["Bourgerie"].  The motions are fully briefed.

The case involves a 42 U.S.C. § 1983 claim alleging that Defendants violated Zackary Moffitt's Fourteenth Amendment rights as a detainee at the Summit County Detention Center [the "Jail"] based on their failure to provide medical care. Plaintiffs also assert a claim against Sheriff Minor in his individual and official capacities as the final policymaker for the Jail, asserting that the training on alcohol withdrawal and policies regarding medical care were constitutionally inadequate. Plaintiffs argue that the undisputed facts show that Zackary Moffitt ["Moffitt"] was suffering from alcohol withdrawal, and ultimately died after being detained by Defendants.

Defendants argue that summary judgment is appropriate on this claim because Plaintiffs cannot show that they were deliberately indifferent to Moffitt's medical needs and because they are entitled to qualified immunity. Additionally, Minor asserts that he is entitled to judgment in his official capacity as to training and policies that are alleged to be deficient. Finally, Minor and Bourgerie argue that Moffitt's minor children are not proper parties in this § 1983 action.

II.    FACTUAL BACKGROUND

I have considered all the facts alleged by the parties, but have stated only those facts I deem most material. Exhibits submitted by Defendants are referenced by letter, and exhibits submitted by Plaintiffs are referenced by number.[1] I have not cited to the evidence where the facts are undisputed or where I thought it was not necessary.

---

[1] Unless otherwise noted, the reference in this Order to Plaintiffs' numbered exhibits are to the exhibits attached to the response to the Jailhouse Defendants' motion. I note that while Exhibits 1 through 15 and 28 through 40 correspond to the numbered exhibits in CM ECF 112, Exhibits 17 through 27 do not. When the numbers do not match up, I have cited the CM-ECF number for clarity. Some of these documents were submitted conventionally. See ECF Nos. 113-114, 117.

To the extent a party has not specifically denied a fact tendered as undisputed by the opposing party, I have deemed that fact to be undisputed. As discussed in Sections III.B of my Practice Standards, a party must admit or deny the asserted fact and, as to a denial, provide "a brief explanation of the reason(s) for the denial and a specific reference to material in the record supporting the denial." *See also* Fed. R. Civ. P. 56(c)(1). To the extent a fact is disputed by a party but it has not cited material in the record in support of the dispute or showed that the evidence does not establish the absence or presence of a genuine dispute, that fact is also deemed undisputed. Fed. R. Civ. P. 56(c), (e). A genuine issue of material fact is not established by argument or a statement that a party is without sufficient information to admit or deny a fact.

In 2013 Minor was the Sheriff of the Summit County Sheriff's Office and Bourgerie was the Captain of the Jail. Bourgerie oversaw the operations of the Jail. Minor is a final policymaker for Summit County and the Jail.

The Jail had a written policy requiring patrol officers arresting persons with a blood alcohol content ["BAC"] higher than .30 to obtain medical clearance before bringing the arrestee to a detoxification center. The Jail followed this same practice for arrestees booked into the Jail with a BAC higher than .30.[2] The Jail's practice was to require written documentation from St. Anthony's Summit County Medical Center ["SMC"] that the arrestee had been medically evaluated and cleared for the Jail.

---

[2] Moreover, Jail policy states that when a deputy comes into contact with a person incapacitated by alcohol who is suspected of committing a criminal act, the deputy shall make an "immediate evaluation . .. as to whether medical personnel should be summoned to determine the person's medical condition." (Ex. 4.)

On July 6, 2013, a highly intoxicated 33-year-old Moffitt was taken to SMC. Moffitt was discovered to have a BAC of .392, showing he was acutely intoxicated, and SMC began to immediately treat Moffitt for this. Moffitt complained of "alcohol intoxication, vomiting blood, coughing blood, [and] bloody stool," and that his "kidneys hurt, [and] liver hurts." (Ex. 1—"Laboratory workup demonstrates significant alcohol intoxication, alcohol hepatitis.") Rather than complete his treatment, Moffitt pulled the IV out of his arm and left the emergency room ["ER"] and SMC, and then sat in front of the building. Seeing Moffitt leave, SMC called the Jail to report that Moffitt had pulled out his IV and walked out of the ER after being admitted for acute intoxication. (Ex. 2.)

Defendant Wilson responded to the call at around 11:07 a.m., and arrested Moffitt on an outstanding warrant for violation of a restraining order related to alcohol consumption. Wilson had been advised of Moffitt's BAC level, and upon arrest noted that Moffitt "had the strong odor of alcohol on his breath, slurred speech[,] and was very unsteady on his feet." (Ex. 3.) Despite allegedly knowing about the policies and practice of the Jail as to evaluations and medical clearance described above, and observing Moffitt's obvious intoxication, Wilson did not obtain a medical clearance but took him to the Jail. (Ex. 5, Wilson Dep. 4:9-20; 61:14-16.)

Upon intake to the Jail, Moffitt noted on a Questionnaire that he was going through alcohol withdrawal and had recently been hospitalized. (Ex. E.) The Completed Questionnaire stated, however, that Moffitt was "medically cleared at SMC

before . . . coming to Jail", (*id.*), when he had, in fact, not been medically cleared.[3]

According to Bourgerie, the deputies in the booking shift knew that Moffitt's BAC level was .392 at the time of booking (Ex. 6, Bourgerie Dep. 43:13-21), yet accepted Moffitt into the Jail without written medical clearance. (Ex. 7.)

The Jailhouse Defendants assert that they were unaware at the time of Moffitt's detention at the Jail that the Completed Questionnaire report was inaccurate.[4] Plaintiffs deny this, asserting that Moffitt's BAC of .392 was printed on a large board in the Jail and was seen by each Defendant. I have not, however, seen evidence that supports this, although I note that Bourgerie believed he saw a BAC for Moffitt on the board. (Ex. 6, Bourgerie Dep. 45:10-22). Bourgerie did not learn, however, that Moffitt's BAC was .392 until the afternoon of July 9th or July 10th. (*Id.* 44:13-15.) Some of the Jailhouse Defendants knew, however, of Moffitt's BAC. *See* Section III, *infra*.[5]

Initially, Moffitt was too intoxicated to complete the booking process and was put into a holding cell. (Ex. 8.)

On the morning of July 7, 2016, Fidler observed that Moffitt had vomited in his cell. Fidler asked if Moffitt was okay, and Moffitt responded that he had been drinking a lot, was hungover, and wanted to go back to bed.

---

[3] Plaintiffs assert that Wilson falsely told staff at the Jail that he had obtained medical clearance for Moffitt (ECF No. 110, Ex. 9), which Wilson disputes. This dispute is not relevant to the summary judgment motions at issue.

[4] *See* Ex. R, Hosier Dep. 28:8-16; Ex. O, Giordano Dep. 154:16-18; Ex. J, Diurba Dep. 14:4-12, 41:20-23; Ex. P, Lambert Dep. 29:16-19; Ex. B, Fidler Dep. 42:14-23; Ex. N, Hyde Dep. 30:23-31:10, 40:7-11, 127:25-128:2.

[5] I also address additional facts as to the Defendants that I find relevant to the deliberate indifference test in Section III.

Later that morning, Moffitt complained of feeling sick and Bourgerie went to his cell at about 11:30 a.m.  Bourgerie noted that Moffitt appeared pale and "slightly agitated".  (Ex. 10.)  Moffitt told Bourgerie that he had been throwing up a green fluid for the last two hours, showing him a neon, lime-green substance on a towel.  Moffitt expressed his distress about the green color of his vomit.  Bourgerie told Moffitt that he was not concerned about the color because he "did not believe the human body exuded anything green and that it had to be something he had consumed."  (*Id.*)  Bourgerie explained that if the fluid was red that would be a different situation.  (*Id.*)  While Bourgerie thought the color was strange, he thought it was something that Moffitt had eaten before he came into custody.  (Ex. H, Bourgerie Dep. 28:8-22.)

Bourgerie asked Moffitt why he thought he was vomiting, and Moffitt stated that he was detoxing from a two-week bender.  (Ex. G; Ex. H, Bourgerie Dep. 29:10-30:18.)  Bourgerie asked Moffitt if he had a history of bad detoxes that included hallucinations or seizures, and Moffitt said he did not but that this was the worst detox he had.  (*Id.*)  Moffitt said he was starting to see things out of the corners of his eyes.[6]  Bourgerie told Moffitt that he did not see a reason for an ER visit at that time.  (Ex. G; ECF No. 115, Ex. 3, Bourgerie Dep. 37:9-11.)  Bourgerie brought Moffitt up to Holding 1 to be observed by staff (Ex. G), and briefed Diurba on Moffitt's condition.

Bourgerie knew on July 7, 2013, that Moffitt had a history of a habitual use of alcohol.  (ECF No. 115, Ex. 3, Bourgerie Dep. 56:2-6.)  Bourgerie reported that Moffitt

---

[6]  Bourgerie testified that he was unsure if Moffitt was describing hallucinations or if he was seeing "'dots' or something similar from vomiting."  (Ex. G; *see also* ECF No. 115, Ex. 3, Bourgerie Dep. 31:3-20.)

told him that he had had issues with drinking and periods of sobriety, but that he would occasionally would relapse.  (Ex. 6, Bourgerie Dep. at 43:25-44:6; Ex. G.)  Moffitt further told him that he "had never had severe symptoms of withdrawal in the past.… He said that he'd normally been able to stop drinking and just go back to work and not have any issues from his withdrawal."  (ECF No. 115, Ex. 3, Bourgerie Dep. 21:7-20.)[7]

Bourgerie acknowledged that he failed to request medical assistance for Moffitt because the regular on-call doctor, Dr. Gray, was on vacation.  (Ex. 6, Bourgerie Dep. 57:2-58:20—the training materials say to get "this guy to a doctor" and he would have called the doctor to help him to assess the situation but the doctor was on vacation).[8]  Bourgerie explained:

> [Moffitt] was showing mild to moderate symptoms. And if I have a question, like him seeing things out of the corners of his eyes, then I thought it would be helpful to get that guidance [from Dr. Gray with a phone call].  However, being that guidance wasn't available, with the mild to moderate symptoms, it didn't rise to going to an emergency room.

(*Id.* 57:21-58:2; 61:1-62:15.)  "The reason I had contemplated Dr. Gray was more of an assurance for me, but that was it."  (*Id.* 61:4-5.)

Bourgerie also testified that he did not transfer Moffitt to the ER because it would have dropped the Jail below its minimum staffing level.  (Ex. 6, Bourgerie Dep. 123:13-125:1.)  He then clarified, however, that the severity of the symptoms Moffitt was

---

[7]   Bourgerie testified that he "knew that alcohol withdrawal could have some serious health risks" but was not sure if he knew at the time of the Moffitt incident that it could be fatal.  (*Id.* 33:9-13.)  He also did not know until after Moffitt's death that symptoms of alcohol withdrawal syndrome can come and go with periods of confusion mixed with periods of lucidity.  Bourgerie stated that it would have been helpful to know about such waxing and waning symptoms before Moffitt's death.  (*Id.* 38:11-39:2.)

[8]   Summit County had rejected Sheriff Minor's request to have medical personnel employed at the Jail because of cost.

showing did not rise to the level of taking him to the ER, and that he would have taken him to the ER if he had been showing more serious symptoms. (*Id.* 123:13-127:14.)[9]

It was within the discretion of the Jail deputies to determine whether an inmate's medical condition rises to the level of a serious medical need. Minor testified that all staff were responsible for detecting potential medical issues of inmates and were supposed to bring any concerns to the attention of a supervisor to take appropriate action. (ECF No. 115, Ex. 1, Minor Dep. 105:2-18.) Minor also testified that if an inmate asked to go to the hospital, deputies would typically ask the inmate follow-up questions and do some investigating to determine what the issue was. (*Id.* 75:1-8.) Minor acknowledged, however, that his staff were not medical experts. (*Id.* 26:25-7:5; *see also* ECF No. 115, Ex. 5, Fidler Dep. 55:11-24—it's up to the deputies that respond to get medical attention if needed but they are not given any specific training); ECF No. 115, Ex. 3, Bourgerie Dep. 62:6-23—he was not a doctor and had "zero classes" to give him a "heads up as to what the signs and symptoms of alcohol withdrawal are".) Minor also acknowledged that the Jail did not have a back-up physician who would make house calls to the jail like Dr. Gray did. (ECF No. 115, Ex. 1, Minor Dep. 26:11-25.)

After Bourgerie brought Moffitt up to Holding Cell 1 on July 7th, he was placed under observation from approximately 11:00 a.m. through 11:10 p.m. (Ex. I.) A Welfare Log was kept to ensure that Moffitt was "still breathing and alive and well." (Ex. J,

---

[9] While Plaintiffs argue that Bourgerie was more concerned with the financial impact of sending Moffitt to the hospital than with Moffitt receiving the immediate medical care he needed, the evidence does not support that assertion.

Diurba Dep. 53:4-8.)[10]  During this 12 hour period, Moffitt was observed through video monitoring and deputies made 14 in-person observations or checks of Moffitt's condition.  Fidler (NF54), Diurba (JD 57) and Hosier (RH42), made personal checks of Moffitt.  (Ex. I)  Moffitt was moved back to B-Pod at 11:25 p.m.

On the morning of July 8, 2013, Fidler escorted Moffitt to his appearance before a judge.  (Ex. K, audio recording of court appearance.)   Defendants contend that Moffitt lucidly answered questions from the judge and argued that he should be released on a personal recognizance ["PR"] bond.  The Judge denied bond.  Plaintiffs deny that Moffitt "lucidly" answered questions to the extent Defendants seek to imply that Moffitt's health was sound at the time or that his medical needs were being addressed.  They assert that Moffitt asked for a PR bond because he was very sick and needed immediate medical help.  Moffitt explained to the judge that he had not eaten since the preceding Wednesday, was barely able to hold down a glass of water, had been vomiting green substances, and that he could not get help for his serious medical issues so long as he remained in jail.  (*Id.* at 36 seconds).

After his court appearance, Moffitt was returned to B Pod.  Later in the afternoon of July 8th, Moffitt used the intercom in his cell to inform Fidler in the control room that he thought he was going to have a seizure.  (Ex. B, Fidler Dep. 54:9-15.)  Fidler

_____

[10]   As a matter of policy, Plaintiffs assert that there was no central log that tracked the exhibited symptoms of inmates who complained of and/or were experiencing serious medical conditions that could be accessed by Jail staff.  (ECF No. 115, Ex. 3, Bourgerie Dep. 83:8-84:6.)  Defendants admit there was no central log but deny Plaintiffs' assertion that the Jail does not document serious medical conditions.  Inmates who have medical complaints are put into a holding cell for observation and a welfare check log is started to monitor their conditions.  (*Id.* 83:3-84:13.)  However, Bourgerie acknowledged that this log is only kept during that observation period, and does not document all the behavior or symptoms of the inmates.  (*Id.*)

admitted that a seizure could be a medical red flag (*id.* 54:22-24) but did not seek medical attention for Moffitt.  Instead, he asked deputies to bring Moffitt up front so they could observe him and seek medical attention if needed.  (*Id.* 54:9-15.)

At approximately 5:12 p.m., Lambert, Giordano, and Hyde responded to Fidler's request to check on Moffitt.  They found when they went to Moffitt's cell that he was pacing and panicky.  (Ex. 17, ECF No. 112-16, and 28.)  Moffitt informed them he was having some type of attack, such as a stroke, heart attack or panic attack (*id.*), and that he had a headache and had been throwing up.  (*Id.*)  Hyde, who was a paramedic/ emergency medical technician ["EMT"] but was not working in that capacity at the time, made initial observations of Moffitt that were inconsistent with the claim of a seizure.  (Ex. N, Hyde Dep. 16:10-14.)  Also, Hyde observed that Moffitt "was not – he was not shaking, he did seem anxious... he was walking and talking to me, normal course. . . ." (*Id.* at 86:20-87:1.)  While Plaintiffs assert that a disputed issue of material fact exists regarding Hyde's credibility, this is not a proper consideration on summary judgment.[11]

While Hyde met with Moffitt, Giordano asked other inmates in the common area about Moffitt and learned that nothing "out of the ordinary had happened with" him.  (Ex. O, Giordano Dep. 48:6-20.)  Hyde, Giordano, and Lambert then escorted Moffitt out of B Pod, and Moffitt walked with them down the hallway to the front of the Jail.  (Ex. N, Fidler Dep. 86:25, 87:6.)  There, Hyde continued his observations of Moffitt by checking

---

[11]  Plaintiffs also attack Lambert's credibility.  As the Jailhouse Defendants note, however, it is Plaintiffs' burden to present specific facts demonstrating the existence of a genuine dispute of material fact.  *Nat'l Am. Ins. Co. v Am. Re-Insurance Co.*, 358 F.3d 736, 742 (10th Cir. 2004).  Thus, "when evaluating a motion for summary judgment", the court "should not determine whether it believes the movant's evidence; rather, it must determine whether the nonmovant offered any specific facts that demonstrate the existence of a material fact to be tried."  *Id.* at 743.

his vital signs which were within "normal limits, but slightly elevated."  (Ex. M.)  Moffitt

was under observation for 45 minutes, and ate and conversed with the deputies.

Moffitt was returned to general population in the B-Pod at approximately 6:30

p.m. on July 8, 2013, after he reported feeling better.  Plaintiffs assert that there was

then no way for deputies to observe him in his cell in B-Pod other than viewing him in-

person and face-to-face, as there are no video surveillance cameras in those cells. In

other words, Moffitt's relocation meant that he was no longer in the holding cells where

deputies are supposed to check on inmates every fifteen minutes.  (Ex. 6, Bourgerie

Dep. 94:4-24.)

Early the next morning on July 9, 2013, at approximately 1:00 a.m., Moffitt called

to the control room to talk to Diurba.  Diurba could not understand Moffitt, and he and

Hosier went to check on Moffitt.  At his cell they found a delusional Moffitt reporting that

he was hearing voices that were telling him to kill himself.  Additionally, Moffitt told

Diurba and Hosier that he tried to choke or kill himself three times.  Diurba called

Colorado West Mental Health ["Colorado West"] for a mental health check, placed

Moffitt in a suicide smock, moved him to the padded cell in Holding 1 for suicide watch,

and listed specific statements of suicidal ideation on the Report.  (Ex. S.)

When Diurba called Colorado West, he used the phone to allow the mental

health professional to hear Moffitt's symptoms.  (Ex. J, Diurba Dep. 68:19-25.)

Colorado West stated someone would come by the next day.  Plaintiffs assert that by

Diurba's own admission, Moffitt was hallucinating at the time (which made him less than

reliable), and Diurba admitted that Moffitt may not have described the symptoms of

alcohol withdrawal he had been experiencing. (Ex. 23, Diurba Dep. 68:19-69:16.) Plaintiffs also assert that Hosier and Diurba knew at that time that Moffitt was engaging in bizarre behavior, including self-harm, suicidal ideation, agitation, and hallucinations, but took no steps to ensure Moffitt received medical treatment for alcohol withdrawal. (*See* Ex. 22, ECF No 112-21, Hosier Dep. 113:18-114:1; Ex. 23, ECF No. 112-22 Diurba Dep. 20:19-24, 40:5-8.) Moreover, Plaintiffs note that Colorado West could not provide Moffitt treatment for his alcohol withdrawal as that is a physical as compared to a mental condition. (Ex. 21, ECF No. 112-20.)

After calling Colorado West, Diurba and Hosier brought Moffitt from his jail cell to the holding cell. Plaintiffs assert that in the holding cell Moffitt continued to exhibit apparent symptoms of delirium tremens ["DTs"]. Throughout the early morning hours of July 9, 2013, other detainees reported that Moffitt appeared to be hallucinating and that Moffitt "believed that the [jail] staff and hospital staff were fighting and spilling human organs on the floor" and that he had heard voices "telling him to kill himself." (Ex. 21, ECF No. 112-20; Ex. 23, ECF No. 112-22, Diurba Dep. 20:19-24.) Despite Moffitt's display of hallucinations, his sweating and agitation, and all of the other symptoms he had been reporting that Plaintiffs claim were obvious signs of the DTs, none of the Jail staff sought medical intervention on behalf of Moffitt, other than the call to Colorado West, and Plaintiffs assert that Moffitt's condition continued to dramatically deteriorate. (Ex. 24, ECF No. 112-23.)

Throughout the early morning of July 9th, Moffitt remained in a holding cell under video observation and periodic in-person checks. (Ex. T, video recording.) Over the

-12-

next six hours, 15 in-person checks were made by deputies, including Hosier (RH42), Diurba (JD57) and Giordano (CG 16). (ECF No. 78, Ex. I at SCSO 00098.)

Shortly after being placed in the holding cell on July 9th, at approximately 1:20 a.m., Moffitt was seen on the video monitor with his hands on his throat. The deputy watching the video contacted Hosier to report this but stated he did not think that Moffitt was applying any pressure. (Ex. R, Hosier Dep. 110:14-19.) Hosier testified that he was sure he checked on Moffitt, and did not see him trying to choke himself. (*Id.* 110:20-22.) Hosier did, however, admit that he heard Moffitt coughing several times within the first two hours of the early morning on July 9th. (*Id.* 111:23-25.)

Diurba also stated that he "heard a choking and coughing sound in the cell" that morning and called Deputy Collins in the control room to ask what Moffitt was doing. Collins told Diurba that he saw Moffitt trying to choke himself. Diurba later told investigators that he "was not concerned about Moffitt 'choking' himself as he believed that the worst case scenario [wa]s that he could go unconscious[.]" (Ex. 21, ECF No. 112-20.)

When Giordano came on shift on July 9, 2013, she was informed to watch Moffitt because he was threatening to hurt or choke himself. (Ex. O, Giordano Dep. 103:22-104:3.) Plaintiffs assert that Giordano and Hyde were also informed that Moffitt was "seeing delusions or visions" and had told guards that he had already seen a doctor when this was not true. (Ex. 25, ECF No 112-24.) Hyde was informed that a mental health check had been requested. (Ex. N, Hyde Dep. 45:7-21.)

Hyde checked on Moffitt after Hyde heard him yelling. Hyde said Moffitt was agitated. (Ex. N, Hyde Dep. 107:11-12.) Hyde informed the other deputies that Moffitt was more "erratic" on July 9th than on July 8th, and that Moffitt was seeing "delusions", claiming he already talked to someone from Colorado West. (Ex. 25, ECF No. 112-24.)

At 6:18 a.m., Giordano checked on Moffitt as she started her shift and saw that he was naked. (Ex. O, Giordano Dep. 100:4-12; Ex. I; Ex. W.) She did not think this was "strange" or out of the ordinary. (*Id.* 105:3-5; Ex. N, Hyde Dep. 44:15-20.) Giordano described Moffitt as "articulate, he made contact with me." (Ex. O, Giordano Dep. 104:1-9, Exhibit W at 6:18:42-06:19:03 a.m.)

At approximately 7:16-7:18 a.m., Giordano again checked on Moffitt. He was standing up and came to the door to talk to her. Moffitt asked Giordano for the keys, stating that he needed "to open the door, and go back to my cell, I've seen the doctor, and want to go back." Plaintiffs assert from this that Giordano knew that Moffitt had been hallucinating as Giordano knew that he had not seen a doctor. (Ex. 26, ECF No. 112-25.) Indeed, Giordano admitted that she, Hyde, and Lambert were concerned that Moffitt had stated he had seen a doctor when he had not. (Exs. 28A, 28B, ECF Nos. 112-27 and 28.) Plaintiffs further assert that Moffitt being naked is obviously strange and out of the ordinary, and that Giordano knew that Moffitt had attempted to harm himself and was experiencing other symptoms of alcohol withdrawal. Nonetheless, she did nothing to initiate a medical intervention.

Giordano also noted that Moffitt kept sticking his tongue out in an unusual way when he spoke, causing her to ask staff if they had noticed this behavior and check the

pass-on book. (Ex. O, Giordano Dep. at 110-111.) Giordano told Lambert about this, and that it could be "a sign of additional symptomology for a medical problem." (Ex. 26 ECF No. 112-25; Ex. 28; Ex. 12, Giordano Dep. 107:11-113-10). She did not, however, note that issue in the pass-on book.[12]

The Jailhouse Defendants assert that at approximately 7:20 a.m., Moffitt began to strike himself forcefully, including hitting his head against the corner of the padded bench. (Ex. T.) Plaintiffs deny this, asserting that Moffitt was striking himself, and attempting to harm himself for over six hours prior to 7:20 a.m., and that this was observable on the video monitor screen. (Ex. 29, Video.) Defendants note, however, that Plaintiffs fail to make any specific time reference to the moment before 7:20 a.m. where Moffitt was striking himself forcefully.

Fidler, who was then working in the Control Room, saw Moffitt's violent behavior on a video monitor screen and called Lambert at the booking desk at approximately 7:23 a.m. (Ex. B, Fidler Dep. 113:3-114:5.)

At approximately 7:24 a.m., Fidler told Lambert that Moffitt was hitting his head, so she went to check on Moffitt. Both Lambert and Giordano talked to Moffitt. At approximately 7:26 a.m., a Colorado West mental health counselor arrived and

---

[12]  Plaintiffs assert that Moffitt's medical issues and requests for medical aid were also observed by other inmates. Chad Demming asserted that "Moffitt was complaining that he was sick. . . On one of the days, he heard Moffitt push his intercom button and tell the staff he was having chest pains. . . Every day Moffitt was there he was 'freaking out.'" (Ex. 34.) John Watson stated: "Moffitt called for help and was crying that he couldn't be locked into six walls. He said he had a seizure and needed a doctor." Also, on what appears to be July 9th, Watson heard Moffitt push the intercom button and three deputies came to check on him. One of the deputies was Deputy Diurba. Moffitt told the staff he wanted to commit suicide, he was dizzy, and thought he needed to see a doctor. Moffitt said he couldn't be locked into six walls and that he needed to talk to somebody. The staff told Moffitt that they wouldn't be able to get him anyone to talk to until the next day and Moffitt cried about that. (Ex. 35.)

approached the door of the holding cell where Lambert was talking to Moffitt. At 7:26:56, Hyde approached the door and began speaking to Moffitt. Moffitt started striking himself again, and Fidler was asked to open the door to the cell.

At 7:27 a.m., Hyde entered the cell to talk to Moffitt. The Jailhouse Defendants assert that Hyde began by making a few initial assessments of Moffitt's condition, including that there was no vomit and Moffitt was talking and was not sweating, and checked his pulse. (Exs. T and W at 7:27:30; Ex. N, Hyde Dep. 67:12-17, 68:9-17.) Plaintiffs deny this in part, noting that Hyde testified that he saw Moffitt was "super slippery" because of his profuse sweating, and "as the paramedic side, I should have recognized [DTs] right off the bat like, but you can't ... that's also a sign of having a heart attack, you know[.]" (Ex. 17, ECF No. 112-16, at SCSO 04191.) Plaintiffs also note that Hyde stated that he "[i]nstananeously knew something was wrong" with Moffitt from just looking at him. Hyde observed that Moffitt had knocked himself out and was "breathing really hard" and fast. (*Id.* at SCSO 4190, 4203, 4198.) Finally, Plaintiffs assert that Giordano noticed that Moffitt was on the ground and sounded like he was snoring, and Hyde told her that "he hit himself hard enough, he might have knocked himself out." Giordano at this point thought "something doesn't sound right." (Ex. 26, ECF No. 112-25, at SCSO 4103.)

As Hyde was speaking with Moffitt, he observed that Moffitt was unsettled with a crazy look in his eye. Moffitt made a motion that caused Hyde to move Moffitt to a sitting position. At this point, Hyde testified he "was worried about trying to keep him safe, let him not hit me, he was bleeding from the nose. So my focus was – because I

was the one in there trying to make sure he didn't hurt himself or me." (Ex. N, Hyde Dep. 118:11-16.) And, "once we had the situation controlled, 911 would have been the next immediate action to get him physical help prior to what did happen." (*Id.* 119:20-25,120:1.) Plaintiffs assert, however, that Hyde was not the only deputy working at the time and another deputy, including Fidler (who was observing the situation in the control room), could have and should have called for emergency medical assistance.

At 7:28 a.m. Moffitt attempted to strike Hyde, and the deputies restrained Moffitt. Lambert then exited the cell to call for medical assistance. (Ex. W.) Again, Plaintiffs note that there was no reason to delay calling for assistance until after Moffitt was restrained, as there were other deputies who could have done so. Lambert began the call by requesting non-emergency assistance, but when she heard that Moffitt was not breathing she then requested immediate emergency assistance.

Once Moffitt stopped breathing, Hyde and/or Giordano performed CPR and attempted to use an AED. Shortly thereafter, the ambulance arrived and paramedics took over Moffitt's medical care.

Moffitt was transported from the Jail to the SMC, and was later transferred to St. Anthony Central Hospital in Lakewood, Colorado. Moffitt died on July 13, 2013, four days after the last events described above.

Sheriff Minor testified in response to questioning about whether Moffitt had a serious medical need when in the Jail that he had a heart attack, "[h]e had a seizure and his heart stopped. . . .[a]t that specific moment in time, he had a medical issue." (ECF No. 115, Ex. 1, Minor Dep. 89:18-21.)

Following an autopsy, the coroner determined that Moffitt died as a result of lack of oxygen to the brain due to or as a consequence of cardiac arrest caused by the "combined impact of an abnormal heart and excited delirium syndrome." (Ex. X.) While Plaintiffs admit this, it is undisputed that their experts Drs. Blum and Jobin testified that Moffitt was experiencing serious symptoms of alcohol withdrawal syndrome that were a factor in his death. Indeed, Dr. Jobin testified that the agitation tremors that Moffitt was experiencing led to hallucinations and seizures and ultimately caused a respiratory and circulatory collapse. (Ex. L, Dr. Jobin Dep. 112:17-24.) Construing the evidence in the light most favorable to Plaintiffs, an inference can be certainly be drawn that alcohol withdrawal caused or contributed to his death.[13]

After Moffitt's death and after the conclusion of an independent Internal Affairs investigation, the Jail found that Defendant Wilson violated Jail Policy and Procedures by failing to obtain medical clearance prior to booking Moffitt into the Jail, and by providing false or misleading statements regarding Moffitt's medical clearance.

Sheriff Minor personally awarded Defendants Hyde, Lambert, Giordano, and Fidler with a commendation for their conduct with respect to Moffitt.

As to training regarding alcohol withdrawal, the Jail trains new deputies through a Field Training Officer ["FTO"] program that lasts for the first 14 to 16 weeks that a

---

[13] While Drs. Blum and Jobin and Nurse Grametbauer opined as to the cause of death and other issues material to the summary judgment motions in their reports (Exs. 30, 32-33), they are not admissible for purposes of summary judgment as they are unsworn. Unsworn expert reports do not satisfy the admissibility requirements of Fed. R. Civ. P. 56(e), and cannot be used to defeat summary judgment without additional affidavit support. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 n.17 (1970); *Peak ex rel. Peak v. Tank Coatings, Inc.*, 606 Fed. Appx. 891 (10th Cir. 2015). Thus, I have not considered the expert reports, although I have considered their deposition testimony.

deputy is on the job. One week of the program covers detox holds and requires the trainee to read the Jail's policies on Intoxicated Persons and Mental Health Detentions. (ECF No. 80, Ex. A-6.) A quiz asks trainees to identify symptoms of alcohol withdrawal. In 2007, an article on "Alcohol Withdrawal Syndrome" (Ex. 18, ECF No. 112-17) that covered signs of the syndrome was included in the manual that trainees were required to read. (*Id.*, Ex. A-5, Giordano Dep. 26:2-24; *see also* Ex. A-7.)[14]

Plaintiffs assert, however, that Jail employees are not regularly trained on the signs and symptoms of alcohol withdrawal, citing to Minor's deposition. This is not entirely accurate. Minor reviewed a detentions training log that purportedly showed training required as of June 7, 2013. He agreed that the log did not list training on the symptoms of alcohol withdrawal and how to respond. *(*ECF No. 115, Ex. 1, Minor Dep. 86:19-23.) He also testified, however, that the log may be incomplete. (*Id.*) Yet I note that many of the Defendants stated that they did not have additional training other than through the FTO program. (*See, e.g.,* Ex. 12, Giordano Dep. 54:1-12.)

Between 2007, when the alcohol withdrawal materials were incorporated into FTO training, and July 2013, Defendants assert that no inmate at the Jail had a major medical incident or died from alcohol related symptoms. (Ex. A, Bourgerie Decl. ¶¶ 8-10.) Plaintiffs deny this, stating that Sheriff Minor knew of one prior severe case of alcohol withdrawal. (ECF No. 115, Ex. 1, Minor Dep. 13:16-21.)

---

[14]  Bourgerie did not have such training as he was hired before the policy was implemented. Bourgerie was asked in his deposition if he was given any training in recognizing the signs and symptoms of alcohol withdrawal, and responded that he had training in sudden in-custody death and excited delirium, which present very similarly to DTs, a classic symptom of alcohol withdrawal. (ECF No. 115, Ex. 3, Bourgerie Dep. 19:4-12.) He acknowledged, however, that he had no specific training in alcohol withdrawal, and no formal training, "[j]ust experience." (*Id.* 19:10-12; 33:14-34:3.)

III.    ANALYSIS

    A.    Standard of Review

Summary judgment may be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the ... moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit."  *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000).  "A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented."  *Id.*

The burden of showing that no genuine issue of material fact exists is borne by the moving party.  *Horizon/CMS Healthcare Corp.*, 220 F.3d at 1190.  The court must, on summary judgment, "'view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.'"  *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (quotation omitted).  Doubts must be resolved in favor of the existence of triable issues of fact.  *Boren v. Sw. Bell Tel. Co.*, 933 F.2d 891, 892 (10th Cir. 1991).

    B.    The Merits of Defendants' Motions

        1.    The Claim by Moffitt's Minor Children

Minor and Bourgerie argued in their summary judgment motion that Moffitt's minor children M.M. and C.M. were not proper parties.  In response, Plaintiffs conceded

that M.M. and C.M. are not proper parties and voluntarily dismissed them.  Accordingly, M.M. and C.M. will be dismissed from the case.

### 2.    The Claim Against the Individual Defendants

Defendants argue that they are entitled to judgment as a matter of law on Plaintiff's deliberate indifference claim for failure to provide medical treatment, and assert qualified immunity.  The Supreme Court in *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), held that government officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known.  *Harlow* places a presumption in favor of immunity of public officials acting in their individual capacities.  *Schalk v. Gallemore*, 906 F.2d 491, 499 (10th Cir. 1990).

As noted in my Order on Defendant Wilson's Motion for Summary Judgment issued on August 3, 2017 (ECF No. 133) ["August 3, 2017 Order"], when a "'defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established.'"  *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009) (quotation omitted).  Thus, "'[q]ualified immunity is applicable unless the official's conduct violated a clearly established constitutional right.'"  *Id.* (quotation omitted).  In determining whether the plaintiff has met the burden on this issue, the court must construe the facts in the light most favorable to the plaintiff.  *Id.*

"Under the Due Process Clause "pretrial detainees are …  entitled to the degree of protection against denial of medical attention which applies to convicted inmates

under the Eighth Amendment." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009).  For Plaintiffs to prevail on this claim, they must establish a deliberate indifference to Moffitt's serious medical needs by the Defendants.  *Id.*

There is both an objective and subjective component to the deliberate indifference analysis.  *Martinez*, 563 F.3d at 1088.[15]  "The objective component of the test is met if the 'harm suffered rises to a level sufficiently serious to be cognizable under the Cruel and Unusual Punishment Clause' of the Eighth Amendment."  *Id.* (quotation and internal quotation marks omitted).  "The subjective component requires that Plaintiffs show Defendants knew that Moffitt faced a serious risk of harm and disregarded that risk, by failing to take reasonable measure to abate it.  *Id.*

### a.  Objective Component

The Jailhouse Defendants argue that the undisputed facts and admissions by Plaintiffs' experts show from an objective perspective that no sufficiently serious and obvious need for medical care existed during Moffitt's detention from July 6 through July 8, 2013.  During that time, Defendants contend that Moffitt suffered from intermittent mild or moderate alcohol withdrawal and did not display symptoms that would have objectively signaled the need for urgent medical care.  They rely on Plaintiffs' expert Drs. Blum and Jobin's testimony in their depositions that even as of the afternoon of July 8, 2013, Moffitt's presentation did not support severe alcohol withdrawal.  (*See,*

---

[15]  In the Order on Defendant Wilson's Motion for Summary Judgment, I  rejected Plaintiffs' argument that a purely objective standard should be applied in this claim based on *Kingsley v. Hendrickson*, ___ U.S. ___, 135 S. Ct. 2466 (2015).  *See Williams v. Miller*, No. 15-CV-0028-JED, FHM, 2016 WL 4537750, at *11 (N.D. Okla. Aug. 30, 2016); *Harding v. Casaus*, No. CIV-15-316-R, 2016 WL 8711400, at *7 n. 14 (W.D. Okla. April 22, 2016).  I affirm that ruling here.

*e.g.,* Ex. F, Dr. Blum Dep. at 113:17-114:14.)  Defendants' characterization of the

testimony of Drs. Blum and Jobin is not, however, entirely accurate.

Dr. Blum testified as to the symptoms that Moffitt reported to Bourgerie on July 7,

2013, that it was difficult to determine whether they were mild or serious symptoms of

alcohol withdrawal that needed medical attention, and that in retrospect the symptoms

were not mild.  (Ex. F, Dr. Blum Dep. 99:5-102:20.)  While Dr. Blum was asked to state

that Moffitt's symptoms presented to Lambert, Hyde, and Giordano on the afternoon of

July 8, 2013, did not indicate a need for medical treatment, he stated that they did not

support the need for "urgent" medical treatment.  (*Id.* 114:15-19.)  He also testified,

however, that the deputies ignored Moffitt's history of alcohol symptoms that had

occurred from July 6th onward, including the "many episodes" leading up to the point on

July 9th where Moffitt needed urgent care.  (Ex. 31, Dr Blum Dep. 119:3-120:12.)  This

included his "repeated vomiting in excess of 12 times, . . .his reports of anxiety and the

visual disturbances" as well as "reports of him being more agitated."  (*Id.* 120:13-23.)

Similarly, Dr. Jobin testified that while Moffitt was in severe withdrawal and DTs

by the morning of July 9th, if he "had been treated 12 hours earlier, if he had been

assessed for his agitation earlier, he would have been treated with medication and this

wouldn't have happened or it had a much, much, much less chance of happening."  (Ex.

L, Jobin Dep. 81:1-15.)  Nurse Grametbauer testified that Moffitt's symptoms even on

July 7th that were presented to Bourgerie required medical treatment.  (Ex. 14,

Grametbauer Dep. 49:4-51:25.)  Finally, Defendant Bourgerie recognized the need for

medical treatment and assessment, as he stated he would have called Dr. Gray if he

were available to evaluate Moffitt, although he did not think that a trip to the ER was required.

I find that Defendants are improperly conflating the need for urgent medical care (*i.e.,* the need to respond within minutes or to call 911), with the need for other medical treatment such as an evaluation or examination. A factfinder could find from the above evidence that the need for a medical evaluation was apparent as early as July 7, 2013.

Moreover, Defendants' argument ignores the fact that the court must look to the harm claimed by Plaintiffs to determine whether it is sufficiently serious. *See Martinez*, 563 F.3d at 1088. The harm claimed by Plaintiffs on behalf of Moffitt is severe alcohol withdrawal and ultimately death. This condition is sufficiently serious to meet the objective component, regardless of when Plaintiffs' medical experts opined that Moffitt first needed urgent medical treatment or care. *Id.*; *see also Stefan v. Olson*, 497 F. App'x 568, 577 (6th Cir. 2012) (holding plaintiff's "extremely elevated .349 blood-alcohol level and verbal communication of a history of alcoholism accompanied by withdrawal seizures communicated an objectively serious medical need); *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009) (holding there was "no dispute" that the plaintiff, who was suffering from alcohol withdrawal, "had a serious medical need").

Finally, it is undisputed that Moffitt suffered in the Jail over several days with symptoms including nausea, headaches and pain, vomiting, not eating or sleeping, anxiousness, agitation, hallucinations, and suicidal ideation. Ultimately, he began to forcefully hit himself but emergency medical care was not called until Moffitt stopped breathing. The pain and suffering imposed by the failure and delay in getting him

treatment lasted several days, and the Eighth Amendment forbids "'unnecessary *and* wanton infliction of *pain.*'"  *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000) (emphasis in original).  This also sufficient to establish the objective element.  *Id.*

        b.     Subjective Element and Whether Right Was Clearly Established

Before addressing whether Plaintiffs have satisfied the subjective part of the deliberate indifference test, I first address Defendants' arguments that the law was not clearly established.  I reiterate my finding in the Order denying Wilson's summary judgment motion that the appropriate inquiry in this case is whether a reasonable officer (or jail official) in July 2013 would have understood that failing to seek medical care for an intoxicated arrestee who exhibited the symptoms that Moffitt did and the officer's actions in connection with same would violate the arrestee's constitutional rights. (August 3, 2017 Order at 19-20) (citing *Barton v. Tabor*, 820 F.3d 958, 966 (8th Cir. 2016)).

The Tenth Circuit has recognized that a claim can be brought on behalf of an intoxicated arrestee who dies in jail due to a lack of medical treatment or inadequate medical treatment if the plaintiff shows deliberate indifference to serious medical needs. *Martinez*, 563 F.3d at 1088.  Thus, I find that the law was clearly established on that issue.[16]  *See also Lancaster v. Monroe Cnty., Ala.*, 116 F.3d 1419, 1425-26 (11th Cir.

---

[16]  While the Tenth Circuit in *Martinez* court ultimately found that the defendants did not subjectively disregard the risk of the claimed harm, which in that case was death by heart attack, this was because there was no evidence in the record indicating that the arrestee would suffer from a heart attack. 563 F.3d at 1089-90.  I find that this case is distinguishable.  The evidence from Plaintiffs' medical experts establishes that there were signs and symptoms that Moffitt was suffering from the harm claimed here of alcohol withdrawal syndrome well before he was provided medical treatment, as discussed in Sections II and III.B.2.a, *supra*.

1997) (in case where intoxicated person died after being arrested and jailed, court held it was clearly established that an official violates a pretrial detainee's right to due process if he acts with deliberate indifference to the serious medical needs of the detainee; "the case law had made it clear that an official acts with deliberate indifference when he knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate").

Thus, I turn to the evidence to determine whether Defendants subjectively disregarded the risk of the claimed harm. As noted in the Order of August 3, 2017, Plaintiffs assert that Moffitt died from the DTs or alcohol withdrawal syndrome. This syndrome can lead to a "medical emergency with a high mortality rate" and to cardiovascular collapse, http://emedicine.medscape.com/article/166032-overview. (*See also* Ex. L, Dr. Jobin Dep. 112:17-24—the agitation tremors suffered by Moffitt led to "hallucinations, eventual seizures that caused a complete respiratory and circulatory collapse".)

### i. Hosier

I first address Defendant Hosier. He first encountered Moffitt as part of the welfare checks completed when Moffitt was in the holding cell on July 7, 2013. Hosier thought that Moffitt was detoxing from alcohol or drugs, but did not know which. (Ex. 24, ECF No. 112-23.)

Hosier also encountered Moffitt again in the early morning hours of July 9th when he and Diurba responded to a request to check on him. Moffitt expressed suicidal ideation and reported that he was hearing voices that were telling him to kill himself.

Moffitt told Hosier and Diurba that he had choked himself three times that night attempting to kill himself.  (Ex. 24, ECF No. 112-23.)  Hosier and Diurba placed Moffitt in a suicide smock (*id.*), and called for a mental health check, allowing the mental health professional to listen to Moffitt.  They then brought Moffitt up front to a padded observation cell to await the mental health check that was to occur the next day.  Over the next six hours, 15 in-person checks were made by deputies, including Hosier and Diurba.

Moffitt was then seen on the video monitor with his hands on his throat at approximately 1:20 a.m. on July 9th.  The deputy watching the video contacted Hosier to report that Moffitt was trying to choke himself.  Hosier testified that he was sure he checked on Moffitt, and did not see him with his arms around his throat trying to choke himself.[17]  Hosier did, however, admit that he heard Moffitt coughing several times within the first two hours of the early morning on July 9th.

I find from the foregoing that, even construing the evidence in the light most favorable to Plaintiffs, Hosier did not disregard a serious risk of harm.  While Hosier knew that Plaintiff was detoxing on July 7th, there is no evidence that Hosier should have known from his interaction or observations with Moffitt that he faced a serious risk of harm, or that Hosier drew that inference and then failed to act.  Indeed, Moffitt was put into the holding cell so he could be checked by the deputies, a welfare log was started, and Moffitt was personally checked by the deputies approximately 14 times

---

[17]  While Plaintiffs assert that Hosier did not check on Moffitt, the exhibit they cite (Ex. 24) does not state that.

while he was in the cell, including checks by Hosier.  There is also no evidence that Hosier had been briefed by Bourgerie as to the specific symptoms that Bourgerie had observed on July 7th that could be indicative of a serious problem in connection with alcohol withdrawal, such as the neon green vomit that Moffitt had thrown up.

Hosier also did not disregard a serious risk of harm to Moffitt during his interactions with him on July 9th.  The harm that Moffitt was complaining of at approximately 1:00 a.m. was suicidal ideation, with voices purportedly telling him to kill himself.  Hosier and Diurba did not disregard that risk; they called a mental health professional, let that person talk to and listen to Moffitt, and were told that the professional would be over there early that morning (only a few hours away.)  Hosier and Diurba placed Moffitt in a suicide smock and padded observation cell to await the mental health check.  There is no evidence during the time that Moffitt was under observation those early morning hours of July 9th that Hosier was on notice or should have been on notice that Moffitt was still detoxing or that he was suffering from alcohol withdrawal syndrome.   Moreover, Hosier stated that Moffitt did not ask to see a doctor. (Ex. 24.)

While Hosier was told at one point on July 9th that Moffitt was choking himself, when he went to check on Moffitt he was not doing this.  Hosier also did not see Moffitt try to hurt himself during the times he checked on him.  While Hosier admitted that he heard coughing from Moffitt within the first two hours of the early morning on July 9th, there is no evidence that he actually heard Moffitt choking.  Given that he did not hear choking or see Moffitt attempting to hurt himself, the coughing sounds alone are not

sufficient, in my opinion, to have alerted Hosier that Moffitt faced a serious risk of physical harm and then disregarded that risk.

Although Hosier may have ultimately been wrong in his assessment that Moffitt needed mental health treatment as compared to treatment for his alcohol related symptoms, a mistake or even negligent failure to provide adequate medical care does not rise to the level of a constitutional violation. *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976). Accordingly, I grant summary judgment as to Hosier, and find that he is entitled to qualified immunity. Plaintiffs have not demonstrated deliberate indifference.

ii.     Diurba

The same facts discussed above as to Hosier also apply to Diurba, as he was with Hosier during the contacts with Moffitt on July 7th and 9th. There are some additional facts, however, that must be discussed as to Diurba. First, there is evidence on July 7th that Diurba had been briefed as to what Bourgerie had encountered that led to Moffitt being in the holding cell for observation. To reiterate, Moffitt had complained of feeling sick that morning, he appeared pale and agitated to Bourgerie, and he reported throwing up a neon green fluid for two hours. Moffitt also had reported to Bourgerie that he was detoxing from a two-week bender, that this was the worse detox he ever had, and that he was starting to see things out of the corners of his eyes. Construing the evidence in the light most favorable to Plaintiffs, Diurba must be presumed to have known this based on the briefing. Moffitt was placed in observation from 11:00 a.m. through 11:10 p.m., periodic checks were made on him, and Diurba

testified that a Welfare Log was kept to ensure that Moffitt was "still breathing and alive and well." (Ex. J, Diurba Dep. 53:4-8.)

On July 9th, in addition to what was discussed with Hosier, Diurba saw that Moffitt was "agitated and distraught". Moffitt told Diurba that he needed to tell the vent to stop talking to himself, and that he was hearing voices telling him to kill himself. (Ex. 21, ECF No. 112-20.) Inmate John Watson testified that Moffitt told Diurba that he needed to see a doctor, that he was dizzy, that he couldn't be locked into six walls, that he needed to talk to somebody, and he was sick from alcohol. Moffitt was told that the Jail wouldn't be able to get him anyone to talk to until the next day. (Ex. 35.)

At approximately 1:20 a.m. on July 9th, Moffitt was seen on the video monitor with his hands on his throat. Diurba admitted that he "heard a choking and coughing sound in the cell" on the morning of July 9th, and was told by Deputy Collins that he saw Moffitt trying to choke himself. Moreover, Moffitt had told Diurba earlier that he tried to kill himself three times by strangling. (Ex. 21, ECF No. 112-20.) Nonetheless, Diurba told the CBI investigators that he "was not concerned about Moffitt 'choking' himself as he believed that the worst case scenario [wa]s that he could go unconscious[.]" (*Id.*)

I find from the foregoing that, unlike Hosier, Diurba was aware of facts from which the inference could be drawn that Moffitt had a serious medical need that could not wait for a mental health professional to arrive and consciously disregarded that risk. Construing the evidence in the light most favorable to Plaintiffs, Diurba knew from his briefing with Bourgerie of the serious symptoms that Moffitt displayed on July 7th, including the green neon vomit he had thrown up. Unlike Hosier, Moffitt purportedly told

Diurba that he needed to see a doctor. While Diurba, like Hosier, could reasonably have believed Moffitt was suicidal and suffering from a psychiatric problem on July 9th, as compared to continued alcohol detoxing or alcohol withdrawal syndrome, he also knew on July 9th that Moffitt was trying to choke himself and was not concerned about that, even though choking is an obvious risk that can lead to death.

I find from the foregoing that Diurba subjectively disregarded the risk to Moffitt that he could die or seriously injure himself, at least by July 9th, and failed to act. Indeed, as referenced earlier, Dr. Blum testified that deputies ignored Moffitt's history of alcohol symptoms, including the "many episodes" leading up to the point on July 9th where Moffitt needed urgent care, and Dr. Jobin testified that while Moffitt was in severe withdrawal and DTs by the morning of July 9th, if he "had been treated 12 hours earlier, if he had been assessed for his agitation earlier, he would have been treated with medication . . . this wouldn't have happened or it had a much, much, much less chance of happening." (Ex. 31, Dr. Blum Dep. 119:3-120:24; Ex. L, Jobin Dep. 81:1-15.) The Tenth Circuit has held that "[a] prisoner may satisfy the subjective element by showing that defendants' delay in providing medical treatment caused either unnecessary pain or a worsening of h[is] condition." *Mata v. Saiz*, 427 F.3d 745, 755 (10th Cir. 2005).

Accordingly, Plaintiffs have met both the objective and subjective tests as to Diurba, and I find for purposes of summary judgment that Diurba was deliberately indifferent as to Moffitt. The Jailhouse Defendants' Motion for Summary Judgment is therefore denied as to Diurba, and I find that he is not entitled to qualified immunity.

### iii.   Fidler

On July 7, 2013, Fidler saw that Moffitt had vomited in his cell.  Fidler asked if Moffitt was okay, and Moffitt responded that he had been drinking a lot, was hungover, and wanted to go back to bed.  When Moffitt was later moved to the holding cell for observation, Fidler was one of the deputies who checked on Moffitt.

 On the morning of July 8th, Fidler escorted Moffitt to his court appearance where Moffitt described how ill he was and that he needed a PR bond because he could not get help for his medical issues while in jail.  Later that afternoon, Moffitt used the intercom to inform Fidler that he had a panic attack and thought he was about to have a seizure.  (Ex. 9.)  Fidler requested that other deputies check on Moffitt, and asked them to bring Moffitt up front so they could observe him and seek medical attention if needed. Fidler was also in the control room on July 9th monitoring Moffitt in the holding cell beginning at approximately 6:00 a.m., and saw the events that transpired that day.

From his post in the control room, Plaintiffs assert and a jury could find that Fidler had a bird's eye view of Moffitt's deterioration over the course of much of his three-day detention in the Jail, yet took no steps to ensure that Moffitt receive medical attention.  I agree with Plaintiffs that the subjective element of the deliberate indifference test is met as to Fidler.  Unlike Defendant Hosier, there is evidence that Fidler knew about Moffitt's BAC level of .392, and knew that a BAC over .3 was dangerous.  (Ex. 9; Ex. B, Fidler Dep. 44:7-11.)  Indeed, he testified that one could die if they drank too much, and that a BAC of .392 potentially raises a medical risk of death or serious injury.  (Ex. B, Fidler

Dep. 41:9-42:8.)  Fidler also admitted that in his experience working in the jail, he had never seen anyone that intoxicated.  (Ex. 9; *see also* Ex. B, Fidler Dep. 41:2-5.)

Fidler also saw the many symptoms of alcohol withdrawal that Moffitt exhibited over the three day period that he was monitoring Moffitt and yet failed to request medical assistance.  Thus, he knew that Moffitt was vomiting as early as July 7th, and on July 8th had reported a panic attack and that he was going to have a seizure.  Fidler knew that seizure can a red flag of a medical concern.  (Ex. B, Fidler Dep. 54:22-24.)  Fidler was present at Moffitt's court appearance on July 8th where he stated that he was ill, had not eaten since the preceding Wednesday, was barely able to hold down a glass of water, had been vomiting green substances, and that he could not get help for his serious medical issues so long as he remained in jail.  Then, at approximately 6:00 a.m. on July 9th, and after being informed that Moffitt had expressed the previous night that he wanted to kill himself, Fidler saw Moffitt "acting weird", yelling and talking to himself, pulling his gown off and on, and acting like he was grabbing something in the air or punching at something.  (Ex. 9.)  Moffitt was under 15 minute observation checks at that time, but Fidler did not tell any of the deputies performing the checks about what he saw.  (*Id.*)  At approximately 7:20 a.m. Fidler observed Moffitt begin to aggressively strike himself in an attempt to cause self-harm.  While Fidler called Defendants Lambert and Hyde to check on Moffitt, he still did not call for medical assistance.

A reasonable jury could find that Fidler knew that a substantial risk to Moffitt's health existed given his high BAC when admitted to the jail and the level of danger it posed, the serious symptoms that Fidler observed and had heard about on July 7th and

8th, and particularly the symptoms that he saw Moffitt displaying on the morning of July 9th, given his knowledge that Moffitt had expressed suicidal thoughts and was acting so oddly. Yet he informed no one about these symptoms and took no action. Even when Moffitt began to aggressively hit himself in an attempt to cause self-harm, seriously escalating the situation, Fidler did not seek medical assistance but instead only asked deputies to go check on Moffitt and bring him up front. This evidence supports an inference that Fidler knew about and consciously disregarded a substantial risk to Moffitt's health, and a jury could thus find that he was deliberately indifferent to Moffitt's medical needs. *See Mata*, 427 F.3d at 755; *Sealock v. Colorado*, 218 F.3d 1205, 1211-12 (10th Cir. 2000) (when defendant knew that unexplained chest pain posed a serious risk to an inmate's health, failure to summon an ambulance would have disregarded that risk, arguably constituting deliberate indifference).

Accordingly, the Jailhouse Defendants' Motion for Summary Judgment is denied as to Fidler, and I find that he is not entitled to qualified immunity.

### iv. Hyde, Lambert, and Giordano

As with Fidler, Hyde, Lambert, and Giordano had knowledge of the seriousness of Moffitt's condition. Hyde testified that he knew when he was interacting with Moffitt that he had come in with an extraordinarily high BAC of .392, and Hyde assumed that Moffitt was detoxing and having alcohol withdrawal. (Ex. 11, Hyde Dep. 31:23-32:15.) Hyde also knew that Moffitt had been in the hospital before being booked at the Jail and had pulled out his own IV, and before that had been binge drinking and consuming alcohol. (Ex. 25, ECF No. 112-24.) Similarly, Giordano knew that Moffitt had a BAC of

.392 before being booked at the Jail, and had been told by Moffitt's girlfriend on July 8th that she was concerned about Moffitt's health because he was highly intoxicated and she had taken Moffitt to the hospital to be treated for that. (Ex. 12, Giordano Dep. 73:1-76:15.)[18]  Lambert also had been told by Moffitt's girlfriend that she was very concerned about Moffitt's well-being and that she wanted him to "get clean" and to sober up because Moffitt had issues with alcohol. (Ex. 27B, ECF No. 112-26.)

Hyde, Giordano, and Lambert first encountered Moffitt on July 8, 2013, after Moffitt reported that he was about to have a seizure. They found when they went to Moffitt's cell that he was "pacing" and "panicky." (Exs. 27-29, ECF No. 112-26-29.) Moffitt informed them he was having some type of attack, such as a stroke, heart attack, or panic attack. (*Id.*). Moffitt's blood pressure was determined to be slightly elevated. (Ex. M.)

While Hyde did not believe from his observations that Moffitt was having a seizure, Moffitt reported to Hyde and Giordano that he had not been sleeping, had a headache for the past couple days, had been vomiting, and was dizzy. (Ex. M; Ex. 25, ECF No. 112-24; Ex. 12, Giordano Dep. 51:1-53:13, 56:18-21; Ex. 29.)  Moffitt told Hyde he had to see a doctor. (Ex. 11, Hyde Dep. 94:10-25.)  Hyde stated that Moffitt was "really worked up and really anxious", and testified that these are typical complaints for a person detoxing from alcohol or drugs or going through DT's, not merely a hangover. (*Id.* 32:22-34:2, 93:24-11; Ex. 25, ECF No. 112-24.)  Hyde testified that the

---

[18]  Hyde had been trained on "the basic small stuff" about alcohol withdrawal syndrome during FTO training program by Giordano and other deputies. (Ex. 11, Hyde Dep. 154:18-155:8.)  Giordano had been trained on alcohol withdrawal syndrome through being provided the article on that syndrome (Ex. 18). (Ex. 12, Giordano Dep. 53:20-54:5.)

symptoms could be the sign of something very serious, and that this would be for a doctor to decide.  (Ex. 25, ECF No. 112-24; Ex. 11, Hyde Dep. 35:6-10, 72:24.)

Lambert also stated that she was told by Moffitt that he had been having seizures all day, that Giordano and Hyde heard this, and that Lambert observed Moffitt grabbing his head saying he's in pain.  (Ex. 19, ECF No. 112-18, Lambert Dep. 45:7-11, 47:13-48:25.)   Lambert saw that Moffitt was upset and agitated, he told her he had been vomiting, and he asked for a doctor.  (*Id.* 49:1-50:8, 81:18-82:7; Ex. 27, ECF No. 112-26.)  Lambert also knew that Moffitt had reported hearing things through the speaker and was having hallucinations.  She knew that these could be signs of alcohol withdrawal, and that would be an issue for a doctor to decide.  (*Id.* 49:1-50:2, 82:11-24.) Hyde thought at the time that Moffitt was having a panic attack (Ex. 11, Hyde Dep. 69:19-70:4), and Giordano thought it was stress or anxiety (Ex. 28).  Lambert also thought that Moffitt was having a mental problem, although she acknowledged that she did not have the training to determine whether a hallucination was caused by a mental or physical impairment.  (Ex. 19, ECF No. 112-18, Lambert Dep. 83:7-14.)

Hyde, Giordano, and Lambert escorted Moffitt out of B Pod for observation. Lambert stated that they were checking to see if Moffitt was going through alcohol withdrawals as she knew Moffitt had issues with alcohol.  (Ex. 27B, ECF No.112-26.) Moffitt denied having alcohol withdrawals when asked by Lambert.  (*Id.*)  Moffitt was eventually returned to his cell after he reported feeling better.

On July 9, 2013, Hyde, Lambert and Giordano came on shift at the Jail at 6:00 a.m.  Hyde reported that Moffitt was more "erratic" than when he saw him on July 8th,

and that he was agitated. (Ex. 25, ECF No. 112-24.) When Giordano first checked on Moffitt at approximately 6:20 a.m., he was naked. (Ex. 12, Giordano Dep. 105:3-5.) Moffitt was articulate but Giordano thought something was wrong with him because he wanted the keys to go back to his cell and he told her that he had seen "the doctor" when she knew that this was not true. (Ex. 28; *see also* Ex. 12, Giordano Dep. 105:15-25, 107:25-108:12.) Giordano thought from this that Moffitt was "off", and also noted of concern that Moffitt kept sticking his tongue out oddly when he talked. (Ex. 28; Ex. 12, Giordano Dep. 108:11-12, 110:23-112:7.) She thought this could be "a sign of additional symptomology for a medical problem." (Ex. 12, Giordano Dep. 110:23-113:10). Giordano had also been notified that Moffitt had threatened to kill himself, and that he had told the night shift deputies that he tried to choke himself three times. (Ex. 29.)

A little while later, Hyde checked on Moffitt when he heard yelling from his cell. Moffitt was agitated but calmed as soon as Hyde checked on him. A few minutes later, at 7:20 a.m., Moffitt started forcefully striking himself in the neck and hitting his head or neck against the padded bench in the cell. After Fidler called to have a deputy check on Moffitt, Lambert saw him lying on the floor and then saw him punch himself in the neck, which was very red. (Ex. 27B, ECF No. 112-26). Lambert, Giordano and Hyde entered the cell, Lambert reported that Moffitt's eyes were fixed and he was "completely out", he did not speak, and he was breathing rapidly. (*Id.*) Moffitt resumed self-harm behavior, and Hyde was shocked at how hard Moffitt was hitting himself. (Ex. 25, ECF No. 112-

24.)  He was slippery with sweat, and Hyde thought Moffitt had knocked himself out.

(*Id.*)  He also thought that perhaps Moffitt had been seeing delusions or visions.  (*Id.*)

As Hyde was trying to calm Moffitt, Moffitt looked at him with a "wild-eyed" and "out of control" look.  (Ex. 25, ECF No. 112-24.)  Hyde said that Moffitt looked at him like he wanted to "kill me, hit me, hurt me", even though they had a good rapport the day before, and that Moffitt did not appear to know who Hyde was.  (*Id.*)  Moffitt took a swing at Hyde, leading Hyde, Giordano, and Lambert to restrain Moffitt.  (*Id.*)  Lambert then left to call 911 for help.  She stated that while Giordano asked her to call for an ambulance, she was just going to call for a non-emergency response to check Moffitt out.  (Ex. 27B, ECF No. 112-26.)  She was concerned that Moffitt was having alcohol withdrawal issues.  (*Id.*)

While Lambert was on the phone with dispatch, Moffitt's face began turning blue and Giordano and Hyde attempted to perform CPR.  (Ex. 27B, ECF No. 112-26.)   Hyde was not able to get a pulse.  (*Id.*; Ex. 25, ECF No. 112-24.)  When Lambert heard that Moffitt had stopped breathing and was turning blue she then told dispatch that it was now an emergency and they needed medical assistance immediately.  (Ex. 27B, ECF No. 112-26.)

 While Defendants argue that Hyde, Giordano, and Lambert's actions do not amount to deliberate indifference or disregard, I disagree.  Hyde and Giordano knew that Moffitt had been booked into the Jail with a very high BAC, a dangerous condition, and that he had been previously in the Hospital for this condition.  Giordano and Lambert had also been told by Moffitt's girlfriend of his problems with alcohol and his

high level of intoxication.  They knew on both July 8th and July 9th, even before Moffitt began hitting himself aggressively in an attempt to self-harm, that Moffitt was experiencing multiple symptoms consistent with alcohol withdrawal syndrome.  This included agitation, vomiting, headaches, hallucinations, dizziness, lack of sleep, acting panicky and/or having a panic attack, pacing, and grabbing his head saying he's in pain.  They also knew on July 8th that Moffitt's blood pressure was slightly elevated and that he reported trying to kill himself three times and having seizures all morning.  Moreover, they knew early on July 9th, even before Moffitt began trying to aggressively harm himself, that Moffitt was naked in the cell, that he reported seeing the doctor when he had not and was asking for the keys to his cell, he was sticking his tongue out in an odd way, and he had reported to the night shift deputies that he tried to choke himself three times.  Giordano thought at that time that something was wrong with Moffitt, and that he was "off".

Giordano, Hyde, and Lambert knew that many of these symptoms could be signs of alcohol withdrawal syndrome or DTs, that Moffitt was asking for a doctor after having been admitted to the Jail highly intoxicated, and that it was for a doctor to make the determination as to whether alcohol withdrawal syndrome was occurring as they did not have the training to do so.  Indeed, Hyde testified that the symptoms could be the sign of something very serious, and that this would be for a doctor to decide.  (Ex. 25, ECF No. 112-24; Ex. 11, Hyde Dep. 35:6-10, 72:24.)  Yet they failed to request medical intervention of any kind.

Even after Moffitt began experiencing much more severe symptoms on July 9th, aggressively hitting himself in an attempt to cause harm and being completely out of it and unresponsive at times, the deputies did not immediately call for medical assistance. This was despite Giordano's testimony that "something doesn't sound right" and Hyde's testimony that he instantaneously knew something was wrong and that as a paramedic, he "should have recognized [DTs] right off the bat like, but you can't ... that's also a sign of having a heart attack, you know[]" (Ex. 17, ECF No. 112-16; Ex. 25, ECF No. 112-24.) And when Giordano did ask that an ambulance be called, Lambert only initially called for nonemergency assistance, even though she was concerned that Moffitt was going through alcohol withdrawal. She only asked 911 for emergency assistance after she learned that Moffitt had turned blue and stopped breathing.

A reasonable jury could find from the foregoing that these Defendants knew of a risk of serious harm to Moffitt in connection with alcohol withdrawal or the DTs, knew that Moffitt was exhibiting obvious symptoms of the DTs or alcohol withdrawal syndrome on July 8th and 9th, and intentionally and consciously disregarded that risk by not providing timely or adequate medical assistance. *See Farmer v. Brennan*, 511 U.S. 825, 842 (1994) (a plaintiff "need not show that a prison official acted or failed to act believing that harm would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm"). Thus, I find that deliberate indifference has been shown.

The Jailhouse Defendants' summary judgment motion is therefore denied as to Hyde, Giordano, and Lambert, and I find that they are not entitled to qualified immunity.

v.    Bourgerie

I now turn to Defendant Bourgerie.  Construing the evidence in the light most favorable to Plaintiffs, Bourgerie knew on July 7th that Moffitt was not feeling well.  (Ex. 13.)  He looked "clammy" and his cell was disheveled.  Moffitt told Bourgerie he had been vomiting a neon green substance for the past two or three hours, showed him a towel with this vomit, and stated he was concerned for his own welfare.  (*Id.*)  Moffitt also said he was starting to see things out of the corners of his eyes.  Bourgerie knew at that time that Moffitt had been very intoxicated, and Moffitt told him he was detoxing from a two-week bender.  He also knew that Moffitt had an extensive history with alcohol problems.  Further, Moffitt told Bourgerie that while he did not have a history of bad detoxes that included hallucinations or seizures, this was the worst detox he had. (*Id.*)  Bourgerie thought that Moffitt was exhibiting mild to moderate symptoms associated with detoxing from alcohol.  (ECF No. 115, Ex. 3, Bourgerie Dep. 20:6-21; Ex. 10.)

Construing the evidence in the light most favorable to Plaintiffs, Bourgerie thought that a doctor's assessment would be useful, but failed to obtain medical treatment because the doctor who contracted with the Jail was unavailable and because taking Moffitt to the ER would drop the Jail below its required staffing levels.  Together this evidence could reasonably support a finding that Bourgerie knew of a substantial risk to Moffitt's health, as he thought that a doctor should probably be consulted, and consciously disregarded that risk.  *Mata*, 427 F.3d at 753; *see also Self v. Crum*, 439 F.3d 1232 ("a prison health official who serves 'solely ... as a gatekeeper for other

medical personnel capable of treating the condition may be liable under the deliberate indifference standard if []he delays or refuses to fulfill that gatekeeper role'", and such a claim is actionable "where the need for additional treatment or referral to a medical specialist is obvious") (quotation and internal quotation marks omitted).  While Defendants argue that Bourgerie's contact with Moffitt occurred days before he arguably demonstrated signs of severe alcohol withdrawal, Nurse Grametbauer testified that the symptoms presented by Moffitt to Bourgerie required medical attention, and that mere observation of the inmate  was not sufficient.  (Ex. 14, Grametbauer Dep. 49:12-51:25.)[19]

Accordingly, I deny summary judgment as to Bourgerie, and find that he is not entitled to qualified immunity.

vi.   <u>Minor</u>

Plaintiffs also assert a claim against Minor in both his individual and official capacities.  Minor seeks a finding of qualified immunity on the individual capacity claim. I find that Plaintiffs have failed to show any direct personal participation by Minor as to Moffitt and the events leading up to his death.  The evidence shows that the first time that Minor learned about Moffitt was on July 9, 2013, after Moffitt was transported out of the Jail.  He did not participate in any decisions regarding Moffitt's medical care in the

---

[19]  While Dr. Blum testified that it was difficult to know whether the symptoms Moffitt experienced on July 7th were mild or severe withdrawal, he also stated in retrospect that it wasn't mild withdrawal.  (Ex. F, Dr. Blum Dep. 102:8-20.)  Moreover, when asked whether Bourgerie's decision to send Moffitt for observation in a holding cell was a reasonable option (instead of obtaining medical care), Dr. Blum stated he was "not certain, because observation with no action, I'm not certain what the point of observation with no action is with increasingly severe symptoms" namely, "significant nausea and vomiting."  (*Id.* 101:3-102:1.)  The jury could find that this action was not reasonable.

-42-

Jail.  And he cannot be liable for any constitutional torts of his employees on a *respondeat superior* basis.  *Dodds v. Richardson*, 614 F.3d 1185, 1201-02 and n. 10 (10th Cir. 2010).

The next question is whether Plaintiffs have demonstrated supervisory liability as to Minor.  An Eighth Amendment violation occurs as to a supervisor where "'the official knows of, and disregards an excessive risk to inmate health or safety,' and there is an affirmative link between the constitutional violation and the supervisor's actions." *Keith v. Koerner*, 707 F.3d 1185, 1188 (10th Cir. 2013) (quotation omitted).  This affirmative link has "three related, indistinct prongs":  "'(1) personal involvement, (2) sufficient causal connection, and (3) culpable state of mind.'"  *Id.* (quoting *Dodds*, 614 F.3d at 1198 n. 6, 1204).  The first prong, a supervisor's personal involvement in unconstitutional conduct, can be established with evidence that the supervisor "'promulgated, created, implemented or possessed responsibility for the continued operation of a policy.'"  *Id.* (quoting *id.* at 1199).

In the case at hand, Plaintiffs argue that Minor implemented a policy that required the deputies (and Bourgerie) to determine an inmate's need for medical attention for both serious and non-emergent problems, including alcohol withdrawal syndrome, despite the fact that these employees had no medical training or training on alcohol withdrawal and its symptoms.  Plaintiffs also point to, among other things, a policy of understaffing (regardless of the medical needs of an inmate) or staffing of the Jail at its bare minimum, and a failure to adequately train or supervise Jail staff in regard to alcohol withdrawal syndrome.

Even if I assume for purposes of summary judgment that Plaintiffs have met the first prong regarding Minor's supervisory personal involvement through the policies and other actions complained, I find that Plaintiffs have not shown a causal connection or that Minor had a sufficiently culpable state of mind.  Since deliberate indifference is required for the constitutional deprivation Plaintiffs allege, Plaintiffs must show that Minor acted with deliberate indifference that a constitutional violation would occur.  *See Dodds*, 614 F.3d at 1204-05.  "[D]eliberate indifference' is a stringent standard of fault under § 1983, requiring proof that a municipal actor disregarded a known or obvious consequence of an action.'"  *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (quotation and internal quotation marks omitted).  "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."  *Id.* (quotation omitted).

Here, Plaintiffs have not shown a pattern of unconstitutional violations by the Jail staff regarding the failure to determine an inmate's need for medical attention for serious and non-emergent problems such as alcohol withdrawal syndrome that would have put Minor on notice of problems with Jail policies and/or training.  While Minor testified to one other incident involving severe symptoms of alcohol withdrawal of an inmate, he did not reference any injury to the inmate that occurred as a result.  (ECF No. 115, Ex. 1, Minor Dep. 13:16-21).  Nor is there any evidence that the inmate needed or was denied medical care in connection with the alcohol withdrawal, and there is no identified time frame as to this incident, *i.e.,* whether it occurred before or after the FTO training adopted in 2007 regarding alcohol withdrawal syndrome.  This incident

thus does not support Plaintiffs' argument of a pattern of constitutional violations regarding the failure to determine an inmate's need for medical attention.

Moreover, Bourgerie testified that from the time he became Detentions Caption in 2008 up until the incident involving Moffitt, there were no incidents in which an inmate at the Jail either died or suffered a major medical event related to alcohol withdrawal, despite people frequently being intoxicated when they are booked into the Jail. (Ex. A, Bourgerie Decl. ¶¶ 8-10.) And Plaintiffs did not show that any incidents occurred due to the failure of Jail staff to determine the need for medical attention for other serious problems. Thus, Plaintiffs have not shown that Minor was on notice of a deficiency in regard to the policy of having Jail staff determine an inmate's need for medical attention. "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 563 U.S. at 62. Sheriff Minor thus did not have the requisite culpable state of mind to be held liable as a supervisor as to these issues.

I also note that while Plaintiffs argue that there was no training on alcohol withdrawal syndrome, this is not accurate. Deputies were trained beginning in 2007 on that syndrome through the FTO program. Plaintiffs have not identified any particular deficiencies with that program nor have they shown that any deficiencies in that training caused Moffitt's death. I acknowledge however, that there is a dispute about whether additional training on alcohol withdrawal and its symptoms was provided, and Plaintiffs assert that Bourgerie (who started work with the Jail prior to implementation of the FTO

program) did not have any formal training.  Yet Plaintiffs have provided no evidence that additional training (or training of Bourgerie) would have prevented Moffitt's death.

On that issue, Plaintiffs argued that if Defendants had better training, they would have better recognized the signs of alcohol withdrawal syndrome as to Moffitt. However, the evidence they rely on from Bourgerie's deposition does not support this. Bourgerie was asked whether Jail staff would be better equipped to identify signs and symptoms of alcohol withdrawal if they attended a training class taught by Plaintiffs' expert, Dr. Blum, on alcohol withdrawal signs and symptoms.  Bourgerie answered that he thought such training would help staff better identify symptoms, "but I don't know they would have been able to do it in this case" with Moffitt as he "presented uniquely". (ECF No. 115, Ex. 3, Bourgerie Dep. 63:2-64:8; 106:7-18.)  Without evidence of specific deficiencies, Plaintiffs cannot establish a failure to train in a way that would establish the personal involvement of Sheriff Minor.  *See Keith*, 843 F.3d at 839 ("a plaintiff 'must identify a specific deficiency in the ... training program closely related to [the] ultimate injury, and must prove that the deficiency in training actually caused his jailor to act with deliberate indifference to the safety [of the inmate].'") (quotation omitted).

Plaintiffs also refer to Minor's failure to have any medical staff at the Jail, arguing that this renders him liable pursuant to *Lopez v. LeMaster*, 172 F.3d 756 (10th Cir. 1999).  In *Lopez*, the court noted that the sheriff did not specifically state that he requested the needed funds for additional staffing or notified the state that funds were needed.  *Id.* at 763.  In contrast, the evidence here shows that Minor specifically requested medical staff and it was denied by Summit County.  (Ex. 1, Minor Dep. 21:11-

23:2.)  This also does not show a culpable mind as to Minor.  Moreover, Minor testified that the reason he requested medical staff was that the doctor they used for the inmates was going to retire, but that they found an alternative through the hiring of Dr. Gray as an on-call physician.  (*Id.* 23:3-21.)

While Plaintiffs argued that if Dr. Gray was not available, it was Jail policy to wait until he was available and not to call for medical assistance, this is not supported by the testimony of Minor and Bourgerie relied on by Plaintiffs.  Thus, Minor testified that if Dr. Gray was unavailable there were other medical facilities in the area, and that calling 911 was an option (although he noted that 911 was not called as to Moffitt because the deputies believed he was having a mental health episode and Colorado West was called).  (ECF No. 115, Ex. 1, Minor Dep. 26-11:24.)  Similarly, Bourgerie testified that Jail staff was not prohibited from calling someone else if Dr. Gray was not available, and that he would have taken Moffitt to the ER if his symptoms were severe.  (ECF No. 115, Ex. 3, Bourgerie Dep. 59:11-16, 126:24-127:8 *see also* ECF No. 112, Ex. 12, Giordano Dep. 64:9-15—when Dr. Gray is unavailable, the Jail calls for an ambulance or takes the inmates to the hospital).

Although Plaintiffs appear to contend that it is constitutionally inadequate to allow non-medical detention officers to triage inmates, *i.e.*, to serve as gatekeepers to determine whether medical assistance is needed, they have provided no authority supporting this argument.  And as previously noted, Plaintiffs have provided no evidence that any prior inmate suffered a medical injury as a result of having deputies or other Jail staff serve as gatekeepers or by not having medical personnel on site.

Plaintiffs also assert that there was a policy to have minimal staff or understaffing at the Jail, and that this caused Bourgerie to not call for medical assistance. This is not supported by the testimony relied on by Plaintiffs. First, while Bourgerie referred to staffing levels, there was no evidence about a policy on staffing levels or that the policy was to understaff the Jail. Plaintiffs have cited no evidence or testimony from any witness that the Jail was understaffed or that Sheriff Minor knew of purported staffing inadequacies. Moreover, although Bourgerie testified that the Jail would have dropped below minimum staffing levels if he took Moffitt to the ER on July 7th, he also stated that he "absolutely would have dropped below staffing levels to take [Moffitt"] to the ER" if he thought it was necessary, and that he could make that decision. (ECF No. 115, Ex. 3, Bourgerie Dep. 126:24-127:14.) Thus, Plaintiffs have not shown that minimum staffing levels caused Bourgerie to not seek medical assistance. In short, there is no causal connection between the staffing numbers and the ability of staff to get medical care for Moffitt, as the staff had the ability to call for an ambulance at any time they thought one was needed.

Finally, Plaintiffs argue that Sheriff Minor ratified the actions of the deputies by later commending officers for their actions on that date. However, Minor cannot be liable for post-incident actions he may have taken. *See Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009) ("basic principals of linear time prevent us from seeing how conduct that occurs *after* the alleged violation could have somehow caused that violation"); *Durkee v. Minor*, 841 F.3d 872, 877 (10th Cir. 2016) (reaffirming *Cordova* in regard to actions of Sheriff Minor in that case); *see also Butler v. City of Norman*, 992

F.2d 1053, 1055-1056 (10th Cir. 1993) (rejecting position that a supervisor was liable for an officer's use of excessive force merely because the supervisor did not discipline the officer after the incident).

Accordingly, I grant summary judgment as to Sheriff Minor in his individual capacity, and find that he is entitled to qualified immunity.

### 3. The Official Capacity Claim Against Minor

The claim against Sheriff Minor in his official capacity as a final policymaker is a claim against Summit County. Thus, "[m]unicipal liability ... attaches where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986); *see also Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694-94 (1978) (a local government may not be sued under § 1983 for an injury allegedly inflicted by its employees except when they were engaged in the execution of a government policy or custom). To sustain a municipal liability claim for § 1983 violations, the plaintiff must show: (1) the existence of a municipal custom or policy; (2) a direct causal link between the custom or policy and the violation alleged, and (3) deliberate indifference on the part of the municipality. *See Schneider v. City of Grand Junction*, 717 F.3d 760, 769 (10th Cir. 2013); *Anaya v. Crossroads Managed Care Sys., Inc.*, 195 F.3d 584, 592 (10th Cir. 1999).

Also, "[i]n limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983," although a municipality's culpability is "most tenuous" for such claims. *Connick*, 563 U.S. at 61. For a

municipality to be liable for a decision not to train its employees, the failure to train must amount to deliberate indifference to the rights of persons with whom the untrained employees would come into contact. *Id.*

I find that a claim against Summit County based on failure to train fails for the same reasons expressed in connection with the claim against Minor in his individual capacity. Plaintiffs have not shown that Summit County was on notice of any deficiencies in training.

I acknowledge, however, that the Tenth Circuit has held, at least in connection with claims of excessive force, that "evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, is sufficient to trigger municipal liability." *Allen v. Muskogee*, 119 F.3d 837, 841-42 (10th Cir. 1997). Here again, however, the evidence is that training about alcohol withdrawal syndrome was put in place in 2007 through the FTO program, years before the incident. Moreover, while Plaintiffs have presented evidence that intoxicated people are routinely booked into the Jail, Plaintiffs did not show that there were recurring symptoms presenting an obvious potential for a constitutional violation in connection with the adequacy of, or the failure to provide, medical treatment. Indeed, prior to the Moffitt incident, Minor could only recall one other case of severe alcohol withdrawal, and there is no evidence regarding a lack of or inadequacy of medical attention in that case.

To the extent that Plaintiff relies on policies of Summit County that were discussed in connection with Minor's individual capacity claim or a ratification claim, I

reject a claim of municipal liability for the same reasons discussed in the prior section. Plaintiffs' conclusory allegations of deliberate indifference in connection with those policies are not sufficient.

Plaintiffs also argue that the alleged actions of the individual Defendants employed by Summit County states a claim against the County because they had an extended opportunity to do better but consistently responded in a constitutionally deficient manner. Plaintiffs argue in that regard that the individual Defendants' pattern of unconstitutional conduct shows that Summit County's customs and practices are illegal as well. There is no evidence, however, that Summit County was on notice of any unconstitutional conduct by the individual Defendants. Moreover, the cases cited by Plaintiffs in support of its argument, all nonbinding cases from other United States District Courts, involved motions to dismiss where the allegations against the municipality were presumed to be true.[20] That is not the situation here.

Additionally, Plaintiffs argue that the evidence demonstrates that Summit County intentionally fosters, tolerates, and maintains a widespread custom and practice of deliberate indifference to inmates' serious medical needs, including deliberately ignoring potential and known medical emergencies, improperly treating inmates' medical complaints as faked or exaggerated, and taking a dangerous and financially-motivated "wait-and-see" approach to medical complaints. The evidence, however, does not support this, as Plaintiffs cite to no specific examples of this prior to the Moffitt incident.

---

[20] *See Rykard v. City of Dothan*, 2011 U.S. Dist. LEXIS 101135, *9-10 (M.D. Ala. Aug. 9, 2011); *Jacoby v. DuPage County Ill.*, 2013 U.S. Dist. LEXIS 89934, *8-10 (N.D. Ill. June 26, 2013), *Smith v. Corrections Corp. of America, Inc.*, 674 F. Supp. 2d 201, 206-07 (D.D.C. 2009).

Moreover, Plaintiffs did not cite evidence in support of the argument that Summit County has a custom, policy, or practice of encouraging officers to deprive inmates of medical care for financial reasons.

Finally, Plaintiffs assert that Summit County rejected Sheriff Minor's request for a medical person to be on staff due to cost, and argue that "[d]eliberate indifference to serious medical needs may be shown by proving there are such gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care." *Garcia v. Salt Lake Cnty.*, 768 F.2d 303, 308 (10th Cir. 1985). In *Garcia*, the Tenth Circuit found that a county could be held liable when it staffed its jail so that "there was no physician present at the jail most of the time[,]" "a nurse was at the jail four to five hours five days a week[,]" a medical technician was on duty only part time, and the deputies "only medical training consisted of training in first aid." *Id.* at 308. I find that case is distinguishable.

In *Garcia*, there was no indication that a contract doctor had been retained, as here with Dr. Gray. Moreover, there is evidence that when Dr. Gray was not available, Jail staff could call for an ambulance. Finally, there is no evidence prior to the Moffitt incident that this arrangement was deficient or that inmates' medical needs had not been met. While "deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action or inaction", *Barney v. Pulsipher*, 143 F.3d 1299, 1307-08 (10th Cir. 1998), Plaintiffs have not shown that a violation of federal

rights in regard to adequate medical care was a highly predictable or plainly obvious consequence of Summit County's action or inaction.

In conclusion, I find that summary judgment should be granted as to the claim against Sheriff Minor in his official capacity, which is a claim against Summit County.

4.    Spoilation of Evidence

On a final note, Plaintiffs argue that summary judgment is particularly inappropriate in cases like this one, where there has been spoilation of crucial evidence while it was in the sole control of Defendants.  Thus, they assert that Summit County failed to produce any surveillance footage from July 8, 2013, even though it produced footage from the other days that Moffitt was incarcerated.

Plaintiffs contend that they presented undisputed evidence that Moffitt was manifesting signs of obvious serious medical need on that day and it is reasonable to believe this "lost" surveillance footage contains highly relevant evidence that would support their claims.  They argue that the lack of access to the evidence will prejudice them at trial, and that Summit County's failure to produce this surveillance footage should give rise to an adverse inference.  At the very least, Plaintiffs argue that there are genuine issues of material fact as to whether Summit County acted in bad faith by failing to produce this surveillance footage such that Plaintiffs could be entitled to an adverse inference instruction at trial.

I first reject the argument that the lack of surveillance footage from July 8, 2013 is another basis for denying Defendants' motion for summary judgment.  Moreover, I decline at this time to find that an adverse inference should be drawn from the lack of

this footage.  Plaintiffs have presented no evidence of bad faith in connection with the destruction of that footage.  *See Aramburu v. Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir. 1997) ("the general rule is that bad faith destruction of a document relevant to proof of an issue at trial gives rise to an inference that production of the document would have been unfavorable to the party responsible for its destruction").

Defendants assert that the explanation for the lack of video on that date is that some portions of Moffitt's stay in the Jail were retained for an investigation by the CBI and an internal investigation by the Jefferson County Sheriff's Office.  The video on July 8, 2013 was not collected, and no investigator requested it be copied or preserved. Defendants assert that the video was recorded over a short time later in the normal data practices of the Jail and well before Plaintiff sent notice of a possible claim.   Plaintiffs have provided no evidence to refute this, and "mere negligence in losing or destroying records is not enough [for an adverse inference] because it does not support an inference of consciousness of a weak case."  *Id.*

IV.    CONCLUSION

Based upon the foregoing, it is

ORDERED that Plaintiffs M.M. and C.M. are **DISMISSED** and shall hereafter be removed from the caption.  It is

FURTHER ORDERED that Defendants Giordano, Diurba, Fidler, Hosier, Hyde and Lambert's Motion for Summary Judgment (ECF No. 78) is **GRANTED** as to the claims against Defendant Hosier and **DENIED** as to the remaining Defendants.  It is

also denied to the extent that Plaintiffs asked for an adverse inference based upon spoilation of evidence.  It is

FURTHER ORDERED that Defendants Minor and Bourgerie's Motion for Summary Judgment (ECF No. 80) is **GRANTED IN PART AND DENIED IN PART**.  It is **GRANTED** as to the claims against Defendant Minor in both his individual and official capacities, and he is dismissed from the lawsuit.  The motion is **DENIED** as to Defendant Bourgerie.

Dated:  September 28, 2017

BY THE COURT:


s/ Wiley Y. Daniel
Wiley Y. Daniel
Senior United States District Judge